UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority          _____
Send              _____
Enter             _____
Closed            _____
JS-5/JS-6         _____
Scan Only         _____

| | | | |
|---|---|---|---|
| **CASE NO.:** | CV 15-07490 SJO (MRWx) | **DATE:** | April 6, 2016 |
| **TITLE:** | Westlake Services, LLC et al. v. Credit Acceptance Corporation | | |

========================================================================
**PRESENT:** THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                     Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**         **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                         Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** [Docket. No. 38]

This matter is before the Court on Defendant Credit Acceptance Corporation's ("CAC" or "Defendant") Motion to Dismiss ("Motion"), filed on February 29, 2016. Plaintiffs Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake") and Nowcom Corporation ("Nowcom") (together, "Plaintiffs") opposed the Motion ("Opposition") on March 7, 2016, and Defendant replied ("Reply") on March 14, 2016. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for March 28, 2016. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

        A.      The Westlake Action

The Court is familiar with both the background of the instant action and the litigants, having presided over a patent infringement action filed by CAC against Plaintiffs in 2013 (the "Westlake Action"). *See generally Credit Acceptance Corp. v. Westlake Services, LLC et al.*, No. 13-cv-01523 SJO (C.D. Cal.).[1] In that case, Westlake filed two Covered Business Method ("CBM") petitions at the U.S. Patent Trials and Appeals Board ("PTAB") seeking to have U.S. Patent No. 6,950,807 (the "'807 Patent"), the patent asserted by CAC in the Westlake Action, invalidated. *See Westlake Services, LLC v. Credit Acceptance Corp.*, CBM2014-00176, 2015 WL 576798 (Patent Tr. & App. Bd. Feb. 9, 2015). The Court granted Westlake's motion to stay the Westlake Action pending the PTAB's determination regarding the validity of the '807 Patent, and maintained

---

[1] Citations to docket entries in *Credit Acceptance Corp. v. Westlake Services, LLC et al.*, No. 13-cv-01523 SJO (C.D. Cal.), of which the Court takes judicial notice pursuant to Federal Rules of Evidence 201(b) and 201(c)(1), are hereinafter cited as "([Document title], No. 13-cv-01523, ECF No. [X].)".

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 15-07490 SJO (MRWx)     DATE: April 6, 2016

the stay until CAC filed a motion to dismiss the Westlake Action with prejudice ("Motion to Dismiss").  (*See* Order Granting Moving Defs.' Mot. to Stay Case Pending CBM Pet. Review, No. 13-cv-01523, ECF No. 67; Notice of Mot. and Mot. to Dismiss Case with Prejudice, No. 13-cv-01523, ECF No. 99.)  The Court granted CAC's Motion to Dismiss on August 24, 2015—denying Westlake and Nowcom's motion for leave to file a second amended answer and counterclaims for lack of subject-matter jurisdiction—and denied Westlake's motion for attorneys' fees and costs ("Fees Motion"), determining the case to not be "exceptional" within the meaning of 35 U.S.C. section 285.  (*See* Order Granting Pl.'s Mot. to Voluntarily Dismiss with Prejudice and Denying Defs.' Mot. for Leave to File Second Am. Answer and Countercls., No. 13-cv-01523, ECF No. 109; Order Denying Defs.' Mot. for Recovery of Attorneys' Fees, Costs, and Expenses, No. 13-cv-01523, ECF No. 121.)

      B.    <u>Plaintiffs' Initial Complaint in the Instant Action</u>

Subsequent to the Court's dismissal of the Westlake Action but prior to the Court's denial of Westlake's Fees Motion, Westlake and Nowcom filed a separate civil action against CAC on September 24, 2015 asserting the following four causes of action:  (1) violation of Section 2 of the Sherman Act; (2) monopolization and attempted monopolization through the maintenance of a "sham litigation" in violation of Section 2 of the Sherman Act; (3) *Walker Process*; and (4) Unfair Competition under Cal. Bus. & Prof. Code section 17200 *et seq.*  (*See generally* Compl., ECF No. 1.)  In particular, Plaintiffs alleged that CAC obtained the '807 Patent by fraud on the United States Patent and Trademark Office ("USPTO") and by fraudulent concealment of prior sales and prior art.  (Compl. ¶ 9.)  Plaintiffs alleged that "[t]hrough its enforcement of the fraudulently procured patent against Westlake, Nowcom, and other competitors, CAC hindered and delayed Westlake and Nowcom and their fellow competitors from competing in the market for sub-prime auto loans."  (Compl. ¶ 10.)  Plaintiffs further alleged that two of these wrongful enforcement efforts include the Westlake Action and a patent infringement action against Drivetime Automotive Group in the United States District Court for the Central District of California initiated March 4, 2013 (the "Drivetime action").  (Compl. ¶¶ 11-12.)

In their initial Complaint, Plaintiffs alleged the following facts.  CAC represents that it is the owner by assignment of the '807 Patent.  (Compl. ¶ 4.)  The application leading to the '807 Patent was filed on December 31, 2001, and the '807 Patent issued on September 27, 2005.  (Compl. ¶ 38.)  Jeffrey Brock is the named inventor of the '807 Patent, and signed an inventor declaration indicating he was aware of his duty to disclose prior sales of the claimed invention.  (Compl. ¶ 39, Ex. H.)  Mr. Brock has been employed by CAC since 1995 and currently holds the position of Vice President of Sales Operations.  (Compl. ¶ 40, Ex. I.)

On October 11, 2013, Westlake filed its first CBM petition at the PTAB seeking review of the '807 Patent ("CBM-1").  (Compl. ¶ 13.)  On March 31, 2014, the PTAB instituted review of claims 1-9, 13, and 33-42, but declined to institute review of claims 10-12 and 14-33.  (Compl. ¶ 13.)  On March 24, 2015, the PTAB issued its Final Written Decision in CBM-1 finding claims 1-9, 13, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| **CASE NO.:** CV 15-07490 SJO (MRWx) | **DATE:** April 6, 2016 |

33-42 of the '807 Patent to be invalid because they claim unpatentable subject matter outside the scope of 35 U.S.C. section 101 ("Section 101"). (Compl. ¶ 13.) CAC did not seek rehearing of the Final Written Decision and did not appeal the final decision to the federal circuit. (Compl. ¶ 13.)

Westlake filed a second CBM petition ("CBM-2") seeking review of the remaining claims of the '807 Patent on August 15, 2014. (Compl. ¶ 14.) CAC filed its Preliminary Response in CBM-2 on November 20, 2014, raising an estoppel argument and seeking to terminate the proceedings. (Compl. ¶ 14.) The PTAB rejected CAC's arguments for discretionary termination under 35 U.S.C. section 325(d), but concluded that CAC's argument regarding 35 U.S.C. section 325(e) was not yet ripe. (Compl. ¶ 15.) The PTAB ultimately instituted review of claims 10-12 and 14-33 on Section 101 grounds, stating that "[i]n light of [the] recent guidance from the Supreme Court and the Federal Circuit, we are persuaded that Petitioner's evidence, if not rebutted, would demonstrate that it is more likely than not that claims 10-12 and 14-33 are directed to non-statutory subject matter." (Compl. ¶ 16.) CAC did not request rehearing on the institution decision, and on May 14, 2015 the PTAB denied CAC's request to terminate the CBM-2 proceedings, finding that estoppel did not apply to claims 10-12 and 14-33. (Compl. ¶ 17.) A hearing before the PTAB took place on CBM-2 on September 10, 2015, and a Final Written Decision from the PTAB is due no later than February 6, 2016. (Compl. ¶ 18.)

None of CAC, its counsel, Mr. Brock, or "anyone else at CAC" disclosed to the USPTO during prosecution of the '807 Patent sales and offers for sale CAC made on its patented invention, the Credit Approval Processing System ("CAPS®"), as early as August 2000, notwithstanding that the filing date of the application leading to the '807 Patent is December 31, 2001. (Compl. ¶¶ 19-20, Ex. J.) This failure to disclose was "intentional." (Compl. ¶ 43.) CAC admitted that CAPS® is the embodiment of the '807 Patent by way of the Complaint it filed in the Westlake Action. (Compl. ¶ 21 [quoting Compl., *Credit Acceptance Corp. v. Westlake Services, LLC et al.*, No. 13-cv-01523 SJO ¶ 16 (C.D. Cal. Mar. 4, 2013), ECF No. 1].) CAC has been advertising that CAPS® is "patented," and the only patent currently assigned to CAC is the '807 Patent. (Compl. ¶ 28.)

CAC failed to disclose material prior art to the USPTO during prosecution of the '807 Patent, including third-party public use of a computing software product by ZoomLot, a company which was acquired by CAC's competitor National Auto Credit Inc. ("NAC") in 2000. (Compl. ¶ 23, Ex. C, Ex. D.) Prior to the issuance of the '807 Patent, CAC filed a copyright infringement suit against NAC asserting that CAC held valid copyrights over its financing program materials. (Compl. ¶ 24, Ex. E.) In 1995, CAC and NAC "resolved the case with NAC acknowledging that CAC has valid copyrights over its financing program materials." (Compl. ¶ 24, Ex. E.) NAC published details regarding ZoomLot via the Internet as early as 2000. (Compl. ¶ 24, Ex. C.) "CAC was aware of Zoomlot due to the nature of the copyright infringement suit and furthermore, because the companies were competitors in the field of sub-prime automobile lending." (Compl. ¶ 46.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** CV 15-07490 SJO (MRWx)   **DATE:** April 6, 2016

Plaintiffs alleged that CAPS® sales information "would have been material to the patentability of the claims of the '807 Patent," that Zoomlot is "material [prior art] to at least claims 14, 17, 18, and 19 of the '807 Patent," and that Mr. Brock, CAC, and their counsel were under an affirmative obligation to disclose these materials to the USPTO during prosecution. (Compl. ¶¶ 20, 25-26.) Plaintiffs further allege had CAPS® sales information and Zoomlot been disclosed to the USPTO, various claims of the '807 Patent would not have issued. (Compl. ¶¶ 22, 27.)

      C.      The Court's Order Dismissing Plaintiffs' Initial Complaint

The Court dismissed Plaintiffs' initial Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 7, 2015 ("Dismissal Order"), finding that Plaintiffs (1) failed to adequately identify a relevant product market; (2) failed to adequately allege that a geographic market for e-commerce software that facilitates auto loans is limited to the United States; (3) failed to allege sufficient facts to support an inference that Defendant has market power in either of Plaintiffs' two purportedly relevant markets; and (4) failed to adequately allege exclusionary conduct based on *Walker Process* fraud or a "sham litigation" theory. (*See* Order Granting Def.'s Mot. to Dismiss, ECF No. 24)  In the Dismissal Order, the Court afforded Plaintiffs fourteen (14) days to file a First Amended Complaint ("FAC"). (*See* Dismissal Oder 14.)

On December 17, 2015, Plaintiffs filed their first *ex parte* application seeking to extend the deadline to file the FAC until February 19, 2016 in light of their retention of an expert to address "complicated economic issues surrounding the market definition." (Pls.' Ex Parte Appl. for Extension of Time to File FAC ("First Request"), ECF No. 25.)  This request was not opposed by Defendant, and the Court granted the request on December 18, 2015. (Notice of Non-Opposition, ECF No. 26; Order Granting First Req., ECF No. 27.)

On February 12, 2016, Plaintiffs filed a second ex parte application seeking to extend the deadline to file the FAC another thirty (30) days. (Pls.' Ex Parte Appl. for Extension of Time to File FAC ("Second Request"), ECF No. 31.)  The Court denied this second request, which was opposed by Defendant, noting that "[t]he Court ha[d] already afforded Plaintiffs more than two months to file a First Amended Complaint that addresses the deficiencies noted in the Court's December 7, 2015 dismissal order . . ., which is a significant amount of time, particularly in light of Plaintiffs' apparent intention to file antitrust claims against Defendant since at least July 20, 2015." (Order Den. Second Req., ECF No. 34.)

      D.      Plaintiffs' First Amended Complaint

            1.      Profit Sharing Programs and Indirect Lending

Plaintiffs filed the FAC on February 19, 2016, asserting causes of action against Defendant for actual and attempted monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. (*See* First Am. Compl., ECF No. 37.)  Plaintiffs allege the following in the FAC.  The automotive

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  CV 15-07490 SJO (MRWx)          DATE:  April 6, 2016

finance industry for "indirect lending," the primary method for motor vehicle sale financing in the United States, generally consists of consumers, dealers, and financial institutions.  (FAC ¶¶ 10-11.)  Under the "indirect lending" model, the dealer and consumer "directly negotiate financing in the same transaction as part of the vehicle purchase transaction, which is consummated pursuant to a retail installment sales contract ('RISC')."  (FAC ¶ 11.)  Once the RISC is consummated, the dealer assigns the RISC, or certain payment streams under the RISC, to a financial institution willing to finance the RISC under various arrangements.  (FAC ¶ 12.)  The originating dealer assigns the RISC to a lender for two primary reasons:  (1) the dealer does not want to service the account or collect the future stream of payments; or (2) the dealer wants to receive the financial benefit of the transaction immediately.  (FAC ¶ 13.)

The arrangements under which RISCs are financed can be divided into two categories:  (1) a "purchase program;" or (2) a "profit sharing program."  (FAC ¶ 14.)  Under the former, the lender purchases the RISC in exchange for a one-time, lump sum payment to the dealer, which is described as an "up-front payment" or "advance."  (FAC ¶¶ 15, 18.)  The amount of the advance is based on various factors, including the customer's credit, the vehicle's value, and the down payment.  (FAC ¶ 15.)

Under the "profit sharing program," dealers are offered a discounted up-front payment for the assignment of a RISC in exchange for a share of the customer's future stream of installment payments.  (FAC ¶ 16.)  Although the dealer's up-front payment is smaller than what it would have received under a purchase program, the dealer has an opportunity to earn a greater amount over time based on the performance of the RISC.  (FAC ¶ 16.)  Although the "overwhelming majority" of the indirect financing of RISCs is done under a purchase program, the profit sharing program "is a significant and growing separate market."  (FAC ¶ 18.)

    2. <u>The Relevant Product and Geographic Markets</u>

The relevant product market is the "business of providing indirect financing for used car sales to dealers through a profit sharing program," which has the "essential elements" of (1) dealers wanting a share of future payment streams; (2) under RISCs for used cars; (3) originated by dealers; and (4) financed pursuant to a profit sharing program.  (FAC ¶¶ 19-20.)  The only "players in the concentrated relevant product market" are CAC, Westlake, Go Financial, Western Funding Incorporated, and Consumer Portfolio Services. (FAC ¶ 21.) Between 2011 and 2015, CAC had an average direct market share of approximately 87%, and has an aggregated market share of over 95% when combined with Go Financial, who CAC licensed after suing for patent infringement.  (FAC ¶ 21.)

There is no substitute for a profit sharing program in the indirect auto finance market, and dealers who specifically desire to share in the customer payments therefore have no other means to sell the RISC to an indirect lender.  (FAC ¶ 17.)  That said, in the direct lending market, dealers can participate in the future stream of payments by becoming a "Buy Here, Pay Here" ("BHPH")

**CASE NO.:** CV 15-07490 SJO (MRWx)        **DATE:** April 6, 2016

dealer. (FAC ¶ 17 n.3.) However, BHPH dealers face distinct disadvantages in that (1) there is no up-front payment on the vehicle; and (2) the dealer must directly service the account and handle billing, collecting payments, handling defaults, and other tasks. (FAC ¶ 17 n.3.)

The relevant geographic market is the United States, because the indirect financing profit sharing market "requires a local sales team who can develop and maintain long-term relationships with dealers on behalf of the finance lender." (FAC ¶ 22.) All of the competitors in the relevant product market are located in the United States, and auto dealers do not obtain indirect financing for used car sales from entities outside the United States. (FAC ¶ 24.)

> 3. CAC's "Portfolio Program" and the Importance of its Collateral Pool

CAC, which was founded in 1967 and went public in 1992, offers two types of programs: the "Portfolio Program" and the "Purchase Program." (FAC ¶¶ 25, 27-28.) The Portfolio, which is include in and operated via CAC's Credit Approval Processing System ("CAPS"), is CAC's version of a profit sharing program. (FAC ¶ 28.) Between 2010 and 2015, over 90% of CAC's portfolio consisted of loans financed under its Portfolio Program. (FAC ¶ 28.) Dealers who wish to enroll in CAC's Portfolio Program must either pay CAC a $9,850 subscription fee or allow CAC to retain 50% of its first accelerated Dealer Holdback payment. (FAC ¶ 29.)

Under CAC's Portfolio Program, the lender's profits are shared at two stages. First, "front-end profits" are shared with the dealer based on the performance of the individual RISC, which "generally equals 20% of collections." (FAC ¶ 30.) The dealer generally receives (1) a down payment from the consumer; (2) a non-recourse cash payment advance from CAC; and (3) after the advance has been recovered by CAC, the cash from payments made on the consumer loan, net of collection costs and CAC's servicing fee ("dealer holdback"). (FAC ¶ 30.) Second, "back-end profits" based on the collateral pool's performance are paid out to the dealer if the dealer (1) fills its collateral pool with 100 deals; and (2) has payments collected verses payments due exceed 80%. (FAC ¶¶ 31-32.) As a result of the potential for "back-end profits," CAC's Portfolio Program incentivizes dealers to both send more, better performing deals to CAC. (FAC ¶ 33.)

> 4. Westlake Is Unable to Compete

Other finance lenders in the indirect financing profit sharing market that cannot offer a collateral pool, including Westlake, are unable to compete against CAC for good performing deals and are forced to compete for the remaining deals that have a higher risk of default. (FAC ¶ 34.) Moreover, without the collateral pool, a lender who finances the riskier deal is unable to absorb the losses against the profits gained from good performing deals within the pools. (FAC ¶ 34.)

Westlake finances RISCs for used car loans through its Profit Builder Program. (FAC ¶ 37.) Like CAPS, the Profit Builder Program provides a discounted cash advance in exchange for allowing dealers to participate in a portion of the customer's payment streams. (FAC ¶ 37.) Unlike CAPS,

the structure of the deal reached using the Profit Builder Program, including the amount of the cash advance and the percentage share of the payment stream, is based entirely on the merits of the individual deal alone, without regard to the volume or performance of aggregated deals that the dealer had historically booked with Westlake. (FAC ¶ 37.) When creating the Profit Builder Program, Westlake "deliberately chose to avoid the claims of the '807 Patent by bundling deals together and pricing individual deals against the bundle," and avoided using a collateral pool (FAC ¶ 37.)

      5.    The '807 Patent

The collateral pool is a "distinctive feature" of CAC's Portfolio Program, which CAC touted as incorporating its patented CAPS system. (FAC ¶ 36.) The patent underlying CAPS, the '807 Patent, issued on September 27, 2005 from U.S. Application No. 10/037,055 (the "Application"), which was filed on December 31, 2001 and lists Jeffrey M. Brock as the named inventor. (FAC ¶ 39.) The '807, in CAC's own words, embodies "the core components of [CAC's] CAPS method and systems." (FAC ¶ 40.) At the time of the Application, CAPS was "the commercial embodiment of the invention claimed in the '807 Patent." (FAC ¶ 40.)

Moreover, the "core components of CAPS were also, at the time of the Application, substantially the same as the CAPS version that was already in commercial use by CAC before December 31, 2000, more than one year prior." (FAC ¶ 40.) Indeed, it fully anticipates at least claims 1, 4, and 5 of the '807 Patent. (FAC ¶¶ 58-59, 74.) Both CAC and Mr. Brock knew that CAPS had been sold and publicly used "**more** than one year prior to December 31, 2001," and further knew that such public use and sales would be a bar to CAPS's patentability. (FAC ¶¶ 41-42, 51-54 [emphasis in original].) For example, CAC's 2000 Annual Report reveals that CAC began "testing" CAPS in August 2000, which was followed by a "rollout" in December 2000, which in a corporate context, means first being offered for sale or use. (FAC ¶¶ 43-49.) CAC's patent prosecution attorneys were also aware of the prior offers for sale and sales of CAPS, as evidenced by the firm's attestation that the CAPS mark was used in association with the sale of goods "at least as early as" June 2000. (FAC ¶ 50.)

CAC and Mr. Brock "hatched a scheme to defraud" the PTO in order to obtain a patent on CAPS notwithstanding those earlier sales by concealing them. (FAC ¶ 62.) CAC, Mr. Brock, and their prosecution attorneys conspired to conceal and in fact did conceal information about the prior offers for sale and sales of CAPS from the PTO while prosecuting the Application. (FAC ¶ 65.) Moreover, in later filings, CAC "altered course" and began stating in SEC filings and annual reports that CAPS was not "offered" until January 2001. (FAC ¶ 78.)

On March 4, 2013, CAC brought an action for infringement of the '807 Patent against Westlake, and made similar threats to other competitors in the relevant market. (FAC ¶¶ 84-85.) Indeed, CAC continues to assert the '807 Patent and demand royalties from other market participants, including at least Drivetime. (FAC ¶ 86.) These threats of litigation were objectively baseless and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** CV 15-07490 SJO (MRWx)   **DATE:** April 6, 2016

made in bad faith. (FAC ¶ 87.) As a result of CAC's anticompetitive conduct in enforcing the fraudulently procured '807 Patent, Westlake lost, and continues to lose, sales through their competing software program, and less competition and higher prices in the relevant market has resulted. (FAC ¶¶ 88-89.)

II.   DISCUSSION

In the Motion, Defendant argues the Complaint should be dismissed with prejudice because Plaintiffs: (1) fail to adequately allege a relevant market; (2) fail to adequately allege that Defendant had market power; (3) fail to plead *Walker Process* fraud or sham litigation; and (4) fail to adequately plead antitrust injury. (*See generally* Mot., ECF No. 38.) These bases largely mirror those set forth in Defendant's first motion to dismiss. (*See* Mot. to Dismiss, ECF No. 15.)

Westlake responds that it has sufficiently alleged both monopolization and attempt to monopolize claims by sufficiently alleging *Walker Process* fraud, sham litigation, a relevant market "or submarket", and antitrust injury. (*See* Opp'n, ECF No. 39.)

   A.   Legal Standard for Motion to Dismiss

Federal Rule of Civil Procedure 12 ("Rule 12"), which provides for dismissal of a plaintiff's cause of action for "failure to state a claim on which relief can be granted," *see* Fed. R. Civ. P. 12(b)(6), must be read in conjunction with Federal Rule of Civil Procedure 8(a) ("Rule 8"). *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although the pleader is not required to plead "detailed factual allegations" under Rule 8, this standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Pleadings that contain nothing more than legal conclusions or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* (citation and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9") provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened standard applies because allegations of fraud "must be specific enough to give a defendant notice" of its allegedly fraudulent conduct so that the defendant "may defend against the charge." *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1092 (N.D. Cal. 2014) (citing *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)). As a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 15-07490 SJO (MRWx)</u>     DATE: <u>April 6, 2016</u>

general matter, allegations sounding in fraud, including allegations of fraudulent conduct used to support claims under the UCL, "must satisfy the particularity requirement of Rule 9(b)." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir. 2009) (citing *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1103-04 (9th Cir. 2003)). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Mui Ho v. Toyota Motor Corp.,* 931 F. Supp. 2d 987, 992 (N.D. Cal. 2013) (quoting *Cafasso, United States ex rel v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1055 (9th Cir. 2011)) (internal quotation marks omitted) (formatting in original). "Where a fraudulent omission is at issue, the requirements of Rule 9(b) are relaxed, but not eliminated." *UMG Recordings, Inc. v. Global Eagle Entertainment, Inc.*, No. 14-3466, 2015 WL 4606077, at *8 (N.D. Cal. June 22, 2015).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court may only consider the complaint, documents incorporated by reference in the complaint, and matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court may deny leave to amend where amendment would be futile or if the claim is legally insufficient. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

      B.    <u>Actual Monopolization Claim</u>

"In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) Possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (quoting *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.), *cert. denied*, 506 U.S. 1034 (1992)).

          1.    <u>Possession of Monopoly Power in Relevant Market</u>

              a.    <u>Market Definition: Relevant Product Market</u>

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). A "relevant market" is determined by a product market and a geographic market.[2] *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). The Ninth Circuit has explained that the term "relevant market"

---

[2] CAC does not take issue with Westlake's decision to define the geographic market as the United States. (*See generally* Mot.)

encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the area of effective competition . . . where buyers can turn for alternative sources of supply. The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (quoting *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1140, 1146 (9th Cir. 1988)). In an attempt to monopolize claim under Section 2, the "purpose of defining the relevant market . . . is to determine whether [the defendant] has sufficient market power to pose a threat of **monopoly**." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1447 n.6 (9th Cir. 1995) (emphasis in original).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Newcal*, 513 F.3d at 1045 (quoting *Brown Shoe*, 370 U.S. at 325). Although "[t]here is no requirement that these elements of the antitrust claim be pled with specificity . . . a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal*, 513 F.3d at 1044-45 (internal citations omitted); *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 Fed. App'x 598, 599 (9th Cir. 2011) ("The failure to allege a product market consisting of reasonably interchangeable goods renders the [complaint] 'facially unsustainable' and appropriate for dismissal.") (citing *Newcal*, 513 F.3d at 1045). Where, as here, a plaintiff premises its antitrust allegations on a "submarket," the plaintiff "must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Newcal*, 513 F.3d at 1045.

Westlake alleges in the FAC that the "relevant product market (or sub-market)" is "the business of providing indirect financing for used car sales to dealers through a profit sharing program." (FAC ¶ 93.) CAC argues that this product market is inadequately alleged, and contends that the FAC fails to explain why a profit sharing program does not compete with any of the "myriad alternative sources of direct and indirect credit for used-car sales." (Mot. 7-8.) In particular, CAC takes issue with the FAC's purported failure to provide any explanation as to why a dealer who today participates in a profit sharing program would not switch to alternatives such as (1) a purchase program, which the FAC alleges the "overwhelming majority" of dealers allegedly turn to in order to indirectly financing of RISCs; (2) BHPH direct financing; or (3) any other form of financing. (Mot. 8.) Indeed, CAC submits that "automobile financing is about obtaining money—a completely fungible item—and how to pay for the cost of borrowing that money. (Mot. 8.) According to CAC, "common sense dictates that financing via profit-sharing competes with all other financing options that are available to dealers," and "it is simply implausible to think that there could be a relevant market limited to indirect used-car financing through a profit-sharing program."

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 15-07490 SJO (MRWx)</u>        DATE:  <u>April 6, 2016</u>

Westlake responds that courts have rejected CAC's "money as a fungible item" argument, and submits that the Court should not be persuaded by CAC's "fact-issue challenge." (Opp'n 14-15.) The Court agrees, and declines CAC's invitation to use "common sense" to disavow Westlake's profit sharing financing market in the absence of any fact or expert discovery on the issue.

Indeed, the FAC alleges that "[t]here are no reasonable substitutes for these financing programs" because "[d]ealers who specifically desire to share in the customer payments have no other means to sell the RISC to an indirect lender." (FAC ¶¶ 17, 93.) The FAC specifies that two potential alternatives to the profit sharing program noted by CAC in its Motion—purchase programs and BHPH—have several potential disadvantages for dealers. In particular, the FAC alleges that "purchase programs" do not permit dealers to share in future customer payments, which may give the dealer the opportunity to earn a greater amount over time based on the performance of the RISC. (*See* FAC ¶¶ 16-17.) Meanwhile, the FAC alleges that many dealers are not equipped to handle account servicing, and therefore would encounter difficulties using BHPH. (*See* FAC ¶ 17 n. 3.)

Accepting the factual allegations in the FAC as true, as the Court must when ruling on a motion to dismiss, the Court finds that these allegations are sufficient to demonstrate that the alleged submarket for providing indirect financing for used car sales to dealers through a profit sharing program is "economically distinct" from the general product market of automobile financing. *Newcal*, 513 F.3d at 1045. There is thus no "fatal legal defect" that warrants dismissal on the basis of the alleged relevant product market. *Id.* Cases cited by CAC in support of its position are inapposite. *Cf. Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (dismissing complaint where it contained only "conclusory allegations" that "merely restate a commonly used test for market definition without providing any factual basis for that claim"); *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF (PVT), 2008 WL 8096149, at *5 (N.D. Cal. Oct. 28, 2008) (finding plaintiff's relevant market definition inadequate where the complaint "set[] forth in relatively vague terms that a customer may prefer to purchase a discrete solution over an integrated solution for a variety of reasons," and lacked "some explanation regarding possible substitutes"). Thus, the Court **DENIES IN PART** the Motion on this ground.

        b.    <u>Market Power</u>

"A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008). Market power can be proven with either direct or circumstantial evidence. *Rebel Oil*, 51 F.3d at 1434. "One type of proof is direct evidence of the injurious exercise of market power," which requires that a plaintiff "put[] forth evidence of restricted output and supracompetitive prices . . ." *Id.* Where a plaintiff seeks to prove market power through circumstantial evidence pertaining to the structure of the market, the plaintiff must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short

CASE NO.:  CV 15-07490 SJO (MRWx)          DATE:  April 6, 2016

run."  Id. (citing *Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir. 1987), *cert. denied*, 484 U.S. 1026 (1988)).

Monopoly or market power can be demonstrated where the defendant owns a "dominant share" of the market, and courts "generally require a 65% market share to establish a prima facie case of market power."  *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  The question of whether a defendant possesses monopoly or market power is one of fact.  *See Rebel Oil*, 51 F.3d at 1438.

The FAC alleges that CAC is an "entrenched player" in the market for used car loan indirect financing profit sharing programs in the United States, "possessing a market share greater than 85%." (FAC ¶ 97.)  The FAC further alleges that CAC has the power to control prices and/or to exclude competition in the relevant market, and that it has in fact excluded competition by enforcing its rights in the '870 Patent against its competitors, which Westlake alleges was fraudulently obtained.  (FAC ¶¶ 97-112.)  Westlake further alleges in the FAC that there are significant barriers to market entry, including CAC's intellectual property rights, substantial up-front capital investment required to penetrate the relevant market, and the requirement of access to a nationwide sales and distribution network.  (FAC ¶ 98.)  These allegations are sufficient to survive a motion to dismiss.  *See Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996) (finding plaintiff's market power allegations sufficient where it alleged, in addition to alleging that defendant had a 90% market share, that defendant charged rates other than those mandated by its tariffs and that defendant's off-tariff pricing made it impossible for others to compete for the sale of gas).  Accordingly, the Court **DENIES IN PART** the Motion on this basis.

       2.       <u>Willful Acquisition or Maintenance of Market Power:  Exclusionary Conduct</u>

Two separate doctrines provide hurdles that a plaintiff must clear when challenging the enforcement of an issued patent on antitrust grounds.  First, issued patents are presumed valid pursuant to 35 U.S.C. section 282(a), and "the law recognizes a presumption that the assertion of a duly granted patent is made in good faith."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998).  Second, the filing of a lawsuit is generally protected by the First Amendment and immunized from antitrust liability under the *Noerr* doctrine.  *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *see also Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (hereinafter, "*PRE*").  Thus, enforcement of patents through litigation can constitute exclusionary conduct for Section 2 purposes only where (1) the patentee seeks to enforce a patent obtained through fraud on the USPTO (so-called "*Walker Process* fraud"); or (2) the antitrust plaintiff is able to demonstrate that the patent infringement suit comes within *PRE*'s narrow "sham" litigation exception to *Noerr* immunity.  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

///

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 15-07490 SJO (MRWx)</u>　　　　DATE: <u>April 6, 2016</u>

      a.     <u>*Walker Process* Fraud</u>

A claim of *Walker Process* fraud requires that a plaintiff allege facts sufficient to establish, with particularity, the following elements: (1) a false representation or deliberate omission of fact material to patentability; (2) made with the intent to deceive the patent examiner; (3) on which the examiner justifiably relied in granting the patent; and (4) but for which misrepresentation or deliberate omission the patent would not have been granted. *C.R. Bard*, 157 F.3d at 1364. Rule 9(b)'s "heightened pleading standard" for fraud requires "identification of the specific who, what, when, where, and how of the material representation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). Plaintiffs' *Walker Process* claim is premised on the purported withholding of material sales-related information from the patent examiner during prosecution of the Application. (*See generally* FAC ¶¶ 41-83.) CAC only takes issue with the first two elements, (*see* Mot. 11-13), which the Court addresses in turn.

      I.     <u>False Representation or Deliberate Omission of Material Fact</u>

The FAC alleges that two specific, fraudulent, material misrepresentations and/or omissions took place before the PTO. First, the FAC alleges that CAC, Mr. Brock, and CAC's prosecution attorneys failed to disclose to the examiner CAC's prior public use of the CAPS program embodying the claims of the '807 Patent, which occurred as early as August 2000 according to CAC's own publically available documents. (FAC ¶¶ 42-46.) The FAC also alleges that CAC, Mr. Brock, and CAC's prosecution attorneys failed to disclose to the examiner prior offers for sale and sales in the United States of CAPS that occurred at least as early as June, 2000. (FAC ¶¶ 46-50.) In particular, the FAC alleges that, in prosecuting the Application, Mr. Brock submitted two separate declarations in which he knowingly and intentionally concealed from the examiner prior sales of and offers to sell CAPS. (FAC ¶¶ 67-68.) The FAC further alleges that CAC and its prosecution attorneys intentionally did not inform the examiner about the prior sales of CAPS despite knowing about them. (FAC ¶¶ 70-71.) Finally, the FAC alleges these misrepresentations and/or omissions were "material" because, had the examiners been told of the offers for sale and sales of CAPS that occurred more than one year before the Application was filed—December 31, 2001—the examiners would not have allowed at least claims 1, 4, and 5 of the '807 Patent pursuant to 35 U.S.C. § 102(b)'s "public use" and/or "on sale" bars. (FAC ¶¶ 73-75.)

CAC first argues that the FAC's allegations of undisclosed prior sales are insufficient to state a claim for *Walker Process* fraud because the FAC does not establish the materiality of the "sales." (Mot. 12-13.) The Court disagrees, and finds that the FAC alleges with particularity the "who, what, when, where, and how" of the allegedly material omissions committed before the PTO. The FAC alleges that Mr. Brock, CAC, and CAC's prosecution firm, Bell, Boyd & Lloyd LLC, deliberately omitted relevant sales information regarding CAPS in their correspondences with the PTO. Moreover, these deliberate omissions are alleged to be material, as the public uses, offers to sell, and sales of CAPS are alleged to have occurred more than one year prior to the filing of the Application, in contravention of 35 U.S.C. § 102(b). CAC's citation to *Exergen* and *ESCO*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:  CV 15-07490 SJO (MRWx)           DATE:  April 6, 2016

*Corp. v. Cashman Equip. Co.* ("*ESCO*"), No. 2:12-cv-01545-RCJ-CWH, 2016 WL 320113, at *5 (D. Nev. Jan. 26, 2016), for the apparent proposition that "a showing of materiality requires Plaintiffs at least to identify both the specific limitations in each claim and the portions of the reference where the material information is found" is misguided.  (Mot. 12-13.)  Unlike the defendants in *Exergen* and *ESCO*, Westlake does not contend that CAC failed to disclose a material **prior art** reference to the PTO—which might be relevant for purposes of anticipation and/or obviousness—but instead argues that Mr. Brock, CAC, and CAC's prosecution attorneys failed to disclose public use and sales information that rightly should have invalidated the '807 Patent under 35 U.S.C. section 102(b).  Even if this were the universal test, however, the FAC alleges that, as of December 30, 2000, the CAPS system publicly used, offered for sale, and sold by CAC practiced each element of claims 1, 4, and 5 of the '807 Patent, and specifies the limitations that were allegedly practiced by the then-existing CAPS system.  (FAC ¶¶ 56-61.)  Thus, the Court finds that the FAC adequately alleges that CAC and its representatives made deliberate omissions of fact material to patentability to the examiner.

      ii.  <u>Intent to Deceive Examiner</u>

Although the "who, what, when, where, and how of the material misrepresentation or omission committed before the PTO" must be pled with particularity, *Exergen*, 575 F.3d at 1327, a plaintiff "need not plead the intent element of its *Walker Process* claim with particularity," *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 316-17 (N.D. Cal. 2007).  The FAC alleges that Mr. Brock, CAC itself, and CAC's patent prosecution firm all knew of the sales and offers to sell CAPS more than a year prior to the filing of the Application, as well as CAC's public use of the program around this same time.  (FAC ¶¶ 49-54.)  The FAC further alleges that Mr. Brock, CAC, and CAC's patent prosecution firm each knowingly withheld this public use and sales information.  (FAC ¶¶ 69-72, 76-81.)

The Court is not persuaded by CAC's efforts to cast doubt on whether Mr. Brock had any involvement of statements made during prosecution of the Application.  The FAC alleges that Mr. Brock worked in CAC's Information Technology department, during which time he conceived of and began developing CAPS, then became the Direct of Sales, and then moved on to various vice president roles within CAC.  (FAC ¶¶ 52-53.)  The FAC further alleges that Mr. Brock submitted two separate inventor declarations attesting that he was aware of his continuing duty to disclose to the PTO and its examiners any information material to the patentability of his claims.  (FAC ¶¶ 67, 81.)  These allegations are more than "colorful rhetoric" indicating that Mr. Brock intended to deceive the PTO.

For the foregoing reasons, the Court concludes that the FAC sufficiently alleges a *Walker Process* fraud claim, and **DENIES IN PART** CAC's Motion on this basis.

///
///

      b.      <u>Sham Litigation</u>

A litigation can be considered a "sham" litigation exempt from *Noerr* immunity if (1) the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) the lawsuit "conceals an attempt to interfere directly with the business relationship of a competitor . . . through the use [of] the governmental **process**—as opposed to the **outcome** of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60-61 (emphasis in original) (internal quotation marks and citations omitted).

Westlake's sham litigation theory is premised on allegations that CAC initiated and obtained an objectively baseless lawsuit because it knew the '807 Patent was fraudulently procured through material intentional misrepresentations and omissions that CAC used to drive Westlake out of the market. (FAC ¶¶ 87, 99-112.) For the reasons stated in Section II(B)(2)(a), *supra*, the FAC adequately alleges that the Westlake Action was "objectively baseless," for accepting as true the factual allegations contained therein, no reasonable litigant could have expected to overcome a challenge brought pursuant to 35 U.S.C. section 102(b). CAC's references to the Court's prior orders both in the instant action and in the Westlake Action are immaterial, for the FAC is the operative pleading and supersedes all previous pleadings, and in any event contains novel, detailed allegations of wrongdoing on the part of CAC.

The Court also finds the second element, which is not contested by CAC in its papers, to be sufficiently pled. Westlake alleges in the FAC that CAC "initiated, and maintained bad faith and sham patent infringement litigation . . . with the specific intent to interfere directly with W[estlake's] actual and potential business relationships." (FAC ¶ 106.) This allegation is sufficient to plead the second element of the "sham" litigation exception to *Noerr* immunity. *See OpenLCR.com, Inc. v. Rates Tech., Inc.*, 112 F. Supp. 2d 1223, 1233 (D. Colo. 2000) (finding allegations regarding subjective intent to harm sufficient where complaint alleged that the defendant "brought its lawsuit with the subjective intent to harm [plaintiff's] business relationships").

For the foregoing reasons, the Court finds that the FAC adequately pleads both a substantive *Walker Process* claim and that CAC's initiation and maintenance of the Westlake Action is excepted from *Noerr* immunity under the "sham" litigation doctrine. The Court accordingly **DENIES IN PART** CAC's Motion on this basis.

      3.      <u>Causal Antitrust Injury</u>

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). "[T]o show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil*, 51 F.3d at 1433.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| **CASE NO.:** <u>CV 15-07490 SJO (MRWx)</u> | **DATE:** <u>April 6, 2016</u> |

      a.    <u>Allegations Regarding Westlake's Antitrust Injury</u>

CAC argues that the FAC's other allegations demonstrate that Westlake's inability to compete flows not from the securing or enforcing of the '807 Patent, but instead "from the fact that [CAC] was the first company to introduce an innovative new method of financing," and that as a result, the "only logical and plausible inference to be drawn . . . is that whatever market position [CAC] may have obtained is the result of its business acumen and legitimate competition on the merits." (Mot. 15.) CAC argues that, according to the FAC, it is CAC's introduction of the 100-deal volume requirement that "excludes other finance lenders from competing for the RISC," rather than the alleged procurement of the '807 Patent or any attempted enforcement thereof. (Mot. 16.)

The Court reads the FAC differently, and finds that it adequately alleges antitrust injury. Although it might be true that CAC competed successfully for over 12 years without any alleged enforcement of the '807 Patent, Westlake alleges in the FAC that it did so in part because its competitors chose to design around the claims of the '8078 Patent. (*See* FAC ¶ 38 [alleging that Westlake "deliberately chose to avoid the claims of the '807 Patent by bundling deals together and pricing individual deals against the bundle" when creating its Profit Builder Program].) Moreover, that a company might have competed successfully on the merits at one point in time does not negate the possibility that it resorted to anticompetitive conduct at a later point in time.

Westlake alleges in the FAC that CAC's enforcement of the '807 Patent has caused and produced antitrust injury by "substantially and unreasonably restrict[ing], lessen[ing], foreclos[ing], and eliminat[ing]" competition in the development, marketing, and sale of indirect financing profit sharing programs for used automobile loans. (FAC ¶ 115.) The FAC further alleges that CAC's conduct has (1) erected barriers to entry in the relevant market, (2) limited consumer and dealer choice "as to selection, price and quality of such programs;" (3) "artificially restricted and reduced" consumer and dealer access to Westlake's competitive financing programs; (4) "restrained or monopolized" the market for development, marketing, and sale of indirect profit sharing programs; (5) and enabled CAC to charge supracompetitive prices for indirect profit sharing programs to the detriment of consumers and dealers. (FAC ¶ 115.) Thus, Westlake's antitrust injury is adequately pled, and the Court **DENIES IN PART** CAC's Motion on this ground.

      b.    <u>Allegations Regarding Nowcom's Antitrust Injury and Standing</u>

Nowcom, however, presents a different situation. The FAC contains a paragraph captioned "Westlake's Antitrust Standing," which alleges that Westlake has the "requisite standing to assert antitrust claims against CAC because it was a participant and competitor in the same relevant market and has suffered damages as a direct consequence of CAC's actions." (FAC ¶ 113.) No such allegations are made with respect to Nowcom, which allegedly "provides technology such as Dealer desktop software for Westlake Financial Services' independent and franchise car dealerships that facilitates the financing and/or acquisition of retail installment sales contracts by

CASE NO.: CV 15-07490 SJO (MRWx)          DATE: April 6, 2016

running credit reports, managing auto inventory, printing contracts and forms, and adding insurance binders."  (FAC ¶ 8.)

"A plaintiff who complains of an injury too remote from the alleged restraint or that is derivative of an injury suffered by a third party absent from the suit is generally unable to establish antitrust standing." *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 1106, 1116-17 (E.D. Cal. 2002).  Here, the FAC alleges that "[t]he players in the concentrated relevant product market are few:  CAC, Westlake Financial Services, Go Financial, Western Funding Incorporated, and most recently, Consumer Portfolio Services."  (FAC ¶ 21.)  Tellingly, Nowcom is not included in this exhaustive list, and the FAC does not allege how or why a company that provides technological services to one of CAC's competitors is itself either a consumer of CAC's services or one of its competitors.  "[B]oth the competitors [of CAC] and the purchasers [of CAC's services] are in the better legal position to raise antitrust claims against" CAC.  *Cargill Inc. v. Budine*, No. CV-F-07-349-LJO-SMS, 2007 WL 2506451, at *6 (E.D. Cal. Aug. 30, 2007).  Accordingly, the Court **GRANTS IN PART** CAC's Motion and **DISMISSES** Nowcom Corporation as a plaintiff in this action.

      C.      Attempted Monopolization

CAC does not separately address the merits of Westlake's second cause of action for attempted monopolization.  (*See generally* Mot., Reply, ECF No. 40.)  "The following elements are required to establish an attempt to monopolize claim:  '(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury.'"  *SmileCare*, 88 F.3d at 783 (quoting *Pac. Express*, 959 F.2d at 817).  Attempted monopolization claims differ from ordinary monopolization claims only in the necessary level of market power to constitute a "dangerous probability" of monopolization and the requisite intent.  *Rebel Oil*, 51 F.3d at 1433.  Because "the minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case," the Court finds the former satisfied for the reasons articulated in Section II(B)(1)(b), *supra*.  *Id.* at 1438.  With respect to the latter, Westlake must show that CAC acted with the "specific intent" to control prices in, or exclude competition from, the relevant market.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  For the reasons articulated in Section II(B)(2), the FAC adequately alleges such intent.  The Court therefore finds that Westlake has adequately alleged an attempt to monopolize claim, and **DENIES IN PART** CAC's Motion on this basis.

III.      RULING

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant CAC's Motion to Dismiss.  CAC has fourteen (14) days to file an Answer to the First Amended Complaint.

IT IS SO ORDERED.