JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
Email:       jason.russell@skadden.com
             douglas.smith@skadden.com

JONATHAN L. FRANK *admitted pro hac vice
JAMES A. KEYTE *admitted pro hac vice
PATRICK G. RIDEOUT *admitted pro hac vice
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Email:       jonathan.frank@skadden.com
             james.keyte@skadden.com
             patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>Defendant. | CASE NO: 2:15-cv-07490 SJO (MRWx)<br><br>**DISCOVERY MOTION**<br><br>**DEFENDANT'S SUPPLEMENTAL MEMORANDUM REGARDING PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM ADDITIONAL CUSTODIANS AND DOCUMENTS CONCERNING INVENTORSHIP, THE DECISION TO SUE WESTLAKE, AND DOCUMENTS IMPROPERLY DESIGNATED AS PRIVILEGED**<br><br>Magistrate Judge: Michael R. Wilner<br>Courtroom: 550<br>Hearing Date: March 29, 2017<br>Hearing Time: 9:30 AM<br><br>Fact Discovery Cutoff: March 31, 2017<br>Pretrial Conference: August 28, 2017<br>Trial Date: September 11, 2017 |

Desperately in search of a viable theory for its floundering case, Westlake seeks a do-over on its discovery agreements and asks this Court to require Credit Acceptance—mere weeks before the close of fact discovery—to bear the burden and expense of running new searches and harvesting the documents of four new custodians. Westlake also asks the Court for the "extreme remedy" of piercing the attorney-client privilege based on the crime-fraud exception despite the conspicuous absence of any evidence supporting its fraud allegations. That Westlake itself acknowledges the impropriety of its requests is laid bare by its conduct since filing the joint stipulation. Westlake has curiously taken off calendar the depositions of two, and possibly three, of the four proposed new custodians. That alone speaks volumes about Westlake's protestations about their "importance" and all but proves Credit Acceptance's point that the burden and cost of searching for and harvesting the proposed custodians' files would far outstrip any probative value those documents might have, if any. Westlake similarly has done next to nothing to satisfy its extremely high burden to pierce the attorney-client privilege, and has come forth with no "independent and clear" prima facie evidence on any of the five elements of fraud. Westlake does not even submit evidence of any communications between Credit Acceptance and the USPTO, nor explain how documents about the CAPS pilot test program give rise to an on-sale or public use bar problem within the meaning of 35 U.S.C. § 102 and interpretative case law—which Westlake ignores.

## I. WESTLAKE STILL HAS NOT ADDUCED ANY EVIDENCE OF FRAUD.

To pierce the sacrosanct attorney-client privilege here, Westlake must adduce "independent and clear" prima facie evidence of common law fraud on the USPTO. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1358-59 (Fed. Cir. 2011). In explaining that Westlake did not even argue how any of the five elements of common law fraud were met based on the record here, Credit Acceptance highlighted that Westlake did not submit the '807 Patent application, inventor declarations, any produced documents containing correspondence between the USPTO and Credit Acceptance's in-house counsel or outside patent counsel, or anything from the 421 pages in the publicly available file on the '807 Patent. Nor did Westlake rely on deposition testimony from Credit Acceptance's

in-house counsel or outside counsel, whose testimony Westlake should have obtained before attempting to invade the sacrosanct privilege.[1] To the extent that Westlake offers new evidence or arguments for the first time in reply, the Court should ignore them.[2] Even if considered, it bears emphasis that Westlake has not provided—and cannot provide—the requisite "independent and clear" prima facie evidence of fraud on the USPTO, which requires (1) a material representation or omission; (2) falsity, (3) intent to deceive, (4) justifiable reliance, and (5) injury. *Unigene Labs.*, 655 F.3d at 1358-59.

<u>Representation</u>.  Since filing the joint stipulation, Westlake deposed outside counsel, Peter Zura.  Mr. Zura was not "involved in the preparation of the initial application for the '807 patent" in December 2001 when the alleged fraud on the USPTO occurred, but rather only in 2004-2005 when responding to the USPTO's October 1, 2004, action. (Smith Decl. Ex. 19 at 16:15-17.)  Mr. Zura testified that he did not recall if he ever spoke to Mr. Brock, the named inventor, or Mr. Canfield, the outside counsel who prepared and filed the '807 Patent application.  (*Id.* at 17:20-22; 15:14-21.)  Mr. Zura also testified that he was "not aware" of "whether the invention claimed by the '807 patent was [accessible] to the public before December 31st of 2000" and has "no recollection" as to whether "the invention claimed by the '807 patent was commercially exploited by Credit Acceptance

---

[1] Despite filing its original complaint in September 2015, Westlake chose to ignore those individuals until the last minute.  It forwent making in-house counsel a document custodian, and noticed his deposition for the first time only 21 days from the close of the extended fact discovery period. (Smith Decl. Ex. 18.)  It also originally served the deposition notices of outside counsel in July 2016, but took those depositions off calendar and did not set them until three weeks from the close of discovery.  (Smith Decl. ¶1.)  For a party seeking to carry the doubly high burden of piercing the attorney-client privileged based on *Walker-Process* fraud, Westlake has not taken its burden seriously.  The Court should decline to pierce the attorney-client privilege on Westlake's empty record.

[2] For the first time in reply, Westlake asserts yet another theory: implied waiver of the attorney-client privilege.  As a threshold matter, the Court should not consider it. *See, e.g., Bridgham-Morrison v. National Gen. Assurance Co.*, 2015 WL 12712762, at *2 (W.D. Wash. Nov. 16, 2015) ("For obvious reasons, new arguments and evidence presented for the first time on Reply. . . are generally waived or ignored.").  In any event, Westlake is wrong that mere assertion of good faith results in an implied waiver. *See, e.g., In re Method of Processing Ethanol Byproducts & Related Subsystems ('858) Patent Litig.*, 2014 WL 2938183, at *3 (S.D. Ind. June 30, 2014) ("This court has no indication that [the party] or the inventors intend to use the fact or content of any communications with and advice from counsel (whether their original patent prosecution counsel or lawyers at Cantor Colburn) as evidence of good faith dealings with the PTO. There is thus no basis, at this point, on which to find an express or implied waiver of the attorney-client privilege.").

before December 31st, 2000." (*Id.* at 32:22-33:2, 33:4-8.)  Finally, Mr. Zura testified that he had "no recollection"—over a decade later—of whether anyone at his firm "provide[d] any information" to the USPTO relating to Credit Acceptance's supposed "pre-December 31st, 2000 uses" of CAPS.  (Smith Decl. Ex. 19 at 34:6-13.)  Because Mr. Zura has no knowledge, whether first-hand or otherwise, or recollection, of any misrepresentation or omission to the USPTO, his testimony does not establish a misrepresentation or omission.

<span style="padding-left:2em"></span>Materiality.  Westlake also cannot establish a prima facie showing of materiality by relying on the mere absence in the '807 Patent file of information relating to the CAPS pilot test program.  As the Federal Circuit explained, "[t]here is no presumption that information not filed by an applicant was material simply because patentability ensued." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998).  Furthermore, the inventor declarations for the '807 Patent do not reveal any misrepresentation or omission, material or otherwise.  In pertinent part, they only contain an acknowledgement of the "duty to disclose . . . all information which is known to me to be material to the patentability of th[e] application in accordance with Title 37, Code of Federal Regulations, 1.56." (*See* ECF Doc. 1, Ex. H.)  Under Section 1.56, materiality requires "a prima facie case of unpatentability of a claim," which is "established when the information *compels a conclusion* that a claim is unpatentable under the preponderance of evidence."  37 C.F.R. § 1.56 (emphasis added).  While Westlake contends that the few documents it cites reveal an on-sale or public use bar that should have been disclosed, those documents come nowhere close to suggesting—let alone *compelling*—that conclusion.  Furthermore, while Mr. Zura agreed that the sale or public use of an invention more than one year before the application date for a patent would be material to the patentability of that invention (Smith Decl. Ex. 19 at 40:11-41:5), that testimony is unremarkable.  It merely states the obvious: that a bar to patentability, if met, would be material.  The testimony, however, says nothing of whether the CAPS pilot test program meets the legal test for those bars.  Westlake has thus left unanswered a multitude of questions about whether the CAPS pilot test program even tends to show an on-sale or public use bar issue, including whether the developmental version of CAPS as it existed in 2000 was an embodiment of the claims in the '807 Patent;

whether the CAPS pilot test program in 2000 could qualify as a "commercial offer for sale" or public use within the meaning of applicable case law; and whether the developmental version of CAPS as it existed in 2000 meet the legal definition of "ready for patenting." Indeed, Westlake offers no expert opinion, no case law analysis, or even a recitation of the law, but instead its own self-serving recitation of facts by purposely mischaracterizing and taking out of context documents about the CAPS pilot test program. (*See* JS at 55-59.) As to the unpled "inventorship" issue, Westlake's argument reflects a fundamental misunderstanding about the patent law regarding inventorship, as Credit Acceptance established. (*See* JS at 36-38, 59-60.) Westlake may not rely on its own mischaracterizations, cherry-picked selections, or misunderstandings or ignorance of the law to establish a prima facie showing of materiality, or any other fraud element.[3]

    Intent, Justifiable Reliance, and Injury. Westlake failed to show that Credit Acceptance "intended to and did mislead the examiner into taking favorable action that would not otherwise have been taken." *C.R. Bard, Inc.*, 157 F.3d at 1365. While Westlake will undoubtedly cite the largely *undeveloped* record for the proposition that Credit Acceptance did not disclose information about the CAPS pilot test program to the USPTO, "[d]eceptive intent is not inferred simply because information was in existence that was not presented to the examiner." *Id.*[4] Furthermore, Credit Acceptance had nothing to gain by misnaming or omitting an inventor from the '807 Patent application because Credit Acceptance would have owned the resulting patent regardless.[5] The idea that a different employee should have been listed as inventor cannot justify piercing the privilege

---

[3] *See, e.g., Pegues v. Miss. State Emp't. Serv. of Miss. Emp't. Sec. Com'n*, 699 F.2d 760, 773 (5th Cir. 1983) ("[P]laintiffs' proof did not establish a prima facie case . . . due principally to their mischaracterization of certain [evidence]."); *Cecilio*, 908 F. Supp. 519, 532 (N.D. Ill. 1995) ("[Plaintiff's argument] displays a fundamental misunderstanding of the law: Such a showing is not even enough to make out a prima facie case . . . .").
[4] *See also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3476735, at *18 n.22 (S.D.N.Y. Nov. 30, 2006) ("[I]n asserting its crime-fraud argument [defendant] fails to offer any evidence going to the fraudulent intent that it must show to establish that there is probable cause to believe that [plaintiff] was seeking to mislead the PTO.").
[5] *See, e.g., Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 542 (Fed. Cir. 1990) (affirming finding of no inequitable conduct for failing to name co-inventors in part because "inventor would have had no motive to intentionally lie about inventorship because the company would own any patent that might (and did) issue.").

4

1 when, even if there was such mistake, it would have no impact on Credit Acceptance.

2       As to justifiable reliance and injury, Westlake has not made a "clear" showing that the USPTO would not have issued the patent if, in fact, it did not know of the CAPS pilot test program.  Fatally, Westlake ignores the applicability of the experimental use exception to the on-sale and public use bars.  As the Ninth Circuit has explained, "[i]f a transfer [of the invention to a third-party] is made for the dominant purpose of experimentation, that is, to perfect the invention, and only incidentally for the profit of the inventor, then there is no public use or sale within the meaning of the statute."  *Kock v. Quaker Oats Co.*, 681 F.2d 649, 652 (9th Cir. 1982).  While Westlake tries to spin the facts, the objective, contemporaneous record establishes that only the CAPS *pilot test program* (i.e., an experimental use) was available to 11 pilot test dealers between August and December 2000 to determine whether and how CAPS worked, and to change it accordingly.  (JS at 55.)  Only in January 2001, after the pilot program ended, did Credit Acceptance offer CAPS for sale and to non-pilot program dealers, confirmed by the *uncontroverted record* establishing that the first sale of CAPS did not occur until January 9, 2001, less than one year before the patent application date.  (*See Id.* at 55-59.)

## II.   *IN CAMERA* REVIEW IS NOT EVEN WARRANTED.

      Having failed to make a prima face showing by independent and clear evidence that the crime fraud exception applies, Westlake may attempt to pivot in reply and argue that it needs *in camera* review of certain documents to establish the exception's applicability.  As the Supreme Court has stated, however, "examination of the evidence, even by the judge alone, in chambers might in some cases jeopardize the security which the [attorney-client] privilege is meant to protect."  *United States v. Zolin*, 491 U.S. 554, 569 (1989) (quotation omitted)).  Because Westlake has failed to adduce evidence on any the five elements of fraud, no reasonable belief can exist that *in camera* review may yield evidence establishing the exception's applicability.  *In camera* review should therefore be denied.  *See Avnet, Inc. v. Motio, Inc.*, 2015 WL 5474435, at *7 (N.D. Ill. Sept. 16, 2015).

1  DATED:  March 15, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/Douglas A. Smith*_____
Douglas A. Smith
Attorney for Defendant
Credit Acceptance Corporation