JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600
Email:          jason.russell@skadden.com
                    douglas.smith@skadden.com

JONATHAN L. FRANK *admitted *pro hac vice*
JAMES A. KEYTE *admitted *pro hac vice*
PATRICK G. RIDEOUT *admitted *pro hac vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:   (212) 735-3000
Facsimile:    (212) 735-2000
Email:          jonathan.frank@skadden.com
                    james.keyte@skadden.com
                    patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>            Plaintiff,<br><br>v.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>            Defendant. | CASE NO: 2:15-cv-07490 SJO (MRWx)<br><br>**REDACTED PUBLIC VERSION**<br><br>**DEFENDANT CREDIT ACCEPTANCE CORPORATION'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR EVIDENTIARY SANCTIONS**<br><br>Magistrate Judge: Hon. Michael R. Wilner<br>Courtroom: 550<br>Hearing Date: March 29, 2017<br>Hearing Time: 9:30 a.m.<br><br>Fact Discovery Cutoff: March 31, 2017<br>Pretrial Conference: August 28, 2017<br>Trial Date: September 11, 2017 |

Despite the parties having litigated the issues underlying this case since July 2015, Westlake concedes in its Opposition that it did not identify 391 backup tapes at Iron Mountain and 3,054 backup tapes *at Westlake itself* until a year-and-a-half later, in mid-December 2016, when Credit Acceptance's own diligent review of Westlake's document production exposed that Westlake failed to produce any documents for 10 of the 17 years in the relevant period.[1]  Westlake further concedes that, in a knee-jerk reaction, it claimed that these backup tapes were "inaccessible" before performing *any* investigation into the burden of restoring them and at what cost.  Now, in Opposition, Westlake estimates the cost at a mere $56,800.  Worse still, Westlake admits that, by the time of its belated disclosure, even if it had immediately endeavored to restore the backup tapes and produce responsive information (as it should have done but refused to do), it would have been too late.  There was simply not enough time remaining before the original or the extended fact discovery cutoffs to provide this information to Credit Acceptance.  Especially given the critical nature of the withheld documents to one of Westlake's two damages theories in this case, and the fact that a sampling of six of the backup tapes reveals that Westlake may have withheld more than 22,000 responsive documents, Westlake's belated disclosure should be met with evidentiary sanctions in the form of exclusion, an adverse inference, and/or a presumption at summary judgment and trial.

## I.   Westlake Concedes It Ignored Its Obligations to Disclose the Backup Tapes.

Westlake's failure to disclose the backup tapes until the near-end of fact discovery is inexcusable, because the Federal Rules of Civil Procedure ("F.R.C.P.") and the parties' ESI protocol imposed on Westlake multiple obligations to identify and disclose the purportedly "inaccessible" documents. (*See* Joint Stipulation ("J.S.") at 7-16 [ECF No. 100].) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] Burns Decl. ¶ 3 ("In mid-December 2016, CAC sent a letter asking why Westlake's production did not contain documents from certain time frames. . . . At that time, I learned that Westlake routinely backs up data on disaster recovery tapes . . . ."); *see also* J.S. at 30-31.

1

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Westlake does not even bother to address, let alone justify,
3  its defaults. Nor does it explain its procedures for locating potentially responsive
4  documents.
5      Instead, Westlake attempts to distract by shifting the focus to Credit Acceptance's
6  purported delay in producing documents. (*See* J.S. at 29-30.) Putting aside that—unlike
7  Westlake—Credit Acceptance substantially completed its document production in
8  November as it committed to do (Smith Decl. ¶ 2), Credit Acceptance's document
9  production could not have inhibited Westlake from learning of and disclosing the backup
10 tapes. Westlake alone is to blame for ignoring its own obligations.
11     Westlake next argues that it "Promptly Disclosed the Backup Tapes" and was
12 "forthright" in doing so. (J.S. at 31.) Nonsense. Westlake should have identified the
13 backup tapes at various points during the past year-and-a-half, including when initially
14 investigating its damages claims or preparing for the Rule 26(f) conference. (*See* J.S. at
15 7-16.) Also, given that disclosure of the tapes occurred less than two months from the
16 then-close of fact discovery and Westlake never timely objected on the basis of undue
17 burden and cost, Westlake's attempts to seek cost-shifting are wholly improper.
18 Westlake should have substantiated its belated burden and cost objection immediately,
19 not months later in opposition to this motion. Lastly, Westlake argues that it has not
20 waived any objection on burden and cost grounds because it was "reasonably diligent and
21 prompt" and "consistently forthcoming" after it finally learned of the backup tapes. Not
22 so. Westlake's responses and objections contain no such objection, which alone
23 constitutes a waiver,[2] and given Westlake's multiple failures to disclose, its decision not
24 to object on that basis should not be excused for good cause shown.
25 **II.    Westlake All But Admits That the Backup Tapes Are Reasonably Accessible.**
26     When Westlake first learned of the backup tapes in mid-December 2016 (Burns
27 Decl. ¶ 3), it represented that the tapes "qualify as 'inaccessible' discovery" because
28

---

[2] *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

retrieving documents from the tapes would be "time-consuming, expensive, and burdensome." (J.S. Ex. 9.) As Westlake's opposition makes clear, however, Westlake did not have *any* factual basis for contending that the backup tapes were "inaccessible" when it first revealed their existence in a December 20, 2016, letter and during the meet and confer that same day. (Smith J.S. Decl. ¶ 1, Ex. 9.) As of that date, Westlake had not yet conducted *any* investigation into whether, how, and at what burden or cost the backup tapes could be restored. In fact, Westlake did not engage Kroll Discovery "to catalogue and restore backup data" until weeks later in January 2017. Westlake also did not provide Kroll with any sample tapes to analyze until February 2, 2017—more than 45 days after first revealing the backup tapes to Credit Acceptance on December 20. (Waugh Decl. ¶¶ IV-V.) And the documents from that sample were not received until March 1 (J.S. 34), the day *after* the last day to serve this motion on regular notice.[3]

Perhaps to avoid highlighting its grossly negligent or purposeful delay, Westlake's Opposition contains no discussion about the burden and cost of restoring the backup tapes. As late as February 21, 2017, though, Westlake represented to Credit Acceptance *and this Court* that the cost of restoration alone would be $200,000. (J.S. Ex. 16 ("Westlake estimates that ***restoring*** – not reviewing – all backup tapes containing potentially relevant information would cost approximately $200,000.").) Now, just weeks later, Westlake does not even attempt to substantiate the $200,000, or even explain how it arrived at that amount. Rather, the only mention of burden and cost is in the Waugh declaration, which puts the restoration cost at a mere $56,800—approximately one-quarter of the figure represented to this Court.[4] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Smith Decl. Ex. 20.) More importantly, it is

---

[3] Westlake is wrong that Credit Acceptance "categorically refused to consider cost-shifting," "sampling," or accepting "anything less than full restoration of all 3,000+ backup tapes at Westlake's sole expense." (J.S. at 32.) The record establishes that Credit Acceptance was actively considering all options but could not have an informed discussion given Westlake's misinformation and sluggish action. (*Id.* at 14-16.)

[4] Waugh Decl. ¶ XIII ("I anticipate it will take approximately 120 days to catalogue, and restore the backup tapes, which equates to $56,800.").

not unduly costly given that Westlake seeks at least $9 million in damages from the alleged "sham" patent infringement litigation plus whatever amount of trebled antitrust damages its expert, if any, is able to substantiate. Courts routinely find amounts double in size to that facing Westlake not to be unduly costly under similar circumstances.[5] And even in the case on which Westlake relies, *Mailhoit v. Home Depot USA, Inc.*, 2012 WL 12884128, at *1 (C.D. Cal. Aug. 29, 2012), the cost of restoring the backup tapes was in the "millions of dollars," thereby "dwarfing any possible recovery," unlike here.

## III.   Credit Acceptance Will Be Unfairly Prejudiced Absent Evidentiary Sanctions.

Of a sample of six tapes, Westlake found 241 potentially responsive documents—which Westlake still has not yet produced. (Smith Decl. ¶ 4.) Extrapolating the sample to the purportedly 568 backup tapes from the relevant period results in 22,814 potentially responsive documents—which is more than an 85 percent increase over the documents Westlake has produced thus far. (*Id.* at ¶ 3.) Westlake attempts to downplay the unfair prejudice to Credit Acceptance from not having these documents by claiming that the tapes would be technically challenging to restore and "many [of the tapes] are likely unusable." (J.S. at 31-32.) As another court found in rejecting a party's claim that backup tapes were "inaccessible" because of undue burden, that argument should be rejected when the tapes are in fact accessible and responsive documents can be produced from them.[6] Furthermore, it is not the quantum of documents that matters but their importance. These documents are from a key time period for one of Westlake's damages claims, and it only takes one document to refute Westlake's allegation that it built and operated its profit sharing program so as to avoid infringing the '807 Patent. Tellingly,

---

[5] *See U.S. ex rel. Guardiola v. Renown Health*, 2015 WL 5056726, at *6 (D. Nev. Aug. 25, 2015) (finding $136,000 "is not an unreasonable sum"); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) ("A response to a discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost of responding may not be unduly burdensome.").

[6] *See U.S. ex rel. Guardiola*, 2015 WL 5056726, at *3 ("[Responding party] has failed to show that the gap-period emails are not reasonably accessible because of undue burden. [The party] has produced emails from the restored March 2011 backup tapes. In so doing, [the party] has demonstrated that it is technologically feasible to restore and produce the gap-period emails.").

4

not a single Westlake deponent has been able to provide testimony supporting that damages theory, even Westlake's designated corporate representatives.

## IV. The Court Should Impose Evidentiary Sanctions.

Westlake asserts that Credit Acceptance should have first brought a motion to compel before seeking sanctions and that Credit Acceptance's motion is a premature motion in limine. (J.S. at 35.) With the extended fact discovery period set to close in two days after this motion is heard, a motion to compel would have been futile, as Westlake's declarations establish that it will take four months alone to restore the backup tapes. (Menger Decl. ¶ 11.) Given that timing, such a motion would have been futile *even if filed on the first day that Westlake disclosed the tapes*. In any event, neither a motion to compel nor the violation of a prior court order is a prerequisite to seeking sanctions under F.R.C.P. 37(c) and the Court's inherent authority.[7] Credit Acceptance is also not required to wait until near-trial to bring a motion for evidentiary sanctions, and, in fact, courts regularly consider sanctions motions at the summary judgment stage.[8] Lastly, Westlake is wrong that courts do not impose evidentiary sanctions in circumstances, like here, where the responding party refuses to produce critical documents until it is too late.[9]

---

[7] *Buffington v. Balt. Cty.*, 913 F.2d 113, 135 (4th Cir. 1990) ("[S]anctions for a violation of Rule 26(e) may be imposed under the court's inherent power even though no order compelling the discovery was violated."); *Tilton v. McGraw-Hill Cos.*, 2007 WL 777523, at *7-8 (W.D. Wash. Mar. 9, 2007); Fed. R. Civ. P. 37(c) advisory committee's note.

[8] *See, e.g., Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1161 (E.D. Cal. 2015) ("imposing evidentiary sanctions on plaintiffs precluding them from introducing into evidence, either in opposition to summary judgment or at trial, any documents that were not produced [before a date certain], and any testimony from [certain] witnesses."); *see also Helget v. City of Hays*, 844 F.3d 1216, 1226-27 (10th Cir. 2017) ("[T]he district court should have ruled on the [sanctions] motion before, or in the process of, deciding summary judgment.").

[9] *Estakhrian v. Obenstine*, 2016 WL 6275599, at *4 (C.D. Cal. May 17, 2016) ("The imposition of the adverse inference jury instruction is appropriate because, [j]ust as the intentional or grossly negligent destruction of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party, so, too, can intentional or grossly negligent acts that hinder discovery support such an inference, even if those acts are not ultimately responsible for the unavailability of the evidence." (quotation omitted)); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 110 (2d Cir. 2002); *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 54 (S.D.N.Y. 2014) ("[A]dverse inference instruction regarding [defendant's] non-production of [documents] is the appropriate sanction for this misconduct."); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2013 WL 5788307, at *7-8 (S.D.N.Y. Oct. 28, 2013).

DATED: March 15, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:     */s/Douglas A. Smith*
        Douglas A. Smith
        Attorney for Defendant
        Credit Acceptance Corporation