Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Timothy B. Yoo - State Bar No. 254332
    tyoo@birdmarella.com
Julian C. Burns - State Bar No. 298617
    jburns@birdmarella.com
Ray S. Seilie - State Bar No. 277747
    rseilie@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff
WESTLAKE SERVICES, LLC d/b/a
WESTLAKE FINANCIAL SERVICES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES, <br><br> Plaintiffs, <br><br> vs. <br><br> CREDIT ACCEPTANCE CORPORATION, <br><br> Defendant. | Case No. 2:15-cv-07490 SJO (MRWx) <br><br> **PLAINTIFF WESTLAKE SERVICES, LLC'S NOTICE OF MOTION AND MOTION TO MODIFY SCHEDULING ORDER, FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, AND TO REOPEN FACT DISCOVERY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:     May 15, 2017 <br> Time:    10:00 a.m. <br> Crtrm.: 10C <br><br> Honorable S. James Otero <br><br> Complaint Filed: September 24, 2015 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER**

**SEAL**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 10:00 a.m. on May 15, 2017, or as soon thereafter as Plaintiff Westlake Services, LLC ("Westlake") may be heard before the Honorable S. James Otero in Courtroom 10C of the above-entitled Court, located at 312 North Spring Street, Los Angeles, California 90012, Westlake will and hereby does request relief from this Court's pretrial scheduling order under Federal Rule of Civil Procedure 16(b)(4) to file a Second Amended Complaint under Federal Rule of Civil Procedure 15(a)(2).

Westlake's motion is supported by this Notice of Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Ray S. Seilie ("Seilie Decl."); the attached exhibits; and such other evidence and arguments as may be presented at or before the hearing on this motion, and all other matters of which the Court may take judicial notice or which it deems appropriate to consider.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 3, 2017.

DATED:  April 10, 2017

Ekwan E. Rhow
Timothy B. Yoo
Julian C. Burns
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:  _____/s/ Ray S. Seilie_____
Ray S. Seilie
Attorneys for Plaintiff WESTLAKE SERVICES,
LLC d/b/a WESTLAKE FINANCIAL SERVICES

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ................................. 4

    A.    The FAC alleges that CAC defrauded the USPTO by concealing prior sales and offers for sale of CAPS. ................................... 4

    B.    Discovery confirms the FAC's allegations and reveals that CAC also defrauded the USPTO about the inventorship of the '807 Patent. ................. 5

    C.    Westlake seeks additional discovery regarding the facts it learned in discovery, but CAC refuses to produce any additional material. ................... 7

    D.    The Magistrate denies Westlake's motion to compel on the sole ground of relevance and advises Westlake that it may be entitled to additional documents if it amends the FAC. ................................... 8

III.    ARGUMENT ................................................................................................ 8

    A.    Good cause supports granting Westlake relief from the July 6, 2016 deadline for amendments. ................................ 9

        1.    Brock's deposition revealed new facts about which Westlake had no reason to be aware before the deadline to amend. ................... 9

        2.    Westlake diligently pursued fact development throughout this case and was obstructed by CAC's delays. ........................ 11

    B.    The proposed amendment should be allowed under Rule 15(a)(2). ............. 13

        1.    The proposed amendment is not futile and plausibly alleges a claim for state law malicious prosecution. ......................... 13

            a.    The Patent Infringement Action was terminated in Westlake's favor. ................................... 13

            b.    The Proposed SAC alleges that the Patent Infringement Action was initiated without probable cause. ......................... 14

            c.    CAC initiated the Patent Infringement Action with malice. ................................... 15

        2.    The proposed amendment would not cause undue prejudice to CAC. ................................... 15

IV.    CONCLUSION ................................................................................ 17

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5

*Angioscore, Inc. v. Trireme Medical, Inc.*,
    No. 12-cv-03393, 2015 WL 8293455 (N.D. Cal. Dec. 9, 2015)......................................9

6
7

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994)....................................................................................10

8
9

*C.F. v. Capistrano Unified Sch. Dist.*,
    656 F. Supp. 2d 1190 (C.D. Cal. 2009) ..........................................................................8

10

*Cole v. Patricia A. Meyer & Assocs., APC*,
    206 Cal. App. 4th 1095 (Cal. Ct. App. 2012) ..............................................................15

11
12

*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987)........................................................................................16

13
14

*Desertrain v City of L.A.*,
    754 F.3d 1147 (9th Cir. 2014)........................................................................................8

15
16

*Fiers v. Revel*,
    984 F.2d 1164 (Fed. Cir. 1993).....................................................................................10

17

*Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*,
    No. CIV. S-05-583, 2006 WL 3733815 (E.D. Cal. Dec. 15, 2006).........................9, 16

18
19

*Ivy v. Mayet*,
    No. 14-cv-04879, 2015 WL 8641144 (N.D. Cal. Dec. 14, 2015)..................................9

20
21

*James ex rel. James Ambrose Johnson, Jr. 1999 Trust v. UMG Recordings,*
    *Inc.*, Nos. C 11-1613, C 11-2431, C 11-5321, 2012 WL 4859069 (N.D.
    Cal. Oct. 11, 2012) .......................................................................................................16

22
23

*Jay v. Mahaffey*,
    218 Cal. App. 4th 1522 (Cal. Ct. App. 2013) ........................................................14, 15

24
25

*Macias v. City of Clovis*,
    No. 13-cv-01819, 2016 WL 1162637 (E.D. Cal. Mar. 24, 2016).....................9, 11, 16

26
27

*Magnetar Tech. Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015).....................................................................................13

28

*Orozco v. Midland Credit Mgmt., Inc.*,
    No. 12-cv-02585, 2013 WL 3941318 (E.D. Cal. July 30, 2013)..................................12

ii

*Sheldon Appel Co. v. Albert & Oliker*,
47 Cal. 3d 863 (Cal. 1989) ................................................................... 15

*Siebel v. Mittlesteadt*,
41 Cal. 4th 735 (2007) ........................................................................ 14

*Trovan, Ltd. v. Sokymat SA, Irori*,
299 F.3d 1292 (Fed. Cir. 2002) ............................................................ 11

*United States v. Webb*,
655 F.2d 977 (9th Cir. 1981) ............................................................... 13

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ................................................ 3

Federal Rule of Civil Procedure 15 .................................................... 8, 9

Federal Rule of Civil Procedure 15(a)(2) .......................................... 3, 13

Federal Rule of Civil Procedure 16 .................................................... 8, 9

Federal Rule of Civil Procedure 16(b) .................................................... 8

Federal Rule of Civil Procedure 16(b)(4) .......................................... 2, 13

Federal Rule of Civil Procedure 30(b)(6) ............................................... 5

iii

WESTLAKE'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Since Defendant Credit Acceptance Corporation ("CAC") produced its first document in this case in mid-November, discovery has not only confirmed the allegations in Westlake's First Amended Complaint ("FAC"), but has also revealed the full extent to which CAC acted to conceal material facts from the United States Patent and Trademark Office ("USPTO") during its fraudulent prosecution of U.S. Patent No. 6,950,807 ("the '807 Patent").  Westlake requests leave to amend its complaint based on the revelation of the following facts:



WESTLAKE'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT



1

2

3

4

5

6

7

8

9          Following briefing on the issue, Magistrate Judge Wilner denied Westlake's motion

10   to compel this discovery on the singular basis that the FAC did not specifically allege that

11   CAC's false inventorship designation was fraudulent.[1]  Of course, Westlake had not

12   discovered the factual basis for this additional fraud until January 2017, long after the

13   pretrial scheduling order's July 6, 2016 deadline for the amendment of pleadings had

14   passed.

15         This avalanche of new facts—which provides a separate basis for Westlake's

16   allegations of *Walker Process* fraud—plainly could not have been incorporated in an

17   amended complaint before the July 6, 2016 deadline.  Accordingly, Westlake respectfully

18   requests that the Court (1) find good cause under Rule 16(b)(4)[2] to grant Westlake relief

19   from the pretrial scheduling order and (2) grant leave for Westlake to file the concurrently-

20   submitted Proposed Second Amended Complaint ("Proposed SAC").[3]

21         The Proposed SAC modifies the FAC in three ways.

22

23

24   _____

25   [1]  As set forth in its concurrently-filed motion for review of this order, Westlake believes
that this ruling was an abuse of discretion.

26   [2]  "Rule" refers to the Federal Rules of Civil Procedure.

27   [3]  Pursuant to this Court's standing order, a "redline" version of the Proposed SAC is
attached as Appendix A to this Motion.  A "clean" version of the Proposed SAC is

28   included as Appendix B.



1

2

3

4

5

6

7

8

9  Good cause supports giving Westlake relief from the pretrial scheduling order to

10 file the Proposed SAC.

11

12 Since

13 then, Westlake has diligently pursued additional discovery concerning the facts

14 surrounding that issue and has been prevented from obtaining that material by CAC's

15 blanket refusal to supplement its productions.  And Westlake's motion to compel was then

16 denied solely on the grounds that the FAC did not contain specific allegations of

17 inventorship fraud.  This motion seeks to address that deficiency, enable Westlake to

18 obtain its requested discovery, and update the operative complaint in this case to conform

19 to facts revealed during discovery.  It cannot be reasonably disputed that Westlake could

20 not have pursued these amendments before the July 6, 2016 amendment deadline.

21  Assuming the Court finds good cause, which it should, the Proposed SAC

22 comfortably meets the requirements for amendment under Rule 15(a)(2), which courts

23 have held should be permitted with "extreme liberality."  The new factual allegations in

24 the Proposed SAC reinforce the causes of action that this Court has already evaluated and

25 held to meet the standard required by Rule 12(b)(6).  These new facts also establish the

26 element of lack of probable cause required to support Westlake's additional cause of action

27 for state law malicious prosecution, a claim whose other elements overlap with the claims

28 already in the FAC.

1    Furthermore, allowing amendment would not result in any undue prejudice to CAC.

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████████ Westlake also would not oppose (and indeed, is

4    affirmatively seeking) extensions of discovery that would enable CAC to conduct any

5    discovery it needs in light of the new allegations.  And to the extent CAC is able to

6    articulate any kind of prejudice, which it cannot, that prejudice is far from "undue": it was

7    CAC's decision to refuse to produce a 30(b)(6) witness, first requested by Westlake on

8    November 1, until mid-January 2017, and generally act sluggishly throughout discovery.

9    ██████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████ CAC

11   should not be rewarded for its initial concealment of the role of its high-level officers in its

12   fraud on the USPTO and subsequent refusal to supplement discovery when that role

13   entered the spotlight during discovery.

14   The Court should therefore (1) grant Westlake relief from the July 6, 2016 deadline

15   for amendment of pleadings; (2) grant Westlake leave to amend its complaint by filing the

16   Proposed SAC; and (3) reopen fact discovery, at least for the limited purpose of document

17   production and fact depositions related to the new allegations.

18   **II.    FACTUAL AND PROCEDURAL BACKGROUND**

19   The parties' interactions during discovery, including the dispute surrounding

20   Westlake's requests for additional discovery from CAC's officers, are detailed in their

21   entirety in the joint stipulation regarding Westlake's motion to compel and accompanying

22   exhibits.  (*See* Dkt. Nos. 120, 121).  This section recounts the facts specifically applicable

23   to this motion and, where necessary, references exhibits from those filings.

24   **A.    The FAC alleges that CAC defrauded the USPTO by concealing prior
         sales and offers for sale of CAPS.**

25   The FAC alleges, *inter alia*, that CAC violated federal antitrust laws by asserting

26   the '807 Patent against actual and potential competitors despite knowing that the patent

27   was invalid because it was obtained through fraud.  Specifically, it alleges that during the

28

patent prosecution process, CAC concealed from the USPTO critical material information regarding sales and uses of CAPS more than one year prior to the patent application that would have barred CAPS's patentability.  As this Court has already observed, the FAC "adequately alleges that CAC and its representatives made deliberate omissions of fact material to patentability to the examiner" and "that CAC initiated and obtained an objectively baseless lawsuit because it knew the '807 Patent was fraudulently procured through material intentional misrepresentations and omissions that CAC used to drive Westlake out of the market."  (Dkt. No. 43 at 14-15).

**B.    Discovery confirms the FAC's allegations and reveals that CAC also defrauded the USPTO about the inventorship of the '807 Patent.**

As an initial matter, Westlake's review of CAC's document production confirms a number of the allegations in the FAC.  ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████.  (Dkt. No. 121 Ex. S).  Earlier that month, a meeting invitation had been circulated inviting CAC employees to "Celebrate our Successful CAPS Launch[.]"  (Seilie Decl. Ex. A).  This "launch" of CAPS—as well as any other pre-December 2000 activities involving CAPS—were not disclosed to the USPTO in CAC's prosecution of the '807 Patent.

But the full extent of CAC's fraudulent conduct was not revealed until Brock's Rule 30(b)(6) deposition on January 18, 2017.[4] ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ ██████████████████████████████████ ██████ 

_____

[4]    Even though Westlake had served its Rule 30(b)(6) notice on November 1, CAC inexplicably refused to produce a witness until mid-January.



(Dkt. No. 121 Ex. N ("Brock Dep. Tr.") at 61:8-62:1 (emphasis added)).

(Brock Dep. Tr. at 62:10-22 (emphasis added)).

[REDACTED]

(Brock Dep. Tr. at 134:19-135:6 (emphasis added)).

Entries on CAC's privilege log corroborate its fraudulent scheme.  The first discussion involving counsel regarding the possibility of a patent on CAPS is dated December 4, 2001—well over a year after CAC had announced the "launch" of CAPS. (*See* Dkt. No. 102-1 Ex. L at 108, Entry No. 9).  That discussion did not involve Brock and concerned "the less than one-year old requirement for patent protection."  (*Id.*). [REDACTED]

[REDACTED]

### C. Westlake seeks additional discovery regarding the facts it learned in discovery, but CAC refuses to produce any additional material.

In the face of this compelling evidence that CAC's fraudulent conduct before the USPTO exceeded even what Westlake had initially alleged, CAC pursued a litigation strategy of obstruction and concealment.  On January 26, Westlake wrote to CAC requesting that, in light of the new facts learned in January, CAC immediately produce documents responsive to six searches from Brock and four additional custodians: David Simmet, Michael Knoblauch, Keith McCluskey, and Brett Roberts.[5]  (Dkt. 121 Ex. D). Perhaps recognizing that the discovery process to date had only revealed additional dimensions of fraudulent conduct, CAC refused to supplement its production, mischaracterizing Westlake's request—made over two months before the scheduled close

---

[5]  The relevance of each of these custodians to the claims in the FAC is described in further detail in Westlake's concurrently-filed motion for review of the Magistrate's order.

1   of fact discovery—as "eleventh-hour" and "untimely."  (Dkt. 102-1 Ex. I at 88).

2   **D.    Magistrate Judge Wilner denies Westlake's motion to compel on the sole ground of relevance and advises Westlake that it may be entitled to additional documents if it amends the FAC.**

3

4   Westlake moved to compel the production of documents from those additional

5   custodians on March 16, 2017.  (Dkt. No. 120).  In an order that Westlake is concurrently

6   challenging, Magistrate Judge Wilner denied Westlake's motion on the sole basis that "the

7   discovery that Westlake seeks from other CAC officials on the issue of identifying the

8   'inventor' is not relevant to its claim as pled in the First Amended Complaint."  (Dkt. No.

9   134).  During the hearing on Westlake's motion to compel, Judge Wilner indicated that if

10  Westlake were to obtain leave to amend its complaint to include allegations concerning

11  inventorship, his ruling would be different.

12  The parties met and conferred on April 3, 2017.  In light of Judge Wilner's order,

13  counsel for Westlake asked CAC's counsel if CAC would stipulate to a motion for

14  Westlake to amend its complaint along the lines suggested by the Magistrate.  CAC

15  refused.

16  ## III.    ARGUMENT

17  The Court 's pretrial scheduling order set an amendment deadline of July 6, 2016.

18  (Dkt. No. 55 at 1).  "In the Ninth Circuit, a request for leave to amend made after the entry

19  of a Rule 16 Scheduling Order is governed primarily by Rule 16(b).  Pursuant to Rule

20  16(b), a scheduling order 'shall not be modified except upon a showing of good cause and

21  by leave of the district judge . . . .'  If good cause is shown, the party must then

22  demonstrate that amendment was proper under Rule 15." *C.F. v. Capistrano Unified Sch.*

23  *Dist.*, 656 F. Supp. 2d 1190, 1192 (C.D. Cal. 2009).

24  The inquiry under Rule 15 is far more permissive than the good faith requirement

25  for modifying the pretrial scheduling order under Rule 16: "Leave to amend 'shall be

26  freely given when justice so requires, . . . and this policy is to be applied *with extreme*

27  *liberality*." *Desertrain v City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014) (emphasis

28  added and citation omitted).  Westlake's motion for leave to amend is supported by good

cause justifying a departure from the pretrial deadline and also meets the requirements for amendment under Rule 15.

### A.   Good cause supports granting Westlake relief from the July 6, 2016 deadline for amendments.

Westlake seeks a straightforward application of the principle that "[a]llowing parties to amend based on information obtained through discovery is common and well established." *Macias v. City of Clovis*, No. 13-cv-01819, 2016 WL 1162637, at *4 (E.D. Cal. Mar. 24, 2016); *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*, No. CIV. S-05-583, 2006 WL 3733815, at *3 (E.D. Cal. Dec. 15, 2006).  Courts have generally found good cause to amend a complaint after the deadline established by a Rule 16 scheduling order where the amendment is based on new facts obtained during the discovery process. *See, e.g.*, *Ivy v. Mayet*, No. 14-cv-04879, 2015 WL 8641144 (N.D. Cal. Dec. 14, 2015) (finding good cause for late amendment with new facts because "[t]here is no evidence that Plaintiffs could have obtained the information . . . until after conducting discovery."); *cf. Angioscore, Inc. v. Trireme Medical, Inc.*, No. 12-cv-03393, 2015 WL 8293455, at *2 (N.D. Cal. Dec. 9, 2015) ("A party is free to seek leave to amend its complaint if, in the course of discovery, it learns of alternative bases for relief.").  Good cause supports relief from the scheduling order because (1) Westlake did not have a factual basis to allege inventorship fraud before the deadline for the motion to amend; and (2) Westlake diligently pursued discovery concerning this issue before seeking to amend.

### 1.   Brock's deposition revealed new facts about which Westlake had no reason to be aware before the deadline to amend.

There can be no serious dispute that Westlake has diligently pursued fact discovery and could not have filed the Proposed SAC (at least with a legitimate factual basis) before the July 6, 2016 amendment deadline. ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████

WESTLAKE'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT



8  ████████████████ "Conception is the touchstone of inventorship, the completion

9  of the mental part of invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d

10  1223, 1227-28 (Fed. Cir. 1994) (citing *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir.

11  1994)).  "[T]he test for conception is whether the inventor had *an idea* that was definite

12  and permanent enough that one skilled in the art could understand the invention." *Id.* at

13  1228 (emphasis added); *see also Fiers v. Revel*, 984 F.2d 1164, 1168 (Fed. Cir. 1993)

14  ("The threshold question in determining inventorship is who conceived the invention.

15  Unless a person contributes to the conception of the invention, he is not an inventor."). ███

22  ████████  The Proposed SAC incorporates these new facts in three ways.

23  *First*, the Proposed SAC contains new allegations regarding CAC's concealment of

24  the true inventor or inventors of the '807 Patent that enhance the fraud allegations already

25  contained in the FAC. █████████████████████████████

28  ███████████████  The new allegations therefore enhance the plausibility of the existing

1  allegations of fraud.

2  

3

4

5  "A patent is invalid if more or less than the true inventors are named." *Trovan,*

6  *Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir. 2002) (citing *Jamesbury Corp. v.*

7  *United States*, 518 F.2d 1384, 1395 (Ct. Cl. 1975)).  And although the law permits patents

8  to be routinely corrected to add inventors, that process can only be used when the "the

9  nonjoinder was done *without deceptive intent* on the part of the person erroneously left off

10  the patent." *Id.* (emphasis added; citing 35 U.S.C. § 256).

11

12

13

14

15

16

17

18

19

20

21

22  This additional evidence supports the inclusion of a malicious prosecution claim in the

23  Proposed SAC.  *See Macias v. City of Clovis*, No. 13-cv-01819, 2016 WL 1162637 (E.D.

24  Cal. Mar. 24, 2016) (permitting the addition of a malicious prosecution claim in an

25  amended complaint based on "new evidence produced during discovery").

26  **2.  Westlake diligently pursued fact development throughout this case and was obstructed by CAC's delays.**

27  Leave to amend should not be denied when it is the non-moving party's fault that

28

1  amendment could not be sought earlier.  *See Orozco v. Midland Credit Mgmt., Inc.*, No.
2  12-cv-02585, 2013 WL 3941318 (E.D. Cal. July 30, 2013) (finding good cause to amend
3  outside amendment deadline because "[i]t is defendant's dawdling, not plaintiff's that
4  caused evidence . . . to be revealed only after the original March 4, 2013 amendment
5  deadline").  There can be little doubt that that Westlake has been diligent throughout
6  discovery and was only unable to learn the additional facts concerning inventorship before
7  January 2017 because of CAC's sluggish behavior throughout discovery.  The original
8  deadline for amendment was July 6, 2016—over four months before CAC produced *a*
9  *single document*.  And even after CAC substantially completed its production of
10 documents in the middle of November, it did not serve Westlake its privilege log until
11 January 6, 2017.  ████████████████████████████████████
12 ████████████████████████████████████████████
13 ████████████████████████████████████████████
14 ████████████████████

15       Moreover, although the facts developed during discovery provide more than an
16 adequate basis to include the additional allegations in the Proposed SAC, Westlake in part
17 seeks leave to amend because CAC, and now Magistrate Judge Wilner, have taken the
18 position that Westlake cannot obtain further discovery into the facts discovered during
19 Brock's deposition absent the inclusion of specific allegations in the complaint.  As
20 detailed in Westlake's concurrently filed motion for review of Magistrate Judge Wilner's
21 March 29 Order, Westlake believes that the FAC's allegations that CAC intentionally
22 deceived the USPTO were sufficient to authorize discovery into all the ways that CAC
23 executed its deception.  But to the extent that amendment is necessary to obtain that
24 discovery, the Proposed SAC would remedy the sole issue that prevented the Magistrate
25 from denying the motion to compel.  That the proposed SAC is in part necessitated by
26 Magistrate Judge Wilner's Order and the litigation positions taken by CAC, further
27 highlights that Westlake has been pursuing fact development with diligence.

28

### B.    The proposed amendment should be allowed under Rule 15(a)(2).

If the Court grants Westlake relief from the pretrial scheduling order under Rule 16(b)(4), it must also grant Westlake leave to amend under Rule 15(a)(2) before the amended complaint can become the operative pleading.  But that standard is much more permissive than the good cause required to modify the scheduling order: the rule itself states that "[t]he court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), which the Ninth Circuit has described as a "policy of favoring amendments to pleadings [that] should be applied with 'extreme liberality.'"  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

#### 1.    The proposed amendment is not futile and plausibly alleges a claim for state law malicious prosecution.

As a general matter, the new facts alleged in the Proposed SAC only make the existing causes of action more plausible.  As this Court already recognized when it denied CAC's motion to dismiss, "the FAC sufficiently alleges a *Walker Process* fraud claim" and specifically found that it "adequately alleges that CAC and its representatives made deliberate omissions of fact material to patentability to the examiner."  (Dkt. No. 43 at 14).  The addition of even more factual allegations to the operative complaint only bolsters the plausibility of the claims in that complaint.

The new facts alleged by the Proposed SAC also support the inclusion of an additional cause of action for malicious prosecution under California law.  Under California law, CAC is liable for malicious prosecution if the Patent Infringement Action "(1) was commenced by or at [Credit Acceptance's] direction and terminated in [Westlake's] favor, (2) was brought without probable cause, and (3) was initiated with malice." *Magnetar Tech. Corp. v. Intamin, Ltd.*, 801 F.3d 1150 (9th Cir. 2015).  All three elements are met.

##### a.    The Patent Infringement Action was terminated in Westlake's favor.

Under California law, a voluntary dismissal with prejudice "is presumed to be a favorable termination on the merits." *Jay v. Mahaffey*, 218 Cal. App. 4th 1522, 1540 (Cal.

1  Ct. App. 2013).  There can be little doubt that the presumption holds here.  The Patent

2  Infringement Action was voluntarily dismissed over the objection of Westlake, who

3  wanted the Court to retain jurisdiction over the action so it could seek a declaratory

4  judgment of non-infringement, patent invalidity, and unenforceability of the '807 Patent.

5  (Seilie Decl. Ex. B at 5).  In support of its motion, CAC represented to the Court that its

6  proposed voluntary dismissal was "with prejudice, would operate as a resolution of the

7  case *on the merits in [Westlake's] favor*, and is accompanied by a covenant not to sue."

8  (Seilie Decl. Ex. C ¶ 2).  The termination plainly "reflect[s] the merits of the action" and

9  therefore constitutes a termination in Westlake's favor.  *Siebel v. Mittlesteadt*, 41 Cal. 4th

10  735, 741 (2007) (citation omitted).

**b.  The Proposed SAC alleges that the Patent Infringement Action was initiated without probable cause.**

12      As this Court noted when it denied CAC's motion to dismiss the FAC, the operative

13  complaint already plausibly alleges "that CAC initiated and obtained an objectively

14  baseless lawsuit because it knew the '807 Patent was fraudulently procured through

15  material intentional misrepresentations and omissions."  (Dkt. No. 43 at 14-15).  ███

16  ████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  █████████

20      Under California law, "[p]robable cause exists when a lawsuit is based on facts

21  reasonably believed to be true, and all asserted theories are legally tenable under the

22  known facts."  *Jay*, 218 Cal. App. 4th at 1540 (quoting *Cole v. Patricia A. Meyer &*

23  *Assocs., APC*, 206 Cal. App. 4th 1095 (Cal. Ct. App. 2012).  CAC's complaint in the

24  Patent Infringement Action asserted that CAC had "full rights to enforce the '807 patent

25  and sue for damages by reason of infringement."  (Seilie Decl. Ex. D ¶ 17).  ███████

26  ███████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28

1 ████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████

4        **c.**     **CAC initiated the Patent Infringement Action with malice.**

5       The existing allegations in the FAC also support an inference of malice.  Under

6 California law, "[t]he 'malice' element . . . relates to the subjective intent or purpose with

7 which the defendant acted in initiating the prior action" and "is a question of fact to be

8 determined by the jury."  *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 874-75

9 (Cal. 1989).  "Malice does not require that the defendants harbor actual ill will toward the

10 plaintiff in the malicious prosecution case, and liability attaches to attitudes that range

11 'from open hostility to indifference.'"  *Cole*, 206 Cal. App. 4th at 1113-14.  Instead, an

12 improper purpose sufficient to show malice can be shown for actions in which "(1) the

13 person initiating them does not believe that his claim may be held valid; (2) the

14 proceedings are begun primarily because of hostility or ill will; (3) the proceedings are

15 initiated solely for the purpose of depriving the person against whom they are initiated of a

16 beneficial use of his property; (3) the proceedings are initiated for the purpose of forcing a

17 settlement which has no relation to the merits of the claim."  *Jay*, 218 Cal. App. 4th at

18 1543.

19       The Court has already found that the FAC plausibly alleges that CAC initiated the

20 Patent Infringement Litigation "with the specific intent to interfere directly with

21 W[estlake's] actual and potential business relationships."  (Dkt. No. 43 at 15).  In

22 particular, despite knowing that the '807 Patent did not name the true inventors and was

23 therefore invalid, CAC initiated the Patent Infringement Litigation in an effort to deter

24 Westlake (and potentially others) from attempting to engage in fair competition against it.

25 These facts are sufficient to allege malice.

26         **2.**     **The proposed amendment would not cause undue prejudice to CAC.**

27       Nor can CAC cannot plausibly oppose amendment by claiming prejudice.  "If a

28

court is to deny leave to amend on grounds of undue prejudice, the prejudice must be substantial." *James ex rel. James Ambrose Johnson, Jr. 1999 Trust v. UMG Recordings, Inc.*, Nos. C 11-1613, C 11-2431, C 11-5321, 2012 WL 4859069, at *2 (N.D. Cal. Oct. 11, 2012). And in the Ninth Circuit, "[t]he party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). CAC cannot carry that burden.

*First*, any documents concerning the new allegations and cause of action in the Proposed SAC are in CAC's possession, so CAC will not be prejudiced based on the availability of evidence. *See Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*, No. CIV. S-05-583, 2006 WL 3733815 (E.D. Cal. Dec. 15, 2006) (finding no prejudice where "information [about new allegations in an amended complaint] is information which [defendants] possess").

*Second*, any prejudice could be cured by this Court through further modifications of applicable discovery deadlines, which Westlake would not oppose (and indeed seeks to some limited degree in this motion). The need for deadline extensions does not constitute prejudice. *Macias*, 2016 WL 1162637, at *5 ("Extending deadlines for discovery, in light of information a party learns through discovery, is not the type of prejudice that precludes amendment. Moreover, prejudice to Defendants, if any, is eliminated by a continuance of the discovery deadlines.").

*Finally*, any prejudice would not be "undue." Westlake's inability to discover the facts concerning the '807 Patent's failure to name the proper inventors results from CAC's own dilatory conduct during discovery. CAC refused to produce any documents to Westlake until mid-November 2016, *over five months* after Westlake served its first set of requests for production in June 2016. In this production, CAC categorically refused to produce any documents concerning inventorship on the basis that inventorship was "irrelevant" to this case. And despite receiving Westlake's notice of 30(b)(6) deposition in early November 2016, CAC further refused to designate a corporate witness to testify as to that deposition until the middle of January 2017. While Westlake has made diligent efforts

to conduct discovery efficiently and expeditiously, CAC has used every tactic at its disposal to slow the process down.  CAC cannot now use its delays as a shield against liability for misconduct discovered during that process.

## IV.     CONCLUSION

For the reasons stated above, the Court should (1) grant Westlake relief from its scheduling order's July 6, 2016 deadline for amendment of pleadings; (2) grant Westlake leave to amend its complaint by filing the Proposed SAC; and (3) reopen the fact discovery period for the limited purpose of requiring CAC to produce documents from the additional custodians at issue in the concurrently filed objection to the Magistrate Judge Order regarding discovery.


DATED:  April 10, 2017

Ekwan E. Rhow
Timothy B. Yoo
Julian C. Burns
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:      /s/ Ray S. Seilie

Ray S. Seilie
Attorneys for Plaintiff WESTLAKE
SERVICES, LLC d/b/a WESTLAKE
FINANCIAL SERVICES

# APPENDIX A

BLECHER COLLINS & PEPPERMAN, P.C.
Maxwell M. Blecher (Ekwan E. Rhow - State Bar No. 26202)
 - mblecher@blechercollins.com
Donald R. Pepperman (State Bar No. 109809)
 - dpepperman@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
 - DROOKS, LICENBERG & RHOW, P.C.
Ekwan E. Rhow (State Bar No. 174604)
 _ erhow@birdmarella.com
Timothy B. Yoo (- State Bar No. 254332)
 _ tyoo@birdmarella.com
Julian C. Burns - State Bar No. 298617
 jburns@birdmarella.com
Ray S. Seilie - State Bar No. 277747
 rseilie@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiffs
WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES and
NOWCOM CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES; and NOWCOM CORPORATION, <br><br> Plaintiffs, <br><br> vs. <br><br> CREDIT ACCEPTANCE CORPORATION, <br><br> Defendant. | Case No. 2:15-cv-07490 SJO (MRWx) <br><br> CIVIL ANTITRUST FIRST[PROPOSED] PLAINTIFF WESTLAKE SERVICES, LLC'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT (15 U.S.C. § 2) AND MALICIOUS PROSECUTION <br><br> [DEMAND FOR JURY TRIAL] <br> Honorable S. James Otero <br><br> Complaint Filed: September 24, 2015 |

Plaintiffs Westlake Services, LLC d/b/a Westlake Financial Services, and Nowcom Corporation (collectively " ("WESTLAKE"), by and through theirits counsel, bring this FirstSecond Amended Complaint ("FACSAC") against defendant Credit Acceptance Corporation ("CAC"), for violations of Section 2 of the Sherman Act (monopolization and attempted monopolization), to secure damages and injunctive relief and demanding trial by jury, claim and allege as follows:

## I.

## SUMMARY OF THE CASE

1.     This antitrust lawsuit centers around CAC's deliberate attempt to monopolize, and its actual monopolization of, the market for indirect lending for used car sales through a profit sharing program in the United States.  CAC possesses a market share exceeding 85% in this market.  CAC has monopolized, or at least attempted to monopolize, this indirect financing profit sharing program market by fraudulently securing a patent, in the process concealing the identity of the true inventors of that patent as well as prior offers for sale and sales of the patented product; and then asserting these purported patent rights far beyond the narrow scope of the actual patent claims (obtained by fraud in the first instance) and through instituting a sham lawsuit premised on invalid and/or unenforceable patent claims in order to slowly and/or aggressively litigate the plaintiffs out of the market.  This ill-founded, bad faith and sham patent infringement action, constitutes a violation of the antitrust laws.

2.     CAC conceived and implemented an anticompetitive scheme to exclude WESTLAKE from this growing and lucrative market.  WESTLAKE has developed, marketed, and sold a competing indirect financing profit sharing program for used car sales.  To thwart WESTLAKE's competition by WESTLAKE and others, CAC has engaged in a campaign that consists of at least the following anticompetitive and monopolistic acts:

(a)     knowingly obtaining and enforcing a fraudulently procured patent; and

(b)      initiation and maintenance of knowingly sham patent infringement litigation based on an invalid and/or unenforceable patent to eliminate and thwart competition from WESTLAKE.

3.      As a consequence of CAC's conduct, competition in this product market has been suppressed and virtually eliminated, and consumers/dealers in this market have suffered a loss of choice and have been required to pay higher prices for used car loan indirect financing profit sharing programs to CAC than would otherwise be the case in a properly functioning and competitive market.  WESTLAKE, the competitive market, and consumers/dealers have suffered antitrust injury by reason of CAC's unlawful, exclusionary, and trade-restraining conduct.

## II.

## JURISDICTION AND VENUE

4.      ~~This~~The First and Second Claims for Relief in this Second Amended Complaint ~~is~~are filed and ~~this action is~~ instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against, CAC for its past and continuing violations of Section 2 of the Sherman Act (15 U.S.C. § 2), as alleged herein.

5.      This Court has original and exclusive jurisdiction over the subject matter of ~~this civil action~~the First and Second Claims for Relief under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1332, and 1337.  CAC maintains offices and transacts business on a systematic and continuous basis within this District and may be found here within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

6.      This Court has supplemental jurisdiction over the Third Claim for Relief (for state law malicious prosecution) under 28 U.S.C. 1367(a).

7.      This Court has diversity jurisdiction over the Third Claim for Relief because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

1

**III.**

2

**INTERSTATE COMMERCE**

3    6.8.    The actions complained of herein have, and will, restrain and adversely

4  affect interstate commerce in that CAC markets and sells its financing programs and

5  services across state lines.  Further, CAC purchases or finances goods and supplies in

6  interstate commerce.

7

**IV.**

8

**PARTIES**

9    7.9.    Plaintiff Westlake Services, LLC d/b/a Westlake Financial Services, is a

10  limited liability company organized under the laws of the State of California.  Westlake

11  Financial Services specializes in the financing and servicing of retail installment sales

12  contracts for used cars.  Westlake Financial Services is an internet-based, privately held

13  finance company that provides automobile financing for independent and franchise car

14  dealers for sales of used cars.

15    8.    Plaintiff Nowcom Corporation is a corporation organized under the laws of

16  the State of California.  Nowcom Corporation provides technology such as Dealer desktop

17  software for Westlake Financial Services' independent and franchise car dealerships that

18  facilitates the financing and/or acquisition of retail installment sales contracts by running

19  credit reports, managing auto inventory, printing contracts and forms, and adding

20  insurance binders.

21    9.10.    Defendant CAC is a corporation organized under the laws of the State of

22  Michigan.  CAC represents that it is the owner of U.S. Patent No. 6,950,807 ("the '807

23  Patent").  CAC claims to be "an indirect finance company, working with car dealers

24  nationwide" and "is a proven industry leader."

25

**V.**

26

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

27    A.A.    **Nature of Indirect Financing in the Auto Finance Industry**

28    10.11. The automotive finance industry for indirect lending generally consists of

4

three primary participants: consumers, dealers, and financial institutions.

~~11.~~12.  The primary method for motor vehicle sale financing in the United States is the "indirect lending" model, which constitutes a substantial majority of the auto finance business.[1]  Under an indirect lending arrangement, the dealer and consumer directly negotiate financing in the same transaction as part of the vehicle purchase transaction, which is consummated pursuant to a retail installment sales contract ("RISC").

~~12.~~13.  Under indirect lending, once the RISC is consummated, the dealer assigns the RISC (or certain payment streams under the RISC) to a financial institution willing to finance the RISC under various arrangements.

~~13.~~14.  The originating dealer assigns the RISC contract to a lender for two main reasons: (a) the dealer does not want to service the account or collect the future stream of payments; and (b) the dealer wants to receive the financial benefit of the transaction now without having to wait.[2]

### ~~B.~~B.   Indirect Automobile Lending Programs

~~14.~~15.  In indirect lending, the various arrangements under which RISCs are financed can be divided into two categories: (a) a "purchase program," and (b) a "profit sharing program".

~~15.~~16.  Under a "purchase program," the finance lender purchases the RISC in exchange for a one-time lump sum payment to the dealer, which is described as an "up-front payment" or "advance."  The amount of the advance is based on various factors, including the customer's credit, the vehicle value, and the down payment.  Once the

---

[1] Financial institutions can also lend directly to consumers so that they are preapproved to purchase a vehicle.  Once a consumer is approved by the financial institution, the consumer can simply negotiate price with the dealer.  The terms of the amount financed and the car parameters are set by the financial institution as part of the loan.  In this direct lending model, financing and purchasing the vehicle are related but separate transactions.

[2] Dealers often have to borrow money to pay for their inventory of cars for sale (known in the industry as "floorplan financing").  Dealers must pay back the floorplan lender when a car is sold, so the vast majority of dealers elect to sell the RISC to a retail financer (or indirect lender) in exchange for a lump sum payment.

[PROPOSED] SECOND AMENDED COMPLAINT

transaction is complete and the RISC is assigned to the finance lender, the entire payment streams go directly to the finance lender with no participation from the dealer.

16.17. Under a "profit sharing program," dealers are offered a more discounted up-front payment for the assignment of a RISC in exchange for a share of the customer's future stream of installment payments.  Although the dealer's up-front payment will be lower than what it otherwise would have received in a purchase program, the dealer is given the opportunity to earn a greater amount over time based on the performance of the RISC.

17.18. There is no substitute for a profit sharing program in the indirect auto finance market.  Dealers who specifically desire to share in the customer payments have no other means to sell the RISC to an indirect lender.[3]  The only other option in indirect lending is the purchase program, which precludes profit sharing.

18.19. The overwhelming majority of the indirect financing of RISCs are done under a purchase program.  But the indirect financing profit sharing program is a significant and growing separate market.

**C.C.   The Relevant Market and Players**

19.20. The relevant product market in this case is the business of providing indirect financing for used car sales to dealers through a profit sharing program.

20.21. The essential elements of the indirect financing "profit sharing" market are: (a) dealers wanting a share of future payment streams; (b) under RISCs for used cars; (c) originated by dealers; and (d) financed pursuant to a profit sharing program.

---

[3] In the direct lending market, dealers can participate in the future stream of payments is to become a direct lender and service the loan directly.  This is called a "Buy Here, Pay Here" ("BHPH") dealer.  However, a BHPH dealer faces two distinct disadvantages in that: (a) there is no up-front payment on the vehicle (having to wait for the payment streams to make their investment back); and (b) the dealer must directly service the account and handle billing, collecting payments, handling defaults, etc.  A dealer is often not equipped to handle account servicing, which a financial institution would handle easily.

[PROPOSED] SECOND AMENDED COMPLAINT

21.22. The players in the concentrated relevant product market arehave been few: CAC, Westlake Financial Services, Go Financial, Western Funding Incorporated, and most recently, Consumer Portfolio Services.[4] CAC has had from 2011 to 2015 an average *direct* market share of approximately 87% of the relevant market.  The other players combined have had an average 13% share of the relevant market during the same period.  When combined with Go Financial, whoto whom CAC licensedissued a license after first suing it for patent infringement, CAC has profited from an aggregated market share of over 95% in the relevant market.

22.23. The relevant geographic market is the United States because the indirect financing profit sharing market requires a local sales team who can develop and maintain long-term relationships with dealers on behalf of the finance lender.  These sales representatives must invest a substantial amount of time to understand the local dealers and their businesses in order to educate them about the benefits of the programs offered by the finance lender.

23.24. CAC publicly represents that it provides indirect financing to "car dealers nationwide" and that its "financing programs are offered through a nationwide network of automobile dealers."

24.25. TheAdditionally, the relevant geographic market is the area of effective competition in which the suppliers operate and where the purchasers practicably turn for supplies.  All of the competitors in the relevant product market are located in the United States and auto dealers do not obtain indirect financing for used car sales from entities outside the United States.  Moreover, the antitrust laws of the United States do not reach conduct or sales from foreign sellers to foreign purchasers.

**D.D.   CAC's Profit Sharing Program: "Portfolio Program"**

25.26. Since 1967, Donald Foss, the current Chairman and CEO of CAC, has

---

[4]   Go Financial and Westlake exited the market for indirect financing for used car deals through a profit-sharing program in early 2016.

[PROPOSED] SECOND AMENDED COMPLAINT

owned and operated automobile dealerships throughout the Michigan area.

26.27. In 1972, Mr. Foss founded CAC in Southfield, Michigan to service and collect retail installment sales contracts that were originated by his automobile dealerships. During the 1980's1980s, CAC began to market its services to unaffiliated dealers located in the Great Lakes Region.

27.28. By 1991, the company had a nationwide growth strategy. In 1992, CAC went public through the NASDAQ followed by a second offering in 1995. By 1996, CAC operated in all 50 states.

28.29. CAC offers two types of programs: the "Portfolio Program" and the "Purchase Program." The Portfolio Program—included in and operated via its proprietary Credit Approval Processing System, or CAPS® ("CAPS")—is CAC's version of a profit sharing program. According to an SEC filing, from 2010 to 2015, over 90% of CAC's portfolio consisted of loans financed under its Portfolio Program.

29.30. Dealers who wish to enroll in the Portfolio Program must pay CAC a subscription fee in the amount of $9,850 or agree to allow CAC to retain 50% of its first accelerated Dealer Holdback payment.

30.31. Under CAC's Portfolio Program, the lender's profits are shared at two stages. The "front-end profits" are shared based on the performance of the individual RISC. The dealer-partner generally receives a down payment from the consumer, a non-recourse cash payment advance from CAC, and after the advance has been recovered by CAC, the cash from payments made on the consumer loan, net of collection costs and CAC's servicing fee ("dealer holdback"). This amount generally equals 20% of collections.

31.32. The distinctive feature of CAC's Portfolio Program is the collateral pool that provides further "back-end" profits based on the pool's performance. In order to receive the back-end profits, a dealer must accomplish two things. First, dealers must satisfy the volume requirement by filling its collateral pool with one-hundred (100) deals. Second, dealers must satisfy the performance requirement of the collateral pool by having the have

1   payments collected versus due to be greater than 80%.

2   ~~32.~~33. If a dealer's collateral pool achieves both its volume and performance

3   threshold, the dealer receives from CAC a second layer of back-end payments based on the

4   performance of the pool as a whole.  The back-end payments are calculated as the

5   percentage of the outstanding payments in the collateral pool.

6   ~~33.~~34. CAC's Portfolio Program creates at least two incentives for dealers.  First,

7   the dealer is incentivized to send more deals to CAC in order to meet the volume

8   requirement.  This built-in feature excludes other finance lenders from competing for the

9   RISC, as there is now no "auction" or competitive bidding.  Second, the dealer is

10  incentivized to send CAC good performing deals in order to meet the performance

11  requirement.  This is because the dealer is incentivized to have its collateral pool perform

12  at a certain rate in order to achieve back-end profits.

13  ~~34.~~35. As a result, other finance lenders in the indirect financing profit sharing

14  market that cannot offer a collateral pool, including WESTLAKE, are unable to compete

15  against CAC for good performing deals and are forced to compete for the remaining deals

16  that have a higher risk of default.  Moreover, without the collateral pool, a lender who

17  finances the riskier deal is unable to absorb the losses against the profits gained from the

18  good performing deals within a collateral pool.

19  ~~35.~~36. The collateral pool is a distinctive feature of CAC's loan profit sharing

20  program.  Because the pool has 100 deals, it offsets some of the risk of bad loans that

21  default, because fifty good deals would offset the risk of some individual bad (or

22  defaulting) deals.

23  ~~36.~~37. CAC's profit sharing program had an additional competitive advantage: CAC

24  touted that CAPS was a patented system and CAC sales representatives on the ground

25  were able to represent to dealers that only CAC's profit sharing program was patented.  As

26  it turns out, as alleged further infra, that patent on CAPS was fraudulently obtained.

27  **~~E.~~E.   Westlake Financial Services' Profit Sharing Program: "Profit Builder"**

28  ~~37.~~38. At all relevant times, Westlake Financial Services was in the profit sharing

1  market by financing RISCs for used car loans through its Profit Builder Program.  Like

2  CAPS, the Profit Builder Program provided a discounted cash advance in exchange for

3  allowing dealers to participate in a portion of the customer's payment streams.  The

4  structure of the deal, including the amount of the cash advance and the percentage share of

5  the payment stream, is based entirely on the merits of the individual deal alone, without

6  regard to the volume or performance of the aggregated deals that the dealer had historically

7  booked with Westlake Financial Services.

8      38.39.  Participants in the indirect profit sharing market, including Westlake

9  Financial Services, were fully aware that CAC had a proprietary interest in CAPS,

10  comprising the Portfolio Program, based on the '807 Patent.  In fact, when Westlake

11  Financial Services created the Profit Builder Program, it deliberately chose to avoid the

12  claims of the '807 Patent by bundling deals together and pricing individual deals against

13  the bundle.  As such, the Profit Builder Program lacked the crucial feature that is necessary

14  for a successful profit sharing program—the collateral pool.   That is, a defaulting deal

15  could not be offset by the good deals in a pool.

16      F.F.   **CAC's '807 Patent**

17      39.40.  The '807 Patent, entitled "System and Method for Providing Financing," is

18  directed at a method of financing utilizing primarily a customer's credit score: (a) to

19  determine an advance amount to be paid to a dealer for each individual product in the

20  dealer's inventory if that particular product is sold to the customer; (b) calculate a front-

21  end profit to be realized by the dealer for each such anticipated transaction; and taking into

22  account the foregoing, (c) present a financing package to the dealer for each individual

23  product in its inventory.  The Patent is further directed to profit sharing in that context,

24  described as "collecting monthly payments from the customer in the monthly payment

25  amount and paying a fraction of the collected monthly payments to the dealer."  The

26  application that resulted in the '807 Patent was filed as U.S. Application No. 10/037,055

27  (the "Application") on December 31, 2001, naming Jeffrey M. Brock as the inventor and

28  CAC as the assignee.  The '807 Patent issued on September 27, 2005.

1    40.41.  Importantly, CACCAC applied for and eventually obtained the '807 Patent

2  for the express purpose of gaining patent protection for its CAPS program.  CAC said so in

3  an earlier filing in this Court:

4         Recognizing the market-changing potential and economic value of CAPS,
          **CAC obtained a patent to protect the core components of the CAPS method**
5         **and systems**. On September 27, 2005, the U.S. Patent and Trademark Office
          duly and legally issued United States Patent No. 6,950,807 ("'807 patent"),
6         entitled "System and Method for Providing Financing."

7  (Case No. 2:13-cv-01523, ECF No. 1, ¶ 16.)  That is, what CAC set out to patent in its

8  December 31, 2001 Application was, in its own words, "the core components of the CAPS

9  method and systems."  Thus, at the time of the Application, CAPS was the commercial

10  embodiment of the invention claimed in the '807 Patent.

11       42.    The patent application identified a single inventor: Jeffrey M. Brock. █

12  ████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████████

17       43.    The patent application did not identify Mr. Simmet, Mr. Knoblauch, Mr.

18  McCluskey, or any other individuals as inventors or co-inventors, only Mr. Brock.

19  ██████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ██████████████████████████████

23       44.    ████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████

27       45.    ████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1  ████████████████████████████████████████████

2  ████████████████████████████████████████

3  ██████████████████████████████

4  46.  ████████████████████████████████████████

5  ████████████████████████████████████████████

6  ███████████████████████

7  **G.     CAPS Was in Use and/or Offered for Sale More Than One Year Prior to the Patent Application**

The core components of CAPS were also, at the time of the Application, substantially the same as the CAPS version that was already in commercial use by CAC before December 31, 2000, more than one year prior.

**G.     CAPS Was in Use and/or Offered for Sale More Than One Year Prior to the Patent Application**

41.47.  This was a problem since CAC and, Mr. Brock both, and others all knew that CAPS had been sold and publicly used ***more*** than one year prior to December 31, 2001, the date of the Application.  Specifically, CAC and Jeffrey Brock knew that such public use and sales would be a bar to CAPS's patentability.

42.48. Publically available documents establish that CAPS was not only offered for sale, but sold more than one year prior to December 31, 2001.

43.49. For instance, in its 2000 Annual Report, CAC touts that it began "testing" CAPS in August 2000, which was followed by a "rollout" in December 2000.  In a corporate context, the plain and ordinary meaning of "rollout" is "an occasion when a new product or service is ***first offered for sale or use***."  (*See* http://www.merriam-webster.com/dictionary/rollout.)

44.50. This "rollout" included offers for sale and actual sales of CAPS by CAC to dealers.  For instance, the fact that CAC itself distinguishes "testing" from a "rollout," indicates that the December 2000 "rollout" was not simply an experimental use of CAPS, but instead included commercial offers for sales and sales.

45.51. Specifically, the December 2000 "rollout" included installing CAPS at each

1    dealership affiliated with CAC and/or owned by Mr. Foss, which resulted in numerous

2    vehicle purchases and sales transactions at those dealerships through CAPS.[5]  The

3    December 2000 "rollout" also included (a) publicizing the details of CAPS to unaffiliated

4    dealers located throughout the Great Lakes Region, (b) entering into dealer agreements

5    with these dealers for access to CAPS, and (c) receiving compensation from dealers for

6    their use of CAPS.

7         46.52. CAC reported in its 2000 Annual Report that it "now [has] 300 dealer-

8    partners on the [CAPS] system" and that "[i]n the first quarter of 2001, approximately 30%

9    of [its] business was processed through CAPS."  At least some of those sales occurred on

10   or before December 30, 2000, i.e., more than one year prior to the Application date.

11        47.53. Moreover, there is proof of actual sales because archived screenshots of

12   CAC's website shows that car dealers could log into a secure site and use CAPS through a

13   link on CAC's website as early as October 9, 2000.

14        54.   ████████████████████████████████████████

15   ████████████████████████

16        (a)     On August 2, 2000, several CAC employees, including Messrs. Brock

17   and Roberts, were "invited to celebrate our successful CAPS launch" on August 12, 2000.

18        (b)   ████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████

24        48.55. Hence, CAC made commercial, non-experimental-use offers for sale and

25   sales of CAPS *more* than one year prior to the filing of the Application, which was

26

27   _____

28   [5]   CAC's 2002 SEC 10-K filing states that CAC "installed" CAPS as early as August 2000.

1    directed at acquiring patent protection for the core components of CAPS.

2    ~~49.~~56. As alleged further *infra*, Mr. Brock was aware of these prior sales of CAPS.

3    ~~50.~~57. Furthermore, during the Application's prosecution, both CAC and its

4 prosecution attorneys—such as Jeffrey H. Canfield of the Bell, Boyd & Lloyd LLC law

5 firm—were likewise aware of the prior offers for sale and sales of CAPS.  For instance,

6 when CAC applied to trademark "CAPS Credit Approval Processing System," it again

7 used the services of the Bell, Boyd & Lloyd law firm.  In the trademark application, CAC

8 attested that the CAPS mark was used in association with the sale of goods "at least as

9 early as" June 2000.  The Bell, Boyd & Lloyd law firm had learned of these prior sales

10 through its representation of CAC in relation to the Application.  Such knowledge of

11 CAPS' prior sales was imputed from Mr. Canfield to the Bell, Boyd & Lloyd attorney that

12 filed the application on CAC's behalf, Sana Hakim.

13    ~~**H.     Brock Spearheaded CAC's Prior CAPS Sales**~~

14    ~~51.     Mr. Brock was intimately aware of the prior offers for sale and sales of~~

15 ~~CAPS because he was the program's principal architect.~~

16    ~~52.     Mr. Brock not only was the sole inventor named on the '807 Patent, but he~~

17 ~~was also responsible for the development of CAPS.  As background, Mr. Brock began his~~

18 ~~career at CAC in 1995, where he started as a funding analyst and steadily advanced into~~

19 ~~more prominent positions.  After his role as a funding analyst, where he handled~~

20 ~~originations of contracts with automotive dealers, he became involved with risk~~

21 ~~management.  After that, he headed CAC's Sales Department.~~

22    ~~53.     Mr. Brock later moved on to CAC's Information Technology department~~

23 ~~where he first conceived of and began developing CAPS.  He later became the Director of~~

24 ~~Sales, and then moved on to various VP roles.  First, he was the Vice President of Sales~~

25 ~~Operations, then Vice President of Remarketing, and then he eventually became the Vice~~

26 ~~President and Senior Vice President of Loan Servicing.~~

27    ~~54.     It was in these roles at CAC that Mr. Brock developed and later patented~~

28 ~~CAPS by way of the Application and resulting '807 Patent.~~

1   I.**H.**   **As of December 30, 2000, CAPS Was Ready For Patenting**

2   ~~55.~~58. At the time the prior offers for sale and sales were made, CAPS was ready

3   for patenting.

4   ~~56.~~59. This is because when CAPS was sold more than one year prior to the filing

5   date of the Application, i.e., on or before December 30, 2000, CAPS was already a

6   commercial embodiment of the claims of the '807 Patent.  This is supported by CAC's

7   earlier representations to this Court:

8   Recognizing the market-changing potential and economic value of CAPS,
**CAC obtained a patent to protect the core components of the CAPS method**

9   **and systems**. On September 27, 2005, the U.S. Patent and Trademark Office
duly and legally issued United States Patent No. 6,950,807 ("'807 patent"),

10  entitled "System and Method for Providing Financing."

11  (Case No. 2:13-cv-01523, ECF No. 1, ¶ 16.)

12  ~~57.~~60. Notably, CAC holds no other patents in its name except for the '807 Patent.

13  ~~58.~~61. CAPS, as it existed before December 30, 2000, is covered by the claims of

14  the ~~'807~~'807 Patent.

15  ~~59.~~62. For example, at least each element of independent Claim 1 and dependent

16  Claims 4 and 5 of the '807 Patent was fully disclosed by CAPS at the time of the prior

17  sales.  As alleged *supra*, the '807 Patent's claims, including Claims 1, 4, and 5 are directed

18  at a method of financing utilizing primarily a customer's credit score: (a) to determine an

19  advance amount to be paid to a dealer for each individual product in the dealer's inventory

20  if that particular product is sold to the customer; (b) calculate a front-end profit to be

21  realized by the dealer for each such anticipated transaction; and taking into account the

22  foregoing (c) present a financing package to the dealer for each individual product in its

23  inventory.  The Patent's claims are also directed at profit sharing in the above context,

24  whereby the dealer receives 80% of the payments collected from the customer.

25  ~~60.~~63. As of December 30, 2000, CAPS allowed a dealer to receive information

26  from a customer including a credit score and thereon: (a) determine the up-front advance

27  the dealer could expect both as part of CAC's Portfolio Program or its Purchase Program;

28  (b) compute the front-end profit the dealer could expect to receive from that customer for

1    each car in its inventory; and (c) present a written credit approval to the customer, along

2    with corresponding proposed terms for each car in its inventory.  CAPS further had, at that

3    time, a profit participation component whereby the dealer would receive 80% of all cash

4    collections on customer accounts. ██████████████████████████████████████

5    ███████████████████████████████████████

6        61.64.  The core components of CAPS at the time of the Application were

7    substantially the same as they were as of December 30, 2000.  Hence, more than one year

8    prior to the filing date of the '807 Patent Application, CAPS fully disclosed the elements

9    of at least independent Claim 1, and thus, at least one claim of the '807 Patent was fully

10    reduced to practice in the form of CAPS on or before December 30, 2000.

11        J.I.    **CAC Willfully and Fraudulently Obtained the '807 Patent**

12        62.65.  In late 2001, upon witnessing CAPS's enormous commercial potential and

13    tangible results, CAC and Mr. BrockCAC's executives, including Mr. Roberts, Mr.

14    Simmet, and Mr. Knoblauch, were confronted with a harrowing dilemma: On the one

15    hand, as alleged *supra*, CAPS had already achieved significant market penetration, with

16    over 300 auto dealers on the system by the end of the first quarter 2001.  And, in fact, by

17    the end of 2001, 78% of CAC's sales were through CAPS.  Based on that tremendous

18    commercial success and future potential, CAC wanted to obtain patent protection for

19    CAPS in order to exclude others from using their claimed methods so CAC could box out

20    its competition and achieve market dominance.  On the other hand, however, CAC and

21    Brock knew that prior sales of CAPS (including those disclosed in CAC's public filings)

22    more than one year earlier would otherwise prevent them from obtaining such patent

23    protection over their prized system.  Accordingly, CAC and Mr. Brock hatchedembarked

24    on a scheme to defraud the United States Patent & Trademark Office ("USPTO") in order

25    to obtain a patent on CAPS notwithstanding those earlier sales by concealing them.

26        63.66.  Mr. Brock and CAC knew that time was of the essence, since both knew that

27    CACit had publicly disclosed the fact of commercial offers for sale and sales occurring in

28    and before December 2000, and thus, for their scheme to have any chance of working, they

1    needed to apply for a patent by no later than sometime in December 2001.

2        64.67. In furtherance of their fraudulent scheme, CAC and Mr. Brock retained the

3    services of the Bell, Boyd & Lloyd LLC law firm to submit the Application and prosecute

4    it before the USPTO.  The Application was submitted on December 31, 2001, the last day

5    of 2001.

6        65.68. As part of their bold scheme, Mr. Brock, CAC, and the prosecution attorneys

7    conspired to conceal, and in fact did conceal among other things, information about the

8    prior offers for sale and sales of CAPS, as well as the true inventorship of the patent, from

9    the USPTO while prosecuting the Application.

10       69.    As the inventor of the system claimed in the '807 Patent, Mr. Brock Also in

11   furtherance of this scheme, at CAC's instruction, Mr. Brock falsely identified himself as

12   the sole inventor of the '807 Patent to conceal the involvement of Mr. McCluskey, Mr.

13   Simmet, and Mr. Knoblauch, all of whom were higher-ranking CAC officers, in its

14   conception.  Mr. Brock then assigned the patent to CAC for one dollar.  On information

15   and belief, this scheme was concocted and implemented to insulate CAC from the fact that

16   its high-level executives were aware of the prior offers for sale and sales and place sole

17   responsibility for the fraud on the USPTO on Mr. Brock.  CAC could then feign ignorance

18   of the prior sales if the validity of the '807 Patent was subsequently challenged.

19       70.    CAC's also concealed of the true inventors of the '807 Patent to create an

20   advantage in future patent infringement litigation.  On information and belief, CAC knew

21   that if it sought to enforce the '807 Patent against actual and future competitors, those

22   litigants were likely to rely on CAC's designation of Mr. Brock as the inventor of the

23   patent in pursuing discovery.  By placing Mr. Brock—whom CAC knew lacked

24   knowledge about the circumstances surrounding the conception of the '807 Patent—front

25   and center in the patent application, CAC intentionally concealed from possible discovery

26   knowledge about the prior offers for sale and sales held by its more senior executives.

27       66.71. Even though he was not responsible for the conception of the '807 Patent, a

28   its purported inventor, Mr. Brock still had a duty to disclose material information to the

PTO, especially to the Examiners assigned to the prosecution of the Application, Ronald Laneau and Lynda C. Jasmin. Jasmin.  On information and belief, CAC was aware that the named inventor on the Application would have these duties, and instructed Mr. Brock to pose as the sole inventor of the '807 Patent in an effort to avoid these duties.

67.72.  As part of the prosecution process, Mr. Brock submitted two separate inventor Declarations, on December 31, 2001 and January 10, 2002, respectively, each time attesting that (a) he was aware of his continuing duty to disclose to the USPTO and its Examiners any information that was material to the patentability of his claims and (b) that he would do so.  Mr. Brock also declared that he was the sole original inventor of the claimed invention.  These Declarations were knowingly false when made, as Mr. Brock never intended to disclose the prior sales of CAPS, which he and his supervisors at CAC knew would preclude a patent from issuing on the Application.  These Declarations were also knowingly false when made because Mr. Brock knew that others, including potentially Mr. Simmet and Mr. Knoblauch, should have been identified as inventors instead of, or at least in addition to, Mr. Brock.  Mr. Brock submitted these fraudulent Declarations at CAC's instruction and on its behalf.

68.73.  Under 37 C.F.R. 1.56, those involved in the prosecution of a patent application, such as the Application, were required to disclose "all information which is known … to be material to the patentability of this application."  That included prior sales and offers to sell the claimed invention:

> possible prior public uses, **sales, offers to sell**, derived knowledge, prior invention by another, inventorship conflicts, and the like. "Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc*., 326 F.3d 1226, 1234, 66 USPQ2d 1481, 1486 (Fed. Cir. 2003) (emphasis in original) (finding article which was not prior art to be material to enablement issue).

*See* Manual of Patent Examining Procedure 2001 Duty of Disclosure, Candor, and Good Faith [R-08.2012] (http://www.uspto.gov/web/offices/pac/mpep/s2001.html).).

74.    Mr. Brock The obligation to disclose all material information to the USPTO

extends to information concerning the true identities of all inventors of the claimed invention because of the requirement that a patent application be submitted by *all* joint inventors of the claimed invention.  *See* 37 C.F.R. § 1.45(a).  Furthermore, an inventor must contribute to the conception of the invention.  "The threshold question in determining inventorship is who conceived the invention.  Unless a person contributes to the conception of the invention, he is not an inventor."  *Fiers v. Revel*, 984 F.2d 1164, 1168 (Fed. Cir. 1993).  Moreover, 35 U.S.C. § 102(f), which was the statute governing conditions for patentability during the '807 patent's prosecution, stated that "A person shall be entitled to a patent *unless* . . . he did not himself invent the subject matter sought to be patented."  35. U.S.C. § 102(f) (emphasis added).

69.75. CAC was involved in the prosecution of the '807 Patent throughout the duration of the prosecution process including by assisting in the drafting and review of each of the materials before they were submitted to the USPTO and Examiners Laneau and Jasmin.  During this entire process—which spanned from at least between December 31, 2001 to the Patent's issuance on September 27, 2005, and which included at least six official correspondences submitted to the Examiners—CAC and Mr. Brock waswere aware that heMr. Brock and all other individuals involved in the preparation or prosecution of the application had a duty to disclose material information to the Examiners, such as CAPS's prior sales. and the fact that others had actually conceived of the invention.  Yet, heCAC and Mr. Brock knowingly and intentionally concealed this material information from Mr. Laneau and Ms. Jasmin notwithstanding his dutytheir duties to disclose them.

70.76. Likewise, the prosecution attorneys at the Bell, Boyd & Lloyd LLC firm, including Jeffrey H. Canfield, also did not tell the USPTO about the prior sales of CAPS or the identity of the true inventors despite knowing about them.  The prosecution attorneys were aware of the relevance of the prior offers for sale and sales and intentionally concealed the prior offers for sale and sales of CAPS from the USPTO by not providing this material information.

71.77. CAC was also aware of the relevance of the prior offers for sale and

1   salesidentity of the true inventors and intentionally concealed the prior offers for sale and

2   sales of CAPSthis information from the USPTO by not providing this information.

3       72.78.  That no one disclosed to the USPTO and Examiners Laneau and Jasmin

4   information regarding the prior offers for sale and sales of CAPS is evident as the file

5   history for the Application, which includes no less than 15 official communications

6   between the applicants and the Examiners, makes no mention of CAPS or prior sales of the

7   invention of the '807 Patent.  Furthermore, the Application only identifies Jeffrey M.

8   Brock as the sole inventor, and does not identify any other individuals.

9       **K.      Prior Offers for Sale and Sales of CAPS.J.     The Information CAC
        Concealed from the USPTO Would Have Been Material to Its**

10      **Evaluation of the USPTOApplication**

11      73.79.  The prior offers for sale and sales of CAPS would have been material to the

12  USPTO.

13      74.80.  If the USPTO had been told of the offers for sale and sales of CAPS that

14  occurred more than one year before the Application was filed, the USPTO (through

15  Examiners Laneau and Jasmin) would not have allowed the '807 Patent to issue.  This is

16  because, as alleged *supra*, CAPS fully anticipates at least Claims 1, 4, and 5 of the '807

17  Patent and was offered for sale and sold more than one year prior to the Application date.

18      75.81.  Hence, these offers for sale, actual sales, publication, or public use of CAPS

19  on or before December 30, 2000 are a bar to patentability under 35 U.S.C. § 102(b).

20      **L.K.     The Prior Offers for Sale and Sales of CAPS Were Actively Concealed,
                   Demonstrating an Intent to Deceive the USPTO**

21

22      76.82.  CAC's public disclosures ***prior*** to the filing of the '807 Patent Application

23  state that CAPS was offered for sale and sold at least as far back as December 2000.  And,

24  in fact, CAPS was commercially exploited and used publicly as early as August 2000.

25      77.83.  Although CAPS was commercially offered for sale and sold to dealers in or

26  before December 2000, CAC did not file its Application to patent CAPS until the very end

27  of December 2001, on December 31, 2001.

28      78.84.  Recognizing this issue and in furtherance of their scheme to defraud the

USPTO, *after* filing the Application, CAC altered course in its public disclosures, stating in its subsequent SEC filings and annual reports that CAPS was not "offered" until January 2001.

79.85. This modification in the public disclosure of the sale of CAPS following the Application's filing, is indicative that Mr. Brock, the prosecution attorneys, and CAC wanted to hide evidence of the prior offers for sale and sales occurring in or before December 2000, which evidences their specific intent to deceive the USPTO as they prosecuted the Application.

80.86. In fact, CAC's ex post public statements that CAPS was not "offered" until January 2001 are directly undercut by sworn representations CAC made to the USPTO when later applying for a trademark for the CAPS® mark, namely, that the mark was used in association with the sale of goods "at least as early as" June 2000.

87.    M.Anticipating that these statements in its public disclosures and prior representations to the USPTO might endanger the application for the '807 Patent, CAC required Mr. Brock to identify himself as the sole inventor of the Claims in the patent despite the fact that he was not solely responsible for their conception.

### L.    USPTO Examiners' ~~Justifiable Reliance~~Justifiably Relied on CAC and Mr. Brock's Misrepresentations

81.88. Mr. Brock *twice* submitted Declarations during the prosecution of the Patent Application attesting that he understood his duty to inform the USPTO of any information material to the patentability of the Patent Application.  Again, he did this with the knowing intent to conceal material information in contravention of his duty of disclosure.

82.89. The prosecution attorneys are also under a continuous duty to disclose material information regarding a pending patent application to the USPTO.  37 C.F.R. 1.56.

83.90. The USPTO—and specifically Examiners Laneau and Jasmin—justifiably relied upon the omission of facts regarding the prior offers for sale and sales of CAPS, because, without any knowledge of the prior sales, the USPTO issued the '807 Patent.  The

1   USPTO also relied on the omission of facts regarding the true inventorship of CAPS

2   because, without knowledge of the true inventors, the USPTO issued the '807 Patent.  As a

3   matter of course, the USPTO and the public that the USPTO serves were injured by the

4   issuance of an invalid patent obtained by fraud.

5   **N.M.   CAC's Abusive and Anticompetitive Patent Infringement Litigation**

6   84.91.  On March 4, 2013 CAC brought an action for infringement of the '807

7   Patent against WESTLAKE in the United States District Court for the Central District of

8   California, Case No. 13-cv-01523 SJO. (the "Patent Infringement Action").

9   92.    CAC knew, at the time it brought the Patent Infringement Action against

10  Westlake, that the '807 Patent was invalid because it improperly identified Mr. Brock as

11  the sole inventor and because it had failed to disclose to the USPTO the offers for sale and

12  sales of the CAPS program that had been made over one year preceding the patent

13  application.

14  93.    CAC also knew, at the time it brought the Patent Infringement Action, that

15  Westlake would likely rely on the '807 Patent application's representation that Mr. Brock

16  was the sole inventor of the patent and was therefore unlikely to seek the sworn testimony

17  of witnesses such as Mr. McCluskey, Mr. Simmet, and Mr. Knoblauch who knew about

18  the prior sales and public uses of CAPS that, if disclosed, would have prevented the

19  USPTO from issuing the patent.

20  85.94.  CAC made similar threats to other competitors in the relevant market.

21  86.95.  CAC continues to assert the '807 Patent and demand royalties from other

22  market participants, including at least Drivetime.

23  87.96.  CAC's threats of litigation were objectively baseless and made in bad faith

24  because it knew that the '807 Patent was procured fraudulently through material

25  intentional misrepresentations and omissions to the Examiners during prosecution of the

26  Application.

27  88.97.  As a result of CAC's anticompetitive conduct in enforcing the fraudulently

28  procured '807 Patent, WESTLAKE lost, and continues to lose, sales through their

1  competing software program and have been hindered and delayed in competing in the

2  relevant market.

3      89.98. CAC's anticompetitive activities have caused adverse impacts on the

4  relevant market, including but not limited to less competition and higher prices in the

5  relevant market.

6  ## VI.

7  ## CLAIMS FOR RELIEF

8  ## FIRST CLAIM FOR RELIEF

9  ### (Actual Monopolization in Violation of Section 2

10  ### of the Sherman Act (15 U.S.C. § 2))

11      90.99. WESTLAKE hereby alleges and incorporates by reference each allegation

12  set forth in Paragraphs 1 through 8998 of this First Amended Complaint, as if set forth in

13  full herein.

14      91.100.    The antitrust laws are concerned with protecting the economic

15  freedom of participants in the relevant market.  The aims and objectives of the antitrust

16  laws are aimed at encouraging innovation, industry, and competition.  The central purpose

17  of the antitrust laws is to preserve competition and it is that interaction of competitive

18  forces that benefits consumers.

19      92.101.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the

20  willful monopolization of any part of the trade or commerce among the States.

21  **RELEVANT MARKET**

22      93.102.    The relevant product market (or sub-market) for antitrust purposes in

23  this case is defined as the business of providing indirect financing for used car sales to

24  dealers through a profit sharing program.  There are no reasonable substitutes for these

25  financing programs.  Consumers/dealers do not consider these programs to be reasonably

26  interchangeable with other types of automobile financing programs.  The cross-elasticity of

27  demand between used car loan indirect financing profit sharing programs and other types

28  of financing programs is extremely low.

94.103.      The relevant geographic market for antitrust purposes is the United States.

95.104.      Relevant market definition is a fact-intensive determination to be made exclusively by the finder of fact.

## MONOPOLY POWER

96.105.      CAC has monopoly power in the relevant market as reflected by, *inter alia*, its dominant share of the relevant product market, its ability to exclude competition in that market, and its ability to charge supracompetitive prices for its products.

97.106.      CAC is an entrenched player and dominates the market for used car loan indirect financing profit sharing programs in the United States, possessing a market share greater than 85%.  CAC has the power to control prices and/or to exclude competition in the relevant market.

## BARRIERS TO MARKET ENTRY AND EXPANSION

98.107.      There are significant and high barriers to market entry that prevent other indirect lenders from rapidly and meaningfully entering and/or expanding in this relevant market, which include, but are not limited to, the following:

(a)      CAC's dominant and entrenched market position as a monopolist of providing indirect financing profit sharing programs with a history of engaging in exclusionary and anticompetitive conduct to eliminate competition;

(b)      purported patents, trademarks, copyrights, and other intellectual property rights (valid or otherwise) relating to these profit sharing indirect financing programs;

(c)      substantial up-front capital investment required to penetrate and enter the relevant market; and

(d)      requirement of access to a nationwide sales and distribution network.

## CAC'S PREDATORY AND EXCLUSIONARY CONDUCT

99.108.      CAC's monopoly position in the relevant market has been acquired and maintained through clearly intentional exclusionary conduct and patent misuse, as

opposed to business acumen, historic accident, or by virtue of offering a superior product or service, greater efficiency, or lower prices.  CAC has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act.

100.109.    While the patent system serves to encourage innovation, the patent system is subject to misuse.  Meanwhile, the antitrust laws serve to foster competition.  Consequently, the statutory rights afforded by patent law do not support the impermissible broadening of the physical or temporal scope beyond that explicitly articulated in the claims of a patent grant, nor do intellectual property laws confer upon the patent owner immunity or a privilege to violate antitrust laws.

101.110.    CAC's litigation-related exclusionary acts to monopolize the market were either comprised of fraudulent conduct or falsehoods or stemmed from objectively baseless claims that were motivated not to obtain legitimate judicial relief, but rather to injure WESTLAKE and, as such, consisted of sham petitioning which are not immune from antitrust liability.

102.111.    The USPTO imposes on practitioners who apply for patents a duty to disclose information material to patentability.  This duty applies to each individual associated with the filing and prosecution of a patent application.  One who acted fraudulently in obtaining a patent necessarily knows that the patent is unenforceable.  The '807 Patent was the result of fraudulent conduct by individuals who owed a duty of candor to the USPTO.  Furthermore, following a patent grant, the assertion of patent rights against a competitor beyond the scope of the issued patent constitutes patent misuse and renders the underlying patent invalid and unenforceable.  Thus, based on the acts of CAC both prior to and subsequent to the issuance of the '807 Patent, this patent is invalid and unenforceable.

103.112.    A purported patent holder violates the antitrust laws by bringing or maintaining an objectively baseless suit to enforce a patent with knowledge that the patent is invalid and/or unenforceable, that the patent rights asserted extend beyond the scope of

the patent grant such that the litigation is conducted solely, or at least primarily, to suppress competition.  CAC initiated, prosecuted, and maintained an objectively meritless patent infringement action against WESTLAKE in bad faith with the knowledge that its '807 Patent was invalid and/or unenforceable.  Antitrust liability attaches to such conduct even if the patent was lawfully-obtained.  A single sham lawsuit can violate the antitrust laws.[6]

104.113.      Section 2 of the Sherman Act is also violated when a patent holder enforces or maintains an action based on a fraudulently-obtained patent.  Such a violation occurs where the monopolist patent holder obtained the patent by knowing and willful fraud on the USPTO and maintained and enforced the patent with knowledge of the fraudulent procurement.[7]  The patent infringement litigation need ***not*** be objectively baseless or a sham to violate the antitrust laws.

105.114.      Patent applicants and patent holders are required to prosecute patent applications and maintain patents with candor, good faith, and honesty.  Fraud includes an affirmative misrepresentation of a material fact, failure to disclose material information, concealment of material information, or submission of false material information, coupled with an intent to deceive.  A fraudulent omission of fact may also support a finding of fraud on the USPTO sufficient to trigger antitrust liability.

106.115.      The thrust of WESTLAKE's patent-related antitrust claims is that CAC: (a) fraudulently procured the '807 Patent from the USPTO by failing to disclose that the subject of the patent was in public use and/or offered for sale more than one year prior to the patent Application and by failing to identify all inventors of the patent; and (b) initiated, and maintained bad-faith and sham patent infringement litigation intended for the purpose of securing and preserving an unlawful monopoly and premised on an invalid or unenforceable patent driving WESTLAKE out of the market.  CAC took steps to enforce

---

[6] *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979).

[7] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

1  the '807 Patent against WESTLAKE knowing that this patent was obtained through fraud.

2  CAC also initiated patent infringement litigation against WESTLAKE, based on an invalid

3  patent, that was a mere sham to disguise what was nothing more than an anticompetitive

4  plan with the specific intent to interfere directly with WESTLAKE's actual and potential

5  business relationships.

6       107.116.    CAC has initiated and maintained sham patent infringement litigation

7  against WESTLAKE, with the intent to deter other would-be market entrants and to force

8  WESTLAKE out of the relevant market.  CAC's litigation was undertaken solely to

9  interfere with free and open competition and without a legitimate expectation that such

10  efforts would in fact induce or result in proper lawful relief from a legal tribunal.  CAC's

11  litigation against WESTLAKE was objectively baseless because CAC could not

12  realistically or reasonably expect to ultimately succeed.  CAC also specifically intended

13  through its sham litigation to directly interfere with WESTLAKE's business relationships,

14  and it did interfere with WESTLAKE's business relationships and caused it to exit the

15  relevant market.

16       108.117.    Even if CAC's patent was **not** fraudulently obtained, CAC has still

17  violated the antitrust laws by instituting and maintaining patent infringement litigation

18  against WESTLAKE in bad faith based on the '807 Patent knowing that this patent was

19  invalid and/or unenforceable.  CAC continued to pursue this sham litigation even after its

20  awareness of the existence of invalidating prior public use and prior sales and of the fact

21  that the patent application failed to identify all inventors.  The question of whether a legal

22  proceeding is a sham is a question of fact for the jury.  CAC's infringement litigation was

23  initiated and pursued with the intent to monopolize the relevant market without regard for

24  its smaller rival or the degree, the nature or the amount of the alleged infringement.

25       109.118.    CAC's anticompetitive scheme to monopolize or attempt to

26  monopolize the above-described relevant market has been done with the intent to

27  specifically eliminate WESTLAKE as a viable competitor and threat to CAC's monopoly

28  over indirect financing profit sharing programs for used car loans, and to suppress

competition in general.  CAC's overall exclusionary scheme to monopolize the market consists of at least the following anticompetitive acts/conduct to be viewed as a whole:

      (a)    fraudulently obtaining the '807 Patent with the intent to monopolize;

      (b)    engaging in patent misuse by asserting patent rights far beyond the narrow scope of the '807 Patent grant with the intent to create a monopoly;

      (c)    threatening, initiating and maintaining bad faith infringement litigation predicated on the '807 Patent which was obtained through fraud;

      (d)    threatening, initiating and maintaining sham and baseless litigation predicated on the invalid and/or unenforceable '807 Patent; and

      (e)    continuing and increasing baseless litigation after being aware of information demonstrating the invalidity and/or unenforceability of its '807 Patent.

110.119.    Conduct is anticompetitive when it improperly excludes or handicaps competitors in order to gain or maintain a monopoly.  Anticompetitive or exclusionary practices are acts designed to deter potential rivals from entering the market, intervening or preventing access to customers, or preventing existing rivals from increasing their output. Anticompetitive acts are not fair competition on the merits of price, quality or other factors, but instead acts that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  Conduct by a monopolist that constitutes a deliberate effort to discourage and thwart customers from doing business with its rivals is anticompetitive.

111.120.    CAC's anticompetitive and exclusionary conduct described herein is not motivated or driven by technological or efficiency concerns, and has no valid or legitimate business justification.  Rather, its clear purpose and effect is solely to ensure that WESTLAKE cannot successfully invade or erode CAC's dominant and entrenched market position.

112.121.    During the relevant time period, CAC and WESTLAKE have both developed, marketed, and sold competing used car loan indirect financing profit sharing programs in the United States.  The marketing, distribution and sale of such products

28

1  directly involves, and substantially affects, interstate commerce.  The violations of the

2  Sherman Act alleged herein adversely, directly, and substantially impact the flow of such

3  products in interstate commerce.

4  **WESTLAKE'S ANTITRUST STANDING**

5  113.122.      WESTLAKE has the requisite standing to assert antitrust claims

6  against CAC because it was a participant and competitor in the same relevant market and

7  has suffered damages as a direct consequence of CAC's actions.

8  **ANTITRUST INJURY**

9  114.123.      As alleged herein, CAC has engaged in an anticompetitive and

10  exclusionary scheme to prevent WESTLAKE and other competitors from developing,

11  marketing, and selling competing indirect financing profit sharing programs, all for the

12  purpose of maintaining and increasing CAC's dominant controlling market share.

13  115.124.      CAC's conduct has caused and produced antitrust injury, and unless

14  enjoined by this Court, will continue to produce at least the following anticompetitive,

15  exclusionary and injurious effects upon competition in interstate commerce:

16          (a)      competition in the development, marketing, and sale of indirect

17  financing profit sharing programs for used automobile loans has been substantially and

18  unreasonably restricted, lessened, foreclosed, and eliminated;

19          (b)      barriers to entry into the relevant market have been raised;

20          (c)      consumer/dealer choice has been, and will continue to be,

21  significantly limited and constrained as to selection, price and quality of such programs;

22          (d)      consumer/dealer access to WESTLAKE's competitive financing

23  programs will be artificially restricted and reduced, and WESTLAKE's programs will

24  continue to be excluded from the market;

25          (e)      the market for development, marketing, and sale of such programs

26  will continue to be artificially restrained or monopolized; and

27          (f)      CAC will continue to charge supracompetitive prices for these

28  programs to the detriment of consumers/dealers.

116.125.    CAC's exclusionary conduct has caused antitrust injury to WESTLAKE, the industry, and to consumers/dealers.  Antitrust injury based upon a bad faith patent prosecution claim and impermissibly broad assertion of a patent grant is satisfied by: (a) loss of customers, and (b) attorneys' fees and costs incurred in defense of the prior patent infringement suit and subsequent costs because such losses and costs are injuries which flow from CAC's antitrust wrong.

## DAMAGES

117.126.    By reason of, and as a direct and proximate result of, CAC's anticompetitive and exclusionary practices and conduct, WESTLAKE has suffered, and will continue to suffer, financial injury to its business and property.  As a result, WESTLAKE has been deprived of revenue and profits it would have otherwise made, suffered diminished market growth, sustained a loss of goodwill, and expended attorneys' fees/costs to defend against a baseless patent infringement action and to prosecute related proceedings.  WESTLAKE has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.  WESTLAKE conservatively estimates, however, that its actual damages exceed $3 million before mandatory trebling.

## SECOND CLAIM FOR RELIEF

### (Attempted Monopolization in Violation of

### Section 2 of the Sherman Act (15 U.S.C. § 2))

118.127.    WESTLAKE hereby realleges and incorporates by reference each allegation set forth in Paragraphs 1 through 117126 of this First Amended Complaint, as if set forth in full herein.

119.128.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, inter alia, attempts to monopolize any part of the trade or commerce among the States.

## RELEVANT MARKET

120.129.    The relevant product market (or sub-market) for antitrust purposes in

30

this case is defined as the business of providing indirect financing for used car sales to dealers through a profit sharing program.  There are no reasonable substitutes for used car loan profit sharing indirect financing programs and consumers/dealers do not consider these financing programs to be reasonably interchangeable with other types of financing programs.  The cross-elasticity of demand between used car loan indirect financing profit sharing programs and other types of financing programs is extremely low.

121.130.    The relevant geographic market for antitrust purposes is the United States.

## MONOPOLY POWER

122.131.    CAC dominates the relevant market, possessing a market share greater than 85%.  CAC has the power to control prices and/or to exclude competition in the relevant market.

## BARRIERS TO MARKET ENTRY AND EXPANSION

123.132.    As described in Paragraph 98107, significant and high barriers to market entry exist that preclude or discourage new lenders from entering the relevant market.  Significant barriers to expansion also exist, which is evidenced by the fact that only a small number of competitors have managed to marginally penetrate this market, many have exited the market, and none have managed to capture more than a nominal market share.

## CAC'S PREDATORY AND EXCLUSIONARY CONDUCT

124.133.    CAC's conduct and practices are predatory, anticompetitive and exclusionary.  CAC's overall unlawful scheme is described in Paragraphs 99108 through 112121 above.

## WESTLAKE'S ANTITRUST STANDING

125.134.    WESTLAKE has the requisite standing to assert antitrust claims against CAC because it was a participant and competitor in the relevant market and has suffered damages as a direct result of CAC's actions.

**DANGEROUS PROBABILITY OF SUCCESSFULLY OBTAINING A MONOPOLY**

126.135.    Absent action by this Court to enjoin and preclude CAC from continuing its anticompetitive and exclusionary conduct, there is a dangerous probability that CAC will succeed in obtaining a monopoly in the relevant market for used car loan indirect financing profit sharing programs (or continue to monopolize), including the power to set prices, reduce output, or exclude competition in the market.

**SPECIFIC INTENT TO MONOPOLIZE**

127.136.    CAC has undertaken its clearly anticompetitive and exclusionary conduct with the purpose of monopolizing, and with the deliberate and specific intent to monopolize the market for used car loan indirect financing profit sharing programs in the United States.  CAC specifically intends to eliminate, destroy or foreclose meaningful competition in the relevant market through the tactics described above.  CAC's conduct discourages and/or precludes buyers of such financing programs from dealing with or buying from competing indirect lenders such as WESTLAKE.  CAC's scheme is designed to exclude and thwart free and open competition on the merits.

128.137.    CAC's anticompetitive acts affect a substantial amount of interstate commerce in the relevant market and constitute attempted monopolization in violation of Section 2 of the Sherman Act.  CAC's conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Instead, its purpose and effect is to preserve and promote its monopoly position and market stranglehold, to the detriment of consumer/dealer welfare, WESTLAKE, and to CAC's other competitive rivals in the relevant market.

**ANTITRUST INJURY**

129.138.    CAC's anticompetitive acts have caused substantial economic injury to WESTLAKE and have also injured competition in the relevant market by, *inter alia*, foreclosing, lessening, and eliminating competition and depriving dealers from securing lower-cost or higher-quality alternatives for CAC's financing programs.

1    130.139.    As described in Paragraph 114123 through 116125, CAC's conduct

2    has caused and produced antitrust injury, and unless enjoined by this Court, will continue

3    to produce anticompetitive, exclusionary, and injurious effects upon competition in

4    interstate commerce.

5    131.140.    CAC's exclusionary conduct has caused antitrust injury to

6    WESTLAKE, the industry, and consumers.  Antitrust injury based upon a bad faith patent

7    infringement lawsuit and bad faith assertion of the impermissibly broadened scope of a

8    patent grant is satisfied by: (a) loss of customers, and (b) attorneys' fees and costs incurred

9    in defense of the prior patent infringement suit and subsequent defensive efforts because

10   such losses and costs are injuries which flow from the antitrust wrong.

11                                **DAMAGES**

12   132.141.    By reason of, and as a direct and proximate result of, CAC's practices

13   and conduct, WESTLAKE has suffered and will continue to suffer financial injury to its

14   business and property.  As a result, WESTLAKE has been deprived of revenue and profits

15   it would have otherwise made, has suffered diminished market growth, and has sustained a

16   loss of goodwill, and expended attorneys' fees/costs to defend against a baseless patent

17   infringement action and to prosecute related proceedings.  WESTLAKE has not yet

18   calculated the precise extent of its past damages and cannot now estimate with precision

19   the future damages that continue to accrue, but when it does so, it will seek leave of the

20   Court to insert the amount of the damages sustained herein.  WESTLAKE conservatively

21   estimates, however, that its actual damages exceed $3 million before mandatory trebling.

22                        **THIRD CLAIM FOR RELIEF**

23                      **(State Law Malicious Prosecution)**

24        142.    WESTLAKE hereby alleges and incorporates by reference each allegation

25   set forth in Paragraphs 1 through 141 of this First Amended Complaint, as if set forth in

26   full herein.

27        143.    On March 4, 2013 CAC brought the Patent Infringement Action against

28   Westlake.

144.   On August 24, 2015, CAC voluntarily dismissed the Patent Infringement Action against Westlake with prejudice.[8]  In CAC's motion for voluntary dismissal, CAC characterized the dismissal as a termination on the merits in Westlake's favor.

145.   CAC acted without probable cause in bringing the Patent Infringement Action because it knew that it had failed to identify the correct inventors for the '807 Patent to the USPTO and therefore knew that the '807 Patent was invalid.  CAC willfully concealed the true inventors of the '807 Patent to limit the exposure of the upper-level management personnel such as Brett Roberts, Michael Knoblauch, and David Simmet, all of whom were aware of facts that would require the '807 Patent Application to be rejected by the USPTO.

146.   CAC acted maliciously in bringing the Patent Infringement Action because it brought the action for the improper purpose of impeding Westlake's ability to compete with CAC without merit and deterring Westlake (and other potential competitors) from continuing to compete with CAC in the market for indirect financing of auto loans through a profit-sharing program.

147.   As a proximate result of CAC bringing the Patent Infringement Action against Westlake, Westlake has been damaged in a sum to be determined at trial.

148.   As a further proximate result of CAC's Patent Infringement Action against Westlake, Westlake incurred costs no less than $100,000 and no less than the sum of $3,500,000 as attorneys' fees in connection with litigation necessitated by Westlake's malicious prosecution of the Patent Infringement Action.

## PRAYER FOR RELIEF

WHEREFORE WESTLAKE prays that this Court adjudge and decree as follows:

1.      That defendant CAC's conduct alleged in the First Claim for Relief herein be

---

[8]   *See* Order Granting Plaintiff's Motion to Voluntarily Dismiss with Prejudice and Denying Defendants' Motion for Leave to File Second Amended Answer and Counterclaims, *Credit Acceptance Corp. v. Westlake Services, LLC, et al.*, Case No. CV 13-01523 SJO (MRWx) (Aug. 25, 2015) (Dkt. No. 109).

[PROPOSED] SECOND AMENDED COMPLAINT

1  adjudged to be unlawful monopolization in violation of Section 2 of the Sherman Act (15

2  U.S.C. § 2);

3       2.     That defendant CAC's conduct alleged in the Second Claim for Relief herein

4  be adjudged to be an unlawful attempt to monopolize in violation of Section 2 of the

5  Sherman Act (15 U.S.C. § 2);

6       3.     That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15),

7  WESTLAKE be awarded treble the amount of its actual damages and reasonable

8  attorneys' fees and costs of litigation;

9       4.     That, pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), the

10 predatory, anticompetitive, and exclusionary conduct of defendant CAC be permanently

11 enjoined; ~~and~~

12       5.     That defendant CAC maliciously and without probable cause brought the

13 Patent Infringement Action against Westlake; and

14       6.     That, pursuant to California Civil Code Section 3333, WESTLAKE be

15 awarded an amount which will compensate it for all the detriment proximately caused

16 thereby;

17       7.     That, pursuant to California Civil Code Section 3294, WESTLAKE be

18 awarded exemplary damages; and

19       ~~5.~~8.   For such other and further relief as the Court deems just and proper.

20

21

22

23

24

25

26

27

28

[PROPOSED] SECOND AMENDED COMPLAINT

DATED:  April 10, 2017

Ekwan E. Rhow
Timothy B. Yoo
Julian C. Burns
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By: _____
                Timothy B. Yoo
Attorneys for Plaintiff WESTLAKE
SERVICES, LLC d/b/a WESTLAKE
FINANCIAL SERVICES

36

1

## DEMAND FOR JURY TRIAL

2          WESTLAKE hereby demands trial by jury pursuant to Rule 38(b) of the Federal

3   Rules of Civil Procedure and Civil Local Rule 38-1.

4   Dated:  February 19, 2016          BIRD, MARELLA, BOXER, WOLPERT,
                                        NESSIM, DROOKS, LICENBERG & RHOW, P.C.
5                                       EKWAN E. RHOW
                                        TIMOTHY B. YOO
6                                       By:  /s/ Ekwan E. Rhow
7                                           Timothy B. Yoo
                                            Julian C. Burns
8   DATED:  April 10, 2017                  Ray S. Seilie
                                            Bird, Marella, Boxer, Wolpert, Nessim,
9                                           Drooks, Lincenberg & Rhow, P.C.

10

11

12                                      By: _____
13                                          Ekwan E. Rhow
                                            Timothy B. Yoo
14                                      Attorneys for Plaintiffs
                                        Plaintiff WESTLAKE SERVICES, LLC
15                                      d/b/a WESTLAKE FINANCIAL
                                        SERVICES and NOWCOM
16                                      CORPORATION

17

18   4350.2 3384162.1

19

20

21

22

23

24

25

26

27

28

[PROPOSED] SECOND AMENDED COMPLAINT

# APPENDIX B

Ekwan E. Rhow - State Bar No. 174604
 erhow@birdmarella.com
Timothy B. Yoo - State Bar No. 254332
 tyoo@birdmarella.com
Julian C. Burns - State Bar No. 298617
 jburns@birdmarella.com
Ray S. Seilie - State Bar No. 277747
 rseilie@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiffs
WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>Plaintiffs,<br><br>vs.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>Defendant. | Case No. 2:15-cv-07490 SJO (MRWx)<br><br>**[PROPOSED] PLAINTIFF WESTLAKE SERVICES, LLC'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT (15 U.S.C. § 2) AND MALICIOUS PROSECUTION**<br><br>**[DEMAND FOR JURY TRIAL]**<br>Honorable S. James Otero<br><br>Complaint Filed: September 24, 2015 |

Plaintiffs Westlake Services, LLC d/b/a Westlake Financial Services ("WESTLAKE"), by and through its counsel, bring this Second Amended Complaint ("SAC") against defendant Credit Acceptance Corporation ("CAC"), for violations of Section 2 of the Sherman Act (monopolization and attempted monopolization), to secure damages and injunctive relief and demanding trial by jury, claim and allege as follows:

## I.

## SUMMARY OF THE CASE

1.      This antitrust lawsuit centers around CAC's deliberate attempt to monopolize, and its actual monopolization of, the market for indirect lending for used car sales through a profit sharing program in the United States.  CAC possesses a market share exceeding 85% in this market.  CAC has monopolized, or at least attempted to monopolize, this indirect financing profit sharing program market by fraudulently securing a patent, in the process concealing the identity of the true inventors of that patent as well as prior offers for sale and sales of the patented product; and then asserting these purported patent rights far beyond the narrow scope of the actual patent claims (obtained by fraud in the first instance) and through instituting a sham lawsuit premised on invalid and/or unenforceable patent claims in order to slowly and/or aggressively litigate the plaintiffs out of the market.  This ill-founded, bad faith and sham patent infringement action, constitutes a violation of the antitrust laws.

2.      CAC conceived and implemented an anticompetitive scheme to exclude WESTLAKE from this growing and lucrative market.  WESTLAKE has developed, marketed, and sold a competing indirect financing profit sharing program for used car sales.  To thwart competition by WESTLAKE and others, CAC has engaged in a campaign that consists of at least the following anticompetitive and monopolistic acts:

(a)      knowingly obtaining and enforcing a fraudulently procured patent; and

(b)      initiation and maintenance of knowingly sham patent infringement litigation based on an invalid and/or unenforceable patent to eliminate and thwart

competition from WESTLAKE.

3.      As a consequence of CAC's conduct, competition in this product market has been suppressed and virtually eliminated, and consumers/dealers in this market have suffered a loss of choice and have been required to pay higher prices for used car loan indirect financing profit sharing programs to CAC than would otherwise be the case in a properly functioning and competitive market.  WESTLAKE, the competitive market, and consumers/dealers have suffered antitrust injury by reason of CAC's unlawful, exclusionary, and trade-restraining conduct.

## II.

## JURISDICTION AND VENUE

4.      The First and Second Claims for Relief in this Second Amended Complaint are filed and instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against, CAC for its past and continuing violations of Section 2 of the Sherman Act (15 U.S.C. § 2), as alleged herein.

5.      This Court has original and exclusive jurisdiction over the subject matter of the First and Second Claims for Relief under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1332, and 1337.  CAC maintains offices and transacts business on a systematic and continuous basis within this District and may be found here within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

6.      This Court has supplemental jurisdiction over the Third Claim for Relief (for state law malicious prosecution) under 28 U.S.C. 1367(a).

7.      This Court has diversity jurisdiction over the Third Claim for Relief because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

### III.

### INTERSTATE COMMERCE

8.      The actions complained of herein have, and will, restrain and adversely affect interstate commerce in that CAC markets and sells its financing programs and services across state lines.  Further, CAC purchases or finances goods and supplies in interstate commerce.

### IV.

### PARTIES

9.      Plaintiff Westlake Services, LLC d/b/a Westlake Financial Services, is a limited liability company organized under the laws of the State of California.  Westlake Financial Services specializes in the financing and servicing of retail installment sales contracts for used cars.  Westlake Financial Services is an internet-based, privately held finance company that provides automobile financing for independent and franchise car dealers for sales of used cars.

10.      Defendant CAC is a corporation organized under the laws of the State of Michigan.  CAC represents that it is the owner of U.S. Patent No. 6,950,807 ("the '807 Patent").  CAC claims to be "an indirect finance company, working with car dealers nationwide" and "is a proven industry leader."

### V.

### FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.      Nature of Indirect Financing in the Auto Finance Industry**

11.      The automotive finance industry for indirect lending generally consists of three primary participants: consumers, dealers, and financial institutions.

12.      The primary method for motor vehicle sale financing in the United States is the "indirect lending" model, which constitutes a substantial majority of the auto finance business.[1]  Under an indirect lending arrangement, the dealer and consumer directly

---

[1] Financial institutions can also lend directly to consumers so that they are preapproved to

4

negotiate financing in the same transaction as part of the vehicle purchase transaction, which is consummated pursuant to a retail installment sales contract ("RISC").

13.     Under indirect lending, once the RISC is consummated, the dealer assigns the RISC (or certain payment streams under the RISC) to a financial institution willing to finance the RISC under various arrangements.

14.     The originating dealer assigns the RISC contract to a lender for two main reasons: (a) the dealer does not want to service the account or collect the future stream of payments; and (b) the dealer wants to receive the financial benefit of the transaction now without having to wait.[2]

**B.     Indirect Automobile Lending Programs**

15.     In indirect lending, the various arrangements under which RISCs are financed can be divided into two categories: (a) a "purchase program," and (b) a "profit sharing program".

16.     Under a "purchase program," the finance lender purchases the RISC in exchange for a one-time lump sum payment to the dealer, which is described as an "up-front payment" or "advance." The amount of the advance is based on various factors, including the customer's credit, the vehicle value, and the down payment. Once the transaction is complete and the RISC is assigned to the finance lender, the entire payment streams go directly to the finance lender with no participation from the dealer.

17.     Under a "profit sharing program," dealers are offered a more discounted up-front payment for the assignment of a RISC in exchange for a share of the customer's

purchase a vehicle. Once a consumer is approved by the financial institution, the consumer can simply negotiate price with the dealer. The terms of the amount financed and the car parameters are set by the financial institution as part of the loan. In this direct lending model, financing and purchasing the vehicle are related but separate transactions.

[2] Dealers often have to borrow money to pay for their inventory of cars for sale (known in the industry as "floorplan financing"). Dealers must pay back the floorplan lender when a car is sold, so the vast majority of dealers elect to sell the RISC to a retail financer (or indirect lender) in exchange for a lump sum payment.

future stream of installment payments.  Although the dealer's up-front payment will be lower than what it otherwise would have received in a purchase program, the dealer is given the opportunity to earn a greater amount over time based on the performance of the RISC.

18.     There is no substitute for a profit sharing program in the indirect auto finance market.  Dealers who specifically desire to share in the customer payments have no other means to sell the RISC to an indirect lender.[3]  The only other option in indirect lending is the purchase program, which precludes profit sharing.

19.     The overwhelming majority of the indirect financing of RISCs are done under a purchase program.  But the indirect financing profit sharing program is a significant and growing separate market.

**C.     The Relevant Market and Players**

20.     The relevant product market in this case is the business of providing indirect financing for used car sales to dealers through a profit sharing program.

21.     The essential elements of the indirect financing "profit sharing" market are: (a) dealers wanting a share of future payment streams; (b) under RISCs for used cars; (c) originated by dealers; and (d) financed pursuant to a profit sharing program.

22.     The players in the concentrated relevant product market have been few: CAC, Westlake Financial Services, Go Financial, Western Funding Incorporated, and most recently, Consumer Portfolio Services.[4]  CAC has had from 2011 to 2015 an average *direct*

---

[3] In the direct lending market, dealers can participate in the future stream of payments is to become a direct lender and service the loan directly.  This is called a "Buy Here, Pay Here" ("BHPH") dealer.  However, a BHPH dealer faces two distinct disadvantages in that: (a) there is no up-front payment on the vehicle (having to wait for the payment streams to make their investment back); and (b) the dealer must directly service the account and handle billing, collecting payments, handling defaults, etc.  A dealer is often not equipped to handle account servicing, which a financial institution would handle easily.

[4]   Go Financial and Westlake exited the market for indirect financing for used car deals through a profit-sharing program in early 2016.

market share of approximately 87% of the relevant market.  The other players combined had an average 13% share of the relevant market during the same period.  When combined with Go Financial, to whom CAC issued a license after first suing it for patent infringement, CAC has profited from an aggregated market share of over 95% in the relevant market.

23.     The relevant geographic market is the United States because the indirect financing profit sharing market requires a local sales team who can develop and maintain long-term relationships with dealers on behalf of the finance lender.  These sales representatives must invest a substantial amount of time to understand the local dealers and their businesses in order to educate them about the benefits of the programs offered by the finance lender.

24.     CAC publicly represents that it provides indirect financing to "car dealers nationwide" and that its "financing programs are offered through a nationwide network of automobile dealers."

25.     Additionally, the relevant geographic market is the area of effective competition in which the suppliers operate and where the purchasers practicably turn for supplies.  All of the competitors in the relevant product market are located in the United States and auto dealers do not obtain indirect financing for used car sales from entities outside the United States.  Moreover, the antitrust laws of the United States do not reach conduct or sales from foreign sellers to foreign purchasers.

**D.     CAC's Profit Sharing Program: "Portfolio Program"**

26.     Since 1967, Donald Foss, the current Chairman and CEO of CAC, has owned and operated automobile dealerships throughout the Michigan area.

27.     In 1972, Mr. Foss founded CAC in Southfield, Michigan to service and collect retail installment sales contracts that were originated by his automobile dealerships.  During the 1980s, CAC began to market its services to unaffiliated dealers located in the Great Lakes Region.

28.     By 1991, the company had a nationwide growth strategy.  In 1992, CAC

[PROPOSED] SECOND AMENDED COMPLAINT

went public through the NASDAQ followed by a second offering in 1995.  By 1996, CAC operated in all 50 states.

29.     CAC offers two types of programs: the "Portfolio Program" and the "Purchase Program."  The Portfolio Program—included in and operated via its proprietary Credit Approval Processing System, or CAPS® ("CAPS")—is CAC's version of a profit sharing program.  According to an SEC filing, from 2010 to 2015, over 90% of CAC's portfolio consisted of loans financed under its Portfolio Program.

30.     Dealers who wish to enroll in the Portfolio Program must pay CAC a subscription fee in the amount of $9,850 or agree to allow CAC to retain 50% of its first accelerated Dealer Holdback payment.

31.     Under CAC's Portfolio Program, the lender's profits are shared at two stages.  The "front-end profits" are shared based on the performance of the individual RISC.  The dealer-partner generally receives a down payment from the consumer, a non-recourse cash payment advance from CAC, and after the advance has been recovered by CAC, the cash from payments made on the consumer loan, net of collection costs and CAC's servicing fee ("dealer holdback").  This amount generally equals 20% of collections.

32.     The distinctive feature of CAC's Portfolio Program is the collateral pool that provides further "back-end" profits based on the pool's performance.  In order to receive the back-end profits, a dealer must accomplish two things.  First, dealers must satisfy the volume requirement by filling its collateral pool with one-hundred (100) deals.  Second, dealers must satisfy the performance requirement of the collateral pool by having the have payments collected versus due to be greater than 80%.

33.     If a dealer's collateral pool achieves both its volume and performance threshold, the dealer receives from CAC a second layer of back-end payments based on the performance of the pool as a whole.  The back-end payments are calculated as the percentage of the outstanding payments in the collateral pool.

34.     CAC's Portfolio Program creates at least two incentives for dealers.  First,

8

1  the dealer is incentivized to send more deals to CAC in order to meet the volume

2  requirement.  This built-in feature excludes other finance lenders from competing for the

3  RISC, as there is now no "auction" or competitive bidding.  Second, the dealer is

4  incentivized to send CAC good performing deals in order to meet the performance

5  requirement.  This is because the dealer is incentivized to have its collateral pool perform

6  at a certain rate in order to achieve back-end profits.

7     35.    As a result, other finance lenders in the indirect financing profit sharing

8  market that cannot offer a collateral pool, including WESTLAKE, are unable to compete

9  against CAC for good performing deals and are forced to compete for the remaining deals

10  that have a higher risk of default.  Moreover, without the collateral pool, a lender who

11  finances the riskier deal is unable to absorb the losses against the profits gained from the

12  good performing deals within a collateral pool.

13     36.    The collateral pool is a distinctive feature of CAC's loan profit sharing

14  program.  Because the pool has 100 deals, it offsets some of the risk of bad loans that

15  default, because fifty good deals would offset the risk of some individual bad (or

16  defaulting) deals.

17     37.    CAC's profit sharing program had an additional competitive advantage: CAC

18  touted that CAPS was a patented system and CAC sales representatives on the ground

19  were able to represent to dealers that only CAC's profit sharing program was patented.  As

20  it turns out, as alleged further infra, that patent on CAPS was fraudulently obtained.

21     **E.    Westlake Financial Services' Profit Sharing Program: "Profit Builder"**

22     38.    At all relevant times, Westlake Financial Services was in the profit sharing

23  market by financing RISCs for used car loans through its Profit Builder Program.  Like

24  CAPS, the Profit Builder Program provided a discounted cash advance in exchange for

25  allowing dealers to participate in a portion of the customer's payment streams.  The

26  structure of the deal, including the amount of the cash advance and the percentage share of

27  the payment stream, is based entirely on the merits of the individual deal alone, without

28  regard to the volume or performance of the aggregated deals that the dealer had historically

1  booked with Westlake Financial Services.

2      39.    Participants in the indirect profit sharing market, including Westlake

3  Financial Services, were fully aware that CAC had a proprietary interest in CAPS,

4  comprising the Portfolio Program, based on the '807 Patent.  In fact, when Westlake

5  Financial Services created the Profit Builder Program, it deliberately chose to avoid the

6  claims of the '807 Patent by bundling deals together and pricing individual deals against

7  the bundle.  As such, the Profit Builder Program lacked the crucial feature that is necessary

8  for a successful profit sharing program—the collateral pool.   That is, a defaulting deal

9  could not be offset by the good deals in a pool.

10     **F.    CAC's '807 Patent**

11     40.    The '807 Patent, entitled "System and Method for Providing Financing," is

12 directed at a method of financing utilizing primarily a customer's credit score: (a) to

13 determine an advance amount to be paid to a dealer for each individual product in the

14 dealer's inventory if that particular product is sold to the customer; (b) calculate a front-

15 end profit to be realized by the dealer for each such anticipated transaction; and taking into

16 account the foregoing, (c) present a financing package to the dealer for each individual

17 product in its inventory.  The Patent is further directed to profit sharing in that context,

18 described as "collecting monthly payments from the customer in the monthly payment

19 amount and paying a fraction of the collected monthly payments to the dealer."  The

20 application that resulted in the '807 Patent was filed as U.S. Application No. 10/037,055

21 (the "Application") on December 31, 2001.

22     41.    CAC applied for and eventually obtained the '807 Patent for the express

23 purpose of gaining patent protection for its CAPS program.  CAC said so in an earlier

24 filing in this Court:

25         Recognizing the market-changing potential and economic value of CAPS,
           ***CAC obtained a patent to protect the core components of the CAPS method***

26         ***and systems***. On September 27, 2005, the U.S. Patent and Trademark Office
           duly and legally issued United States Patent No. 6,950,807 ("'807 patent"),

27         entitled "System and Method for Providing Financing."

28 (Case No. 2:13-cv-01523, ECF No. 1, ¶ 16.)  That is, what CAC set out to patent in its

                                    10

1   December 31, 2001 Application was, in its own words, "the core components of the CAPS

2   method and systems."  Thus, at the time of the Application, CAPS was the commercial

3   embodiment of the invention claimed in the '807 Patent.

4          42.     The patent application identified a single inventor: Jeffrey M. Brock. ████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10         43.     The patent application did not identify Mr. Simmet, Mr. Knoblauch, Mr.

11  McCluskey, or any other individuals as inventors or co-inventors, only Mr. Brock.

12  ████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ██████████████████████████████████

16         44.     ████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20         45.     ████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ██████████████████████████████████████

25         46.     ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████

28         **G.     <u>CAPS Was in Use and/or Offered for Sale More Than One Year Prior to</u>**

**the Patent Application**

47.     The core components of CAPS were also, at the time of the Application, substantially the same as the CAPS version that was already in commercial use by CAC before December 31, 2000, more than one year prior.  This was a problem since CAC, Mr. Brock, and others all knew that CAPS had been sold and publicly used ***more*** than one year prior to December 31, 2001, the date of the Application.  Specifically, CAC and Jeffrey Brock knew that such public use and sales would be a bar to CAPS's patentability.

48.     Publically available documents establish that CAPS was not only offered for sale, but sold more than one year prior to December 31, 2001.

49.     For instance, in its 2000 Annual Report, CAC touts that it began "testing" CAPS in August 2000, which was followed by a "rollout" in December 2000.  In a corporate context, the plain and ordinary meaning of "rollout" is "an occasion when a new product or service is ***first offered for sale or use***."  (*See* http://www.merriam-webster.com/dictionary/rollout.)

50.     This "rollout" included offers for sale and actual sales of CAPS by CAC to dealers.  For instance, the fact that CAC itself distinguishes "testing" from a "rollout," indicates that the December 2000 "rollout" was not simply an experimental use of CAPS, but instead included commercial offers for sales and sales.

51.     Specifically, the December 2000 "rollout" included installing CAPS at each dealership affiliated with CAC and/or owned by Mr. Foss, which resulted in numerous vehicle purchases and sales transactions at those dealerships through CAPS.[5]  The December 2000 "rollout" also included (a) publicizing the details of CAPS to unaffiliated dealers located throughout the Great Lakes Region, (b) entering into dealer agreements with these dealers for access to CAPS, and (c) receiving compensation from dealers for their use of CAPS.

---

[5]   CAC's 2002 SEC 10-K filing states that CAC "installed" CAPS as early as August 2000.

52.     CAC reported in its 2000 Annual Report that it "now [has] 300 dealer-partners on the [CAPS] system" and that "[i]n the first quarter of 2001, approximately 30% of [its] business was processed through CAPS."  At least some of those sales occurred on or before December 30, 2000, i.e., more than one year prior to the Application date.

53.     Moreover, there is proof of actual sales because archived screenshots of CAC's website shows that car dealers could log into a secure site and use CAPS through a link on CAC's website as early as October 9, 2000.

54.     ███████████████████████████████████████████████████████
███████████████████████████████████

(a)     On August 2, 2000, several CAC employees, including Messrs. Brock and Roberts, were "invited to celebrate our successful CAPS launch" on August 12, 2000.

(b)     ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████

55.     Hence, CAC made commercial, non-experimental-use offers for sale and sales of CAPS *more* than one year prior to the filing of the Application, which was directed at acquiring patent protection for the core components of CAPS.

56.     As alleged further *infra*, Mr. Brock was aware of these prior sales of CAPS.

57.     Furthermore, during the Application's prosecution, both CAC and its prosecution attorneys—such as Jeffrey H. Canfield of the Bell, Boyd & Lloyd LLC law firm—were likewise aware of the prior offers for sale and sales of CAPS.  For instance, when CAC applied to trademark "CAPS Credit Approval Processing System," it again used the services of the Bell, Boyd & Lloyd law firm.  In the trademark application, CAC attested that the CAPS mark was used in association with the sale of goods "at least as early as" June 2000.  The Bell, Boyd & Lloyd law firm had learned of these prior sales

13

1  through its representation of CAC in relation to the Application.  Such knowledge of

2  CAPS' prior sales was imputed from Mr. Canfield to the Bell, Boyd & Lloyd attorney that

3  filed the application on CAC's behalf, Sana Hakim.

4       **H.**    **As of December 30, 2000, CAPS Was Ready For Patenting**

5       58.    At the time the prior offers for sale and sales were made, CAPS was ready

6  for patenting.

7       59.    This is because when CAPS was sold more than one year prior to the filing

8  date of the Application, i.e., on or before December 30, 2000, CAPS was already a

9  commercial embodiment of the claims of the '807 Patent.  This is supported by CAC's

10  earlier representations to this Court:

> Recognizing the market-changing potential and economic value of CAPS,
> ***CAC obtained a patent to protect the core components of the CAPS method
> and systems***. On September 27, 2005, the U.S. Patent and Trademark Office
> duly and legally issued United States Patent No. 6,950,807 ("'807 patent"),
> entitled "System and Method for Providing Financing."

14  (Case No. 2:13-cv-01523, ECF No. 1, ¶ 16.)

15       60.    Notably, CAC holds no other patents in its name except for the '807 Patent.

16       61.    CAPS, as it existed before December 30, 2000, is covered by the claims of

17  the '807 Patent.

18       62.    For example, at least each element of independent Claim 1 and dependent

19  Claims 4 and 5 of the '807 Patent was fully disclosed by CAPS at the time of the prior

20  sales.  As alleged *supra*, the '807 Patent's claims, including Claims 1, 4, and 5 are directed

21  at a method of financing utilizing primarily a customer's credit score: (a) to determine an

22  advance amount to be paid to a dealer for each individual product in the dealer's inventory

23  if that particular product is sold to the customer; (b) calculate a front-end profit to be

24  realized by the dealer for each such anticipated transaction; and taking into account the

25  foregoing (c) present a financing package to the dealer for each individual product in its

26  inventory.  The Patent's claims are also directed at profit sharing in the above context,

27  whereby the dealer receives 80% of the payments collected from the customer.

28       63.    As of December 30, 2000, CAPS allowed a dealer to receive information

from a customer including a credit score and thereon: (a) determine the up-front advance the dealer could expect both as part of CAC's Portfolio Program or its Purchase Program; (b) compute the front-end profit the dealer could expect to receive from that customer for each car in its inventory; and (c) present a written credit approval to the customer, along with corresponding proposed terms for each car in its inventory. CAPS further had, at that time, a profit participation component whereby the dealer would receive 80% of all cash collections on customer accounts. ████████████████████████████ ████████████████████████████████████████

64.     The core components of CAPS at the time of the Application were substantially the same as they were as of December 30, 2000. Hence, more than one year prior to the filing date of the '807 Patent Application, CAPS fully disclosed the elements of at least independent Claim 1, and thus, at least one claim of the '807 Patent was fully reduced to practice in the form of CAPS on or before December 30, 2000.

## I.     CAC Willfully and Fraudulently Obtained the '807 Patent

65.     In late 2001, upon witnessing CAPS's enormous commercial potential and tangible results, CAC's executives, including Mr. Roberts, Mr. Simmet, and Mr. Knoblauch, were confronted with a harrowing dilemma: On the one hand, as alleged *supra*, CAPS had already achieved significant market penetration, with over 300 auto dealers on the system by the end of the first quarter 2001. And, in fact, by the end of 2001, 78% of CAC's sales were through CAPS. Based on that tremendous commercial success and future potential, CAC wanted to obtain patent protection for CAPS in order to exclude others from using their claimed methods so CAC could box out its competition and achieve market dominance. On the other hand, however, CAC knew that prior sales of CAPS (including those disclosed in CAC's public filings) more than one year earlier would otherwise prevent them from obtaining such patent protection over their prized system. Accordingly, CAC embarked on a scheme to defraud the United States Patent & Trademark Office ("USPTO") in order to obtain a patent on CAPS notwithstanding those earlier sales by concealing them.

66.     CAC knew that time was of the essence, since it had publicly disclosed the fact of commercial offers for sale and sales occurring in and before December 2000, and thus, for their scheme to have any chance of working, they needed to apply for a patent by no later than sometime in December 2001.

67.     In furtherance of their fraudulent scheme, CAC retained the services of the Bell, Boyd & Lloyd LLC law firm to submit the Application and prosecute it before the USPTO.  The Application was submitted on December 31, 2001, the last day of 2001.

68.     As part of their bold scheme, CAC and the prosecution attorneys conspired to conceal, and in fact did conceal among other things, information about the prior offers for sale and sales of CAPS, as well as the true inventorship of the patent, from the USPTO while prosecuting the Application.

69.     Also in furtherance of this scheme, at CAC's instruction, Mr. Brock falsely identified himself as the sole inventor of the '807 Patent to conceal the involvement of Mr. McCluskey, Mr. Simmet, and Mr. Knoblauch, all of whom were higher-ranking CAC officers, in its conception.  Mr. Brock then assigned the patent to CAC for one dollar.  On information and belief, this scheme was concocted and implemented to insulate CAC from the fact that its high-level executives were aware of the prior offers for sale and sales and place sole responsibility for the fraud on the USPTO on Mr. Brock.  CAC could then feign ignorance of the prior sales if the validity of the '807 Patent was subsequently challenged.

70.     CAC's also concealed of the true inventors of the '807 Patent to create an advantage in future patent infringement litigation.  On information and belief, CAC knew that if it sought to enforce the '807 Patent against actual and future competitors, those litigants were likely to rely on CAC's designation of Mr. Brock as the inventor of the patent in pursuing discovery.  By placing Mr. Brock—whom CAC knew lacked knowledge about the circumstances surrounding the conception of the '807 Patent—front and center in the patent application, CAC intentionally concealed from possible discovery knowledge about the prior offers for sale and sales held by its more senior executives.

71.     Even though he was not responsible for the conception of the '807 Patent, a

its purported inventor, Mr. Brock still had a duty to disclose material information to the PTO, especially to the Examiners assigned to the prosecution of the Application, Ronald Laneau and Lynda C. Jasmin.  On information and belief, CAC was aware that the named inventor on the Application would have these duties, and instructed Mr. Brock to pose as the sole inventor of the '807 Patent in an effort to avoid these duties.

72.    As part of the prosecution process, Mr. Brock submitted two separate inventor Declarations, on December 31, 2001 and January 10, 2002, respectively, each time attesting that (a) he was aware of his continuing duty to disclose to the USPTO and its Examiners any information that was material to the patentability of his claims and (b) that he would do so.  Mr. Brock also declared that he was the sole original inventor of the claimed invention.  These Declarations were knowingly false when made, as Mr. Brock never intended to disclose the prior sales of CAPS, which he and his supervisors at CAC knew would preclude a patent from issuing on the Application.  These Declarations were also knowingly false when made because Mr. Brock knew that others, including potentially Mr. Simmet and Mr. Knoblauch, should have been identified as inventors instead of, or at least in addition to, Mr. Brock.  Mr. Brock submitted these fraudulent Declarations at CAC's instruction and on its behalf.

73.    Under 37 C.F.R. 1.56, those involved in the prosecution of a patent application, such as the Application, were required to disclose "all information which is known … to be material to the patentability of this application."  That included prior sales and offers to sell the claimed invention:

> possible prior public uses, **sales, offers to sell**, derived knowledge, prior invention by another, inventorship conflicts, and the like. "Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc*., 326 F.3d 1226, 1234, 66 USPQ2d 1481, 1486 (Fed. Cir. 2003) (emphasis in original) (finding article which was not prior art to be material to enablement issue).

*See* Manual of Patent Examining Procedure 2001 Duty of Disclosure, Candor, and Good Faith [R-08.2012] (http://www.uspto.gov/web/offices/pac/mpep/s2001.html).

74.     The obligation to disclose all material information to the USPTO extends to information concerning the true identities of all inventors of the claimed invention because of the requirement that a patent application be submitted by *all* joint inventors of the claimed invention.  *See* 37 C.F.R. § 1.45(a).  Furthermore, an inventor must contribute to the conception of the invention.  "The threshold question in determining inventorship is who conceived the invention.  Unless a person contributes to the conception of the invention, he is not an inventor."  *Fiers v. Revel*, 984 F.2d 1164, 1168 (Fed. Cir. 1993).  Moreover, 35 U.S.C. § 102(f), which was the statute governing conditions for patentability during the '807 patent's prosecution, stated that "A person shall be entitled to a patent *unless* . . . he did not himself invent the subject matter sought to be patented."  35. U.S.C. § 102(f) (emphasis added).

75.     CAC was involved in the prosecution of the '807 Patent throughout the duration of the prosecution process including by assisting in the drafting and review of each of the materials before they were submitted to the USPTO and Examiners Laneau and Jasmin.  During this entire process—which spanned from at least between December 31, 2001 to the Patent's issuance on September 27, 2005, and which included at least six official correspondences submitted to the Examiners—CAC and Mr. Brock were aware that Mr. Brock and all other individuals involved in the preparation or prosecution of the application had a duty to disclose material information to the Examiners, such as CAPS's prior sales and the fact that others had actually conceived of the invention.  Yet, CAC and Mr. Brock knowingly and intentionally concealed this material information from Mr. Laneau and Ms. Jasmin notwithstanding their duties to disclose them.

76.     Likewise, the prosecution attorneys at the Bell, Boyd & Lloyd LLC firm, including Jeffrey H. Canfield, also did not tell the USPTO about the prior sales of CAPS or the identity of the true inventors despite knowing about them.  The prosecution attorneys were aware of the relevance of the prior offers for sale and sales and intentionally concealed the prior offers for sale and sales of CAPS from the USPTO by not providing this material information.

77.     CAC was also aware of the relevance of the identity of the true inventors and intentionally concealed this information from the USPTO by not providing this information.

78.     That no one disclosed to the USPTO and Examiners Laneau and Jasmin information regarding the prior offers for sale and sales of CAPS is evident as the file history for the Application, which includes no less than 15 official communications between the applicants and the Examiners, makes no mention of CAPS or prior sales of the invention of the '807 Patent.  Furthermore, the Application only identifies Jeffrey M. Brock as the sole inventor, and does not identify any other individuals.

**J.      The Information CAC Concealed from the USPTO Would Have Been Material to Its Evaluation of the Application**

79.     The prior offers for sale and sales of CAPS would have been material to the USPTO.

80.     If the USPTO had been told of the offers for sale and sales of CAPS that occurred more than one year before the Application was filed, the USPTO (through Examiners Laneau and Jasmin) would not have allowed the '807 Patent to issue.  This is because, as alleged *supra*, CAPS fully anticipates at least Claims 1, 4, and 5 of the '807 Patent and was offered for sale and sold more than one year prior to the Application date.

81.     Hence, these offers for sale, actual sales, publication, or public use of CAPS on or before December 30, 2000 are a bar to patentability under 35 U.S.C. § 102(b).

**K.      The Prior Offers for Sale and Sales of CAPS Were Actively Concealed, Demonstrating an Intent to Deceive the USPTO**

82.     CAC's public disclosures ***prior*** to the filing of the '807 Patent Application state that CAPS was offered for sale and sold at least as far back as December 2000.  And, in fact, CAPS was commercially exploited and used publicly as early as August 2000.

83.     Although CAPS was commercially offered for sale and sold to dealers in or before December 2000, CAC did not file its Application to patent CAPS until the very end of December 2001, on December 31, 2001.

84.     Recognizing this issue and in furtherance of their scheme to defraud the

19

USPTO, *after* filing the Application, CAC altered course in its public disclosures, stating in its subsequent SEC filings and annual reports that CAPS was not "offered" until January 2001.

85.     This modification in the public disclosure of the sale of CAPS following the Application's filing, is indicative that Mr. Brock, the prosecution attorneys, and CAC wanted to hide evidence of the prior offers for sale and sales occurring in or before December 2000, which evidences their specific intent to deceive the USPTO as they prosecuted the Application.

86.     In fact, CAC's ex post public statements that CAPS was not "offered" until January 2001 are directly undercut by sworn representations CAC made to the USPTO when later applying for a trademark for the CAPS® mark, namely, that the mark was used in association with the sale of goods "at least as early as" June 2000.

87.     Anticipating that these statements in its public disclosures and prior representations to the USPTO might endanger the application for the '807 Patent, CAC required Mr. Brock to identify himself as the sole inventor of the Claims in the patent despite the fact that he was not solely responsible for their conception.

**L.     USPTO Examiners' Justifiably Relied on CAC and Mr. Brock's Misrepresentations**

88.     Mr. Brock *twice* submitted Declarations during the prosecution of the Patent Application attesting that he understood his duty to inform the USPTO of any information material to the patentability of the Patent Application.  Again, he did this with the knowing intent to conceal material information in contravention of his duty of disclosure.

89.     The prosecution attorneys are also under a continuous duty to disclose material information regarding a pending patent application to the USPTO.  37 C.F.R. 1.56.

90.     The USPTO—and specifically Examiners Laneau and Jasmin—justifiably relied upon the omission of facts regarding the prior offers for sale and sales of CAPS, because, without any knowledge of the prior sales, the USPTO issued the '807 Patent.  The

1    USPTO also relied on the omission of facts regarding the true inventorship of CAPS

2    because, without knowledge of the true inventors, the USPTO issued the '807 Patent.  As a

3    matter of course, the USPTO and the public that the USPTO serves were injured by the

4    issuance of an invalid patent obtained by fraud.

5             **M.**     **CAC's Abusive and Anticompetitive Patent Infringement Litigation**

6           91.     On March 4, 2013 CAC brought an action for infringement of the '807

7    Patent against WESTLAKE in the United States District Court for the Central District of

8    California, Case No. 13-cv-01523 SJO (the "Patent Infringement Action").

9           92.     CAC knew, at the time it brought the Patent Infringement Action against

10   Westlake, that the '807 Patent was invalid because it improperly identified Mr. Brock as

11   the sole inventor and because it had failed to disclose to the USPTO the offers for sale and

12   sales of the CAPS program that had been made over one year preceding the patent

13   application.

14          93.     CAC also knew, at the time it brought the Patent Infringement Action, that

15   Westlake would likely rely on the '807 Patent application's representation that Mr. Brock

16   was the sole inventor of the patent and was therefore unlikely to seek the sworn testimony

17   of witnesses such as Mr. McCluskey, Mr. Simmet, and Mr. Knoblauch who knew about

18   the prior sales and public uses of CAPS that, if disclosed, would have prevented the

19   USPTO from issuing the patent.

20          94.     CAC made similar threats to other competitors in the relevant market.

21          95.     CAC continues to assert the '807 Patent and demand royalties from other

22   market participants, including at least Drivetime.

23          96.     CAC's threats of litigation were objectively baseless and made in bad faith

24   because it knew that the '807 Patent was procured fraudulently through material

25   intentional misrepresentations and omissions to the Examiners during prosecution of the

26   Application.

27          97.     As a result of CAC's anticompetitive conduct in enforcing the fraudulently

28   procured '807 Patent, WESTLAKE lost, and continues to lose, sales through their

1   competing software program and have been hindered and delayed in competing in the

2   relevant market.

3       98.     CAC's anticompetitive activities have caused adverse impacts on the

4   relevant market, including but not limited to less competition and higher prices in the

5   relevant market.

## VI.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (Actual Monopolization in Violation of Section 2

## of the Sherman Act (15 U.S.C. § 2))

11      99.     WESTLAKE hereby alleges and incorporates by reference each allegation

12   set forth in Paragraphs 1 through 98 of this First Amended Complaint, as if set forth in full

13   herein.

14      100.    The antitrust laws are concerned with protecting the economic freedom of

15   participants in the relevant market.  The aims and objectives of the antitrust laws are aimed

16   at encouraging innovation, industry, and competition.  The central purpose of the antitrust

17   laws is to preserve competition and it is that interaction of competitive forces that benefits

18   consumers.

19      101.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful

20   monopolization of any part of the trade or commerce among the States.

## RELEVANT MARKET

22      102.    The relevant product market (or sub-market) for antitrust purposes in this

23   case is defined as the business of providing indirect financing for used car sales to dealers

24   through a profit sharing program.  There are no reasonable substitutes for these financing

25   programs.  Consumers/dealers do not consider these programs to be reasonably

26   interchangeable with other types of automobile financing programs.  The cross-elasticity of

27   demand between used car loan indirect financing profit sharing programs and other types

28   of financing programs is extremely low.

103.   The relevant geographic market for antitrust purposes is the United States.

104.   Relevant market definition is a fact-intensive determination to be made exclusively by the finder of fact.

### MONOPOLY POWER

105.   CAC has monopoly power in the relevant market as reflected by, *inter alia*, its dominant share of the relevant product market, its ability to exclude competition in that market, and its ability to charge supracompetitive prices for its products.

106.   CAC is an entrenched player and dominates the market for used car loan indirect financing profit sharing programs in the United States, possessing a market share greater than 85%.  CAC has the power to control prices and/or to exclude competition in the relevant market.

### BARRIERS TO MARKET ENTRY AND EXPANSION

107.   There are significant and high barriers to market entry that prevent other indirect lenders from rapidly and meaningfully entering and/or expanding in this relevant market, which include, but are not limited to, the following:

(a)   CAC's dominant and entrenched market position as a monopolist of providing indirect financing profit sharing programs with a history of engaging in exclusionary and anticompetitive conduct to eliminate competition;

(b)   purported patents, trademarks, copyrights, and other intellectual property rights (valid or otherwise) relating to these profit sharing indirect financing programs;

(c)   substantial up-front capital investment required to penetrate and enter the relevant market; and

(d)   requirement of access to a nationwide sales and distribution network.

### CAC'S PREDATORY AND EXCLUSIONARY CONDUCT

108.   CAC's monopoly position in the relevant market has been acquired and maintained through clearly intentional exclusionary conduct and patent misuse, as opposed to business acumen, historic accident, or by virtue of offering a superior product or service,

greater efficiency, or lower prices.  CAC has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act.

109.    While the patent system serves to encourage innovation, the patent system is subject to misuse.  Meanwhile, the antitrust laws serve to foster competition. Consequently, the statutory rights afforded by patent law do not support the impermissible broadening of the physical or temporal scope beyond that explicitly articulated in the claims of a patent grant, nor do intellectual property laws confer upon the patent owner immunity or a privilege to violate antitrust laws.

110.    CAC's litigation-related exclusionary acts to monopolize the market were either comprised of fraudulent conduct or falsehoods or stemmed from objectively baseless claims that were motivated not to obtain legitimate judicial relief, but rather to injure WESTLAKE and, as such, consisted of sham petitioning which are not immune from antitrust liability.

111.    The USPTO imposes on practitioners who apply for patents a duty to disclose information material to patentability.  This duty applies to each individual associated with the filing and prosecution of a patent application.  One who acted fraudulently in obtaining a patent necessarily knows that the patent is unenforceable.  The '807 Patent was the result of fraudulent conduct by individuals who owed a duty of candor to the USPTO.  Furthermore, following a patent grant, the assertion of patent rights against a competitor beyond the scope of the issued patent constitutes patent misuse and renders the underlying patent invalid and unenforceable.  Thus, based on the acts of CAC both prior to and subsequent to the issuance of the '807 Patent, this patent is invalid and unenforceable.

112.    A purported patent holder violates the antitrust laws by bringing or maintaining an objectively baseless suit to enforce a patent with knowledge that the patent is invalid and/or unenforceable, that the patent rights asserted extend beyond the scope of the patent grant such that the litigation is conducted solely, or at least primarily, to

suppress competition.  CAC initiated, prosecuted, and maintained an objectively meritless patent infringement action against WESTLAKE in bad faith with the knowledge that its '807 Patent was invalid and/or unenforceable.  Antitrust liability attaches to such conduct even if the patent was lawfully-obtained.  A single sham lawsuit can violate the antitrust laws.[6]

113.    Section 2 of the Sherman Act is also violated when a patent holder enforces or maintains an action based on a fraudulently-obtained patent.  Such a violation occurs where the monopolist patent holder obtained the patent by knowing and willful fraud on the USPTO and maintained and enforced the patent with knowledge of the fraudulent procurement.[7]  The patent infringement litigation need **not** be objectively baseless or a sham to violate the antitrust laws.

114.    Patent applicants and patent holders are required to prosecute patent applications and maintain patents with candor, good faith, and honesty.  Fraud includes an affirmative misrepresentation of a material fact, failure to disclose material information, concealment of material information, or submission of false material information, coupled with an intent to deceive.  A fraudulent omission of fact may also support a finding of fraud on the USPTO sufficient to trigger antitrust liability.

115.    The thrust of WESTLAKE's patent-related antitrust claims is that CAC: (a) fraudulently procured the '807 Patent from the USPTO by failing to disclose that the subject of the patent was in public use and/or offered for sale more than one year prior to the patent Application and by failing to identify all inventors of the patent; and (b) initiated, and maintained bad-faith and sham patent infringement litigation intended for the purpose of securing and preserving an unlawful monopoly and premised on an invalid or unenforceable patent driving WESTLAKE out of the market.  CAC took steps to enforce the '807 Patent against WESTLAKE knowing that this patent was obtained through fraud.

---

[6] *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979).

[7] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

CAC also initiated patent infringement litigation against WESTLAKE, based on an invalid patent, that was a mere sham to disguise what was nothing more than an anticompetitive plan with the specific intent to interfere directly with WESTLAKE's actual and potential business relationships.

116.    CAC has initiated and maintained sham patent infringement litigation against WESTLAKE, with the intent to deter other would-be market entrants and to force WESTLAKE out of the relevant market.  CAC's litigation was undertaken solely to interfere with free and open competition and without a legitimate expectation that such efforts would in fact induce or result in proper lawful relief from a legal tribunal.  CAC's litigation against WESTLAKE was objectively baseless because CAC could not realistically or reasonably expect to ultimately succeed.  CAC also specifically intended through its sham litigation to directly interfere with WESTLAKE's business relationships, and it did interfere with WESTLAKE's business relationships and caused it to exit the relevant market.

117.    Even if CAC's patent was *not* fraudulently obtained, CAC has still violated the antitrust laws by instituting and maintaining patent infringement litigation against WESTLAKE in bad faith based on the '807 Patent knowing that this patent was invalid and/or unenforceable.  CAC continued to pursue this sham litigation even after its awareness of the existence of invalidating prior public use and prior sales and of the fact that the patent application failed to identify all inventors.  The question of whether a legal proceeding is a sham is a question of fact for the jury.  CAC's infringement litigation was initiated and pursued with the intent to monopolize the relevant market without regard for its smaller rival or the degree, the nature or the amount of the alleged infringement.

118.    CAC's anticompetitive scheme to monopolize or attempt to monopolize the above-described relevant market has been done with the intent to specifically eliminate WESTLAKE as a viable competitor and threat to CAC's monopoly over indirect financing profit sharing programs for used car loans, and to suppress competition in general.  CAC's overall exclusionary scheme to monopolize the market consists of at least the following

anticompetitive acts/conduct to be viewed as a whole:

(a)     fraudulently obtaining the '807 Patent with the intent to monopolize;

(b)     engaging in patent misuse by asserting patent rights far beyond the narrow scope of the '807 Patent grant with the intent to create a monopoly;

(c)     threatening, initiating and maintaining bad faith infringement litigation predicated on the '807 Patent which was obtained through fraud;

(d)     threatening, initiating and maintaining sham and baseless litigation predicated on the invalid and/or unenforceable '807 Patent; and

(e)     continuing and increasing baseless litigation after being aware of information demonstrating the invalidity and/or unenforceability of its '807 Patent.

119.    Conduct is anticompetitive when it improperly excludes or handicaps competitors in order to gain or maintain a monopoly.  Anticompetitive or exclusionary practices are acts designed to deter potential rivals from entering the market, intervening or preventing access to customers, or preventing existing rivals from increasing their output. Anticompetitive acts are not fair competition on the merits of price, quality or other factors, but instead acts that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  Conduct by a monopolist that constitutes a deliberate effort to discourage and thwart customers from doing business with its rivals is anticompetitive.

120.    CAC's anticompetitive and exclusionary conduct described herein is not motivated or driven by technological or efficiency concerns, and has no valid or legitimate business justification.  Rather, its clear purpose and effect is solely to ensure that WESTLAKE cannot successfully invade or erode CAC's dominant and entrenched market position.

121.    During the relevant time period, CAC and WESTLAKE have both developed, marketed, and sold competing used car loan indirect financing profit sharing programs in the United States.  The marketing, distribution and sale of such products directly involves, and substantially affects, interstate commerce.  The violations of the

1  Sherman Act alleged herein adversely, directly, and substantially impact the flow of such
2  products in interstate commerce.

3  ## WESTLAKE'S ANTITRUST STANDING

4  122.   WESTLAKE has the requisite standing to assert antitrust claims against
5  CAC because it was a participant and competitor in the same relevant market and has
6  suffered damages as a direct consequence of CAC's actions.

7  ## ANTITRUST INJURY

8  123.   As alleged herein, CAC has engaged in an anticompetitive and exclusionary
9  scheme to prevent WESTLAKE and other competitors from developing, marketing, and
10 selling competing indirect financing profit sharing programs, all for the purpose of
11 maintaining and increasing CAC's dominant controlling market share.

12 124.   CAC's conduct has caused and produced antitrust injury, and unless enjoined
13 by this Court, will continue to produce at least the following anticompetitive, exclusionary
14 and injurious effects upon competition in interstate commerce:

15     (a)   competition in the development, marketing, and sale of indirect
16 financing profit sharing programs for used automobile loans has been substantially and
17 unreasonably restricted, lessened, foreclosed, and eliminated;

18     (b)   barriers to entry into the relevant market have been raised;

19     (c)   consumer/dealer choice has been, and will continue to be,
20 significantly limited and constrained as to selection, price and quality of such programs;

21     (d)   consumer/dealer access to WESTLAKE's competitive financing
22 programs will be artificially restricted and reduced, and WESTLAKE's programs will
23 continue to be excluded from the market;

24     (e)   the market for development, marketing, and sale of such programs
25 will continue to be artificially restrained or monopolized; and

26     (f)   CAC will continue to charge supracompetitive prices for these
27 programs to the detriment of consumers/dealers.

28 125.   CAC's exclusionary conduct has caused antitrust injury to WESTLAKE, the

1  industry, and to consumers/dealers.  Antitrust injury based upon a bad faith patent

2  prosecution claim and impermissibly broad assertion of a patent grant is satisfied by: (a)

3  loss of customers, and (b) attorneys' fees and costs incurred in defense of the prior patent

4  infringement suit and subsequent costs because such losses and costs are injuries which

5  flow from CAC's antitrust wrong.

6                                   **DAMAGES**

7        126.   By reason of, and as a direct and proximate result of, CAC's anticompetitive

8  and exclusionary practices and conduct, WESTLAKE has suffered, and will continue to

9  suffer, financial injury to its business and property.  As a result, WESTLAKE has been

10  deprived of revenue and profits it would have otherwise made, suffered diminished market

11  growth, sustained a loss of goodwill, and expended attorneys' fees/costs to defend against

12  a baseless patent infringement action and to prosecute related proceedings.  WESTLAKE

13  has not yet calculated the precise extent of its past damages and cannot now estimate with

14  precision the future damages that continue to accrue, but when it does so, it will seek leave

15  of the Court to insert the amount of the damages sustained herein.  WESTLAKE

16  conservatively estimates, however, that its actual damages exceed $3 million before

17  mandatory trebling.

18                       **SECOND CLAIM FOR RELIEF**

19                   **(Attempted Monopolization in Violation of**

20                   **Section 2 of the Sherman Act (15 U.S.C. § 2))**

21        127.   WESTLAKE hereby realleges and incorporates by reference each allegation

22  set forth in Paragraphs 1 through 126 of this First Amended Complaint, as if set forth in

23  full herein.

24        128.   Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, inter alia, attempts to

25  monopolize any part of the trade or commerce among the States.

26                             **RELEVANT MARKET**

27        129.   The relevant product market (or sub-market) for antitrust purposes in this

28  case is defined as the business of providing indirect financing for used car sales to dealers

---

29

1  through a profit sharing program.  There are no reasonable substitutes for used car loan
2  profit sharing indirect financing programs and consumers/dealers do not consider these
3  financing programs to be reasonably interchangeable with other types of financing
4  programs.  The cross-elasticity of demand between used car loan indirect financing profit
5  sharing programs and other types of financing programs is extremely low.

6      130.  The relevant geographic market for antitrust purposes is the United States.

7  ## **MONOPOLY POWER**

8      131.  CAC dominates the relevant market, possessing a market share greater than
9  85%.  CAC has the power to control prices and/or to exclude competition in the relevant
10  market.

11  ## **BARRIERS TO MARKET ENTRY AND EXPANSION**

12      132.  As described in Paragraph 107, significant and high barriers to market entry
13  exist that preclude or discourage new lenders from entering the relevant market.
14  Significant barriers to expansion also exist, which is evidenced by the fact that only a small
15  number of competitors have managed to marginally penetrate this market, many have
16  exited the market, and none have managed to capture more than a nominal market share.

17  ## **CAC'S PREDATORY AND EXCLUSIONARY CONDUCT**

18      133.  CAC's conduct and practices are predatory, anticompetitive and
19  exclusionary.  CAC's overall unlawful scheme is described in Paragraphs 108 through 121
20  above.

21  ## **WESTLAKE'S ANTITRUST STANDING**

22      134.  WESTLAKE has the requisite standing to assert antitrust claims against
23  CAC because it was a participant and competitor in the relevant market and has suffered
24  damages as a direct result of CAC's actions.

25  ## **DANGEROUS PROBABILITY OF SUCCESSFULLY OBTAINING A**
26  ## **MONOPOLY**

27      135.  Absent action by this Court to enjoin and preclude CAC from continuing its
28  anticompetitive and exclusionary conduct, there is a dangerous probability that CAC will

succeed in obtaining a monopoly in the relevant market for used car loan indirect financing profit sharing programs (or continue to monopolize), including the power to set prices, reduce output, or exclude competition in the market.

### SPECIFIC INTENT TO MONOPOLIZE

136.   CAC has undertaken its clearly anticompetitive and exclusionary conduct with the purpose of monopolizing, and with the deliberate and specific intent to monopolize the market for used car loan indirect financing profit sharing programs in the United States.  CAC specifically intends to eliminate, destroy or foreclose meaningful competition in the relevant market through the tactics described above.  CAC's conduct discourages and/or precludes buyers of such financing programs from dealing with or buying from competing indirect lenders such as WESTLAKE.  CAC's scheme is designed to exclude and thwart free and open competition on the merits.

137.   CAC's anticompetitive acts affect a substantial amount of interstate commerce in the relevant market and constitute attempted monopolization in violation of Section 2 of the Sherman Act.  CAC's conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Instead, its purpose and effect is to preserve and promote its monopoly position and market stranglehold, to the detriment of consumer/dealer welfare, WESTLAKE, and to CAC's other competitive rivals in the relevant market.

### ANTITRUST INJURY

138.   CAC's anticompetitive acts have caused substantial economic injury to WESTLAKE and have also injured competition in the relevant market by, *inter alia*, foreclosing, lessening, and eliminating competition and depriving dealers from securing lower-cost or higher-quality alternatives for CAC's financing programs.

139.   As described in Paragraph 123 through 125, CAC's conduct has caused and produced antitrust injury, and unless enjoined by this Court, will continue to produce anticompetitive, exclusionary, and injurious effects upon competition in interstate commerce.

140.   CAC's exclusionary conduct has caused antitrust injury to WESTLAKE, the industry, and consumers.  Antitrust injury based upon a bad faith patent infringement lawsuit and bad faith assertion of the impermissibly broadened scope of a patent grant is satisfied by: (a) loss of customers, and (b) attorneys' fees and costs incurred in defense of the prior patent infringement suit and subsequent defensive efforts because such losses and costs are injuries which flow from the antitrust wrong.

## DAMAGES

141.   By reason of, and as a direct and proximate result of, CAC's practices and conduct, WESTLAKE has suffered and will continue to suffer financial injury to its business and property.  As a result, WESTLAKE has been deprived of revenue and profits it would have otherwise made, has suffered diminished market growth, and has sustained a loss of goodwill, and expended attorneys' fees/costs to defend against a baseless patent infringement action and to prosecute related proceedings.  WESTLAKE has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.  WESTLAKE conservatively estimates, however, that its actual damages exceed $3 million before mandatory trebling.

## THIRD CLAIM FOR RELIEF

## (State Law Malicious Prosecution)

142.   WESTLAKE hereby alleges and incorporates by reference each allegation set forth in Paragraphs 1 through 141 of this First Amended Complaint, as if set forth in full herein.

143.   On March 4, 2013 CAC brought the Patent Infringement Action against Westlake.

144.   On August 24, 2015, CAC voluntarily dismissed the Patent Infringement Action against Westlake with prejudice.[8]  In CAC's motion for voluntary dismissal, CAC

---

[8]   *See* Order Granting Plaintiff's Motion to Voluntarily Dismiss with Prejudice and

characterized the dismissal as a termination on the merits in Westlake's favor.

145. CAC acted without probable cause in bringing the Patent Infringement Action because it knew that it had failed to identify the correct inventors for the '807 Patent to the USPTO and therefore knew that the '807 Patent was invalid. CAC willfully concealed the true inventors of the '807 Patent to limit the exposure of the upper-level management personnel such as Brett Roberts, Michael Knoblauch, and David Simmet, all of whom were aware of facts that would require the '807 Patent Application to be rejected by the USPTO.

146. CAC acted maliciously in bringing the Patent Infringement Action because it brought the action for the improper purpose of impeding Westlake's ability to compete with CAC without merit and deterring Westlake (and other potential competitors) from continuing to compete with CAC in the market for indirect financing of auto loans through a profit-sharing program.

147. As a proximate result of CAC bringing the Patent Infringement Action against Westlake, Westlake has been damaged in a sum to be determined at trial.

148. As a further proximate result of CAC's Patent Infringement Action against Westlake, Westlake incurred costs no less than $100,000 and no less than the sum of $3,500,000 as attorneys' fees in connection with litigation necessitated by Westlake's malicious prosecution of the Patent Infringement Action.

## PRAYER FOR RELIEF

WHEREFORE WESTLAKE prays that this Court adjudge and decree as follows:

1. That defendant CAC's conduct alleged in the First Claim for Relief herein be adjudged to be unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

2. That defendant CAC's conduct alleged in the Second Claim for Relief herein

_____

Denying Defendants' Motion for Leave to File Second Amended Answer and Counterclaims, *Credit Acceptance Corp. v. Westlake Services, LLC, et al.*, Case No. CV 13-01523 SJO (MRWx) (Aug. 25, 2015) (Dkt. No. 109).

1    be adjudged to be an unlawful attempt to monopolize in violation of Section 2 of the

2    Sherman Act (15 U.S.C. § 2);

3         3.      That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15),

4    WESTLAKE be awarded treble the amount of its actual damages and reasonable

5    attorneys' fees and costs of litigation;

6         4.      That, pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), the

7    predatory, anticompetitive, and exclusionary conduct of defendant CAC be permanently

8    enjoined;

9         5.      That defendant CAC maliciously and without probable cause brought the

10   Patent Infringement Action against Westlake; and

11        6.      That, pursuant to California Civil Code Section 3333, WESTLAKE be

12   awarded an amount which will compensate it for all the detriment proximately caused

13   thereby;

14        7.      That, pursuant to California Civil Code Section 3294, WESTLAKE be

15   awarded exemplary damages; and

16        8.      For such other and further relief as the Court deems just and proper.

17   DATED:  April 10, 2017            Ekwan E. Rhow
                                       Timothy B. Yoo
18                                     Julian C. Burns
                                       Ray S. Seilie
19                                     Bird, Marella, Boxer, Wolpert, Nessim,
                                       Drooks, Lincenberg & Rhow, P.C.
20

21

22
                                       By: _____
23                                          Timothy B. Yoo
                                            Attorneys for Plaintiff WESTLAKE
24                                          SERVICES, LLC d/b/a WESTLAKE
                                            FINANCIAL SERVICES
25

26

27

28

[PROPOSED] SECOND AMENDED COMPLAINT

1

## **<u>DEMAND FOR JURY TRIAL</u>**

WESTLAKE hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Local Rule 38-1.

DATED:  April 10, 2017

Ekwan E. Rhow
Timothy B. Yoo
Julian C. Burns
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: _____
Timothy B. Yoo
Attorneys for Plaintiff WESTLAKE
SERVICES, LLC d/b/a WESTLAKE
FINANCIAL SERVICES

3368505.3

35