JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600
Email:       jason.russell@skadden.com
             douglas.smith@skadden.com

JONATHAN L. FRANK *admitted *pro hac vice*
JAMES A. KEYTE *admitted *pro hac vice*
PATRICK G. RIDEOUT *admitted *pro hac vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:   (212) 735-3000
Facsimile:   (212) 735-2000
Email:       jonathan.frank@skadden.com
             james.keyte@skadden.com
             patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>Defendant. | CASE NO: 2:15-cv-07490 SJO (MRWx)<br><br>**(1) DEFENDANT CREDIT ACCEPTANCE CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.;**<br><br>*Filed Under Separate Cover*:<br><br>**(2) DECLARATION OF ZACHARY FAIGEN; and**<br><br>**(3) [PROPOSED] ORDER.**<br><br>The Honorable Judge S. James Otero<br><br>Hearing Date:      Oct. 2, 2017<br>Hearing Time:      10:00 a.m.<br>Courtroom:         10C<br><br>Pretrial Conference:   Nov. 20, 2017<br>Trial Date:            Dec. 4, 2017 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 2, 2017, at 10:00 a.m. PT, or as soon thereafter as the matter may be heard, before the Honorable S. James Otero in Courtroom 10C of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, Defendant Credit Acceptance Corporation ("CAC") will move the Court to exclude the expert opinions of Dr. Donald House, Sr., pursuant to Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Dr. House's opinions regarding the relevant product market should be excluded because his economic analyses in support of his product market opinions are methodologically flawed and do not address substitutability, which is necessary under settled law.

Dr. House's opinions regarding the relevant geographic market should be excluded because he fails to undertake any economic analysis to support his opinions; instead, his opinions are unsubstantiated assertions that are unconnected to market realities.

Dr. House's opinions regarding damages should be excluded because his damages model (i) ignores marketplace realities, (ii) improperly assumes that Plaintiff Westlake Services, LLC's purported damages were caused by CAC's alleged anticompetitive conduct, and (iii) does not disaggregate the impact and damages attributable to lawful competition or unrelated market events.

This motion is based on this Notice of Motion and Motion to Exclude the Expert Opinions of Donald House, Sr., the Memorandum of Points and Authorities, the Declaration of Zachary Faigen and accompanying exhibit, all pleadings and papers on file in this action, all matters of which this Court may take judicial notice, and such other and further oral or documentary evidence as may be presented to the Court at or prior to the hearing on this motion.

i

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1    This motion is made following the conference of counsel pursuant to Local Rule 7-

2    3, which took place telephonically on August 21, 2017.

3

4    DATED:  August 28, 2017

5                             SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

6

7    By: _____ */s/ Jason D. Russell* _____
                         Jason D. Russell
8                **Attorney for Defendant Credit Acceptance Corporation**

9

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ............................................................................1

ARGUMENT .................................................................................4

I.   DR. HOUSE'S PRODUCT MARKET  OPINIONS ARE METHODOLOGICALLY FLAWED .........................................5

    A.   Dr. House Was Required to Perform a Substitutability Analysis to Support His Proposed Relevant Product Market Definition ..........5

    B.   Dr. House's Analyses Are Methodologically Flawed, Unreliable, and Do Not Properly Address Substitutability .....................7

    C.   Dr. House Cannot Build a Product Market Around Targeted Customers ...........................................11

II.  DR. HOUSE'S GEOGRAPHIC MARKET IS CONTRARY TO LAW .....13

III. DR. HOUSE'S ARTIFICIAL MODEL IS METHODOLOGICALLY INCAPABLE OF ADDRESSING ANTITRUST INJURY OR DAMAGES ...........................................................15

    A.   Dr. House's Damages Model Ignores Marketplace Realities ............15

    B.   Dr. House's Damages Model Improperly Assumes Causation..........17

CONCLUSION ...........................................................................20

iii

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

# TABLE OF AUTHORITIES

## CASES

*AFMS LLC v. United Parcel Service Co.*,
No. CV 10-5830 JGB (AJWx), 2014 WL 12515335
(C.D. Cal. Feb. 5, 2014) ................................................................. 1, 2, 5, 6

*Apple, Inc. v. Samsung Electronics Co.*,
No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012)........... 3, 15

*Bailey v. Allgas, Inc.*,
148 F. Supp. 2d 1222 (N.D. Ala. 2000), *aff'd*, 284 F.3d 1237
(11th Cir. 2002) ........................................................................................ 14

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ................................................... 15, 16, 19

*Carter v. Variflex, Inc.*,
101 F. Supp. 2d 1261 (C.D. Cal. 2000) ........................................................ 5

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ............................................... 15, 16, 19, 20

*In Re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*,
984 F. Supp. 2d 1021 (C.D. Cal. 2013) ....................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................................. 1, 5

*Education Logistics, Inc. v. Laidlaw Transit, Inc.*,
No. CV 07-06-M-DWM, 2012 WL 761950 (D. Mont. March 8, 2012) ................ 18

*El Aguila Food Products, Inc. v. Gruma Corp.*,
131 F. App'x 450 (5th Cir. 2005) .............................................................. 17

*In re Fresh Del Monte Pineapples Antitrust Litigation*,
No. 04-md-1628 (RMB)(MHD), 2009 WL 3241401 (S.D.N.Y. Sept. 30,
2009) ...................................................................................................... 6, 8

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)................................................................................ 5, 15

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
895 F.2d 1417 (table), 1990 WL 12148 (9th Cir. 1990) ....................... 5, 8

*Heerwagen v. Clear Channel Communications*,
435 F.3d 219 (2d Cir. 2006), *overruled in part on other grounds by*
*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546
F.3d 196 (2d Cir. 2008) ....................................................... 3, 14, 15

*It's My Party, Inc. v. Live Nation, Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) ....... 3, 13, 14

*Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) ........................................................... *passim*

iv

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

*In re Live Concert Antitrust Litigation*,
  863 F. Supp. 2d 966 (C.D.Cal. 2012) ...................................... 5, 6, 12, 19, 20

*Magnetar Technologies Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015) .................................................. 4, 15, 18, 20

*McGlinchy v. Shell Chemical Co.*,
  845 F.2d 802 (9th Cir. 1988) ................................................... 4, 15, 17, 18

*McLaughlin Equipment Co. v. Servaas*,
  No. IP98-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ..................... 6

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
  924 F.2d 1484 (9th Cir. 1990) ................................................................ 13

*Oltz v. Saint Peter's Community Hospital*,
  861 F.2d 1440 (9th Cir. 1988) ............................................................... 2, 5

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*,
  371 F. App'x 719 (9th Cir. 2010) ............................................................ 1, 6

*R.S.E., Inc. v. Pennsy Supply, Inc.*,
  523 F. Supp. 954 (M.D. Pa. 1981) ............................................................ 19

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................... 5

*In re REMEC Inc. Securities Litigation*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................. 19, 20

*Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.*,
  63 F.3d 1267 (3d Cir. 1995) .................................................................. 17

*United States v. Rockford Memorial Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ........................................................... 12, 13

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*,
  98 F. Supp. 2d 729 (W.D. Va. 2000) ......................................................... 10

*Water Craft Management, L.L.C. v. Mercury Marine*,
  361 F. Supp. 2d 518 (M.D. La. 2004), *aff'd*, 457 F.3d 484 (5th Cir. 2006) ...... 13, 14

*Williams v. Boeing Co.*,
  No. C98-761P, 2006 WL 126440 (W.D. Wash. Jan. 17, 2006) ............................... 9

## RULES

Fed. R. Evid. 702(a) ........................................................................... 5

## OTHER AUTHORITIES

*Phillip E. Areeda & Herbert Hovenkamp*, Antitrust Law: An Analysis of Antitrust
  Principles and Their Application (4th ed. 2015) ........................................... 16

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010),
  http://ftc.gov/os/2010/08/100819hmg.pdf ........................................ 2, 3, 10, 12, 13

Pursuant to Federal Rule of Evidence 702, Credit Acceptance Corporation ("CAC") moves to exclude the testimony of Dr. Donald House, Sr., an expert proffered by Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake").

## INTRODUCTION

In this antitrust case, Westlake contends that CAC fraudulently applied for and received U.S. Patent No. 6,950,807 (the "'807 Patent"), and that this patent allowed CAC to achieve monopoly power in the purported narrow relevant product market for indirect financing through a "profit-sharing" program. (Declaration of Douglas A. Smith ISO CAC's Motion for Summary Judgment ("Smith Decl.") (ECF No. 187-3) Ex. 22 ("House Rpt.") ¶ 6.) Westlake claims that the '807 Patent prevented it from offering a profit-sharing program that could effectively compete to acquire loan contracts (known as Retail Installment Sales Contracts ("RISCs")) from dealers, and that this allegedly caused Westlake damages of over $300 million in lost profits beginning in 2004, and continuing for three years into the future to 2020. (*Id.* ¶ 14, Tables 5-6, pg. 43.)

Because an antitrust plaintiff cannot prove its case without expert testimony,[1] Westlake relies on Dr. Donald House, Sr., to attempt to establish the necessary elements of its antitrust claims: (i) market definition, (ii) market power in the relevant market, (iii) injury to competition and (iv) damages. As set forth below, Dr. House's opinions are both irrelevant *and* unreliable, and, thus, should be excluded under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) and its progeny.

*First*, with respect to the relevant product market—*i.e.*, "the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand,"

---

[1] *See, e.g., Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 721 (9th Cir. 2010) (without expert testimony, plaintiff had "insufficient evidence to sustain a jury verdict on its proposed market definition"); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (excluding expert opinion that failed to connect the alleged antitrust injury to specific acts committed by defendant); *AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, at *6 (C.D. Cal. Feb. 5, 2014) ("In order to opine on issues related to market definition and competition, the Ninth Circuit requires expertise in the area of economics.").

1

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988)—Dr. House's analysis is methodologically flawed and his opinions fatally deficient. Although he asserts that the relevant product market is "indirect financing for used car sales through a profit-sharing program" (House Rpt. ¶ 32), Dr. House readily concedes there are many forms of car financing available to dealers that are functional substitutes and achieve the same ultimate purpose of providing financing for used car purchasers (*e.g.*, purchase programs and Buy-Here-Pay-Here financing ("BHPH")). Dr. House opines that the purportedly distinct economic "submarket" for "profit-sharing" programs is effectively insulated from competition from these other financing products. Accordingly, under well-settled law, Dr. House must show, with *economic analysis*, that profit-sharing programs and other forms of financing are not subject to reasonable interchangeability of use and cross-elasticity of demand—*i.e.*, that dealers do not (or could not) switch from a profit-sharing program to another form of financing in response to significant changes in price or other competitive factors. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009) (substitutability analysis is necessary given the variety of comparable products at issue); *AFMS*, 2014 WL 12515335, at *8 ("[C]ourts have made clear that a detailed examination of market data and a thorough economic analysis are required for admissibility of 'antitrust economics' opinions . . . .").

This Dr. House does not and cannot do. The sole economic analyses he employs—namely (i) a probit model[2] and (ii) the hypothetical monopolist test ("HMT")[3]—do not address the fundamental and necessary question of substitutability in the relevant product market. Dr. House acknowledged his probit model cannot show whether dealers switch

---

[2] A probit model analyzes whether a given set of factors leads to certain choices in the real world. (*See infra* Part I.A.)

[3] The hypothetical monopolist test described in the U.S. Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines asks whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") on the product in the proposed market. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines, 8-9 (2010), http://ftc.gov/os/2010/08/100819hmg.pdf ("Merger Guidelines"); s*ee also infra* Part I.B.

between profit-sharing and other finance programs on a deal-by-deal basis. It is thus irrelevant and cannot support his market definition. Dr. House's HMT is also flawed, as it does not conform to the methodology described by the Merger Guidelines. *See* Merger Guidelines at 8-9. Dr. House admits that competition in the market takes place on a deal-by-deal basis, and acknowledges the relevant transaction in his proposed relevant market is the lenders' acquisition of RISCs from dealers. But he erroneously applies a SSNIP to CAC's enrollment and monthly program fees, which are unconnected to the relevant individual financing transactions.[4] Because Dr. House's HMT examines a price term outside the market he identifies, it skirts the required analytical framework and cannot survive scrutiny under *Daubert*.

*Second*, while Dr. House opines that the relevant geographic market is the entire United States (House Rpt. ¶¶ 46-47), he offers no meaningful economic analysis to support this opinion. Rather, he simply asserts that because there are lenders such as CAC and Westlake that compete in local markets throughout the country, the relevant geographic market must be nationwide. Dr. House's opinion is contrary to law. Where competition occurs locally—and Dr. House admits there are local and regional players who compete with CAC and Westlake on a deal-by-deal basis—the "market's geographic dimension is local, not national." *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 492 (D. Md. 2015) ("The fact that Live Nation promotes in many localities throughout the country simply does not by itself justify defining the promotion market nationally."); *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) ("Local markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally."). Because Dr. House's opinion on the relevant geographic market contravenes the legal standard, it cannot aid the trier of fact and must be excluded. *See It's My Party*, 88 F. Supp. 3d at 492; *cf. Apple, Inc. v.*

---

[4] CAC charges dealers enrollment and licensing fees for access to their internet-based software program (*i.e.*, "CAPS"). These fees cover dealer participation in *all* of CAC's indirect financing programs, not just CAC's profit-sharing program.

1    *Samsung Elecs. Co.*, 2012 WL 2571332, at *7 (N.D. Cal. June 30, 2012) (expert opinion
2    "will not assist the trier of fact" because it is "contrary to law").

3      *Third*, Dr. House employs a methodologically unsound and unreliable injury and
4    damages model. In claiming to calculate what Westlake's profits would have been in the
5    "but-for" world (*i.e.*, absent CAC's alleged anticompetitive behavior), Dr. House eschews
6    the two standard methodologies for assessing antitrust impact and damages—the "before-
7    after" and "yardstick" methods. Instead, Dr. House bases his calculations on a 1986 study
8    of certain U.S. consumer products. The authors of that study used results from consumer
9    surveys conducted in shopping malls from 1979-82 to predict market shares in those
10    consumer goods markets. Dr. House admits this study has never been applied to *any*
11    consumer financing industry, much less indirect auto financing. (Declaration of Zachary
12    Faigen Ex. 1 ("House Tr.") 332:5-13.) Nevertheless, Dr. House uses this study as the sole
13    basis for his impact and damages calculations, and assumes—without analyzing the auto
14    finance industry at all (*Id.* 331:13-23)—that the "but-for" market shares the 1986 survey
15    authors predicted for those U.S. consumer goods would *exactly mirror* the market shares
16    in his proffered market of indirect auto financing through a profit-sharing program.

17      Further, Dr. House fails to connect Westlake's purported damages to CAC's alleged
18    anticompetitive conduct—a fundamental and fatal methodological flaw. Rather, he
19    simply assumes that all of Westlake's lost profits were caused by CAC. (*Id.* 217:1-7.)
20    Settled *Daubert* law does not permit this. *See, e.g.*, *McGlinchy*, 845 F.2d at 806-07.
21    Moreover, because Dr. House simply assumes that all of Westlake's purported damages
22    were caused by CAC, he does not—as he must—separate the impact and damages
23    attributable to lawful competition or unrelated market events. That failure also warrants
24    exclusions of Dr. House's damages opinions. *See Magnetar Techs. Corp. v. Intamin, Ltd*.,
25    801 F.3d 1150, 1160 (9th Cir. 2015).

26      <u>**ARGUMENT**</u>

27      Federal Rule of Evidence 702 permits expert testimony if "scientific, technical, or
28    other specialized knowledge will help the trier of fact to understand the evidence or to

1  determine a fact in issue." Fed. R. Evid. 702(a). The proponent of the proposed expert

2  testimony bears the burden of establishing the admissibility requirements are met by a

3  preponderance of the evidence. *AFMS*, 2014 WL 12515335, at *2.

4      Rule 702 requires that any scientific testimony or evidence admitted is both

5  relevant and reliable. *Daubert*, 509 U.S. at 589. The relevance prong is often described in

6  terms of "fit," and the Supreme Court has cautioned that "'[f]it is not always obvious, and

7  scientific validity for one purpose is not necessarily scientific validity for other, unrelated

8  purposes." *Id.* at 591. If there is "too great an analytical gap between the data and the

9  opinion proffered," the expert opinion must be excluded. *Gen. Elec. Co. v. Joiner*, 522

10 U.S. 136, 146 (1997). The reliability prong demands that experts use valid scientific

11 methodology to reach their conclusions. *See Daubert*, 509 U.S. at 590. Subjective belief

12 or speculation cannot satisfy this standard. *See id.*

## I.   DR. HOUSE'S PRODUCT MARKET OPINIONS ARE METHODOLOGICALLY FLAWED

### A.   Dr. House Was Required to Perform a Substitutability Analysis to Support His Proposed Relevant Product Market Definition

16     A relevant product market "includes the pool of goods or services that enjoy

17 reasonable interchangeability of use and cross-elasticity of demand." *Oltz*, 861 F.2d at

18 1446. Reasonable interchangeability examines whether products perform the same

19 function. *Ky. Speedway*, 588 F.3d at 917; *see also Carter v. Variflex, Inc.*, 101 F. Supp.

20 2d 1261, 1266-67 (C.D. Cal. 2000) (products that serve the same function and are sold to

21 the same group of consumers belong in the same market). Cross-elasticity of demand

22 measures the rate at which consumers switch to substitutes in response to price changes.

23 *Ky. Speedway*, 588 F.3d at 917; *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966,

24 984 (C.D. Cal. 2012). The critical inquiry for market definition is, thus,

25 substitutability—whether consumers can defeat a significant price increase by switching

26 to substitute products. *See Ky. Speedway*, 588 F.3d at 917 (substitutability analysis is

27 necessary given the variety of comparable products at issue); *Rebel Oil Co. v. Atl.*

28

5

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1   *Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (expert examination of whether other
2   producers constrain the price-increasing ability of a potential monopolist is required).
3   Evidence that products merely have distinct characteristics, however, is irrelevant to
4   market definition. *See, e.g.*, *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams,*
5   *Inc.*, 895 F.2d 1417 (table), 1990 WL 12148, at *3 (9th Cir. 1990) ("'Courts have
6   repeatedly rejected efforts to define markets by price variances or product quality
7   variances.'") (citation omitted); *accord In re Fresh Del Monte Pineapples Antitrust Litig.*,
8   2009 WL 3241401, at *11 (S.D.N.Y. Sept. 30, 2009) (evidence that the MD-2 pineapple
9   is distinct from other pineapples is "largely irrelevant in determining whether the MD-2
10   pineapple forms a distinct submarket.").

11       Defining a market for antitrust purposes requires economic expertise. *See AFMS*,
12   2014 WL 12515335 at *6; *Plush Lounge*, 371 F. App'x at 721; *In re Live Concert*, 863 F.
13   Supp. 2d at 1000. To be admissible, expert opinions on market definition must be based
14   on economic analysis that uses market data to address substitutability among products.
15   *See, e.g.*, *Ky. Speedway*, 588 F.3d at 917; *AFMS*, 2014 WL 12515335 at *8 ("[C]ourts
16   have made clear that a detailed examination of market data and a thorough economic
17   analysis are required for admissibility of 'antitrust economics' opinions."); *McLaughlin*
18   *Equip. Co., v. Servaas*, 2004 WL 1629603, at *7 (S.D. Ind. Feb. 18, 2004) (excluding
19   expert opinion "not based on the type of data reasonably relied on by economists such as
20   market data analysis or cost analysis"). While experts may look to qualitative factors to
21   inform their economic analysis, "these practical indicia come into play only after the
22   'outer boundaries of a product market are determined' by evaluating 'the reasonable
23   interchangeability of use or the cross-elasticity of demand between the product itself and
24   substitutes for it.'" *Ky. Speedway*, 588 F.3d at 918 (quoting *Brown Shoe Co. v. United*
25   *States*, 370 U.S. 294, 325 (1962)). Absent proper economic analysis of product use or
26   consumer response to price changes, expert opinions on market definition must be
27   excluded. *See id.* at 918-19; *McLaughlin*, 2004 WL 1629603, at *7.

28

## B. Dr. House's Analyses Are Methodologically Flawed, Unreliable, and Do Not Properly Address Substitutability

Dr. House opines that the relevant product market is "indirect financing for used car sales through a profit-sharing program." (House Rpt. ¶ 32.) In indirect financing,[5] the buyer obtains a loan (the RISC) from the car dealer with the dealer having arranged—through an auction-like process—to sell or assign the RISC to a lender, which thereafter services the RISC and collects payments from the buyer. Within the fragmented marketplace for indirect financing there are thousands of lenders (including Westlake and CAC) that offer various programs to dealers with numerous price and non-price features. The types of programs that lenders offer include "purchase" programs—where the dealer receives an immediate, lump-sum payment from the lender with no sharing of future collections or risk of default—and "profit-sharing" programs where the dealer receives an immediate, lump-sum payment and the opportunity to share in some portion of future collections and/or risk of non-payment.[6]

While Dr. House acknowledges that dealers have alternative financing options, and these financing options serve the *same function* as a profit-sharing program (*i.e.*, providing compensation to dealers in exchange for the dealers' RISCs), he asserts that profit-sharing programs nevertheless constitute a separate antitrust submarket. (House Tr. 36:5-20.) Dr. House admittedly did not conduct a direct analysis of cross-elasticity of demand to support his proposed submarket. (*Id.*. 222:12-18.) Rather, Dr. House offers two economic analyses: (i) a probit model, which attempts to successfully predict which indirect financing option a dealer will choose, based on certain loan characteristics; and (ii) the HMT. (House Rpt. App'x B, App'x C.) As set forth below, Dr. House's use of

---

[5] Indirect auto financing is one of three main categories of financing for consumers seeking to purchase a used vehicle. The other two categories are (i) direct financing, where the car buyer obtains a loan directly from a lender, like a bank, and uses the proceeds to buy a car, and (ii) BHPH, where the consumer obtains a loan from the dealer, and the dealer services the loan.

[6] For a more complete recitation of marketplace dynamics, *see* CAC Statement of Undisputed Material Facts (ECF No. 187-2) ¶¶ 60, 61, 64, 67-73, 75-76, 105-115, 118.

1  each methodology is fundamentally flawed, and therefore cannot support his opinions

2  under *Daubert*. Absent these methodologies, Dr. House's market definition opinion lacks

3  the required economic analysis and should be excluded in its entirety.

## 1.  Dr. House's Probit Model Is Irrelevant and Unreliable

5  Dr. House's probit model looks at five loan characteristics—interest rate, loan

6  value, book value of the vehicle, monthly payment and consumer credit score—and uses

7  those characteristics to attempt to predict whether historical RISCs were sold or assigned

8  via a purchase program or a profit-sharing program. (*Id.* App'x B at 52-53.) The probit

9  model, however, is incapable of addressing substitutability among products, and is based

10  on data that does not differentiate between purchase and profit-sharing programs, which

11  makes the data unreliable for Dr. House's stated purpose.

### (a)  Dr. House's Probit Model Does Not Address Substitutability

13  Dr. House acknowledges that his model does not show whether dealers can or

14  actually do switch between purchase and profit-sharing programs on a deal-by-deal basis,

15  and that the model "doesn't address the issue of substitutability" at all:

> Q: . . . Let me make sure I understand what your probit model can do and cannot do in your view. . . . Am I correct that it cannot address whether dealers currently switch back and forth between methods of financing? . . .
> A: It -- right. . . . It says that they're different, but it doesn't address the issue of substitutability. . . .
> Q: So it also likewise can't identify whether dealers could switch to others in the event of a decrease in compensation for the same reason?
> A: It does not.

22  (House Tr. 253:15-254:16.) At best, Dr. House's model shows that profit-sharing

23  programs "finance deals with observably distinct statistical characteristics." (House Rpt.

24  ¶ 36 (referring to the five loan characteristics).) But, even if true, such differentiation

25  cannot inform market definition. *See Haagen-Dazs*, 1990 WL 12148, at *3; *Fresh Del

26  Monte Pineapples*, 2009 WL 3241401, at *11. These failures render Dr. House's probit

27  model irrelevant and unhelpful to the trier of fact. *See Ky. Speedway*, 588 F.3d at 917.[7]

---

28  [7] Contrary to the stated relevant product market definition in Dr. House's Report of *all*

*(cont'd)*

8

### (b)   The Data Underlying Dr. House's Probit Model Are Unreliable

Dr. House's probit model is also unreliable because it is based on data that do not differentiate between purchase programs and profit-sharing programs. Economic modeling requires accurate data to produce reliable conclusions. *See Williams v. Boeing Co.*, 2006 WL 126440, at *3 (W.D. Wash. Jan. 17, 2006) (finding expert's probit analysis was not reliable because expert relied on indicator that was not accurate or consistent measure of whether promotion occurred). If the underlying data are unreliable, an expert cannot draw reliable conclusions from that data, and the analysis is properly excluded. *See In Re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1040 (C.D. Cal. 2013) (excluding economic analysis due to "serious bias" in the data).

Here, the Equifax data underlying Dr. House's probit model are inherently unreliable for his stated purpose. *Equifax does not track whether a deal was financed with a profit-sharing program or a purchase program*. (House Tr. 258:9-13; 265:19-24.) Therefore, Dr. House was unable to identify which loans in his data set were funded by purchase programs and which were funded by profit-sharing. Without that data, Dr. House simply assumed that *all* loans financed by CAC (and two other lenders that offer profit-sharing programs) were profit-sharing loans. CAC, however, offers a purchase program in addition to its profit-sharing program. The model thus improperly characterizes CAC's purchase program loans as profit-sharing loans. (House Rpt. App'x B at 49 n.85; House Tr. 261:8-262:13.)[8] Similarly, despite acknowledging that there are

---

*(cont'd from previous page)*

deals financed by a profit-sharing program, Westlake now claims the probit model proves there is a "captive population" of dealers who can *only* finance deals through a profit-sharing program. (Westlake's Opp. to CAC's Motion for Summary Judgment (ECF No. 200) at 21).) But, to establish such a group, Westlake still would need the requisite substitutability analysis, which neither Dr. House's probit model nor HMT provides. Moreover, even assuming Dr. House had performed such analysis with respect to these alleged *targeted consumers* with particular characteristics (which he does not provide), he would still need to perform a price discrimination analysis, which he admits he did not do. (*See infra* Part I.C.)

[8] It bears emphasis that Dr. House (through Westlake) requested and received deal-specific data for CAC's profit-sharing and purchase programs, but did not use or analyze

*(cont'd)*

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1  local and regional lenders who offer profit-sharing programs, Dr. House stated that he
2  "d[id]n't know how [he] would identify them" (House Tr. 262:16), and therefore elected
3  to simply count all loans assigned to those lenders as purchase deals, even though an
4  unknown number were not. (*Id.* 274:7-17.) Thus, while Dr. House purports to compare
5  profit-sharing and purchase programs using his probit model, the flawed underlying data
6  prevent him from accurately doing so. Accordingly, even if the results from his model
7  were somehow relevant to market definition—they are not—such results are inherently
8  unreliable and, thus, unhelpful to the trier of fact.

9  ### 2.  Dr. House's HMT Is Also Methodologically Flawed

10  Dr. House's HMT is similarly flawed. In the abstract, the HMT is designed to
11  evaluate whether products are reasonably interchangeable, and thus belong in the same
12  antitrust market. *See* Merger Guidelines at 8-9. The test asks whether a hypothetical
13  monopolist could profitably impose a SSNIP on a relevant product *in the alleged market*
14  *at issue*. *Id.* at 9. At its core, the HMT is a test of substitutability: if enough consumers
15  could switch to alternative products such that the SSNIP would be unprofitable, then the
16  product market must expand to include those alternatives. *See Ky. Speedway*, 588 F.3d at
17  918. Experts cannot perform their "own version" of the SSNIP analysis that lacks
18  appropriate controlling standards. *Id.* Expert opinions that identify a historically
19  profitable price increase, but do not address consumer switching, cannot serve as reliable
20  evidence of whether a defendant can raise prices over competitive levels. *Va. Vermiculite*
21  *Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 737 (W.D. Va. 2000) ("[A]n
22  observed price increase may result from a rightward shift of a demand curve, a leftward
23  shift of a supply curve, or a combination of these two movements.").

24  Dr. House acknowledges that the relevant transaction in his proposed relevant
25  market is the lenders' acquisition of RISCs from dealers, and lenders compete to acquire

26  _____

27  *(cont'd from previous page)*
this data for any purpose, including for his probit model. (*See* CAC Statement of
28  Undisputed Material Facts (ECF No. 187-2) ¶¶ 86-87.)

1  RISCs on a deal-by-deal basis. (*See* House Tr. 67:13-69:9; 239:25-240:19.) Thus, the
2  relevant price term for a SSNIP in this market is the compensation lenders offer to
3  dealers to acquire RISCs. Given that, a proper HMT would assess whether a hypothetical
4  monopolist of profit-sharing programs could profitably decrease compensation to dealers
5  through a profit-sharing program on a deal-by-deal basis. If enough dealers could switch
6  to other means of financing in response to that decrease in compensation, then the
7  relevant market is too narrow, and must be expanded to include those substitute products.

8  Here, Dr. House's HMT does not perform the necessary assessment, because it
9  does not analyze the relevant price term—*i.e.*, the compensation offered to dealers for
10 their RISCs. Instead, Dr. House analyzes the effect of a 2001 price increase for CAC's
11 enrollment and monthly program fees. (House Rpt. App'x C at 56-59.) Those fees,
12 however, are unrelated to the relevant transaction in the proposed market, as defined by
13 Dr. House: "Q: And the candidate market here is the acquisition of RISC contracts
14 through a profit sharing program, right? That's the market definition. A: That is correct."
15 (House Tr. 239:25-240:4.) By focusing on a 2001 increase in CAC's enrollment and
16 monthly program fees, Dr. House's HMT ignores the price being paid in the relevant
17 financing transactions within his proposed market, which again is the compensation
18 lenders offer for individual RISCs. Dr. House's failure to properly analyze this price is
19 contrary to the methodology established by the Merger Guidelines. Indeed, as designed,
20 Dr. House's HMT is irrelevant to the ultimate question of substitutability within the
21 proposed market, because it does not (and cannot) analyze whether dealers would switch
22 to alternative methods of financing for individual deals. Thus, Dr. House's product
23 market opinions based on his HMT must be excluded. *See Ky. Speedway*, 588 F.3d at 918.

24 ### C.  Dr. House Cannot Build a Product Market Around Targeted Customers

25 Dr. House testified repeatedly that loans for credit-challenged consumers—even
26 deep subprime borrowers—are funded through both profit-sharing *and* purchase
27 programs. (House Tr. 64:10-13 ("Q: So . . . there are dealers who participate in deep
28 subprime with purchase programs and profit sharing programs? A: Yes, yes."); 119:20-23;

270:16-24.) Perhaps realizing that such a concession undermines his proposed relevant market, Dr. House appeared to pivot at his deposition to a new proposed submarket built around a conceptualized subset of deep subprime car buyers who can *only* obtain financing through a profit-sharing program. (*Id.* 50:22-25; 119:3-23.) Dr. House claims that purchase programs cannot compete for this "captive population." (*Id.* 119:3-8.)

A product market definition built around targeted customers, however, cannot be maintained unless a hypothetical monopolist could (i) identify the captive customers, and (ii) profitably impose a SSNIP on them. Merger Guidelines at 12; *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990) ("Diet soft drinks sold to diabetics are not a relevant product market . . . because the manufacturers cannot separate their diabetic customers from their other customers and charge the former a higher price."). Here, Dr. House did not identify any subset of deep subprime consumers, much less a captive subset. In fact, when asked at his deposition to identify the characteristics of his claimed "captive population" within the deep subprime credit tranche, Dr. House replied: "possibly unemployed, with limited prospects for employment, possibly a spouse that has a night job, few assets, maybe bankrupt once." (House Tr. 84:7-10.)[9] Dr. House provides no evidence—industry data, economic analysis, or anything else—to support a relevant product market of used car financing through a profit-sharing program for consumers who, among other things, have "a spouse that has a night job." Such an unsupported opinion not only reveals Dr. House's inability to define a relevant market, its unreliability means it cannot possibly aid the trier of fact. *See In re Live Concert*, 863 F. Supp. 2d at 994 (excluding expert opinion where the "purported definition . . . is neither sufficiently reliable nor sufficiently helpful to the trier of fact").

Dr. House's probit model similarly cannot support a submarket built around a subset of deep subprime consumers. As he acknowledged at his deposition, while his

---

[9] Notably, these characteristics are neither analyzed by Dr. House's probit model nor mentioned anywhere in his report.

12

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1  probit model was good at predicting when a loan was sold or assigned via a purchase

2  program, *it was almost never able to correctly predict when a loan was sold or assigned*

3  *via a profit-sharing program.* (House Tr. 288:16-291:21.) [10] Dr. House ultimately

4  conceded that his model was not designed to accurately assign loans, and was incapable

5  of doing so. (*Id.* at 294:8-295:10.) Dr. House's model, thus, cannot identify the "captive"

6  deals that can only be financed with a profit-sharing program, and provides no support

7  for a submarket within the profit-sharing submarket built around these five characteristics.

8  Finally, even if such a captive subset of consumers *could* be identified, Dr. House

9  concedes he has not performed any price discrimination analysis (*id.* 321:21-23), which is

10  required to sustain a market definition based on targeted customers. Merger Guidelines at

11  12; *Rockford*, 898 F.2d at 1284. Therefore, any opinions Dr. House offers regarding a

12  newly proposed submarket built around targeted consumers must be excluded.

13  ## II.   DR. HOUSE'S GEOGRAPHIC MARKET IS CONTRARY TO LAW

14  Dr. House's conclusory opinions with respect to the relevant geographic market are

15  equally flawed. An expert's geographic market analysis must identify the area where

16  competition takes place, and is a "'fact-intensive exercise centered on the commercial

17  realities of the market and competition' between entities in the market." *It's My Party*, 88

18  F. Supp. 3d at 491; *see also Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924

19  F.2d 1484, 1490 (9th Cir. 1991) (geographic market definition is a "highly technical

20  economic question"); *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518,

21  542 (M.D. La. 2004) ("A plaintiff cannot rely solely on a competitor's service area to

22  compose the geographic market"); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1233

---

23  

24  [10] Dr. House states that "[t]he use of the regression coefficients [*i.e.*, the five loan characteristics] in assigning deals between the two groups results in a success rate of

25  88.48%." (House Rpt. App'x B at 54.) That number is misleading, at best. Among the RISCs in Dr. House's data set that were assigned via a purchase program, his probit

26  model correctly predicted "purchase" 98.62% of the time. For RISCs assigned via profit-sharing, however, the model correctly predicted "profit-sharing" just 0.38% of the time.

27  Thus, the model's 88.48% "success" rate was a function of 90% of the loans in the data set being purchase loans (which the model predicted almost entirely correctly), and only

28  10% being profit-sharing (which the model got almost entirely wrong).

1  (N.D. Ala. 2000) ("The sales area of an antitrust plaintiff has never been a proxy for a
2  geographic market."). Critically, an economic expert cannot ignore local competition
3  when defining the geographic market. *It's My Party*, 88 F. Supp. 3d at 492 (finding that
4  "the promotion market's geographic dimension is local, not national" and "[t]he fact that
5  Live Nation promotes in many localities throughout the country simply does not by itself
6  justify defining the promotion market nationally"); *see also Heerwagen*, 435 F.3d at 230
7  (market for concert tickets is local despite presence of national firms).

8      Here, Dr. House offers the bare opinion that, because there are lenders who offer
9  profit-sharing programs throughout the nation, the market must be national. (House Rpt.
10  ¶¶ 46-47; House Tr. 228:14-18 ("Q: So your opinion is that as a matter of economics, any
11  time there are national players that are competing against each other, the market is
12  national? A: Yes, absolutely.").) This assertion, however, is unconnected to competitive
13  reality. Indeed, Dr. House acknowledges that there are local and regional competitors that
14  offer profit-sharing products, and these firms compete vigorously for individual deals at
15  individual dealerships on a deal-by-deal basis. (*Id.* 227:9-12 ("Q: You would agree that
16  the national players compete against local and regional players for RISC contracts? A:
17  Yes."); 230:1-6 ("Q: I'm not talking about the long run. I'm talking about the short run.
18  I'm talking about individual bidding situations, you would agree that there are local
19  regional players competing vigorously for that business, correct? A: Correct.").)

20      While acknowledging this vigorous local competition, Dr. House eschews any
21  fact-intensive analysis, and simply asserts that the geographic market must be national
22  since the parties to this litigation service local markets throughout the country. That is
23  impermissible. *Water Craft Mgmt.*, 361 F. Supp. 2d at 542; *Bailey*, 148 F. Supp. 2d at
24  1233. The case law is clear that an expert cannot ignore significant competitive
25  interaction between local and national firms in local markets, even if some firms operate
26  nationwide. *See It's My Party*, 88 F. Supp. 3d at 491; *Heerwagen*, 435 F.3d at 230.
27  Absent the required "'fact-intensive exercise centered on the commercial realities of the
28  market and competition' between entities in the market," *It's My Party*, 88 F. Supp. 3d at

491, Dr. House's geographic market analysis amounts to an unsupported assertion and should be excluded. *See Joiner*, 522 U.S. at 146; *cf. Apple, Inc.*, 2012 WL 2571332, at *7.

## III. DR. HOUSE'S ARTIFICIAL MODEL IS METHODOLOGICALLY INCAPABLE OF ADDRESSING ANTITRUST INJURY OR DAMAGES

To prevail on its antitrust claims, Westlake must proffer an economic model that is capable of proving that its injury and subsequent damages were caused by CAC's alleged anticompetitive conduct. *See Magnetar*, 801 F.3d at 1159-60; *McGlinchy*, 845 F.2d at 806-07. Any proposed damages model must accomplish three tasks: (i) accurately capture the realities of the marketplace, so that it can reliably assist the trier of fact to determine injury and damages; (ii) establish a link between the injury suffered and the alleged anticompetitive conduct; and (iii) disaggregate the damages suffered as a result of the anticompetitive acts from damages suffered as a result of lawful conduct. *See Concord Boat v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000); *see also McGlinchy*, 845 F.2d at 807-08. Dr. House's rigid damages model achieves none of these vital purposes and therefore amounts to unreliable speculation.

### A. Dr. House's Damages Model Ignores Marketplace Realities

An antitrust damages model measures the impact of the anticompetitive conduct by constructing a "but-for" world—*i.e.*, how the market would have operated absent the alleged anticompetitive conduct. *See Concord Boat*, 207 F.3d at 1055. To accurately construct this world, a model must consider the particular features of the market and take marketplace realities into account. *See id.* at 1056 (excluding expert opinion based on a model that "was not grounded in the economic reality of the [relevant] market, for it ignored inconvenient evidence"); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592-93 (7th Cir. 1998). Otherwise, the model provides little more than speculation and is not useful to the jury. *Concord Boat*, 207 F.3d at 1057.

*Concord Boat* is instructive. There, the Eighth Circuit excluded the expert's damages opinion because the model "ignored inconvenient evidence," was incapable of capturing the economic reality of the relevant market and failed to account for market

15

CREDIT ACCEPTANCE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1   events that were unrelated to the anticompetitive conduct. *Id.* at 1055-57. The court

2   explained that the model was based on a "theoretical situation" where there were two

3   competitors in the market, and each competitor captured a 50% market share because

4   their products were viewed as equal in quality. *Id.* at 1056. Such a model, however,

5   disregarded undisputed evidence that the defendant—when actually faced with a single

6   competitor prior to the alleged anticompetitive conduct—had achieved a 75% market

7   share, presumably due to superior product quality or some other economic efficiency. *Id.*

8       Here, as in *Concord Boat*, Dr. House's damages model is incapable of accurately

9   capturing the realities of the relevant market, and therefore cannot reliably be used to

10  establish causation or amount of damages. In claiming to calculate what Westlake's

11  profits would have been in the "but-for" world, Dr. House forgoes the two standard

12  methodologies for assessing antitrust damages—the "before-after" and "yardstick"

13  methods.[11] Instead, Dr. House opted to use "first-mover" or "pioneering advantage

14  literature" as a benchmark for Westlake's market share in the but-for world. (House Rpt.

15  ¶¶ 66, 73.) This "pioneering advantage literature" is based on a 1986 study of certain

16  consumer products, which itself was based on consumer surveys conducted in shopping

17  malls between 1979 and 1982. Critically, Dr. House conducted no analysis as to whether

18  the pioneering advantage literature is capable of serving as an accurate yardstick for the

19  market at issue. Indeed, he admits that this literature derived from the 1986 study has

20  never been applied to auto financing, or to any consumer financing market. (House Tr.

21  332:8-13.) Further, he concedes he did not analyze the auto finance industry or test

22  whether the conditions in the auto-finance industry matched the pioneering advantage

23  model. (*Id.* 331:13-23.) Instead, Dr. House simply imports the market share numbers

24  directly from the 1986 study, which analyzed such products as detergent, freeze-dried

25  ───────────────
    [11] "In the before-and-after model of damages, the plaintiff uses its experience prior to and
26  after the antitrust violation to infer what its experience would have been but for the
    antitrust violation." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis
27  of Antitrust Principles and Their Application*, ¶ 392e (4th ed. 2015). "Under the yardstick
    approach, the plaintiff attempts to identify a firm similar to the plaintiff in all respects
28  'but for' the impact of the antitrust violation." *Id.* ¶ 392f.

coffee, and fabric softener, and he concludes that Westlake would have achieved a particular market share as the "second entrant" into the proposed profit-sharing market. (House Rpt. Table 3, p. 39.)

Dr. House's imposition of this static model on the but-for world—without any analysis of whether the model reflects marketplace reality—is methodologically untenable. Indeed, by mechanically applying the pioneering advantage literature, Dr. House disregards two failed attempts by other competitors to successfully offer a profit-sharing program *before CAC applied for the '807 Patent*—highly probative evidence of what might occur in the but-for world. Jayhawk Financial and National Auto Credit both offered profit-sharing programs prior to 2001. (House Tr. 340:1-10.) These firms served as second and third entrants into the market Dr. House identifies, and, importantly, they entered that market when it was not influenced by any alleged exclusionary conduct. Yet Jayhawk and National Auto Credit failed to achieve the market share the pioneering advantage literature predicts. (*Id.* 340:1-13.) Yet, Dr. House did not analyze why these two entrants failed because *he did not think it was relevant*. (*Id.* 105:4-9; 340:11-18.) The market experience of Jayhawk and National Auto Credit, of course, highlights the exact danger of indiscriminately applying the pioneering advantage model to the profit-sharing "market," and exposes that the model does not capture the realities of this "market." Thus, Dr. House ignores "inconvenient evidence," and bases his damages opinion on a 1986 consumer study that has never been applied to consumer finance, and is contradicted by past events within the very marketplace at issue. His damages model is, therefore, unreliable, and his opinions should be excluded. *See Concord Boat*, 207 F.3d at 1055-56.

### B.   <u>Dr. House's Damages Model Improperly Assumes Causation</u>

Courts have repeatedly held that expert opinions on antitrust damages must be excluded if the expert's damages model does not connect the injury to the *specific anticompetitive acts* challenged by the plaintiffs. *See McGlinchy*, 845 F.2d at 806 (expert admitted that he did not relate plaintiff's loss to any specific acts by the defendants); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) (expert's

17

1  model was "irrelevant insofar as it was not in any respect anchored to the specific

2  agreements or marketing practices" at issue); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.,*

3  *Inc.*, 63 F.3d 1267, 1275 (3d Cir. 1995) (expert failed to sufficiently link decline in sales

4  to the alleged price discrimination). It is insufficient to merely identify a decline in sales

5  or lost profits that occurred after the alleged anticompetitive conduct: those outcomes

6  must be connected to the defendant's actions. *Educ. Logistics, Inc. v. Laidlaw Transit,*

7  *Inc.*, 2012 WL 761950, at *7 (D. Mont. Mar. 8, 2012).

8      Dr. House's damages model does not even attempt to connect Westlake's alleged

9  lost sales and profits to any specific acts committed by CAC. Instead, Dr. House simply

10 *assumes* that Westlake's low market share and lost profits resulted from CAC's decision

11 to obtain and enforce the '807 Patent. (House Tr. 217:1-7 ("A: According to my

12 assumptions, the difference between but-for revenues and actual revenues started

13 accumulating in 2004. And my assumption is that the conduct of CAC is directly related

14 to that non -- to that lack of performance. Q: Okay. And that's an assumption? A: That is

15 an assumption.").)[12] Indeed, in lieu of any economic analysis linking CAC's actions to

16 Westlake's alleged lost sales and profits, Dr. House observes that (i) Westlake's profit-

17 sharing program had a lower profit rate than its purchase program and (ii) its profit-

18 sharing program had a lower market share than what the pioneering advantage literature

19 predicted, and assumes based on those two data points that the difference in profit rate

20 and market share must be due to the alleged anticompetitive conduct. Such an approach

21 amounts to speculation devoid of any economic analysis, and must be excluded.

22 *McGlinchey*, 845 F.2d at 806; *Educ. Logistics*, 2012 WL 761950, at *7.

23     Yet even if Dr. House's damages model could connect Westlake's injury to the

24 alleged anticompetitive conduct, he does not attempt to separate out the impact of lawful

25 competition and unrelated market events that could have contributed to Westlake's

26

---

27 [12] Dr. House also assumed it was necessary to have a CAPS-like program to effectively
   compete in the profit-sharing market he proposes, but he did not conduct any analysis to
28 test that assumption. (House Tr. 175:2-24; 177:16-24.)

damages. An economic expert may not simply *assume* that all of the plaintiff's damages are a result of the alleged anticompetitive conduct. *See Magnetar*, 801 F.3d at 1160 (expert must "separate the damages attributable to the [anticompetitive conduct] from other possible causes of losses"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (excluding expert testimony where expert "makes no attempt to account for other possible causes" of plaintiff's damages, and "assumes that the difference between actual return and predicted return is necessarily a result" of the anticompetitive conduct); *In re Live Concert*, 863 F. Supp. 2d at 975 (rejecting damages model that "simply assumes—without further examination—that the difference in average ticket prices . . . is due entirely to Defendants' allegedly anticompetitive conduct" and "analysis does not account for *any* other possible explanation(s)"). To the contrary, experts bear the burden of isolating the damage due to the alleged anticompetitive conduct by disaggregating any damage resulting from lawful competition. *In re Live Concert*, 863 F. Supp. 2d at 975; *Concord Boat*, 207 F.3d at 1056 (model failed to account for relevant market events); *Blue Cross & Blue Shield*, 152 F.3d at 592-93 (affirming exclusion where damages model attributed entire difference in price to the alleged anticompetitive conduct, and failed to consider non-conspiratorial factors); *accord R.S.E., Inc. v. Pennsy. Supply, Inc.*, 523 F. Supp. 954, 965 (M.D. Pa. 1981).

Notwithstanding his obligation, Dr. House ignores obvious alternative explanations for Westlake's lost profits. (*See* House Tr. 192:3-14; 217:1-7.) *First*, Dr. House admits that offering a profitable profit-sharing program is difficult. Dr. House testified that it is challenging to build an algorithm that allows both the dealer and the lender to profit when dealing with the "high-risk" lenders that Dr. House claims the profit-sharing program serves. (*Id.* 152:10 ("it's a very narrow path to walk"); *see generally id.* 151:21-152:19.) In fact, Dr. House testified that Westlake itself "has had trouble perfecting their[]" algorithm, just as Jayhawk Financial and National Auto Credit had trouble with their algorithms when they offered profit-sharing programs. (*Id.* 153:6-9.) Despite acknowledging that this challenge can significantly affect the performance of a profit-

19

sharing program, Dr. House's damages model does not account for the impact of failing to build an optimal algorithm, and he makes no attempt to disaggregate the effect of Westlake's "trouble perfecting their[]" algorithm on Westlake's profit-sharing program.

*Second*, Dr. House disregards fundamental problems with Westlake's profit-sharing program that are evident from the record. For one, Westlake had no underwriting standards for its profit-sharing programs until at least 2013, a business decision that is unconnected to CAC's alleged anticompetitive conduct. (Smith Decl. Ex. 99, at 290, 302 (describing Westlake's two profit-sharing programs as having "no underwriting").) Westlake also struggled to service loans, failed to make profit-sharing payments to dealers, and at times offered higher advances for their profit-sharing program than for their purchase program. (*Id.* Ex. 1, 248:7-249:1; *Id.* Ex. 38, at 843 ("We've had some issues in Profit Builder and Partner where the dealer does not receive their participation payments (when it seems like they should).."); *Id.* Ex. 33, at 407.) Dr. House did not attempt to disaggregate any of these significant problems from CAC's alleged conduct.

*Third*, Dr. House overlooks competitive advantages CAC's profit-sharing program enjoys in comparison to Westlake's program. CAC allows for the sale of ancillary products (*i.e.*, GAP coverage) with its profit-sharing program, provides longer loan terms and offers higher advances. (Smith Decl. Ex. 53, at 314.) Dr. House did not evaluate the impact of these differences on the performance of Westlake's program. (House Tr. 219:1-19.) Accordingly, Dr. House's damages opinions should be excluded. *See Magnetar*, 801 F.3d at 1160; *In re Live Concert*, 863 F. Supp. 2d at 975; *In re REMEC*, 702 F. Supp. 2d at 1273; *Concord Boat*, 207 F.3d at 1056.

## CONCLUSION

For these reasons, the opinions of Dr. House identified herein should be excluded.

DATED: August 28, 2017          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____  */s/ Jason D. Russell*  _____
Jason D. Russell
Attorneys for Defendant
Credit Acceptance Corporation