JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600
Email:        jason.russell@skadden.com
              douglas.smith@skadden.com

JONATHAN L. FRANK *admitted *pro hac vice*
JAMES A. KEYTE *admitted *pro hac vice*
PATRICK G. RIDEOUT *admitted *pro hac vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000
Email:        jonathan.frank@skadden.com
              james.keyte@skadden.com
              patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

**REDACTED PUBLIC VERSION**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>Defendant. | CASE NO.: 2:15-cv-07490 SJO (MRWx)<br><br>**(1) CREDIT ACCEPTANCE CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT;**<br><br>*Separate Cover*:<br><br>**(2) DECLARATION OF JASON D. RUSSELL;**<br><br>**(3) REPLY STATEMENT OF UNDISPUTED MATERIAL FACT AND CONCLUSIONS OF LAW;**<br><br>**(4) RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS;**<br><br>**(5) EVIDENTIARY OBJECTIONS TO THE DECLARATION OF CHRIS URBAN;** |

**(6) EVIDENTIARY OBJECTIONS TO THE DECLARATION OF IAN ANDERSON;**

**(7) RESPONSE TO PLAINTIFF'S REQUEST FOR EVIDENTIARY RULING ON SPECIFIED OBJECTIONS TO THE DECLARATION OF JEFFREY BROCK; and**

**(8) RESPONSE TO PLAINTIFF'S REQUEST FOR EVIDENTIARY RULING ON SPECIFIED OBJECTIONS TO THE DECLARATION OF DOUGLAS BUSK.**

The Honorable Judge S. James Otero

Hearing Date:       Oct. 16, 2017
Hearing Time:       10:00 a.m.
Courtroom:          10C

Pretrial Conference:    Nov. 20, 2017
Trial Date:             Dec. 4, 2017

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

I.     Westlake's *Walker Process*-Based Claims Are Time-Barred ......................2

II.    Westlake Fails To Establish An
       Exception To *Noerr-Pennington* Immunity ...................................................5

       A.     Westlake Cannot Prove *Walker Process* Fraud ..................................5

       B.     Westlake Cannot Prove The Patent Litigation Was Objectively
              Baseless Or Motivated By Subjective Anticompetitive Intent..........10

III.   Westlake Cannot Prove The Other
       Key Elements Of Its Antitrust Claims ..........................................................11

       A.     Westlake Abandons Its Alleged Product Market Definition,
              And Cannot Support Its Newly Minted Product Market ...................11

       B.     Westlake Cannot Prove A Nationwide Geographic Market.............15

       C.     Westlake Cannot Establish That CAC Had Monopoly Power .........16

       D.     Westlake Has No Evidence Of Injury To Competition ....................18

       E.     Westlake Has No Evidence Of Antitrust Injury To Itself ................19

CONCLUSION ................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*AFMS LLC v. United Parcel Service Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015), *aff'd*, No. 15-55778, 2017 WL 3588380 (9th Cir. Aug. 21, 2017) ................................................. 11

*In re Animation Workers Antitrust Litigation*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................... 5

*City of Vernon v. Southern California Edison Co.*,
955 F.2d 1361 (9th Cir. 1992) ....................................................... 19

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
560 F.3d 1317 (Fed. Cir. 2009) ................................................. 9, 10

*Conerly v. Westinghouse Electric Corp.*,
623 F.2d 117 (9th Cir. 1980) ......................................................... 5

*Coppinger-Martin v. Solis*,
627 F.3d 745 (9th Cir. 2010) ..................................................... 4, 5

*Crocs, Inc. v. Effervescent, Inc.*,
No. 06-cv-00605-PAB-KMT, 2017 WL 1229707 (D. Colo. Mar. 31, 2017) ........... 6

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ..................................................... 6

*EZ Dock, Inc. v. Schafer Systems, Inc.*,
276 F.3d 1347 (Fed. Cir. 2002) ..................................................... 9

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ........................................... 3

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
895 F.2d 1417, 1990 WL 12148 (9th Cir. 1990) ............................... 15

*Hasel v. Pulpdent Corp.*,
No. 01-2008(DSD/FLN), 2003 WL 25750088 (D. Minn. May 21, 2003) ........... 9

*Heerwagen v. Clear Channel Communications*,
435 F.3d 219, 230 (2d Cir. 2006) ................................................. 15

*Hexcel Corp. v. Ineos Polymers, Inc.*,
681 F.3d 1055 (9th Cir. 2012) ................................................... 4, 5

*IGT v. Alliance Gaming Corp.*,
No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7071468 (D. Nev. Oct. 21, 2008) ........... 18

*It's My Party, Inc. v. Live Nation, Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015) ............................................... 16

*King Instruments Corp. v. Perego*,
    65 F.3d 941 (Fed. Cir. 1995) .......................................................................... 8

*Kirsopp v. Yamaha Motor Co.*,
    No. CV 14-00496 BRO (VBKx),
    2015 WL 11197829 (C.D. Cal. Jan. 7, 2015) .............................................. 5

*Larson v. Northrop Corp.*,
    21 F.3d 1164 (D.C. Cir. 1994) ....................................................................... 2

*Lukovsky v. City & County of San Francisco*,
    535 F.3d 1044 (9th Cir. 2008) ....................................................................... 5

*Magnetar Technologies Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) ................................................................ 19, 20

*Menasha v. News America Marketing In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ........................................................................ 12

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
    924 F.2d 1484 (9th Cir. 1991) ....................................................................... 16

*Nobelpharma AB v. Implant Innovations Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) ................................................................... 1, 6

*Pace Industries, Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) .......................................................................... 4

*Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*,
    984 F.2d 1182 (Fed. Cir. 1993) ................................................................... 6, 7

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 16, 17

*Rick-Mik Enterprises Inc. v. Equilon Enterprises, LLC*,
    532 F.3d 963 (9th Cir. 2008) ........................................................................ 17

*Robbins Co. v. Herrenknecht Tunnelling Systems USA, Inc.*,
    No. 5:13cv2113, 2015 WL 3454946 (N.D. Ohio May 29, 2015) ............................ 8

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ........................................................................ 16

*Samsung Electronics Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ..................................................................... 3, 4

*Shuffle Master, Inc. v. MP Games LLC*,
    553 F. Supp. 2d 1202 (D. Nev. 2008) .......................................................... 11

*Simms v. U.S. Government Printing Office*,
    87 F. Supp. 2d 7 (D.D.C. 2000) ..................................................................... 3

*Therasense Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ............................................................... 6, 7, 8

CREDIT ACCEPTANCE'S REPLY ISO MOTION FOR SUMMARY JUDGMENT

*TP Laboratories, Inc. v. Professional Positioners, Inc.*,
  724 F.2d 965 (Fed. Cir. 1984) ........................................................... 7, 9

*United States v. Rockford Memorial Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ....................................................... 12, 15

*United States v. Syufy Enterprises*,
  903 F.2d 659 (9th Cir. 1990) .............................................................. 16

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
  382 U.S. 172 (1965).............................................................................. 6

*Wasco Products, Inc. v. Southwall Technologies, Inc.*,
  435 F.3d 989 (9th Cir. 2006) ............................................................... 2

*Wolf v. Wagner Spray Tech Corp.*,
  715 F. Supp. 504 (S.D.N.Y. 1989) ..................................................... 3

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  274 F. Supp. 2d 937 (N.D. Ill. 2003) .................................................. 4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971).............................................................................. 3

## OTHER AUTHORITIES

U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2010) ............................................................... 12, 13

**INTRODUCTION**

Faced with unfavorable law and no supporting facts, Westlake's[1] Opposition [ECF No. 200] ("Opp.") to CAC's Motion for Summary Judgment [ECF No. 187] ("Mot.") concedes or abandons many of the positions pled by Westlake, advances new, previously unpled legal arguments, and impermissibly tries to shift Westlake's burden of proof to Defendant CAC. Yet, all of Westlake's machinations fail and, ultimately, the Opposition merely confirms that there is *no genuine dispute* as to the following points, each of which is fatal to Westlake and warrants summary judgment for CAC:

- Westlake concedes that the injury accrual rule time-bars its *Walker Process*-based claims, but, for the first time in this case, attempts to rely on unpled tolling doctrines in its Opposition. Even if they could be raised for the first time now (they cannot), such doctrines are inapplicable and cannot save these claims;

- Westlake has not adduced any evidence—much less clear and convincing evidence—from which a juror could find the "single most reasonable inference" is that a person at CAC intended to deceive the PTO. Instead, Westlake attempts to prove fraudulent intent by virtue of mere non-disclosure of allegedly material information, which, as matter of law, "will not suffice." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998);

- Westlake hinges its "sham" litigation claim on the allegation that CAC *knew* the '807 Patent was invalid, but Westlake has *no evidence* to support that allegation;

- Westlake's pleaded relevant antitrust product market—"indirect financing for used car sales to dealers through a profit sharing program"—does not exist because, as Westlake's expert concedes, profit-sharing programs regularly compete with other forms of financing (*e.g.*, purchase programs and BHPH) on a deal-by-deal basis, even for "deep subprime" consumers;

- Westlake's belated attempt to define a new product market around a subset of

---

[1] Unless otherwise noted, defined terms shall have the meaning ascribed in CAC's Motion.

the "riskiest" deals fails, because Westlake has not identified this subset of "risky" deals or performed any of the required economic analysis;

- Westlake fails to support its allegation that the relevant geographic market is national. Instead, it seeks to impermissibly shift the burden to CAC;

- Westlake's misguided monopoly power argument is based on pricing changes that are not specific to profit sharing and improper market share calculations;

- Westlake cannot prove injury to competition given CAC indisputably decreased "prices" (*i.e.*, increased dealer compensation) and increased its output; and

- Westlake's damages model neither connects its alleged injury to CAC's alleged anticompetitive conduct, nor disaggregates the impact of lawful competition and unrelated market events. Further, Westlake now admits that the '807 Patent did not patent collateral pools in and of themselves, which is fatal to its claim that it was injured because it designed its profit-sharing program around the '807 Patent by not offering collateral pools.

For these reasons, and those below, summary judgment should enter in CAC's favor.

## ARGUMENT

## I.    Westlake's *Walker Process*-Based Claims Are Time-Barred

Under the applicable injury accrual rule, Westlake's *Walker Process*-based claims are time-barred. Westlake did not file suit until over a decade after the '807 Patent purportedly caused its injury. (*See* Mot. 5-6.) *Westlake does not dispute this.* Rather, Westlake now contends that certain unpled tolling doctrines—the continuing violation doctrine and fraudulent concealment—save its untimely claims. (Opp. 8-9.) Under well-settled law, however, "plaintiffs seeking to toll the statute of limitations . . . must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006); *see also Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) (affirming summary judgment because plaintiff "raised [concealment] for the first time in his opposition to . . . summary judgment"); *Simms v.*

*U.S. Gov't Printing Office*, 87 F. Supp. 2d 7, 10 (D.D.C. 2000). Westlake's failure to plead grounds to toll the four-year statute of limitations bars it from asserting them now.

In any event, these tolling doctrines have no application here. <u>First</u>, Westlake fails to establish a "continuing violation," which requires Westlake to prove that CAC "completed an overt act during the limitations period" that (1) was "a new and independent act that [was] not merely a reaffirmation of a previous act"; and (2) "inflict[ed] new and accumulating injury" on Westlake. *Samsung Elecs. Co., v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). A continuing violation allows a plaintiff to seek "the damages caused by *that act* and that, as to *those damages*, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (emphasis added). While Westlake alleges CAC's *Walker Process* fraud culminated in the issuance of the '807 Patent in 2005 (*i.e.*, outside the limitations period), it fails to adduce any evidence of a *new and independent* act inflicting *new* injury between 2011 and 2015 (*i.e.*, within the limitations period).

Westlake argues that some unspecified CAC "advertising" constitutes a continuing violation. (Opp. 9.) But Westlake fails to identify any such advertising, much less explain *when* it occurred or *how* it is connected to the alleged fraud or caused *new* injury to Westlake. The Opposition also points to CAC's patent maintenance payments to the PTO in 2009, 2013, and 2017.[2] (*Id.*) However, a defendant's "continuing use of the patent and [its] refusal to surrender the patent or to notify [government] officials of the invalidity of the patent" merely *reaffirms* pre-limitations period conduct and does not constitute a "new and independent act." *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 508 (S.D.N.Y. 1989).[3] Further, CAC's patent maintenance payments did not cause any *new injury* to Westlake. Rather, they merely continued the *same* alleged injury that Westlake

---

[2] Because the 2009 payment is not within the limitations period (*i.e.*, 2011-2015), it cannot constitute a continuing violation as a matter of law. *See, e.g., Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1072 (N.D. Cal. 2016).

[3] Westlake provides no evidence of any disclosure obligation or requirement that a patent owner affirm the patent's validity when submitting patent maintenance renewal fees.

1  contends was occurring since day one—supposed "lost profits" caused by its inability to

2  offer a profit-sharing program with the '807 Patent's claimed features.

3  Westlake also contends that CAC's 2013 lawsuit seeking to stop Westlake from

4  infringing the claims of the '807 Patent constituted a continuing violation of the alleged

5  *Walker Process* fraud. Like the patent maintenance fees, however, that lawsuit did not

6  result in any new injury to Westlake. Because its *Walker Process*-based claims only

7  allege injury in the form of lost profits, the 2013 lawsuit merely continued the same

8  alleged injury. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937, 944-

9  45 (N.D. Ill. 2003) ("[I]t is undisputed that the infringement lawsuits did not inflict new

10  and accumulating injury on the plaintiff. Plaintiffs admit that these lawsuits 'did nothing

11  more than reaffirm [defendant's] earlier efforts to block . . . [plaintiff] . . . from

12  competing . . . .' Plaintiffs therefore have not alleged a continuing violation.").[4]

13  Second, Westlake cannot avail itself of fraudulent concealment tolling, which

14  requires proof that (1) CAC took affirmative acts to mislead Westlake; (2) Westlake did

15  not have "actual or constructive knowledge of the facts giving rise to its claim"; and (3)

16  Westlake acted diligently in trying to uncover the facts giving rise to its claim. *Hexcel*

17  *Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). As the Ninth Circuit

18  has repeatedly held, "the plaintiff must point to some fraudulent concealment, some

19  active conduct by the defendant '*above and beyond* the wrongdoing upon which the

20  plaintiff's claim is filed, to prevent the plaintiff from suing in time.'" *Coppinger-Martin v.*

21  *Solis*, 627 F.3d 745, 751 (9th Cir. 2010) (emphasis in original) (citation omitted). But

22  "above and beyond" the alleged fraud on the PTO, Westlake does not identify any acts

23  taken by CAC directed at preventing Westlake from suing. Rather, the Opposition merely

24  points to CAC's purported fraud and its failure to disclose the alleged wrongdoing. (Opp.

25  10.) But "fail[ure] to reveal" alleged wrongdoing is insufficient to invoke fraudulent

26

27
28

_____

[4] Westlake's reliance on *Samsung* and *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987), is inapt. In those cases, the lawsuits filed within the limitations period caused a "new and accumulating injury" distinct from the injury caused by prior acts outside the period. *See Samsung*, 747 F.3d at 1203-04; *Pace*, 813 F.2d at 238-39.

concealment under Ninth Circuit law. *See Coppinger-Martin*, 627 F.3d at 752; *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1052 (9th Cir. 2008); *Kirsopp v. Yamaha Motor Co.*, 2015 WL 11197829, at *4 (C.D. Cal. Jan. 7, 2015).

Further, Westlake's concession that the information it reviewed to discover the purported fraud has been publicly available since at least 2004 dooms any such tolling. (*See* CAC's Reply Statement of Undisputed Material Facts and Conclusions of Law ("RSUF") ¶¶ 7-12; Westlake's Mot. for Summary Judgment [ECF 192-2] 8 ("Westlake learned through publicly available evidence, and without the benefit of fact discovery on that issue, that Credit Acceptance had sold or offered to sell CAPS more than one year before it filed the '807 patent application . . . .").) "If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply." *Hexcel*, 681 F.3d at 1060. Westlake's failure to adduce any evidence that it acted diligently is separately fatal to tolling here. *See Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120-21 (9th Cir. 1980).[5]

## II.   Westlake Fails To Establish An Exception To *Noerr-Pennington* Immunity

It is undisputed that *Noerr-Pennington* immunity insulates CAC from antitrust liability for prosecuting the '807 Patent and commencing patent litigation, unless Westlake can establish the *Walker Process* fraud and "sham" litigation exceptions to such immunity. (Mot. 7-12.) Westlake's Opposition confirms that it cannot establish either.

### A.   Westlake Cannot Prove *Walker Process* Fraud

#### 1.   Westlake Has No Evidence Of Fraudulent Intent

Even considering all reasonable inferences in Westlake's favor, Westlake cannot satisfy its heavy burden of proving by *clear and convincing* evidence that anyone in CAC's patent prosecution knew that information relating to the pilot program was but-for

---

[5] Westlake's own case, *In re Animation Workers Antitrust Litigation*, 123 F. Supp. 3d 1175, 1198 (N.D. Cal. 2015), supports CAC. That case held that mere non-disclosure of alleged wrongdoing is insufficient. Moreover, contrary to Westlake's suggestion, that case does not support the contention that CAC's purported assertions that it had a valid right to enforce the '807 Patent constituted "'affirmative acts of concealment.'" (Opp. 10.)

1  material and withheld it with intent to deceive the PTO. (Mot. 9-11.) Westlake agrees

2  specific intent to deceive must be the "single most reasonable inference" drawn from the

3  facts. (Opp. 13.) If reasonable minds could differ on the issue of intent, summary

4  judgment must be granted in CAC's favor. *See Therasense Inc. v. Becton, Dickinson &*

5  *Co.*, 649 F.3d 1276, 1290-91 (Fed. Cir. 2011) ("[W]hen there are multiple reasonable

6  inferences that may be drawn, intent to deceive cannot be found.").

7        The Opposition confirms that Westlake is incapable of adducing any evidence—

8  much less clear and convincing evidence—of fraudulent intent. Lacking such evidence,

9  Westlake resorts to arguing that CAC's nondisclosure of allegedly material information to

10  the PTO suffices to show intent. (*See* Opp. 14 ("*Even if* CAC and Brock had an earnest

11  belief that its pre-critical date activities were 'experimental' and not disqualifying under

12  Section 102(b), they still had a duty to disclose those activities under the duty of candor

13  they owed to the PTO.") (emphasis added).) But it is well settled that "there must be

14  evidence of intent separable from the simple fact of the omission." *Dippin' Dots, Inc. v.*

15  *Mosey*, 476 F.3d 1337, 1347-48 (Fed. Cir. 2007); *see also Nobelpharma*, 141 F.3d at

16  1071 ("[A] finding of *Walker Process* fraud . . . must be based on independent and clear

17  evidence of deceptive intent together with a clear showing of reliance . . . . A mere failure

18  to cite a reference to the PTO will not suffice."); *Walker Process Equip., Inc. v. Food*

19  *Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("honest mistake as to the effect of prior

20  installation on patentability" will not strip patentee of its patent); *accord Crocs, Inc. v.*

21  *Effervescent, Inc.*, 2017 WL 1229707, at *7 n.7 (D. Colo. Mar. 31, 2017). Even assuming

22  the experimental pilot program was material, Westlake offers no evidence—much less

23  clear and convincing evidence—that the alleged failure to disclose was anything other

24  than an "honest mistake." Indeed, Westlake concedes this possibility. (*See* Opp. 14-15.)[6]

25  _____

26  [6] Westlake's reliance on *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*,
984 F.2d 1182, 1193 (Fed. Cir. 1993), is misplaced. In that case, the defendant argued for

27  the first time on appeal—without any record evidence to support it—that experimental
use justified its failure to disclose prior sales. The Federal Circuit concluded that, without

28  evidentiary support, the defendant "cannot possibly establish, even if true, that the district
court erred in finding [intent to deceive]." *Id.* Here, there is overwhelming evidence that
*(cont'd)*

To buttress its flawed scienter argument, Westlake argues that CAC's attorneys "concocted" the theory that "Brock and others . . . had an earnest belief that the pre-critical date activities were 'experimental' at the time of the application" (Opp. 13), because these employees supposedly testified that they were comfortable the application was timely filed based solely on checking when the CAPS licensing fees were charged to determine when CAPS was first "sold." (*See id.*) Not so. Mr. Pearce and Mr. Brock both testified there was a closed pilot program and that they confirmed when CAPS was first used outside the pilot program to determine whether they could, and when they needed to, file the patent application. (Declaration of Douglas A. Smith [ECF No. 187-3] ("Smith Decl.") Ex. 13, Pearce Dep. 42:11-43:2 ("I was comfortable with the fact that there was a pilot program but that CAPS was not commercially available to the public in any form until January of 2001."); *id.* Ex. 3, Brock Dep. 156:11-157:2, 159:7-10.)[7]

Westlake next contends that the December 31, 2001, patent application date shows intent to deceive because CAC filed its application *too early* and should have waited until January 9, 2002. (Opp. 13.) Far from making fraud the "single most reasonable inference," *the undisputed facts show* that CAC wanted to apply by December 31, 2001, because CAC ended the pilot program and began making CAPS available to non-pilot dealers the first week of January 2001. (*See* RSUF ¶ 43.) The Opposition further argues that CAC had specific intent to deceive because it is charged with its lawyers' knowledge of patent law. (Opp. 15.) But specific intent to deceive cannot be inferred based on constructive knowledge. *Therasense*, 649 F.3d at 1296 (vacating decision when finding of intent rested on conclusion that plaintiff should have known of the materiality of the

---

*(cont'd from previous page)*
the CAPS pilot program was "experimental use," negating a "sale" or "public use." (Mot. 8-10.) Moreover, the court in *Paragon* specifically cited the defendant's ever-changing and "inconsistent justifications" for its failure to disclose as the basis for affirming the district court's finding of "culpable intent." *Id.* No such inconsistencies exist here.

[7] Westlake's distinction between the question of when CAPS was "sold" or "publicly used" and whether the pilot program was "experimental" (*see* Opp. 13) is contrary to law. *See TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984) ("[I]t is incorrect to impose on the patent owner, as the trial court in this case did, the burden of proving that a 'public use' was 'experimental.' These are not two separable issues.").

withheld information); *Robbins Co. v. Herrenknecht Tunnelling Sys. USA, Inc.*, 2015 WL 3454946, at *5 (N.D. Ohio May 29, 2015).[8]

Finally, Westlake contends CAC had a "motive to conceal information about its 'pilot program' from the PTO" because when the patent application was filed "a majority of CAC's loans were being originated through CAPS." (Opp. 15.) But there is nothing unusual—much less deceptive—about seeking a patent in order to commercially exploit an invention during a period of exclusivity. *See King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed. Cir. 1995) ("[T]he Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot.").

Given Westlake's abject failure of proof, even drawing all reasonable inferences in Westlake's favor, no reasonable jury could conclude by *clear and convincing* evidence that intent to deceive is the "single most reasonable inference" here. Again, under settled law, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91. Thus, summary judgment must be granted in CAC's favor.

## 2. Westlake Cannot Prove The Pilot Program Was But-For Material

Westlake similarly fails to adduce evidence from which a jury could conclude by clear and convincing evidence that the non-disclosure of the CAPS pilot program was "but-for" material. (*See* Mot. 8-9; CAC's Opposition to Westlake's Motion for Partial Summary Judgment [ECF No. 198] ("CAC Opp.") 9-23.) Instead, Westlake attempts to shift its burden to CAC, claiming that "CAC must prove that a section 102(b) bar would not, as a matter of law, have prevented issuance of the '807 patent." (Opp. 11.) Westlake is incorrect. As even the case relied on by Westlake confirms, the entity challenging the validity of a patent based on the on-sale or public use bars—*i.e.*, Westlake—bears the

---

[8] Westlake also speculates that CAC was pressured to file by December 31, 2001, because it had publicly stated in a shareholder newsletter that a "rollout" of CAPS occurred in December 2000, thereby suggesting that a January 2001 filing date might raise red flags with the PTO. Westlake cites no testimony or evidence to support this rank conjecture. In any event, the undisputed evidence establishes that CAPS was actually not "rolled out" to non-pilot program dealers until January 2001. (RSUF ¶¶ 43-44.)

1  burden of persuasion to establish that experimental use negation does not apply. *See EZ*

2  *Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1351-52 (Fed. Cir. 2002) ("[A]n accused

3  infringer may overcome a patent's presumption of validity by presenting clear and

4  convincing evidence of facts showing that the patented device was on-sale before such

5  critical date. . . . Because adequate proof of experimentation negates a statutory bar, the

6  focus remains throughout the inquiry on application of the statutory bar itself.").[9]

7          In its Motion, CAC cited compelling evidence in support of each of the 13 factors

8  that courts use to determine whether a sale or public use of an invention was primarily

9  experimental, as opposed to commercial.[10] (*See* Mot. 8-9; CAC Opp. 10-18.) In response,

10  and notwithstanding *its* burden, Westlake provides no analysis of each of these factors.

11  Instead, it argues that the pilot program could not have been experimental because the

12  invention was purportedly already reduced to practice—*i.e.*, CAPS "worked for its

13  intended purpose no later than August 2000." (Opp. 11.) While the pilot program began

14  in August 2000, the undisputed facts show that CAC was still determining whether the

15  patented method would work for its intended purpose. (CAC's Statement of Undisputed

16  Material Facts and Conclusions of Law [ECF No. 198-2] ("AUF") ¶ 78; Mot. 9; CAC

17  Opp. 11-18.) This remained the case until the end of 2000 when CAC had a sufficient

18  quantum of data to determine whether the invention worked for its intended purpose.

19  (AUF ¶ 79.) Westlake does not dispute that, until that point, "[n]o dealer outside the pilot

20  program could have gained or purchased access to CAPS." (RSUF ¶ 43.) Moreover, as

21  Westlake's patent expert conceded, the negating doctrine does not require changes to the

22  claimed invention to substantiate an experimental use. (Faigen Decl. Ex. 136 [ECF No.

23  198-4], Stoll Dep. 117:2-25.) Thus, Westlake fails to show that the pilot program was a

24  reduction to practice, as opposed to an effort by CAC to reduce the invention to practice.

25

26  [9] *See also id.* at 1355 (Linn, J., concurring) ("[T]he burden of persuasion does not shift at any time to the patentee."); *TP Labs.*, 724 F.2d at 971 ("[I]t is incorrect to impose on the

27  patent owner . . . the burden of proving that a 'public use' was 'experimental.'"); *Hasel v. Pulpdent Corp.*, 2003 WL 25750088, at *7 (D. Minn. May 21, 2003) (same).

28  [10] *See Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327 (Fed. Cir. 2009).

1    Westlake also contends that "there is no evidence that the method of Claim 1, as

2  opposed to the impact of CAPS on CAC's business model, was being tested through the

3  'pilot program.'" (Opp. 12.) As a threshold matter, Westlake's expert admitted that he

4  does not have the expertise to determine whether the testing conducted would have tested

5  the claimed steps in the method, and he performed no such analysis. (Smith Decl. Ex. 14,

6  Stoll Dep. 137:22-138:6.) In any event, the undisputed record is contrary to Westlake's

7  contention. CAC contemporaneously identified numerous issues during the pilot program,

8  including those directly bearing on steps in the six-step patented method of Claim 1,

9  namely the steps determining the advance and front-end profit amounts. (AUF ¶ 86; CAC

10  Opp. 13-14.) If Westlake were correct that the pilot testing was done to determine

11  whether CAPS would be a business success, CAC would not have waited until January

12  2001 to launch CAPS since, by early September 2000, it perceived an "immediate

13  demand" for CAPS and believed it would be profitable. (AUF ¶ 87.)[11]

14  ### B.  Westlake Cannot Prove The Patent Litigation Was Objectively Baseless Or Motivated By Subjective Anticompetitive Intent

15

16    Westlake concedes that the basis of its "sham" litigation claim is "*not* that CAC's

17  infringement contentions [in the 2013 patent suit] were objectively baseless." (Opp. 16

18  n.7 (emphasis added).) Rather, Westlake's sole contention is the patent suit was a "sham"

19  because the '807 Patent was "invalid" under § 102(b) and CAC *knew it*. (*Id.* 15-16.)

20    As set forth in CAC's Motion and in even greater detail in the CAC Opposition, the

21  undisputed record makes clear that no reasonable jury could conclude that a reasonable

22  litigant in CAC's shoes would believe it had "no chance" of prevailing in the patent

23  ---

[11] Westlake takes language in *Clock Spring* out of context to invent the non-existent

24  requirement that, for a use to be experimental, the inventor must subjectively intend to file a patent application at the time of experimentation. (Opp. 12.) In *Clock Spring*, the

25  inventor claimed experimental testing of pipes "not dug up and examined until almost a year" after filing the patent application, and the court noted that "there is no experimental

26  use unless claimed features or overall workability are being tested for purposes of the filing of a patent application." 560 F.3d at 1327-28. Contrary to Westlake's suggestion,

27  this language merely conveys that experimentation must be consistent with the purpose of the experimental use exception (*i.e.*, to determine whether the invention worked). *Clock Spring* did not hold that a use is experimental only if the inventor subjectively intended to

28  seek a patent, and CAC is aware of no court interpreting *Clock Spring* this way.

litigation because Westlake undoubtedly would establish the on-sale or public use bars by clear and convincing evidence. (Mot. 11-12; CAC Opp. 9-24.) Further, Westlake still fails to present *any evidence*—much less the requisite clear and convincing evidence— that CAC "knew" at the time of suit that its patent was invalid due to the pilot program. (Opp. 16.) Thus, the Court should enter summary judgment in favor of CAC on this claim.

## III.   Westlake Cannot Prove The Other Key Elements Of Its Antitrust Claims

Westlake's Opposition also confirms that, on the undisputed record, it cannot establish its alleged product and geographic market, monopoly power, or antitrust injury.

### A.   Westlake Abandons Its Alleged Product Market Definition, And Cannot Support Its Newly Minted Product Market

#### 1.   Profit-Sharing Programs Are Not A Relevant Antitrust Market

For the past eighteen months, Westlake advanced an alleged product market of "indirect financing for used car sales to dealers through a profit-sharing program." (Smith Decl. Ex. 25, FAC ¶ 19.) Its expert, Dr. House, similarly espoused this alleged relevant product market. (*See* Smith Decl. Ex. 22, House Rpt. ¶ 32.)[12] As CAC established, Westlake cannot prove the existence of this "market" given: (i) profit-sharing programs regularly compete with other forms of used car financing, including purchase programs and BHPH, on a deal-by-deal basis, even in the "deep subprime" credit tranche (Mot. 14, 18); (ii) Westlake offers no evidence to establish low cross-elasticity of demand among profit-sharing, purchase, and BHPH lending (*id.* 15); (iii) neither Westlake nor Dr. House performed any of the necessary price discrimination analysis (*id.* 18); and (iv) neither Westlake nor Dr. House assessed cross-elasticity of supply, as required in the Ninth Circuit. (*Id.* 19.) Westlake's Opposition confirms there is *no genuine dispute* as to any of

---

[12] CAC objects to Dr. House's and Mr. Stoll's expert reports as inadmissible, because they are not signed under penalty of perjury. *AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1071 (C.D. Cal. 2015) ("The Report is attached to the declaration of counsel, and, although it is signed, it is not sworn under penalty of perjury to be true and correct. '[It] is well established, that an unsworn expert report is inadmissible' under Rule 56(e) to support or oppose summary judgment."); *Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210 (D. Nev. 2008) (sustaining objections to unsworn expert reports on summary judgment) (citation omitted). The reports should not be considered.

1 these material facts (*see* Opp. 16-25), and, thus, CAC is entitled to summary judgment.

2 **2.    Westlake's Newly Minted Product Market Is Unsupported**

3 Unable to salvage its alleged product market definition that includes *all* profit-

4 sharing deals, Westlake shifts in its Opposition to defining a market around a purported

5 "segment of customers for which used car dealers can *only* provide financing through a

6 profit sharing program." (RSUF ¶ 102 (emphasis added); Opp. 17 ("financing companies

7 cannot offer competitive terms on the riskiest category of deals except through profit

8 sharing").)[13] Westlake argues that, in light of "compelling evidence that profit-sharing

9 enables dealers to finance sales that cannot otherwise be financed, a reasonable jury could

10 easily conclude that profit-sharing exists in its own market." (Opp. 17.)

11 But Westlake did not even perform the analysis necessary to prove the existence of

12 a purported "riskiest deals" submarket that supposedly can only be financed through

13 profit-sharing programs. To build an antitrust market around a targeted group of

14 consumers who are "locked in" to a particular product, Westlake must conduct a "price

15 discrimination" analysis. U.S. DOJ & Fed. Trade Comm'n, *Horizontal Merger Guidelines*

16 (2010), http://ftc.gov/os/2010/08/100819hmg.pdf ("Merger Guidelines") § 4.1.4; *United*

17 *States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990). To establish price

18 discrimination, Westlake must (i) identify the subset of customers it contends could only

19 obtain financing through a profit-sharing program, and (ii) analyze whether a small but

20 significant non-transitory increase in price ("SSNIP") could *profitably be imposed on*

21 *those consumers. See id.* (even though diabetics are "locked in" to diet soft drinks, diet

22 soft drinks sold to diabetics are not a relevant product market because manufacturers

23 cannot identify the subset of diet soda drinkers that are diabetic and profitably impose

24 higher prices on only that subset of consumers); *Menasha v. News Am. Mktg. In-Store,*

25 *Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) (vulnerable consumer subset was protected by

26 _____

27 [13] As CAC explained in its Motion, when Dr. House was confronted at his deposition

28 with the failures of his analysis to support the purported "profit-sharing" market, he similarly pivoted to a new submarket within profit sharing comprising only the "riskiest" deals for which profit sharing is allegedly the sole option to finance consumers. (Mot. 18.)

1   other customers who constrained supplier's ability to profitably impose a price increase);

2   Merger Guidelines § 4.1.4 (describing markets built around a targeted subset of

3   consumers as "price discrimination markets"). Here, Westlake fails to analyze its newly

4   minted market within this well-established framework or present evidence to support it.

5   <u>(a)   Westlake cannot identify the "profit sharing-only" loans</u>

6   As a threshold matter, Westlake fails to establish that a lender could identify the

7   "riskiest" deals that supposedly are "locked in" to profit-sharing programs, which is the

8   necessary first step to be able to target such deals. Merger Guidelines § 4.1.4. At best,

9   Westlake cites anecdotal evidence to suggest that some unknown number of profit-

10  sharing deals may *only* be financed using a profit-sharing program. (Opp. 17-18.) But it is

11  undisputed that profit-sharing programs regularly compete with purchase programs and

12  BHPH on a deal-by-deal basis, even when financing "deep subprime" consumers with

13  challenging credit histories. (RSUF ¶¶ 75, 102; Smith Decl. Ex. 9, House Dep. 64:10-13

14  ("Q: So . . . there are dealers who participate in deep subprime with purchase programs

15  and profit sharing programs? A: Yes, yes."); Smith Decl. Ex. 2, Ball Dep. 135:14-22 ("Q:

16  For your customers with challenging credit histories, was it difficult to arrange financing

17  with lenders who did not offer a profit sharing program? . . . THE WITNESS: No.").)

18  Westlake undertakes *no analysis* to attempt to identify or even quantify the

19  purported subset of deals that *only* could be financed through profit sharing. Westlake's

20  Opposition asserts that Dr. House's probit model identifies "qualitative distinctions"

21  between profit-sharing deals and purchase deals. (Opp. 18.) Yet, even if Dr. House's

22  probit model worked—and it does not (*see* below p. 14)—it does not even purport to

23  identify those deals that can *only* be financed by a profit-sharing program.[14] The probit

24  model looks at five characteristics: (1) loan value, (2) vehicle book value, (3) interest rate,

25  (4) monthly payment amount, and (5) Vantage credit score. (*Id.* 19.) But Dr. House

26  conceded that these characteristics do not capture the unique attributes of "profit sharing

27  ───────────────

28  [14] Moreover, the Opposition concedes that the data underlying the probit model cannot distinguish between purchase and profit-sharing deals. (Opp. 19.)

only" deals; when asked to provide the characteristics of consumers in the "riskiest category" who can only be financed with a profit-sharing program, Dr. House identified one-off factors such as a spouse's "night job," "possibly unemployed," "few assets," and "bankrupt once." (RSUF ¶ 97 (citing Smith Decl. Ex. 9, House Dep. 83:17-84:17).) Dr. House's probit model does not analyze these (or similar) consumer characteristics. *By design*, it cannot identify the consumers that he states belong in the "riskiest category" of borrowers who can only be financed by profit sharing.

In any event, Dr. House's probit model does not work for the stated purpose of identifying profit-sharing deals as opposed to purchase program deals. (Opp. 19.) Westlake claims that the model had an assignment success rate of 91.70%. (*Id.*) However, as reflected in the data underlying Dr. House's report and exposed at his deposition, the probit model correctly predicted "profit-sharing" deals just ***0.38%*** of the time. (Declaration of Jason D. Russell ("Russell Decl.") Ex. 142, House Dep. 290:4-11.)[15] Because the probit model is not designed to identify deals that can *only* be financed through profit-sharing programs, and cannot even accurately predict profit-sharing deals, it fails to support Westlake's "market" and Westlake cannot avoid summary judgment.

(b) <u>There is no evidence that lenders could successfully price discriminate for a subset of targeted consumers</u>

Even assuming Westlake could identify a segment of consumers for whom financing could only be obtained through a profit-sharing program, Westlake presents no evidence that would allow a jury to conclude that those consumers were vulnerable to artificial, targeted price increases. First, Westlake concedes that Dr. House failed to conduct *any* price discrimination analysis (RSUF ¶ 94), which is fatal to its attempt to establish a market based on "targeted" consumers.[16] Moreover, there is no dispute that the

---

[15] The claimed overall success rate is exclusively a function of the data set comprising predominantly purchase program loans and the model predicting ***those*** loans correctly 98.62% of the time. (Russell Decl. Ex. 142, House Dep. 288:16-291:21.)

[16] Westlake counters that whether *dealers* can price discriminate against *end customers* is irrelevant to its market definition because "dealers *cannot finance* [certain] deals . . . absent the availability of a profit-sharing structure." (Opp. 21.) This rebuttal misses the mark. The relevant inquiry is whether a *lender* can identify deals that could "only" be

*(cont'd)*

competitive process in indirect financing—*i.e.*, lenders blind bidding for RISCs from dealers (RSUF ¶ 73)—prevents price discrimination, because a lender cannot know in advance whether other lenders are bidding and, if so, for how much. Thus, Westlake cannot prove the existence of its new product market. *Rockford Mem'l*, 898 F.2d at 1284.

Second, while Dr. House offered a hypothetical monopolist test ("HMT") in an attempt to support the previously-espoused market definition of all deals indirectly financed through a profit-sharing program, there can be no dispute that his analysis does not support a market built around a targeted subset of consumers, because *Dr. House did not impose a SSNIP on deals for those consumers*. Further, as CAC established, Dr. House's SSNIP test is fundamentally flawed because it focused on dealer enrollment fees and licensing fees, instead of the advance paid to dealers upon the assignment of RISCs—*i.e.*, the per deal compensation on which competition in the alleged market takes place. (Mot. 17-18.) As even Westlake concedes, the enrollment and licensing fees cited by Dr. House are not even specific to CAC's profit-sharing program,[17] much less to deals that can "only" be financed through a profit-sharing program. (*See id.*) Thus, Westlake's contention that only CAC charges such "unparalleled fees" (Opp. 20) does not support a separate market,[18] and Dr. House's HMT is irrelevant.

### B. Westlake Cannot Prove A Nationwide Geographic Market

CAC established that it is entitled to summary judgment because Westlake cannot provide evidentiary support for its alleged "national" geographic market. (Mot. 19.) The case law is clear: if competition takes place locally, the relevant geographic market is local *even if there are companies that compete nationwide*. (*Id.* (citing, *e.g.*, *Heerwagen v.*

---

*(cont'd from previous page)*

financed through a profit-sharing program, and whether that *lender* can then successfully decrease compensation to *dealers* for those particular deals. Because *dealers* are the consumers in Westlake's alleged market, it is irrelevant whether they can price discriminate against an end customer who is buying a used car.

[17] (*See* Opp. 20 (referencing the "fees that CAC charges dealers to use its program**s**." (emphasis added).)

[18] *See Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, 1990 WL 12148, at *2 (9th Cir. 1990).

1  *Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006); *It's My Party, Inc. v. Live*

2  *Nation, Inc.*, 88 F. Supp. 3d 475, 492 (D. Md. 2015)).)

3  In Opposition, Westlake ignores this settled law and attempts to shift the burden to

4  CAC to disprove Westlake's alleged geographic market: "CAC has not performed any

5  analysis demonstrating that local finance companies meaningfully compete with national

6  programs like CAC or Westlake." (Opp. 21.) As a threshold matter, it is Westlake's

7  burden to prove a geographic market. *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St.*

8  *Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) ("The plaintiff has the burden

9  of establishing the relevant geographic market"). As the cursory paragraph Westlake

10 dedicates to this essential element of its claims reveals, Westlake cannot meet its burden.

11 (*See* Opp. 21.) Dr. House and Westlake have admitted that competition occurs locally and

12 local and regional lenders offer profit-sharing programs that compete with profit-sharing

13 programs offered by national lenders. (RSUF ¶¶ 118-19.) Further, Westlake's own

14 documents reveal that it tracks local lenders and was concerned about competition from

15 them. (*See id.* ¶ 118 (citing, *e.g.*, Smith Decl. Exs. 95, 96).) Westlake's failure to address

16 such evidence or distinguish settled case law is fatal to its antitrust claims.[19]

17 ## C.  <u>Westlake Cannot Establish That CAC Had Monopoly Power</u>

18 To survive summary judgment, Westlake must rebut CAC's argument that there is

19 neither "direct" nor "indirect" evidence of monopoly power. *See United States v. Syufy*

20 *Enters.*, 903 F.2d 659, 664 (9th Cir. 1990). Westlake fails on each point.

21 First, "direct" evidence of monopoly power requires evidence of *both*

22 supracompetitive pricing and reduced output. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51

23 F.3d 1421, 1434 (9th Cir. 1995). In its Opposition, Westlake asserts that CAC was able to

24 charge supracompetitive prices without suffering financially, and that this is evidence of

---

25 [19] Westlake's Opposition does not cite a single case to support its conclusory market

26 definition. It exclusively relies instead on Dr. House's *ipse dixit* that local competition can be ignored because local lenders supposedly "cannot offer what is essentially an

27 unlimited line of credit to dealers." (Opp. 21.) Westlake's geographic market definition cannot be supported by such conclusory statements. *See Morgan, Strand, Wheeler &*

28 *Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991).

market power. (Opp. 22.)[20] Westlake is wrong on the facts and the law. As a threshold matter, evidence of supracompetitive pricing, alone, cannot be direct evidence of market power, and Westlake does not even contend that there was reduced output of profit-sharing programs. (*See* Opp. 22.) Further, the undisputed facts establish that during the relevant period: (i) CAC increased its compensation to dealers, thereby *reducing* its prices for accepting assignment of RISCs (RSUF ¶ 137);[21] and (ii) both the number of dealers using CAC's financing programs and the number of deals assigned to CAC under its profit-sharing program rose. (*Id.* ¶¶ 127-28.) Each of these undisputed facts independently defeats Westlake's claim of direct market power.

Second, Westlake did not adduce indirect evidence of market power. No reasonable jury could conclude (i) CAC had high market share (when all forms of profit sharing are included), (ii) there were significant barriers to entry *into the alleged market*, and (iii) existing competitors could not increase their short-run output. (*See* Mot. 20-22; *see Rebel Oil*, 51 F.3d at 1434. As a matter of law, Westlake's market share calculations are of no value because they fail to include firms outside the "market" that could provide rapid supply responses to any potential increase in price, as required by the Merger Guidelines. (*See* Mot. 21.) Even assuming *arguendo* that Westlake is correct about CAC's high market share (Opp. 22), evidence of high market share is immaterial unless there are significant barriers to entry or limitations on current market participants increasing output. (Mot. 21.) Further, the significant barriers to entry must exist *in the alleged market at issue*. *See, e.g.*, *Rick-Mik Enters.*, 532 F.3d at 972-73 (patents and copyrighted materials in a market where defendant was a *seller* of retail gasoline were not barriers to entry in a

---

[20] Here too, Westlake's focus on "supracompetitive pricing" is erroneous because these fees do not represent a price term in the relevant market for *paying* dealers to *acquire* individual RISCs. (RSUF ¶¶ 64, 64(a).) As the Ninth Circuit has held, evidence supporting monopoly power in a market where the defendant acts as a *seller* does not support monopoly power in a separate market, where the defendant acts as a *buyer*. *See Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008).

[21] Even if the CAPS program fee and dealer enrollment fee were relevant price terms (which they are not), it is undisputed that CAC has not increased monthly fee since 2005, six months before it obtained the '807 Patent (RSUF ¶ 138). It is also undisputed that CAC allowed dealers to defer their enrollment fee beginning in 2005. (*Id.* ¶ 134.)

1  separate antitrust market, where that same defendant was a *buyer* of gasoline franchises).

2  The only barrier to entry Westlake identifies is the '807 Patent itself (Opp. 22), which

3  covers a method of providing financing packages over the Internet.[22] While Westlake

4  alleged in its original complaint a relevant product market "for e-commerce software that

5  facilitates auto loans" (Smith Decl. Ex. 24, Compl. ¶ 32), the FAC substituted a "market"

6  for "indirect financing for used car sales to dealers through a profit sharing program."

7  (Smith Decl. Ex. 25, FAC ¶ 19.) Westlake does not contend—nor could it—that the '807

8  Patent prevented firms from indirectly financing used car purchases through a profit-

9  sharing program, as opposed to using e-commerce software to facilitate auto loans. There

10  is also no merit to Westlake's argument that the '807 Patent was a barrier to entry because

11  collateral pooling, which is referenced in a dependent claim, "is essential to maintaining a

12  viable profit-sharing program." (Opp. 22-23.) Westlake admits the '807 Patent did not

13  "claim the concept of collateral pools in and of themselves." (RSUF ¶ 158.)

14       Westlake also ignores undisputed evidence of new entrants, further undermining its

15  claim of significant barriers to entry. (*See* Opp. 22-23.) It is undisputed that firms can and

16  did begin offering profit-sharing products without collateral pools even when there were

17  allegedly barriers to entry. (RSUF ¶¶ 120-24.) Notably, Dr. House's report shows that

18  there was *more entry in the alleged market during the '807 Patent's lifetime*, as compared

19  to before its issuance or after its disallowance. (Smith Decl. Ex. 22, House Rpt. Table 1.)

20       **D.    Westlake Has No Evidence Of Injury To Competition**

21       As established, an antitrust plaintiff must prove market-wide injury that flows from

22  the alleged anticompetitive conduct. (Mot. 22 (citing cases).) Returning to its misguided

23  theory, Westlake claims that CAC charged dealers supracompetitive prices in the form of

24  its enrollment and program fees. (Opp. 23.)[23] But these fees (i) do not reflect the price

---

25

26  [22] Because the '807 Patent covers a method of providing financing packages, as opposed
    to CAC's profit-sharing program itself (which is *not* patented), Westlake's citation to *IGT*

27  *v. Alliance Gaming Corp.*, 2008 WL 7071468 (D. Nev. Oct. 21, 2008), is inapposite.

28  [23] Westlake also points to minor deviations in pricing policy (Opp. 23), but provides no
    evidence or case law suggesting that these rise to the level of "supracompetitive" pricing.

1  term in the alleged relevant market, and (ii) actually *decreased* during the period of

2  CAC's alleged anticompetitive conduct. (*See supra* Part III.A.2.b; RSUF ¶ 134.) Further,

3  during the relevant period, prices went down and output went up. (RSUF ¶¶ 127-28, 137.)

4  As a matter of law, this undisputed evidence cannot sustain a claim of market-wide injury.

5  ### E.   Westlake Has No Evidence Of Antitrust Injury To Itself

6  Even if Westlake could prove market-wide injury, Westlake cannot succeed on its

7  antitrust claims absent evidence that its own injury was caused by alleged anticompetitive

8  conduct. (Mot. 23-25 (citing, *e.g.*, *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d

9  1150, 1159 (9th Cir. 2015); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371

10  (9th Cir. 1992)).) Although Westlake attempts to distinguish *Magnetar*, the distinctions at

11  which it grasps[24] do not disturb *Magnetar's* unequivocal holding: to establish causation,

12  an antitrust plaintiff must (i) connect the damages claimed to the anticompetitive conduct

13  at issue and (ii) disaggregate the impact of the alleged anticompetitive conduct from the

14  impact of lawful competition or other causes. *See Magnetar*, 801 F.3d at 1159.

15  Here, Westlake has no evidence of damages that are connected to its newly minted

16  product market focused on some subset of deep subprime consumers. Neither Westlake

17  nor Dr. House even attempted to quantify the size of this market—*i.e.*, the number of

18  deals that can only be financed through a profit-sharing program—a prerequisite to

19  calculating damages under Dr. House's damages model. Instead, the model calculates

20  "lost profits" using the *entire* profit-sharing market.[25] Thus, Westlake's causation and

21  [24] Westlake erroneously asserts that *Magnetar* "did not involve . . . maintenance of

22  market power over an entire market." (Opp. 25.) In fact, it did and is directly applicable

23  to Westlake's claim that CAC used a patent to acquire and maintain market power in its

   alleged relevant market. *See Magnetar*, 801 F.3d at 1158. Westlake also claims the

24  anticompetitive conduct alleged in *Magnetar* was based "entirely on an allegedly

   meritless patent infringement lawsuit, and did not involve allegations of *Walker Process*

25  fraud." (Opp. 25.) This is a distinction without a difference. Westlake's claim that

   *Magnetar* cannot be relied upon because it implicates only one of Westlake's two theories

26  is unrelated to the issue and requirements of causation, and does not change the Ninth

   Circuit's unmistakable holding that, to prove causation, an antitrust plaintiff must connect

27  the alleged damages to the anticompetitive conduct and disaggregate the impact of lawful

   competition. *Magnetar*, 801 F.3d at 1159. This Westlake does not—and cannot—do.

   [25] This *cannot* be the relevant market, because profit sharing regularly competes with

28  purchase, even among the most credit-challenged end-customers. (*See supra* Part III.A.1.)

1  damages model amounts to speculation that cannot aid the jury.

2      Further, even if Westlake's damages model were connected to its antitrust market,

3  it cannot establish a link between CAC's allegedly anticompetitive conduct and the

4  claimed harm. (Mot. 24-25.) In its Opposition, Westlake contends it was injured by

5  having to operate its profit-sharing program around the '807 Patent without collateral

6  pools (*see* Anderson Decl. [ECF No. 200-2] ¶¶ 3-4).[26] Yet Westlake admits that the '807

7  Patent did not patent collateral pools in and of themselves. (RSUF ¶¶ 157-58.)[27] Thus,

8  Westlake concedes it was free to offer collateral pools, but chose not to do so. Any "lost

9  profits" were, therefore, self-inflicted.

10     Finally, Westlake's damages model cannot establish antitrust injury because it does

11  not (and cannot) separate damages resulting from the '807 Patent from damages resulting

12  from lawful competition. Westlake agrees that controlling case law requires such

13  separation. (RSUF, Response to Concl. of Law No. 25.) And yet the Opposition does not

14  refute the extensive problems with Westlake's product (*see* Mot. 25; RSUF ¶¶ 169-76), or

15  address CAC's *procompetitive* conduct and the success CAC had in offering its profit-

16  sharing product *both before and after* the alleged anticompetitive conduct. (RSUF ¶ 168;

17  Opp. 25.)[28] Westlake's self-serving conjecture that all damages must relate to the Patent is

18  without support. (Opp. 25.) Given its admitted failure to disaggregate these factors,

19  controlling law compels summary judgment in CAC's favor. *Magnetar*, 801 F.3d at 1159.

20                      **CONCLUSION**

21     For all the foregoing reasons, summary judgment should enter in CAC's favor.

22  _____

23  [26] Westlake effectively concedes that it has *no admissible evidence* to prove it designed its profit-sharing program around the claims in the '807 Patent. (RSUF ¶¶ 145, 154.)

24  [27] Westlake also admits that neither the Patent nor CAPS allowed CAC to "guarantee" credit approval for every potential car buyer—it had been doing this for decades. (Opp. 4.)

25  Thus, Westlake is wrong to contend the '807 Patent "gave CAC the exclusive right to use the features embodied in its . . . Guaranteed Credit Approval System." (*Id.* 1.)

26  [28] Westlake disputes this fact by claiming that CAC's anticompetitive conduct has allowed it to be a successful competitor. (RSUF ¶ 168.) Yet Westlake does not address

27  the evidence cited in support of this fact, which reveals that CAC was successful *prior* to the anticompetitive conduct for reasons that continued to provide a competitive

28  advantage during the alleged damages period. (*Id.*)

1

2   DATED: Sept. 11, 2017        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3                                By: _____*/s/ Jason D. Russell*_____

4                                                    Jason D. Russell
                                                 Attorneys for Defendant
5                                             Credit Acceptance Corporation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28