JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600
Email:        jason.russell@skadden.com
              douglas.smith@skadden.com

JONATHAN L. FRANK *admitted *pro hac vice*
JAMES A. KEYTE *admitted *pro hac vice*
PATRICK G. RIDEOUT *admitted *pro hac vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000
Email:        jonathan.frank@skadden.com
              james.keyte@skadden.com
              patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,<br><br>                    Plaintiff,<br><br>          v.<br><br>CREDIT ACCEPTANCE CORPORATION,<br><br>                    Defendant. | CASE NO.: 2:15-cv-07490 SJO (MRWx)<br><br>**CREDIT ACCEPTANCE CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR; and**<br><br>*Filed Under Separate Cover*:<br><br>**DECLARATION OF DOUGLAS A. SMITH.**<br><br>The Honorable Judge S. James Otero<br><br>Hearing Date:      Oct. 16, 2017<br>Hearing Time:      10:00 a.m.<br>Courtroom:         10C<br><br>Pretrial Conference:   Nov. 20, 2017<br>Trial Date:            Dec. 4, 2017 |

# TABLE OF CONTENTS

I.      DR. HOUSE'S PRODUCT MARKET
        OPINIONS SHOULD BE EXCLUDED ........................................................1

II.     DR. HOUSE'S UNRELIABLE "OPINIONS"
        ON THE GEOGRAPHIC MARKET ARE NOT
        ROOTED IN ANY METHODOLOGY OR ANALYSIS ............................3

III.    DR. HOUSE'S INJURY AND
        DAMAGES OPINIONS ARE UNRELIABLE ............................................4

CONCLUSION.................................................................................................5

CREDIT ACCEPTANCE'S REPLY ISO MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    738 F.3d 960 (9th Cir. 2013) ............................................................................ 4

4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ........................................................................................... 4

5

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .......................................................................... 2

6

7

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .......................................................................... 4

8

*In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ........................................................... 2

9

*Haagen-Dazs v. Double Rainbow Gourmet Ice Creams*,
    No. 88-15043, 1990 WL 12148 (9th Cir. Feb. 8, 1990) ................................... 2

10

11

*In re High-Tech Employee Antitrust Litigation*,
    No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ............ 5

12

*Magnetar Technologies Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) .......................................................................... 5

13

14

*In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation*,
    858 F.3d 787 (3d Cir. 2017) ............................................................................. 4

15

16

### OTHER AUTHORITIES

17

U.S. Department of Justice & Federal Trade Commission,
    *Horizontal Merger Guidelines* (2010) .............................................................. 3

18

19

20

21

22

23

24

25

26

27

28

CREDIT ACCEPTANCE'S REPLY ISO MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.

1    Westlake's Opposition ("Opp.") seeks to persuade the Court that the overt
2  methodological deficiencies underlying Dr. House's opinions are mere factual disputes
3  between the parties properly reserved for cross-examination or a "battle of the experts."
4  Westlake is wrong and its Opposition itself lays bare the methodological flaws that
5  render Dr. House's "expert" opinions irrelevant and unreliable, compelling exclusion.

6  ## I.    DR. HOUSE'S PRODUCT MARKET OPINIONS SHOULD BE EXCLUDED

7    Dr. House's opinions on the relevant product market should be excluded for one
8  simple and straightforward reason: he performed *none of the required economic analysis*
9  to support the existence of a market for "indirect financing for used car sales through a
10 profit-sharing program." (ECF 187-3 Ex. 22 ("House Rpt.") ¶ 32.)[1] The disabling nature
11 of his failure is apparent against the backdrop of the undisputed marketplace dynamics.
12 The parties agree that "[a]ll indirect financing programs" serve the *same purpose*: "to
13 obtain RISCs originated by dealers in conjunction with the sale of vehicles to the end-
14 customers." (ECF No. 221-3 ("RSUF") ¶ 66.) Each transaction is negotiated separately,
15 and, even for subprime consumers, dealers have multiple potential funding options,
16 including profit-sharing programs, purchase programs, and BHPH. (RSUF ¶¶ 61, 75.)
17 Dealers use Internet-based aggregators and platforms to solicit offers from profit-sharing
18 and/or purchase programs, and then compare the offers. (*Id.* ¶¶ 70-72.) Lenders compete
19 to acquire RISCs via a blind auction—they "don't know what the alternative submissions,
20 if there are any other submissions, would be." (ECF No. 187-3 Ex. 9 78:19-21.)[2]

21   Yet Westlake seeks to prove that the products lenders offer simultaneously to
22

23 [1] After Dr. House espoused a narrower market definition comprising deals that could *only*
   be funded by a profit-sharing program, CAC established that this newly defined market is
24 unsupportable. (Mot. 11-13.) In Opposition, Westlake retreats back to its original market
   definition and misleadingly argues this was not addressed by CAC. (*See* Opp. 6 ("CAC is
25 attacking a strawman.").) In reality, CAC's Motion addressed the significant failures in Dr.
   House's analysis of the alleged relevant product market at length. (*See* Mot. 5-13.)
26 [2] Westlake's original complaint was focused on the *selling* of software that was designed
   to (and did) present dealers with approvals under both programs for the same transaction.
27 (RSUF ¶ 77.) But, as for the *acquisition* of RISCs, Westlake admits its purchase
   programs competed directly with CAC's profit-sharing program. (*Id.* ¶ 82.)
28

1  dealers—as part of a blind auction to obtain the same RISCs—are *not* in the same market.
2  To do this, Westlake needs expert analysis showing a *lack* of substitutability—*i.e.*, that
3  dealers cannot defeat a small, but significant price increase (*i.e.*, *lower* advances) by
4  switching to substitute products. (Opp. 6-11.) The Opposition confirms that Dr. House's
5  only attempts at economic analysis (a probit model and HMT) cannot make this showing.

6      First, Westlake admits the probit model "was not designed to show" and does not
7  show "lack of substitutability." (Opp. 7; ECF No. 209-2 Ex. 1 ("House Tr.") 254:7 (probit
8  "doesn't address the issue of substitutability").) Thus, it is methodologically incapable of
9  addressing the critical question for market definition. Westlake claims the probit was
10 designed to demonstrate that "characteristics of profit-sharing deals" supposedly "differ
11 noticeably" from other financing methods (Opp. 8), but, even if true,[3] *that supports*
12 *CAC's position*: purchase and profit-sharing programs are "differentiated products" in the
13 ***same market*** given, as Dr. House admits, they are not "so different that they are unsuited
14 for the same purpose." *Haagen-Dazs v. Double Rainbow Gourmet Ice Creams*, 895 F.2d
15 1417, 1990 WL 12148, at *3 (9th Cir. 1990); (*see* House Tr. 36:18-20; Mot. 7-8).[4]

16     Second, Westlake is wrong that Dr. House's HMT "confirm[s] that profit-sharing
17 programs lack substitutes." (Opp. 10.) The HMT asks if a hypothetical monopolist could
18 profitably impose a SSNIP on *a relevant product in the alleged market*. (Mot. 10-11.) Dr.

---

[3] Westlake offers no meaningful response to Dr. House's flawed reliance on the Equifax data, which *does not even differentiate between profit-sharing and purchase loans*. (Mot. 9-10.) Though Westlake cites *City of Pomona v. SQM*, that case involved a claim that the expert's data sample was "too small," not that the data could not distinguish between the very characteristics the expert was trying to test. 750 F.3d 1036, 1049 (9th Cir. 2014).
[4] Because Dr. House pivoted to a market defined around "targeted" consumers, CAC's Motion emphasized his failure to (i) identify that targeted group, or (ii) show the ability to price discriminate against it. (Mot. 12.) Westlake argues that—once Dr. House altered the sample data—he could identify the target group (profit-sharing deals) "with 90.2% accuracy," which supposedly "establishes the reliability of the probit analysis for the purposes for which it is designed." (Opp. 8.) This is directly contrary to Dr. House's testimony: "My purpose was ***not*** to develop a probit by which I could accurately assign membership. . . . And in the construction of the data set, ***it would never be very good in predicting***." (ECF No. 237-1 Ex. 3 292:24-293:3 (emphasis added).) Further, his altering the sample data renders his model unreliable. *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1039 (C.D. Cal. 2013). In any event, Dr. House admits he did not perform a price discrimination analysis. (House Tr. 321:21-23.)

House posits "the candidate market here is the acquisition of RISC[s] through a profit sharing program" (House Tr. 239:25-240:2), ***but his HMT does not impose a SSNIP in that market***. Instead, Dr. House applies his HMT to CAC's 2001 increases in enrollment and program fees—*i.e.*, fees not charged when RISCs are assigned. This defect, alone, requires exclusion. (*See* Mot. 10-11.) Indeed, Dr. House's flawed methodology fails to account for the now-undisputed fact that CAC actually increased its compensation to dealers (*i.e.*, reduced its prices for accepting assignment of RISCs) during the period of the alleged anticompetitive conduct. (RSUF ¶ 137.) Accordingly, Dr. House's HMT is economically meaningless and cannot assist the trier of fact. (*See* Mot. 10-11.)[5]

## II.   DR. HOUSE'S UNRELIABLE "OPINIONS" ON THE GEOGRAPHIC MARKET ARE NOT ROOTED IN ANY METHODOLOGY OR ANALYSIS

Westlake does not dispute that an expert' must offer geographic market analysis that identifies "the area of effective competition." (Opp. 12.) This is a "'fact-intensive exercise centered on the commercial realities of the market and competition' between entities in the market." (Mot. 13-14 (citing cases).) Dr. House concedes that local and regional lenders offer profit-sharing products and compete for assignment of RISCs on a deal-by-deal basis at the local level. (*See* Mot. 14; Opp. 12.) Yet Westlake advances a national geographic market (Opp. 2), relying on Dr. House's testimony—with no proffered methodology—that "pricing is nationally uniform," dealers "have the option of dealing with . . . a national player and shift their business from the local to the national," and national competitors "will police those local prices to then go back to what we call equilibrium." (*Id.* 12.) Such "opinions" are not the product of the required "fact intensive exercise." Rather, Dr. House admits it is "***just pure theory***," and he "didn't really look at local competition even involving the national players and what those outcomes are."

---

[5] Westlake argues that, in the face of this "SSNIP"—the fee increase in 2001—"CAC's sales did not suffer." (Opp. 11.) This misses the mark. While Dr. House's flawed analysis considered that CAC's *net income* increased over the two-year period he cites (House Rpt. at 59), he failed to consider the significant portion of such income attributable to prior originations or that the originations and dealer enrollments in that period actually decreased. (*See* Declaration of Douglas A. Smith ("Smith Decl.") Ex. 2 at 4; Ex. 5 at 17.)

1  (Smith Decl. Ex. 3 227:16-229:1.) Because he did not analyze the commercial realities of
2  the market, his "opinions" cannot aid the jury and should be excluded. *See Brooke Grp.*
3  *Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).[6]

4  ## III.   DR. HOUSE'S INJURY AND DAMAGES OPINIONS ARE UNRELIABLE

5      Westlake does not dispute that an antitrust damages model must take into account
6  the realities of the relevant market. But Dr. House simply imported the market share
7  percentages from the 1986 study regarding consumer goods to indirect auto financing,
8  without adjustment or analysis.[7] Westlake is wrong to claim that literature supports this
9  rote approach. (Opp. 15.) Indeed, the article Westlake cites applied the 1986 study *only*
10 *after adjusting the number of market entrants and the market share percentages to reflect*
11 *the realities of that market.* The unreliability of Dr. House's mechanical reliance on this
12 study is evident. Dr. House assumes only five competitors would enter the market, and
13 each would achieve a certain share based on order of entry. (House Rpt. ¶ 67.)

14     But CAC entered the market in 1972, and no one else entered for 20 years. (*Id.*,
15 Tbl. 1.) Indeed, as a document on which Dr. House relies highlights, two competitors
16 entered prior to any "anticompetitive" conduct, but failed to achieve the market shares the
17 model predicts all because of CAC's procompetitive conduct. (ECF No. 187-3 Ex. 79, at
18 049; House Tr. 340:1-13.) Rather than address this "economic reality of the [relevant]
19 market," *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000),
20 as it must, Westlake disregards competitors' actual experiences as "irrelevant." (Opp. 16.)

21     Separately, Westlake agrees that Dr. House's opinions must be excluded if his

22
23 [6] Westlake's attempt to distinguish the holdings of CAC's cases with irrelevant factual differences should be rejected. Moreover, the case Westlake cites is not even an antitrust case. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013).
24 [7] Westlake asserts that Dr. House "uses a generally accepted 'yardstick' model to estimate Westlake's profits" (Opp. 1), but Dr. House said he did no such thing because "there is no market that bears substantial similarity to the relevant market identified herein." (House
25 Rpt. ¶ 65.) Yet Dr. House uses Westlake's profit rate from its purchase programs to
26 determine lost profits in the profit-sharing market. Westlake does not explain why the purchase "market" is sufficiently similar to reliably provide a benchmark profit rate, but
27 so dissimilar that it cannot provide a yardstick measurement for market share. *Cf. In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 792 (3d Cir. 2017).
28

damages model does not connect the injury to the specific anticompetitive acts. And Dr. House admits that he simply *assumed* causation. (House Tr. 217:3-7 ("[M]y assumption is that the conduct of CAC is directly related to that non – to that lack of performance.").) Further, Westlake argues that Dr. House's incorporation of the profit rate from Westlake's purchase programs into his model successfully disaggregates the effects of Westlake's business missteps from the alleged misconduct (Opp. 17), but this methodology fundamentally ignores the effects of the numerous business missteps that were *specific to Westlake's profit-sharing programs*. (*See* Mot. 19-20.)

Dr. House's model also fails to disaggregate the effects of CAC's procompetitive conduct and "overlooks [CAC's] competitive advantages." (*Id.* 20.) Westlake responds with the anachronistic contention that CAC "was *only able to offer these advantages because of its fraudulent patent.*" (Opp. 17-18.) As CAC established—and, again, Dr. House himself highlighted—many of its competitive advantages predate the '807 Patent and have nothing to do with it, including, for example, the "network of dealers who really like their product" and the "data [] advantage" that comes from its "40-plus years in business," which, among other things, allows CAC to successfully price and anticipate the performance of its business. (Smith Decl. Ex. 4 79:12-80:16; Mot. 20; ECF No. 187-3 Ex. 79, at 049; Mot. 20.)[8] Thus, Dr. House's damages model fails as a matter of law. *See Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015).[9]

## CONCLUSION

For these reasons, the opinions of Dr. House should be excluded in their entirety.

---

[8] Westlake also argues without citation that CAC's advantages can be traced to its ability to offer "pooling, a feature of CAPS that was covered by the '807 Patent." (Opp. 17-18.) But Westlake has admitted that the '807 Patent did not patent collateral pools. (RSUF ¶ 158.) And CAC has been offering pooling since long before the '807 Patent. (*Id.* ¶ 156.)

[9] Westlake miscites *In re High-Tech Employee Antitrust Litigation*, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) to argue that a failure to disaggregate damages is purely a cross-examination issue. But in that case, the court found that the expert's model "controls for many other variables . . . to ensure that the estimated damages result only from the challenged conduct." *Id.* at *18. The court distinguished the cases CAC cites (*see id.* at *18 nn.39-40), because in those cases—as with Dr. House—the expert's model "made 'no attempt to account for other possible causes'" of the plaintiffs' damages. *Id.* at *18 n.40.

DATED: October 2, 2017     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/*                    *Jason D. Russell*

Jason D. Russell
Attorneys for Defendant
Credit Acceptance Corporation

CREDIT ACCEPTANCE'S REPLY ISO MOTION TO EXCLUDE THE EXPERT OPINIONS OF DONALD HOUSE, SR.