# Exhibit 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

```
(Mark One)
    [X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
           SECURITIES EXCHANGE ACT OF 1934

           FOR THIS FISCAL YEAR ENDED DECEMBER 31, 2003
```

### COMMISSION FILE NUMBER 000-20202

# CREDIT ACCEPTANCE CORPORATION
#### (Exact Name of Registrant as Specified in its Charter)

```
        MICHIGAN                            38-1999511
(State or other jurisdiction of         (I.R.S. Employer
 incorporation or organization)        Identification No.)

25505 W. TWELVE MILE ROAD, SUITE 3000       48034-8339
        SOUTHFIELD, MICHIGAN                (Zip Code)
(Address of Principal Executive Offices)
```

#### REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE:

#### (248) 353-2700

#### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

#### NONE

#### SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

#### COMMON STOCK

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes [X] No [ ]

The aggregate market value of 12,011,309 shares of the Registrant's common stock held by non-affiliates on June 30, 2003 was approximately $120.1 million. For purposes of this computation all officers, directors and 10% beneficial owners of the Registrant are assumed to be affiliates. Such determination should not be deemed an admission that such officers, directors and beneficial owners are, in fact, affiliates of the Registrant.

At January 31, 2004, there were 39,663,690 shares of the Registrant's common stock issued and outstanding.

Exhibit 2

Page 3

Dealer-partner enrollments in the United States for each of the last five years are presented in the table below.

| YEAR | NUMBER OF DEALER-PARTNER ENROLLMENTS |
| ---- | --------------- |
| 1999.................................................... | 311 |
| 2000.................................................... | 293 |
| 2001.................................................... | 224 |
| 2002.................................................... | 143 |
| 2003.................................................... | 399 |

A new dealer-partner is required to execute a servicing agreement, which defines the legal relationship between the Company and the dealer-partner. The servicing agreement assigns the responsibilities for administering, servicing and collecting the amounts due on Loans to the Company. The servicing agreement provides that collections received by Credit Acceptance during a calendar month on Loans assigned by a dealer-partner are applied on a pool-by-pool basis as follows:

- First, to reimburse Credit Acceptance for certain collection costs;

- Second, to pay Credit Acceptance its servicing fee;

- Third, to reduce the aggregate advance balance and to pay any other amounts owing from the dealer-partner to the Company; and

- Fourth, to the dealer-partner as payment for amounts contractually due under the servicing agreement (dealer holdback).

Under the typical servicing agreement, a dealer-partner represents that it will only submit Loans to Credit Acceptance which satisfy criteria established by the Company, meet certain conditions with respect to the binding nature and the status of the security interest in the purchased vehicle, and comply with applicable state, federal and foreign laws and regulations. Dealer-partners receive a monthly statement from the Company, summarizing all activity on Loans originated by such dealer-partner.

In the event that the Company discovers a misrepresentation by the dealer-partner relating to a Loan submitted to the Company, the Company can demand that the Loan be repurchased for the then current balance owed on the Loan less the amount of any unearned finance charge plus the applicable termination fee, generally $500. Upon receipt in full of such amount, the Company will reassign the Loan receivable and its security interest in the financed vehicle to the dealer-partner.

The typical servicing agreement may be terminated by the Company or by the dealer-partner upon written notice. The Company may terminate the servicing agreement immediately in the case of an event of default by the dealer-partner. Events of default include, among other things:

(i) the dealer-partner's refusal to allow the Company to audit its records relating to the Loans assigned to the Company;

(ii) the dealer-partner, without the Company's consent, is dissolved; merges or consolidates with an entity not affiliated with the dealer-partner; or sells a material part of its assets outside the course of its business to an entity not affiliated with the dealer-partner; or

(iii) the appointment of a receiver for, or the bankruptcy or insolvency of, the dealer-partner.

While a dealer-partner can cease submitting Loans to the Company at any time without terminating the servicing agreement, if the dealer-partner elects to terminate the servicing agreement or in the event of a default, the dealer-partner must immediately pay the Company:

(i) any unreimbursed collection costs;

(ii) any unpaid advances and all amounts owed by the dealer-partner to the Company; and

4

Exhibit 2
Page 4

Company cannot demand repayment from the dealer-partner of the advance except in the event the dealer-partner is in default of the servicing agreement. Advances are made only after the Loan is approved, accepted by and assigned to the Company and all other stipulations required for funding have been satisfied.

As advances are originated, they are automatically assigned to the originating dealer-partner's open pool of advances. Periodically, pools are closed and subsequent advances are assigned to a new pool. All advances due from a dealer-partner are secured by the future collections on the dealer-partner's portfolio of Loans. Collections on all related Loans within the pool, after payment of the Company's servicing fee and reimbursement of certain collection costs, are applied to reduce the aggregate advance balance owing against those Loans. Once the advance balance has been repaid, the dealer-partner is entitled to receive future collections from Loans within that pool, after payment of the Company's servicing fee and reimbursement of certain collection costs. If the collections on Loans from a dealer-partner's pool are not sufficient to repay the advance balance, the dealer-partner will not receive the dealer holdback. Loans accepted by the Company are secured by liens on the financed vehicles. The Company's acceptance of Loans is generally without recourse to the general assets of the dealer-partner.

Dealer-partners have an opportunity to receive a portion of the dealer holdback at the time a pool of 100 or more Loans is capped. The amount paid to the dealer-partner is calculated using a formula that considers the collection rate and the advance balance on the capped pool.

The Company records the total payments due under the Loan as a Loan receivable and the amount of its servicing fee as an unearned finance charge, which is netted from the gross amount of the Loan in the balance sheet. The servicing fee represents the portion of the Loan payments above the amount of the advance that the Company is entitled to retain and therefore becomes the interest element on the Loan from the Company's perspective. Amounts contractually due to the dealer-partner, generally 80% of the gross Loan amount, are reflected as a liability (dealer holdback) from which the advance on the Loan is netted. The dealer holdback is a contractual obligation to the dealer-partner from the Company and includes the dealer-partner's profit on the sale of the vehicle as well as the dealer-partner's share of the profits from the financing. Actual payments of dealer holdback will be contingent on collections of the related Loans assigned to the Company.

The Company's business model allows it to share the risk and reward of collecting on the Loans with the dealer-partners. Such sharing is intended to motivate the dealer-partner to assign better quality Loans, follow the Company's underwriting guidelines, and provide appropriate service and support to the customer after the sale. The Company believes this arrangement aligns the interests of the Company, the dealer-partner and the customer. The Company measures various criteria for each dealer-partner against other dealer-partners in their area as well as the top performing dealer-partners. Sales representatives are required to present the results to the dealer-partner and to develop an action plan on a quarterly basis with the dealer-partner to improve the dealer-partner's overall success with the Company's program.

Information on the Company's Loan originations for each of the last five years is presented in the following table:

|  | FOR THE YEARS ENDED DECEMBER 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| AVERAGE LOAN DATA | 2003 | 2002 | 2001 | 2000 | 1999 |
| Average size of Loan accepted.......... | $12,206 | $11,316 | $10,724 | $8,867 | $8,849 |
| Percentage growth in average size of Loan................................... | 7.9% | 5.5% | 21.0% | 0.2% | 5.3% |
| Average initial maturity (in months)... | 37 | 36 | 36 | 32 | 32 |
| Average advance per Loan............... | $ 5,723 | $ 5,243 | $ 5,288 | $4,657 | $4,744 |
| Average advance as a percent of average Loan accepted....................... | 46.9% | 46.3% | 49.3% | 52.5% | 53.6% |

6

Exhibit 2
Page 5

# Exhibit 3

HIGHLY CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4    _____

 5    WESTLAKE SERVICES, LLC    )

 6    d/b/a WESTLAKE FINANCIAL  )

      SERVICES; and NOWCOM      )

 7    CORPORATION,              )

                                )

 8             Plaintiffs,      )

                                )

 9       vs.                    ) Case No.

                                ) 2:15-cv-07490

10    CREDIT ACCEPTANCE         ) SJO (MRWx)

      CORPORATION,              )

11                              )

               Defendant.       )

12    _____ )

13

14                HIGHLY CONFIDENTIAL

15

16            VIDEOTAPED DEPOSITION OF

17         DONALD R. HOUSE, SENIOR, Ph.D.

18            Los Angeles, California

19           Wednesday, July 19, 2017

20                  Volume I

21

22    Reported by:

      LORI M. BARKLEY

23    CSR No. 6426

24    Job No. 2656308

25    PAGES 1 - 356
```

Page 1

Exhibit 3
Page 7

HIGHLY CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                   WESTERN DIVISION
 4    _____
 5   WESTLAKE SERVICES, LLC   )
     d/b/a WESTLAKE FINANCIAL )
 6   SERVICES; and NOWCOM     )
     CORPORATION,             )
 7                            )
             Plaintiffs,      )
 8                            )
       vs.                    ) Case No.
 9                            ) 2:15-cv-07490
     CREDIT ACCEPTANCE        ) SJO (MRWx)
10   CORPORATION,             )
                              )
11           Defendant.       )
     _____)
12
13
14        Videotaped deposition of DONALD R. HOUSE,
15   SENIOR, Ph.D., Volume I, taken on behalf of
16   Defendants, at 300 South Grand Avenue, Los Angeles,
17   California, beginning at 9:38 a.m., and ending at
18   7:18 p.m., on Wednesday, July 19, 2017, before
19   LORI M. BARKLEY, Certified Shorthand Reporter
20   No. 6426.
21
22
23
24
25
                                           Page 2
```

Exhibit 3
Page 8

HIGHLY CONFIDENTIAL

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4        BIRD, MARELLA, BOXER, WOLPERT, NESSIM,

 5        DROOKS, LICENBERG & RHOW

 6        BY:  JULIAN BURNS

 7              - AND -

 8            RAY SEILIE

 9              - AND -

10            TIMOTHY YOO

11              - AND -

12            EKWAN RHOW

13        Attorneys at Law

14        1875 Century Park East, 23rd Floor

15        Los Angeles, California 90067-2561

16        301.201.2100

17        tyoo@birdmarella.com

18        erhow@birdmarella.com

19        jburns@birdmarella.com

20        rseilie@birdmarella.com

21

22

23

24

25
```

Page 3

Exhibit 3
Page 9

HIGHLY CONFIDENTIAL

```
 1   APPEARANCES (Continued)

 2

 3   For Defendants:

 4       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 5       BY:  JAMES KEYTE

 6             - AND -

 7           JEREMY KOEGEL

 8             - AND -

 9           PATRICK RIDEOUT

10            - AND -

11           JONATHAN FRANK

12       Attorneys at Law

13       4 Times Square

14       New York, New York 10036

15       212.735.3386

16       jonathan.frank@skadden.com***

17       zack.faigen@skadden.com

18       patrick.rideout@skadden.com

19

20   Videographer:

21       Steven Togami

22

23   Also Present:

24       Casey Fetzer (In-House Counsel CAC)

25       Matthew List (Charles River Associates)
```

Page 4

Exhibit 3
Page 10

HIGHLY CONFIDENTIAL

```
 1    national, and that polices that type of competition.    15:58:25

 2            So the importance is having national             15:58:31

 3    players, especially those that are pricing uniformly    15:58:33

 4    across all local areas that makes the market national   15:58:36

 5    in scope.                                                15:58:40

 6    BY MR. KEYTE:                                            15:58:41

 7        Q.   And that's your analysis?                       15:58:41

 8        A.   Yes.                                            15:58:43

 9        Q.   You would agree that the national players       15:58:43

10    compete against local and regional players for RISC     15:58:47

11    contracts?                                               15:58:51

12        A.   Yes.  That is -- there is that competition      15:58:52

13    in equilibrium because of the national scope, all       15:58:55

14    local markets should -- should level out at the         15:58:59

15    levels that are commensurate nationwide.                15:59:04

16        Q.   Well, you didn't analyze that?                  15:59:07

17        A.   Well, that's -- that's just pure theory.        15:59:09

18        Q.   I agree with that, that's pure theory.  You     15:59:11

19    didn't analyze whether all competition at the local     15:59:14

20    level, levels out to whatever your national             15:59:17

21    equilibrium, correct?                                   15:59:20

22        A.   No.  But if, in fact -- and we'll see this      15:59:21

23    in some markets that are national in scope, you'll      15:59:24

24    see differences in prices locally here and there for    15:59:27

25    short periods of time.  But -- but the theory is        15:59:29
```

Page 227

Exhibit 3
Page 11

HIGHLY CONFIDENTIAL

```
 1   strong, the theory is strong is that when you have a    15:59:32

 2   national player such as a CAC, that you would expect,   15:59:35

 3   and if we're looking at what kind of pricing you        15:59:40

 4   would see nationally, the expectation is it would be    15:59:43

 5   determined by the national player, and that things      15:59:47

 6   will reach equilibrium.                                 15:59:52

 7        So in terms of asking the question:  Should        15:59:54

 8   I go to all the local areas and look at pricing to      15:59:57

 9   see if, in fact, they are -- there are local markets?   16:00:00

10   An economist doesn't need to do that if, in fact,       16:00:04

11   there's a national player, especially a national        16:00:07

12   player that's the largest, has the largest market       16:00:10

13   share.                                                  16:00:12

14     Q.   Okay.  So your opinion is that as a matter       16:00:12

15   of economics, any time there are national players       16:00:14

16   that are competing against each other, the market is    16:00:16

17   national?                                               16:00:18

18     A.   Yes, absolutely.                                 16:00:19

19     Q.   And so you didn't really look at local           16:00:19

20   competition even involving the national players and     16:00:22

21   what those outcomes are, correct?                       16:00:24

22        MS. BURNS:  Objection, mischaracterizes            16:00:27

23   testimony.                                              16:00:28

24        THE WITNESS:  I did not.  I did not, because       16:00:29

25   my economic training suggests that that would not be    16:00:30
```

Page 228

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | a productive exercise to do because there aren't any | 16:00:32 |
| 2 | impediments for a national player to differentially | 16:00:36 |
| 3 | price across local areas. | 16:00:42 |
| 4 | BY MR. KEYTE: | 16:00:45 |
| 5 | Q. And because you didn't look to see whether | 16:00:46 |
| 6 | local competition, whether, or the extent of local | 16:00:48 |
| 7 | competition of small and regional players, even | 16:00:53 |
| 8 | offering profit sharing products, you don't -- it's a | 16:00:57 |
| 9 | economic and theoretical opinion that those will, in | 16:01:02 |
| 10 | a sense, be controlled by the national competition, | 16:01:07 |
| 11 | correct? | 16:01:09 |
| 12 | MS. BURNS: Objection, lacks foundation. | 16:01:09 |
| 13 | THE WITNESS: The national competition is | 16:01:14 |
| 14 | the police force, so to speak, of identifying areas | 16:01:15 |
| 15 | in which local pricing is above market, and that that | 16:01:20 |
| 16 | option of the local competition -- I mean, the | 16:01:24 |
| 17 | national competition will police those local prices | 16:01:29 |
| 18 | to then go back to what we call equilibrium. | 16:01:32 |
| 19 | Likewise, you don't have the incentive a | 16:01:37 |
| 20 | local player to underprice the national in the long | 16:01:39 |
| 21 | run, so -- | 16:01:42 |
| 22 | BY MR. KEYTE: | 16:01:45 |
| 23 | Q. Well, no. I'm talking -- | 16:01:45 |
| 24 | A. So from that standpoint you would expect | 16:01:46 |
| 25 | this market to be national in scope. | 16:01:48 |

Page 229

Exhibit 3
Page 13

HIGHLY CONFIDENTIAL

```
1   STATE OF CALIFORNIA      ) ss.
2   COUNTY OF LOS ANGELES    )
3
4        I, Lori M. Barkley, CSR No. 6426, do hereby
5   certify:
6        That the foregoing deposition testimony
    taken before me at the time and place therein set
7   forth and at which time the witness was administered
8   the oath;
9        That the testimony of the witness and all
10  objections made by counsel at the time of the
11  examination were recorded stenographically by me, and
12  were thereafter transcribed under my direction and
    supervision, and that the foregoing pages contain a
13  full, true and accurate record of all proceedings and
14  testimony to the best of my skill and ability.
         I further certify that I am neither counsel
15  for any party to said action, nor am I related to any
16  party to said action, nor am I in any way interested
17  in the outcome thereof.
18       IN WITNESS WHEREOF, I have subscribed my
19  name this 24th day of July, 2017.
20
21
22
23        [signature]
24  _____
25  LORI M. BARKLEY, CSR No. 6426

                                          Page 356
```

Exhibit 3
Page 14

# Exhibit 4

HIGHLY CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4

 5   WESTLAKE SERVICES, LLC d/b/a

 6   WESTLAKE FINANCIAL

 7   SERVICES,

 8                    Plaintiff,

 9        vs.            Case No. 2:15-cv-07490 SJO (MRWx)

10                       Hon. S. James Otero

11   CREDIT ACCEPTANCE

12   CORPORATION,

13                    Defendant.

14   _____

15

16

17         HIGHLY CONFIDENTIAL

18   VIDEOTAPED DEPOSITION OF DOUGLAS WESLEY BUSK,

19       Taken at 30800 Telegraph Road, Suite 2925,

20       Bingham Farms, Michigan,

21       Commencing at 9:40 a.m.,

22       Thursday, January 19, 2017,

23       Before Lezlie A. Setchell, CSR-2404, RPR, CRR.

24

25   Pages 1 - 258
```

Page 1

Exhibit 4
Page 16

HIGHLY CONFIDENTIAL

```
 1   APPEARANCES:

 2

 3   TIMOTHY B. YOO

 4   JULIAN C. BURNS

 5   Bird Marella, PC

 6   1875 Century Park East

 7   23rd Floor

 8   Los Angeles, California 90067-2561

 9   310.201.2100

10   tyoo@birdmarella.com

11   jburns@birdmarella.com

12        Appearing on behalf of the Plaintiff.

13

14   JONATHAN L. FRANK

15   PATRICK G. RIDEOUT

16   Skadden, Arps, Slate, Meagher & Flom, LLP

17   4 Times Square

18   New York, New York 10036

19   212.735.3386

20   jonathan.frank@skadden.com

21   patrick.rideout@skadden.com

22        Appearing on behalf of the Defendant.

23

24

25

                                         Page 2
```

Exhibit 4
Page 17

HIGHLY CONFIDENTIAL

```
 1   ZACK FAIGEN

 2   Skadden, Arps, Slate, Meagher & Flom, LLP

 3   300 South Grand Avenue

 4   Los Angeles, California 90071

 5   213.687.5273

 6   zack.faigen@skadden.com

 7        Appearing on behalf of the Defendant.

 8

 9   CASEY A. FETZER

10   Credit Acceptance

11   25505 West 12 Mile Road

12   Southfield, Michigan 48034-8334

13   cfetzer@creditacceptance.com

14        Appearing on behalf of the Defendant.

15

16   ALSO PRESENT:

17   John Schmitzer - Video Technician

18

19

20

21

22

23

24

25
```

Page 3

Exhibit 4
Page 18

```
 1          competitor but we can do some broad groups.  What        11:43:09

 2          about compared to other indirect lenders?               11:43:12

 3    A.    I mean, that's a -- got hundreds or thousands, so I      11:43:17

 4          mean, that's a very broad group.  You know, if -- I      11:43:21

 5          mean, I would say generalizing, you know, you have to    11:43:28

 6          generalize at a high level when you're comparing         11:43:34

 7          yourself to thousands of others, hundreds of others,     11:43:36

 8          but I would say, you know, our time in business is a     11:43:41

 9          strength.  We've been around a long time.  It's a        11:43:43

10          challenging business.  Nobody gets everything            11:43:48

11          perfectly right the first time.                          11:43:51

12                 So over our 40-plus years in business,            11:43:53

13          we've had, you know, the opportunity to make mistakes    11:43:58

14          and learn from our mistakes, plus that time in           11:43:59

15          business just allows you to focus on getting             11:44:05

16          continually better.                                      11:44:07

17                 I think that the experience of the senior         11:44:08

18          management team is a strength.  I think the culture      11:44:15

19          that we've created at the business is a competitive      11:44:18

20          advantage.  I don't think you're going to find a         11:44:22

21          culture like it in very many companies.  I think         11:44:24

22          relative to some but not all in the industry, our long   11:44:28

23          history, you know, gives us a data, you know,            11:44:34

24          advantage.  I mean, it's obviously better to have 30     11:44:39

25          years of data than 5.                                    11:44:43
```

Page 79

Exhibit 4
Page 19

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | | I think we have a highly-effective field | 11:44:46 |
| 2 | | sales force. | 11:44:53 |
| 3 | | So, I mean, I think there are a number of | 11:44:56 |
| 4 | | things.  I don't think there's -- there's no silver | 11:44:59 |
| 5 | | bullet but there's just a lot of things that you need | 11:45:02 |
| 6 | | to execute well. | 11:45:06 |
| 7 | Q. | So what use would data be?  You mentioned that your | 11:45:08 |
| 8 | | long history gives you data.  How would that be | 11:45:14 |
| 9 | | helpful? | 11:45:16 |
| 10 | A. | I mean, the way that -- for financial services | 11:45:19 |
| 11 | | companies to be successful, they've got to accurately | 11:45:23 |
| 12 | | be able to anticipate how the loan they're making is | 11:45:29 |
| 13 | | going to perform, and then they've got to be able to | 11:45:32 |
| 14 | | price to earn a satisfactory return.  So it's | 11:45:37 |
| 15 | | impossible to form an accurate conclusion about loan | 11:45:44 |
| 16 | | performance without data. | 11:45:49 |
| 17 | | MS. BURNS:  All right.  So we're going to | 11:45:53 |
| 18 | | step back to around 2000 until lunch, and I have a | 11:46:08 |
| 19 | | document that we'll mark as Exhibit 34.  The document | 11:46:15 |
| 20 | | is Bates labeled CAC_00002720. | 11:46:23 |
| 21 | | MARKED FOR IDENTIFICATION: | 11:46:23 |
| 22 | | EXHIBIT 34 | 11:46:23 |
| 23 | | Credit Acceptance | 11:46:23 |
| 24 | | organizational chart | 11:46:23 |
| 25 | | 11:46 a.m. | 11:46:33 |

Page 80

Exhibit 4
Page 20

HIGHLY CONFIDENTIAL

```
 1              CERTIFICATE OF NOTARY

 2    STATE OF MICHIGAN )

 3                      ) SS

 4    COUNTY OF MACOMB  )

 5

 6              I, LEZLIE A. SETCHELL, certify that this

 7        deposition was taken before me on the date

 8        hereinbefore set forth; that the foregoing questions

 9        and answers were recorded by me stenographically and

10        reduced to computer transcription; that this is a

11        true, full and correct transcript of my stenographic

12        notes so taken; and that I am not related to, nor of

13        counsel to, either party nor interested in the event

14        of this cause.

15

16

17

18

19

20

21

22        LEZLIE A. SETCHELL, CSR-2404

23        Notary Public,

24        Macomb County, Michigan

25    My Commission expires: April 17, 2018

                                          Page 258
```

# Exhibit 5

# Shareholder Letter

## A MESSAGE FROM OUR CHIEF EXECUTIVE OFFICER

During 2016, we completed our 24th full year as a public company. Over those 24 years, GAAP net income per share (diluted) has grown at a compounded annual rate of 20.1%, with an average annual return on equity of 22.4%. We have done even better over the last 15 years: GAAP net income per share (diluted) has grown at a compounded annual rate of 25.1%, with an average annual return on equity of 27.5%.

Last year, GAAP net income per share (diluted) grew 14.2% to $16.31, with a return on equity of 31.1%.

The table below summarizes our GAAP results for 1992–2016:

| | GAAP net income per share (diluted) | | Year-to-year change in GAAP net income per share | Return on equity[1] |
|---|---|---|---|---|
| 1992 | $ | 0.20 | | 24.1% |
| 1993 | $ | 0.29 | 45.0% | 25.6% |
| 1994 | $ | 0.49 | 69.0% | 31.5% |
| 1995 | $ | 0.68 | 38.8% | 21.5% |
| 1996 | $ | 0.89 | 30.9% | 18.7% |
| 1997 | $ | 0.03 | –96.6% | 0.6% |
| 1998 | $ | 0.53 | 1,666.7% | 9.5% |
| 1999 | $ | (0.27) | –150.9% | –3.9% |
| 2000 | $ | 0.51 | — | 9.1% |
| 2001 | $ | 0.57 | 11.8% | 9.1% |
| 2002 | $ | 0.69 | 21.1% | 10.1% |
| 2003 | $ | 0.57 | –17.4% | 7.5% |
| 2004 | $ | 1.40 | 145.6% | 18.4% |
| 2005 | $ | 1.85 | 32.1% | 21.8% |
| 2006 | $ | 1.66 | –10.3% | 20.2% |
| 2007 | $ | 1.76 | 6.0% | 23.1% |
| 2008 | $ | 2.16 | 22.7% | 22.2% |
| 2009 | $ | 4.62 | 113.9% | 35.6% |
| 2010 | $ | 5.67 | 22.7% | 34.8% |
| 2011 | $ | 7.07 | 24.7% | 40.0% |
| 2012 | $ | 8.58 | 21.4% | 37.8% |
| 2013 | $ | 10.54 | 22.8% | 38.0% |
| 2014 | $ | 11.92 | 13.1% | 37.0% |
| 2015 | $ | 14.28 | 19.8% | 35.4% |
| 2016 | $ | 16.31 | 14.2% | 31.1% |
| *Compound annual growth rate 1992—2016* | | | *20.1%* | |

[1]  Return on equity is defined as GAAP net income for the applicable period divided by average shareholders' equity for such period.

Exhibit 5
Page 23

## UNIT VOLUME

The following table summarizes unit volume growth for 2001–2016:

| | Unit volume | Year-to-year change |
|---|---|---|
| 2001 | 61,928 | |
| 2002 | 49,801 | –19.6% |
| 2003 | 61,445 | 23.4% |
| 2004 | 74,154 | 20.7% |
| 2005 | 81,184 | 9.5% |
| 2006 | 91,344 | 12.5% |
| 2007 | 106,693 | 16.8% |
| 2008 | 121,282 | 13.7% |
| 2009 | 111,029 | –8.5% |
| 2010 | 136,813 | 23.2% |
| 2011 | 178,074 | 30.2% |
| 2012 | 190,023 | 6.7% |
| 2013 | 202,250 | 6.4% |
| 2014 | 223,998 | 10.8% |
| 2015 | 298,288 | 33.2% |
| 2016 | 330,710 | 10.9% |
| *Compound annual growth rate 2001–2016* | | *11.8%* |

In 2016, unit volumes grew 10.9%. Since 2001, unit volumes have grown at a compounded annual rate of 11.8%.

Unit volume is a function of the number of active dealers and the average volume per dealer. The following table summarizes the trend in each of these variables from 2001 to 2016:

| | Active dealers | Year-to-year change | Volume per dealer | Year-to-year change |
|---|---|---|---|---|
| 2001 | 1,180 | | 52.5 | |
| 2002 | 843 | –28.6% | 59.1 | 12.6% |
| 2003 | 950 | 12.7% | 64.7 | 9.5% |
| 2004 | 1,212 | 27.6% | 61.2 | –5.4% |
| 2005 | 1,759 | 45.1% | 46.2 | –24.5% |
| 2006 | 2,214 | 25.9% | 41.3 | –10.6% |
| 2007 | 2,827 | 27.7% | 37.7 | –8.7% |
| 2008 | 3,264 | 15.5% | 37.2 | –1.3% |
| 2009 | 3,168 | –2.9% | 35.0 | –5.9% |
| 2010 | 3,206 | 1.2% | 42.7 | 22.0% |
| 2011 | 3,998 | 24.7% | 44.5 | 4.2% |
| 2012 | 5,319 | 33.0% | 35.7 | –19.8% |
| 2013 | 6,394 | 20.2% | 31.6 | –11.5% |
| 2014 | 7,247 | 13.3% | 30.9 | –2.2% |
| 2015 | 9,064 | 25.1% | 32.9 | 6.5% |
| 2016 | 10,536 | 16.2% | 31.4 | –4.6% |

As the table shows, the gain in unit volumes since 2001 has resulted from an increase in the number of active dealers partially offset by a reduction in volume per dealer.

Exhibit 5
Page 24