JASON D. RUSSELL (CA SBN 169219)
DOUGLAS A. SMITH (CA SBN 290598)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600
Email:       jason.russell@skadden.com
             douglas.smith@skadden.com

JONATHAN L. FRANK *admitted *pro hac vice*
JAMES A. KEYTE *admitted *pro hac vice*
PATRICK G. RIDEOUT *admitted *pro hac vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:   (212) 735-3000
Facsimile:   (212) 735-2000
Email:       jonathan.frank@skadden.com
             james.keyte@skadden.com
             patrick.rideout@skadden.com

Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT ACCEPTANCE CORPORATION, <br><br> Defendant. | CASE No.: 2:15-cv-07490 SJO (MRWx) <br><br> **DEFENDANT CREDIT ACCEPTANCE CORPORATION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** <br><br> Hon. S. James Otero <br><br> Pretrial Conference:   Nov. 20, 2017 <br> Trial Date:   Dec. 5, 2017 |

**TABLE OF CONTENTS**

I. CLAIMS AND DEFENSES .................................................................1

    A. Plaintiff Westlake's Claims: Actual and Attempted Monopolization ...1

    B. Elements Required to Establish Plaintiff Westlake's Claims ..............1

        1. Elements for the *Walker Process* Exception to *Noerr-Pennington* Immunity ...........................................................2

        2. Elements for the "Sham" Litigation Exception to *Noerr-Pennington* Immunity ...........................................................3

        3. Elements of Actual and Attempted Monopolization.................4

    C. Defendant Credit Acceptance's Key Evidence In Opposition to Westlake's Claims ...................................................................5

        1. Key Evidence That *Noerr-Pennington* Immunity Applies.........5

        2. Key Evidence in Opposition to Westlake's Actual and Attempted Monopolization Claims ...........................................7

    D. Defendant Credit Acceptance's Counterclaims and Affirmative Defenses ...................................................................12

    E. Elements Required to Establish Credit Acceptance's Affirmative Defenses ...................................................................13

    F. Defendant Credit Acceptance's Key Evidence In Support of Its Affirmative Defenses ...............................................................13

    G. Third-Party Statements ...................................................16

    H. Identification of Evidentiary Issues ...................................16

        1. Credit Acceptance's Motions in Limine ................................17

        2. Westlake's Motions in Limine................................................18

    I. Identification of Issues of Law .........................................18

II. BIFURCATION OF ISSUES ...........................................................21

III. JURY TRIAL .............................................................................21

IV. ATTORNEYS' FEES ...................................................................21

V. ABANDONMENT OF ISSUES ......................................................22

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

# TABLE OF AUTHORITIES

Page(s)

## CASES

*1st Media, LLC v. Electronic Arts, Inc.*,
  694 F.3d 1367 (Fed. Cir.)......................................................................20, 21

*Beacon Theaters, Inc. v. Westover*,
  359 U.S. 500 (1959)....................................................................................21

*Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France*,
  245 F.3d 1359 (Fed. Cir. 2001) .................................................................15

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)......................................................................................19

*City of Rohnert Park v. Harris*,
  601 F.2d 1040 (9th Cir. 1979).....................................................................19

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
  560 F.3d 1317 (Fed. Cir. 2009)...................................................................19

*Dippin' Dots, Inc. v. Mosey*,
  476 F.3d 1337 (Fed. Cir. 2007) ...............................................................2, 20

*Doe v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000).....................................................................22

*Dominick v. Collectors Universe, Inc.*,
  No. 2:12–cv–04782–ODW(CWx),
  2013 WL 990825 (C.D. Cal. Mar. 13, 2013).............................................21

*EZ Dock, Inc. v. Schafer Systems, Inc.*,
  276 F.3d 1347 (Fed. Cir. 2002) ...............................................................3, 6

*Fleitmann v. Welsbach Street Lighting Co.*,
  240 U.S. 27 (1916)......................................................................................21

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
  826 F.2d 837 (9th Cir. 1987).......................................................................13

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012).....................................................................14

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
  191 F.3d 813 (7th Cir. 1999).......................................................................15

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
  125 F. 3d 1195 (9th Cir. 1997)......................................................................8

*IRS v. Palmer (In re Palmer)*,
  207 F.3d 566 (9th Cir. 2000).......................................................................13

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002)..............................................................15

*Lisle Corp. v. A.J. Manufacturing Co.*,
    398 F.3d 1306 (Fed. Cir. 2005)............................................................3

*Magnetar Technologies Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015)...........................................................10

*Nabsico, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir. 1999)..............................................................22

*Nobelpharma AB v. Implant Innovations Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998)............................................................2

*Petrella v. Metro–Goldwyn–Mayer, Inc.*,
    695 F.3d 946 (9th Cir. 2012), *rev'd*, 134 S. Ct. 1962 (2014) .................13

*Phillips v. Apple Inc.*, No.15-CV-04879-LHK,
    2016 WL 5846992 (N.D. Cal. Oct. 6, 2016),
    *appeal filed*, No. 16-17189 (9th Cir. Nov. 29, 2016)............................19

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
    508 U.S. 49 (1993)..........................................................1, 2, 3, 4

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)...............................................................8

*Samsung Electronics Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014)...........................................................14

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ......................................................2, 20

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982)............................................................22

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990)...............................................................9

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
    382 U.S. 172 (1965)........................................................................2, 4

**STATUTES**

15 U.S.C. § 2 ...............................................................................1

15 U.S.C. § 15 .......................................................................21, 22

15 U.S.C. § 15(a) ........................................................................22

15 U.S.C. § 15b .....................................................................12, 15

15 U.S.C. § 26 ............................................................................19

iii

35 U.S.C. § 102 ................................................................................... 3, 5, 19

35 U.S.C. § 102(a) ...................................................................................... 11

35 U.S.C. § 102(b) .................................................................................. 3, 11

35 U.S.C. § 271(d) ...................................................................................... 22

35 U.S.C. § 282(b)(2) .................................................................................. 11

35 U.S.C. § 282(b)(3) .................................................................................. 11

## RULES

Fed. R. Civ. P. 11 ....................................................................................... 21

Fed. R. Civ. P. 11(c)(4) ............................................................................... 21

Fed. R. Civ. P. 38(b)(1) ............................................................................... 21

Fed. R. Civ. P. 38(c) ................................................................................... 21

Fed. R. Civ. P. 403 ..................................................................................... 17

## REGULATIONS

37 C.F.R. § 1.56 ......................................................................................... 20

37 C.F.R. § 42.304 ...................................................................................... 11

## OTHER AUTHORITIES

American Bar Association, *Model Jury Instructions in Civil Antitrust Cases*
     (A.B.A. 2016) .................................................................................. 2, 3, 4, 5

United States Department of Justice & Federal Trade Commission, *Horizontal
     Merger Guidelines* (2010), http://ftc.gov/os/2010/08/100819hmg.pdf .................. 9

U.S. Patent No. 6,950,807 ........................................................................*passim*

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

Pursuant to Local Rule 16-4 and the Court's Order Re Jury/Court Trial for Civil Cases Assigned to Judge S. James Otero, Defendant Credit Acceptance Corporation ("Credit Acceptance") submits this Memorandum of Contentions of Fact and Law for the trial scheduled to commence on December 5, 2017.

## I.   CLAIMS AND DEFENSES

### A.   Plaintiff Westlake's Claims: Actual and Attempted Monopolization

Plaintiff Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake") pleaded two antitrust claims in its First Amended Complaint.  It plans to pursue both at trial.

Claim 1 (Actual Monopolization):  Defendant Credit Acceptance violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in actual monopolization by purportedly obtaining U.S. Patent No. 6,950,807 (the "'807 Patent") by fraud on the United States Patent and Trademark Office (the "USPTO") (i.e., *Walker-Process* fraud) and by enforcing the Patent through a purported "sham" patent infringement lawsuit against Westlake.

Claim 2 (Attempted Monopolization):  Defendant Credit Acceptance violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in attempted monopolization by purportedly obtaining the '807 Patent by fraud on the USPTO (i.e., *Walker-Process* fraud) and by enforcing the Patent through a purported "sham" patent infringement lawsuit against Westlake.

### B.   Elements Required to Establish Plaintiff Westlake's Claims

To prove its claims for actual and attempted monopolization, Westlake must first prove that the *Walker Process* and "sham" litigation exceptions to *Noerr-Pennington* immunity apply.  Rooted in the First Amendment's right to petition the government, *Noerr-Pennington* immunity ensures that "[t]hose who petition [the] government for

---

1

redress are generally immune from antitrust liability."[1]  If Westlake can overcome *Noerr-Pennington* immunity, Westlake then must prove all the elements of its antitrust claims under Section 2 of the Sherman Act.

### 1. Elements for the *Walker Process* Exception to *Noerr-Pennington* Immunity

For its actual and attempted monopolization claims based on Credit Acceptance having purportedly obtained the '807 Patent by fraud on the USPTO, Westlake must establish the *Walker-Process* fraud exception to *Noerr-Pennington* immunity.   That exception requires Westlake to prove the following:

1. A misrepresentation or omission of material fact before the USPTO;

2. Independent clear and convincing evidence of deceptive intent;[2] and

3. A clear showing of reliance (i.e., that the patent would not have issued but for the misrepresentation or omission).[3]

Westlake contends that the limited, closed testing of Credit Acceptance's Credit Approval Processing System ("CAPS") for approximately six months (the "pilot program") was material information that Credit Acceptance intentionally and fraudulently omitted from the '807 Patent application.  According to Westlake, the '807 Patent would not have issued had Credit Acceptance disclosed the CAPS pilot program in the patent application, because it constituted prior sales or public use of the invention claimed in the '807 Patent.  Westlake contends that the alleged prior sales and public use rendered the

---

[1] *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 60-61 (1993) (hereinafter "*PRE*").

[2] "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (citation omitted).  "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id.* at 1290-91.

[3] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § IV.F.1 (A.B.A. 2016) (hereinafter "Model Jury Instructions in Antitrust Cases"); *Therasense*, 649 F.3d at 1290-91; *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347-48 (Fed. Cir. 2007); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

invention unpatentable under the on-sale or public use bars, 35 U.S.C. § 102.

A patent is not valid if the invention was in public use or on sale in this country more than one year prior to the date of the application for the patent.  *See* 35 U.S.C. § 102(b).  To establish the on-sale or public use bars—and thus "but for" materiality—Westlake must prove by clear and convincing evidence that:

1. Prior to the patent application date of December 31, 2000, the invention claimed in the '807 Patent was sold, the subject of a commercial offer for sale, or in public use in the United States;[4] and

2. The invention was ready for patenting before December 31, 2000.

### 2. Elements for the "Sham" Litigation Exception to *Noerr-Pennington* Immunity

For its actual and attempted monopolization claims based on "sham" litigation, Westlake must also establish the "sham" litigation exception to *Noerr-Pennington* immunity.  That exception requires Westlake to prove the following:

1. Credit Acceptance's patent infringement suit against Westlake in 2013 was "objectively baseless;"[5] and

2. The baseless infringement suit was an attempt to interfere directly with the business relationships of one or more competitors through the use of litigation process as opposed to through the outcome of the infringement suit.[6]

Westlake contends that the lawsuit was "objectively baseless" because the '807

---

[4] To establish that the '807 Patent was sold, the subject of a commercial offer for sale, or in public use, Westlake must also establish that experimental use negation does not apply. *See Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1316 (Fed. Cir. 2005); *EZ Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1351 (Fed. Cir. 2002) ("[I]t is incorrect to impose on the patent owner, as the trial court in this case did, the burden of proving that 'public use' was 'experimental.'  These are not two separable issues.  It is incorrect to ask: 'Was it a public use?' and then 'Was it experimental?' Rather the court is faced with a single issue: Was it public use under 102(b)?'" (alteration in original) (citations omitted)).

[5] *PRE*, 508 U.S. at 62-63 (stating with respect to the objectively baseless prong: "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in [an objectively baseless lawsuit]. . . . Probable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'" (third and fourth alterations in original) (citations omitted)).

[6] Model Jury Instructions in Antitrust Cases §§ IV.F.2, VII.A.4.

Patent was invalid at the time of suit because it was fraudulently obtained from the USPTO, or because even absent fraud, the on-sale or public use bars rendered the patent invalid.  Therefore, under either theory, Westlake must establish (i) the on-sale or public use bar elements, as described above; (ii) that a reasonable litigant with Credit Acceptance's knowledge at the time of bringing suit would not believe that it had a "chance" in prevailing against the asserted basis of invalidity, which must be established by clear and convincing evidence; and (iii) that Credit Acceptance subjectively intended to interfere directly with Westlake's business relationships through the use of the litigation process.

### 3.  Elements of Actual and Attempted Monopolization

In addition to proving the *Walker Process* and "sham" litigation exceptions to *Noerr-Pennington* immunity, Westlake must also prove all the elements of its antitrust claims.[7]  For actual monopolization, Westlake must prove the following by a preponderance of the evidence:

1. The alleged market is a valid antitrust market;

2. Credit Acceptance possessed monopoly power in that market;

3. Credit Acceptance willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

4. Credit Acceptance's conduct occurred in or affected interstate commerce; and

5. Westlake was injured in its business or property because of Credit Acceptance's anticompetitive conduct.[8]

For attempted monopolization, Westlake must prove the following by a preponderance of

---

[7] *See Walker Process Equip.*,  382 U.S. at 174 ("We have concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."); *PRE*, 508 U.S. at 61 ("Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.").

[8] *See* Model Jury Instructions in Antitrust Cases § III.D.1.

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

the evidence:

1.      Credit Acceptance engaged in anticompetitive conduct;

2.      Credit Acceptance had a specific intent to achieve monopoly power in a relevant market;

3.      There was a dangerous probability that Credit Acceptance would achieve its goal of monopoly power in the relevant market;

4.      Credit Acceptance's conduct occurred in or affected interstate commerce; and

5.      Westlake was injured in its business or property by Credit Acceptance's anticompetitive conduct.[9]

**C.      Defendant Credit Acceptance's Key Evidence In Opposition to Westlake's Claims**

Credit Acceptance will establish that Westlake cannot meet its burden of proving that the *Walker Process* or "sham" litigation exceptions to *Noerr-Pennington* immunity apply.  Credit Acceptance will also establish that Westlake cannot prove any of the elements for either of its antitrust claims.

**1.      Key Evidence That *Noerr-Pennington* Immunity Applies**

Credit Acceptance will show that Westlake cannot meet its burden of proving by clear and convincing evidence that the *Walker-Process* exception to *Noerr-Pennington* immunity applies, that is, that Credit Acceptance committed fraud on the USPTO when it obtained the '807 Patent.  Specifically, Credit Acceptance will present evidence that the CAPS pilot program was not a "but for" material fact (i.e., would not have prevented the '807 Patent from issuing), because it qualified as experimental use that negated the on-sale and public use bars under 35 U.S.C. § 102.  Indeed, Credit Acceptance will present evidence on all thirteen of the experimental use negation factors, namely:

(1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, and (9) the degree of commercial exploitation during testing[,] (10) whether the invention reasonably requires

---

[9] Model Jury Instructions in Antitrust Cases § III.D.1.

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.[10]

Credit Acceptance will also present evidence that the first sale or offer for sale of CAPS occurred within one year of the patent application date, and therefore, that the on-sale bar does not apply. Credit Acceptance will also show that CAPS was not reduced to practice until after the pilot program was completed in December 2000, as it was unknown whether CAPS would work for its intended purpose.

Credit Acceptance will also establish that Westlake has no evidence, let alone the required clear and convincing evidence, that Credit Acceptance intended to deceive the USPTO by not disclosing the CAPS pilot program in the patent application or allegedly during the prosecution of that application. It will present evidence that before applying for the patent, Credit Acceptance employees—who had no prior patent experience— verified when the experimental pilot test phase ended and when the invention was first sold or publicly used, and then worked diligently to make sure the patent application was filed within one year of the first sale, offer for sale, or public use.

As to the "sham" litigation exception to *Noerr-Pennington* immunity, Westlake cannot establish that the lawsuit was objectively baseless, as Credit Acceptance had probable cause to bring the patent infringement lawsuit against Westlake. Specifically, Credit Acceptance will establish that it had at least a "chance" of succeeding in the lawsuit notwithstanding potential affirmative defenses of (1) inequitable conduct in the form of fraud on the USPTO and (2) invalidity based on the on-sale or public use bars— both of which Westlake would have to establish by clear and convincing evidence. *See supra* Part I.B.1-2. To make that showing, Credit Acceptance will present evidence on the 13 experimental use negation factors and that it did not commit fraud on the USPTO, as discussed above. Credit Acceptance will also present evidence that it did not bring suit

---

[10] *EZ Dock,* 276 F.3d at 1357.

with the subjective intent to wield the litigation process as an anticompetitive weapon. Specifically, Credit Acceptance will establish that it brought the patent infringement lawsuit nearly eight years after obtaining the '807 Patent and only then when Westlake's internet-based program began offering financing options on every car in a dealer's inventory in the same way as CAPS, an embodiment of some of the claims in the '807 Patent.  In short, Credit Acceptance's subjective intent was to stop perceived infringement of a valid patent, not to use the litigation process to harm Westlake, such as by driving up Westlake's litigation costs or using litigation to distract Westlake from its business operations.

### 2. Key Evidence in Opposition to Westlake's Actual and Attempted Monopolization Claims

Credit Acceptance will show that Westlake lacks evidence to prove the antitrust elements of relevant product and geographic market, monopoly power, specific intent to monopolize, injury caused by the alleged anticompetitive conduct, and resulting damages.

*Relevant Product Market* - Credit Acceptance will show that Westlake's alleged product market of "the business of providing indirect financing for used car sales to dealers through a profit sharing program" (FAC ¶ 120) is not a valid antitrust product market.  Credit Acceptance will present evidence that profit-sharing programs regularly compete with other forms of used car financing, including purchase programs and Buy Here Pay Here ("BHPH") financing, on a deal-by-deal basis, even in the "deep subprime" credit tranche.  Credit Acceptance will also show that there is no evidence of (i) low cross-elasticity of demand among profit-sharing programs, purchase programs and BHPH; (ii) low cross-elasticity of supply; or (iii) lenders being able to price discriminate when acquiring RISCs.  In sum, Credit Acceptance will present evidence showing that the product market should be defined to include functional substitutes, including purchase and BHPH products, and that a hypothetical monopolist of profit-sharing programs could not profitably impose sustained, supracompetitive prices on used car dealers (i.e.,

7

decrease the financial compensation provided to dealers when acquiring RISCs).

*Relevant Geographic Market* - Credit Acceptance will show that Westlake has not offered evidence, including any expert opinions based on actual analysis, to support its allegation that the relevant geographic market is national.  Credit Acceptance will then present evidence showing that competition occurs locally, not nationally, on a deal-by-deal basis.  In short, Credit Acceptance will prove that Westlake's alleged national geographic market is not valid.

*Monopoly Power/Dangerous Probability of Obtaining Monopoly Power* - Credit Acceptance will establish that there is neither "direct" nor "indirect" evidence of monopoly power in the alleged relevant market.

Direct evidence of monopoly power requires evidence of both supracompetitive pricing and reduced output.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Credit Acceptance will show that no such evidence exists.  Rather, Credit Acceptance actually *reduced its prices* (*i.e.*, increased the financial compensation provided to dealers when acquiring RISCs), and *increased its output*, as the number of dealers using Credit Acceptance's financing programs and the number of deals assigned to Credit Acceptance under its profit-sharing program rose during the period of alleged anticompetitive conduct.

Credit Acceptance will establish that when the product market is properly defined, Credit Acceptance's market share percentage is in the single digits—far below the minimum market share necessary to infer monopoly power.  *See generally Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."). Credit Acceptance will also establish that its market share—even in the product market alleged by Westlake—is insufficient to exercise monopoly power, once rapid entrants are considered (i.e., firms who are able to enter the market without incurring significant up-

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

front costs), as they must be.[11]   Furthermore, even were Credit Acceptance to have a dominant market share, Credit Acceptance will establish that monopoly power cannot be exercised because of a lack of significant barriers to entry.[12]   In particular, Westlake alleges that the '807 Patent precluded competitors from offering collateral pools, and that collateral pools are necessary to the successful operation of a profit-sharing program. But, as Credit Acceptance will show, the '807 Patent did not preclude competitors from offering collateral pools because it did not patent collateral pools in and of themselves. Indeed, certain competitors offered profit-sharing programs featuring collateral pools since at least the 1990s through today.  Moreover, collateral pools do not present an entry barrier to a competitor desiring to offer a profit-sharing program.  Indeed, firms can and did begin offering profit-sharing programs without collateral pools during the '807 Patent's existence.

*Injury and Damages* -  In connection with its antitrust claims based on *Walker-Process* patent fraud, Westlake seeks lost profits from 2004-2017, which after the mandatory trebling under the antitrust laws results in a damages claim of nearly a billion dollars.  Whereas Westlake's theory is that it lost profits from building and operating its profit sharing program around the '807 Patent so as to avoid infringing it, Credit Acceptance will show that Westlake cannot support that assertion with any evidence. Indeed, Westlake has no documents evidencing a "build around," and no witness with personal knowledge will testify that Westlake, when building its profit-sharing program, avoided the '807 Patent.  Credit Acceptance will also show that Nowcom, the entity that

---

[11] *See generally* United States Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines*, at 15-16 (2010), http://ftc.gov/os/2010/08/100819hmg.pdf ("Firms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a [Small But Significant and Non-Transitory Increase in Price], without incurring significant sunk costs, are also considered market participants. These firms are termed 'rapid entrants.'").

[12] *See United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." (citation omitted)).

1   programmed the algorithms for Westlake's profit-sharing program, did not build around

2   the '807 Patent either and was never instructed by Westlake to do so.  Credit Acceptance

3   will also present evidence that the '807 Patent did not patent collateral pools in and of

4   themselves.  Therefore, Westlake's claim that it lost profits because it built its profit-

5   sharing program around the '807 Patent will be proven false.

6       Credit Acceptance will also establish that Westlake's damages model does not

7   accurately quantify the purported lost profits from the existence of the '807 Patent.  In

8   particular, Westlake's expert has offered a damages model that does not segregate

9   Westlake's loses attributable to the '807 Patent, if any, from those attributable to its own

10  business failings, as required by Ninth Circuit law.[13]  For example, Westlake's primary

11  contention is that it avoided the '807 Patent by not offering collateral pools, yet

12  Westlake's damages model does not calculate lost profits, if any, specifically associated

13  with being unable to offer collateral pools.  Instead, Westlake's model calculates lost

14  profits based on an assumption that Westlake would have earned a particular market

15  share in the alleged profit-sharing market solely by virtue of being the second entrant into

16  that market, and further wrongly assumes, without any analysis, that Westlake's failure to

17  achieve this market share was due entirely to Credit Acceptance obtaining and enforcing

18  the '807 Patent.

19      In connection with its antitrust claims based on "sham" litigation, Westlake seeks

20  to recover $2.3 million, before mandatory trebling, in attorneys' fees and costs

21  purportedly incurred in defending against Credit Acceptance's patent infringement

22  lawsuit and instituting two Covered Business Method ("CBM") proceedings before the

23  Patent and Trademark Appeals Board ("PTAB").[14]  Credit Acceptance will show that 82

24  percent of these attorneys' fees and costs—namely those Westlake incurred in the two

25

26  [13] *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015) (holding
    that a damages model must "segregate the losses ... caused by acts which were not
27  antitrust violations from those that were." (alteration in original) (citation omitted)).

28  [14] Joint Stipulation Regarding Westlake's Payment of Attorneys' Fees [ECF No. 202].

CBM proceedings—were the result of its own voluntary actions and not because of Credit Acceptance's alleged anticompetitive conduct of filing a purportedly "sham" lawsuit against Westlake. Specifically, while Credit Acceptance's patent infringement lawsuit against Westlake was pending, Westlake voluntarily initiated the CBM1 and CBM2 proceedings to invalidate the '807 Patent. In those proceedings, Westlake attempted to invalidate the patent on grounds *other than* the on-sale or public use bars even though it knew of the purported on-sale or public use bar issue with the '807 Patent and could have asserted those bars as a basis for invalidity during the CBM proceedings.[15] Furthermore, Westlake continued to prosecute the CBM2 proceedings even after Credit Acceptance voluntarily dismissed its patent infringement lawsuit against Westlake, and even after Credit Acceptance covenanted not to sue Westlake. In short, Credit Acceptance's defense of the CBM1 and CBM2 proceedings cannot be construed as a "sham" defense in violation of the antitrust laws, given that Westlake voluntarily instituted and continued those proceedings and sought to invalidate the '807 Patent for reasons that have nothing to do with the allegations that form the basis of its antitrust claims based on "sham" litigation. Put differently, Credit Acceptance did not wield an anticompetitive weapon when it defended those proceedings against Westlake.

*Specific Intent to Achieve A Monopoly* - Credit Acceptance will show that Westlake lacks evidence to prove that Credit Acceptance intended to achieve a monopoly by applying for the '807 Patent and bringing patent infringement suits against Westlake and GO Financial. Credit Acceptance will show that its actions are inconsistent with a company trying to obtain a monopoly. Indeed, it did not actively enforce the '807 Patent immediately. Instead, it brought its patent infringement lawsuits against Westlake and GO Financial 8 years after the Patent's issuance, and only then when faced with actual

---

[15] 37 C.F.R. § 42.304 (stating that a petition for review of a covered business method patent may raise challenges under 35 U.S.C. § 282(b)(2)-(3)); 35 U.S.C. § 282(b)(2) ("Invalidity of the patent or any claim in suit on any ground specified in part II as a condition for patentability"); 35 U.S.C. Part II Ch. 10 (containing the on-sale and public use bars under 35 U.S.C. § 102(a)-(b)).

evidence that Westlake and GO Financial were infringing the claims of the '807 Patent by, among other things, offering Internet-based programs similar to CAPS, an embodiment of some of the claims in the '807 Patent.  Credit Acceptance will also show that Westlake has no evidence that Credit Acceptance even attempted to enforce the '807 Patent before these lawsuits, whether through the issuance of cease-and-desist letters or otherwise.

### D.    Defendant Credit Acceptance's Counterclaims and Affirmative Defenses

Credit Acceptance has not asserted any counterclaims.  Credit Acceptance plans to pursue at trial the following affirmative defenses, which it pleaded in its Answer to the First Amended Complaint:

Affirmative Defense No. 1 (Statute of Limitations) - Westlake's claims for actual and attempted monopolization based on the theory that Credit Acceptance obtained the '807 Patent by fraud on the USPTO (i.e., *Walker-Process* fraud) are barred by the four-year statute of limitations, 15 U.S.C. § 15b.

Affirmative Defense No. 2 (Laches) - The doctrine of laches bars Westlake's antitrust claims, whether for damages or equitable relief, because it waited more than 11 years to bring suit.

Affirmative Defense No. 3 (Collateral Estoppel) - Collateral estoppel bars Westlake from re-litigating the issue of whether Credit Acceptance's patent infringement lawsuit against Westlake was a "sham."

Affirmative Defense No. 4 (Unclean Hands) - The doctrine of unclean hands bars Westlake's requests for equitable relief because Westlake knowingly infringed the '807 Patent and manufactured allegations, without any basis in reality, that it built and operated its profit-sharing program to avoid the claims in the '807 Patent in order to bring this lawsuit.

## E. Elements Required to Establish
## Credit Acceptance's Affirmative Defenses

The elements required to establish the affirmative defenses Credit Acceptance intends to pursue at trial are as follows:

Affirmative Defense No. 1 (Statute of Limitations) - Westlake's injury from the alleged anticompetitive conduct occurred (i.e., its claims accrued) more than four years before it filed its complaint on September 24, 2015.

Affirmative Defense No. 2 (Laches) - Westlake (1) "delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice." *Petrella v. Metro–Goldwyn–Mayer, Inc.*, 695 F.3d 946, 951-52 (9th Cir. 2012).

Affirmative Defense No. 3 (Collateral Estoppel) - Westlake is collaterally estopped if "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." *IRS v. Palmer (In re Palmer)*, 207 F.3d 566, 568 (9th Cir. 2000).

Affirmative Defense No. 4 (Unclean Hands) - Westlake's conduct (1) was "inequitable" and (2) "relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

## F. Defendant Credit Acceptance's Key
## Evidence In Support of Its Affirmative Defenses

Affirmative Defense No. 1 (Statute of Limitations):   Credit Acceptance will establish that Westlake's claims for actual and attempted monopolization based on the theory that Credit Acceptance obtained the '807 Patent by fraud on the USPTO (i.e., *Walker-Process* fraud) are barred by the four-year statute of limitations. Specifically, Credit Acceptance will establish that Westlake purports to have incurred injury in the form of lost profits beginning no later than the '807 Patent's issuance on September 27, 2005, and as early as 2004 while the '807 Patent application was pending, according to

13

1  Westlake's expert's damages model.  Credit Acceptance will also establish that Westlake

2  did not file suit until September 24, 2015 (*see* ECF No. 1), more than four years after it

3  was first purportedly injured.

4      Despite Westlake having not pleaded it in its complaint, Credit Acceptance

5  anticipates that Westlake will assert fraudulent concealment as a reason for why the

6  statute of limitations did not expire on its claims.  To establish fraudulent concealment,

7  Westlake must prove that (1) Credit Acceptance took affirmative acts to mislead

8  Westlake; (2) Westlake did not have "actual or constructive knowledge of the facts giving

9  rise to [its] claim"; and (3) Westlake acted diligently in trying to uncover the facts giving

10  rise to its claim.  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir.

11  2012).  Credit Acceptance will establish that it took no affirmative acts to hide the

12  purported fraud on the USPTO.  In fact, Credit Acceptance publicly disclosed

13  information about the CAPS pilot program, and Westlake itself contends that this public

14  information establishes the on-sale or public use bars to patentability.  Credit Acceptance

15  will also establish that, based on that public information, Westlake had actual or

16  constructive knowledge of the purported fraud no later than 2005 and thus more than four

17  years before filing suit.  Lastly, Credit Acceptance will establish that, despite this

18  publicly available information, Westlake did little to nothing to uncover facts about the

19  '807 Patent's issuance, let alone with the required reasonable diligence, even though its

20  leadership was urged to look into the '807 Patent application while it was pending.

21      Credit Acceptance also anticipates that Westlake will assert the continuing

22  violation doctrine as another reason for why the statute of limitations did not expire on its

23  claims—even though, like fraudulent concealment, it did not plead this tolling doctrine in

24  its complaint.  To establish a continuing violation, Westlake must prove that Credit

25  Acceptance committed an overt act that (1) was a new and independent act that was not

26  merely a reaffirmation of a previous act by Credit Acceptance; and (2) inflicted new and

27  accumulating injury on Westlake.  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d

28  1199, 1202 (9th Cir. 2014).  Credit Acceptance will establish that it did not commit any

14

1  overt act within the limitations period (i.e., four years before Westlake filed suit on

2  September 24, 2015) that resulted in "new" injury.

3      <u>Affirmative Defense No. 2 (Laches)</u> - Credit Acceptance will show that even if

4  Westlake's antitrust claims based on *Walker Process* fraud are not barred by the statute of

5  limitations, they should be barred by the doctrine of laches because Westlake

6  unreasonably delayed for 11 years before bringing this lawsuit.[16]  Specifically, by its own

7  admission, Westlake knew or should have known 11 years before bringing suit of the

8  purported on-sale or public use bar problem that forms the basis of its claims.  Given that

9  Westlake's 11-year delay in bringing suit is beyond the 4-year statute of limitations for

10  antitrust claims,[17] a presumption of laches applies.[18]  Credit Acceptance will also show

11  that it has suffered prejudice because witnesses, including Credit Acceptance's outside

12  patent counsel and Credit Acceptance employees involved with the CAPS pilot program,

13  cannot recall fully events and conversations from the relevant time period—which was 17

14  years ago.  The fact that witnesses' memories have faded over the nearly two decades has

15  prejudiced Credit Acceptance's ability to present a robust defense to Westlake's assertions

16  of fraud on the USPTO.

17      <u>Affirmative Defense No. 3 (Collateral Estoppel)</u> - Credit Acceptance will establish

18  that Westlake already litigated the issue of whether Credit Acceptance's patent

19

20  [16] Even if the 4-year statute of limitations has not expired on Westlake's antitrust claims

21  based on *Walker-Process* fraud because of the continuing violation doctrine, the doctrine
   of laches may still bar those claims.  *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,

22  304 F.3d 829, 837 (9th Cir. 2002) (citing *Bridgestone/Firestone Research, Inc. v. Auto.*
   *Club De L'Ouest De La France*, 245 F.3d 1359, 1364 (Fed. Cir. 2001) ("[T]he theory of

23  `continuing wrong' does not shelter [plaintiff] from the defense of laches.")); *Hot Wax,*
   *Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821-22 (7th Cir. 1999) ("Without the availability

24  of the application of laches to a claim arising from a continuing wrong, a party could,
   theoretically, delay filing suit indefinitely. It would certainly be inequitable to reward this

25  type of dilatory conduct . . . .").

26  [17] 15 U.S.C. § 15b.

27  [18] *See Jarrow Formulas,* 304 F.3d at 837 ("We hold that the presumption of laches is
   triggered if any part of the claimed wrongful conduct occurred beyond the limitations

28  period.").

1   infringement lawsuit was "objectively baseless" and thus a "sham" when it sought

2   attorneys' fees in that lawsuit.  This Court ruled against Westlake on that issue, and the

3   Court's ruling merged into a final judgment.  Credit Acceptance will also establish that

4   Westlake had a full and fair opportunity to litigate the issue, as it knew about, yet did not

5   raise, the purported on-sale and public use bar issues when it moved for attorneys' fees.

6       <u>Affirmative Defense No. 4 (Unclean Hands)</u> - Credit Acceptance will show that

7   Westlake is engaging in "inequitable conduct" because in reality it never cared about

8   building around the '807 Patent, yet manufactured that theory in order to file this

9   retaliatory lawsuit.  Indeed, Westlake has no contemporaneous evidence, direct or

10  circumstantial, of building around the '807 Patent.  Furthermore, while Westlake

11  primarily contends that it built around the '807 Patent by not offering collateral pools, the

12  contemporaneous evidence establishes that Westlake derided collateral pools and thus

13  would not have offered them regardless of whether they were covered by the '807 Patent.

14  Underscoring that Westlake did not care about building around the patent is that it

15  knowingly infringed it, which precipitated Credit Acceptance's infringement lawsuit

16  against Westlake in 2013.  Credit Acceptance will show that Westlake's inequitable

17  conduct relates to the subject matter of its claims, as it forms the very basis for its billion-

18  dollar damages claim after mandatory trebling.

19      **G.**   **Third-Party Statements**

20      There are no third parties in the litigation.

21      **H.**   **Identification of Evidentiary Issues**

22      The parties have filed joint witness and exhibit lists and are in the process of

23  designating excerpts of video depositions to be played during trial.  For proposed

24  exhibits, the parties will file their evidentiary objections and responses on November 13,

25  2017, with the proposed final pre-trial order.  For video deposition excerpts, the parties

26  will file their evidentiary objections and responses by the first day of trial on December 5,

27  2017.  Between now and those filing dates, the parties have scheduled meet and confers

28  to resolve as many evidentiary objections as possible before trial.  Other evidentiary

16

1  issues are set forth in the parties' motions in limine as follows:

2         **1. Credit Acceptance's Motions in Limine**

3      By the time of trial, Credit Acceptance will have filed three motions in limine.
4  *First*, Credit Acceptance has moved to exclude the expert opinions of Westlake's patent
5  expert, Robert Stoll, primarily on the grounds that Mr. Stoll's opinions (1) constitute legal
6  conclusions that are not properly the subject of expert testimony; (2) are based on
7  incorrect legal standards, including the incorrect materiality standard for *Walker-Process*
8  fraud; (3) are based on cherry-picked evidence and ignore obvious alternative
9  explanations, particularly his opinions regarding experimental use negation of the on-sale
10  and public use bars; and (4) should be excluded under Federal Rule of Evidence 403's
11  balancing test because the probative value of his opinions are substantially outweighed by
12  the danger of unfair prejudice or misleading of the jury.  The motion is fully briefed.
13  (*See* ECF Nos. 208 (Mot.), 236 (Opp'n), 238 (Reply).)

14      *Second*, Credit Acceptance has moved to exclude the expert opinions of Westlake's
15  economics expert, Donald R. House, Sr., primarily on the grounds that (1) his relevant
16  product market analysis is methodologically flawed, unreliable, and fails to address
17  substitutability; (2) his geographic market analysis is contrary to law and not based on
18  any analysis; and (3) his damages model ignores marketplace realities, improperly
19  assumes causation, and does not disaggregate the impact and damages attributable to
20  lawful competition or unrelated market events.  The motion is fully briefed. (*See* ECF
21  Nos. 209 (Mot.), 237 (Opp'n), 239 (Reply).)

22      *Third,* Credit Acceptance will move to exclude testimony, presumably from
23  Westlake's President, Ian Anderson, that Westlake built and then operated its profit-
24  sharing program so as to avoid the clams of the '807 Patent.  Credit Acceptance seeks to
25  exclude Mr. Anderson's testimony on the ground that he lacks personal knowledge of any
26  purported build-around, and any testimony he could provide could only be based on a
27  hearsay source or other inadmissible evidence.  Given Westlake's refusal to restore back-
28  up tapes containing documents from 2000-2007, Credit Acceptance also seeks to exclude

17

Westlake from offering or having one of its witnesses testify about any documents from that period, particularly those relating to Westlake's purported build around of the '807 Patent.

### 2. Westlake's Motions in Limine

By the time of trial, Westlake will have filed four motions to limine. *First*, Westlake will move to exclude the opinions of Professor David Hricik on the grounds that Professor Hricik lacks the qualifications to opine on the practices of USPTO patent application examiners. This motion may be rendered moot if the Court excludes the opinions of Westlake's patent expert, Robert Stoll, because Credit Acceptance only intends to offer Professor Hricik's opinions if the Court allows Mr. Stoll to testify.

*Second*, Westlake will move to exclude all references to the Consumer Financial Protection Bureau's Consent Order, which, among other things, required Westlake to pay $25.7 million in redress to affected consumers and a civil money penalty of $4.3 million in the face of unlawful loan, collection, and car repossession practices.

*Third*, Westlake will move to exclude Credit Acceptance from offering any evidence of its subjective intent notwithstanding that intent is relevant to the *Walker Process* and "sham" litigation exceptions to *Noerr-Pennington* immunity and to Westlake's claim for attempted monopolization. *See supra* Part I.B.1-2 (discussing intent elements).

*Fourth*, Westlake may move to exclude any reference to the California State Board of Equalization's ongoing criminal investigation of third-party witness David Ball and his former used car dealership, Ball Automotive. According to Westlake, this motion is "tentative" depending on Westlake's willingness to call Mr. Ball as a witness and whether the criminal investigation remains ongoing when the trial commences.

### I.   <u>Identification of Issues of Law</u>

Other than legal issues raised in its pending motion for summary judgment, Credit Acceptance identifies the following issues of law:

<u>Issue 1</u>:   Whether Westlake lacks Article III and antitrust standing to pursue

18

1    prospective injunctive relief.   To have Article III standing to pursue prospective

2    injunctive relief, Westlake must establish that it "'is immediately in danger of sustaining

3    some direct injury' as the result of the challenged . . . conduct and the injury or threat of

4    injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"   *City of Los*

5    *Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).[19]   Similarly, to establish antitrust standing

6    to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, Westlake

7    must establish "(1) a threatened loss or injury cognizable in equity (2) proximately

8    resulting from the alleged antitrust violation."   *City of Rohnert Park v. Harris*, 601 F.2d

9    1040, 1044 (9th Cir. 1979).   Westlake lacks standing under Article III and Section 16

10   because Westlake is not threatened with future antitrust injury from the '807 Patent or

11   Credit Acceptance generally.   First, Westlake no longer offers a profit-sharing program,

12   and therefore, is not a competitor in the alleged relevant market that Westlake contends is

13   being monopolized.   Nor has Westlake indicated any intention to re-enter the market.

14   Second, the '807 Patent has been invalidated by the PTAB (for reasons other than the on-

15   sale or public use bars), and therefore, Westlake cannot claim future injury from the '807

16   Patent or any action to enforce it.

17       Issue 2: Whether an inventor must subjectively intend to seek patent protection

18   when experimenting with an invention in order for that experimental use to negate

19   application of the on-sale or public use bars under 35 U.S.C. § 102.   Based on the

20   following quotation from the Federal Circuit's decision in *Clock Spring, L.P. v.*

21   *Wrapmaster, Inc.*, 560 F.3d 1317 (Fed. Cir. 2009), Westlake has taken the position that

22   an inventor must have that subjective intent before experimental use negation may apply:

23   "But, there is no experimental use unless claimed features or overall workability are

24   being tested for purposes of the filing of a patent application."   *Id.* at 1327.   Credit

25   

26   [19] *See also Phillips v. Apple Inc.*, No.15-CV-04879-LHK, 2016 WL 5846992, at *6 (N.D.
     Cal. Oct. 6, 2016) ("To establish standing for prospective injunctive relief, a plaintiff
27   must demonstrate that '[s]he has suffered or is threatened with a concrete and
     particularized legal harm coupled with 'a sufficient likelihood that [s]he will again be
28   wronged in a similar way.'" (citation omitted)).

Acceptance believes Westlake is misreading the law.  That language in *Clock Spring* merely conveys that the claimed experimentation must be consistent with the purpose of experimental use negation (i.e., to determine whether the invention worked), such that the invention is ready for patenting. *Clock Spring* did not hold that a use is experimental only if the inventor subjectively intended during testing to file a patent application, and no court has interpreted *Clock Spring* in the manner advanced by Westlake.  To conclude otherwise would mean that an inventor's subjective intent could be dispositive of experimental use—which is not the law.  Indeed, inventor intent is not even one of the 13 factors courts consider when considering experimental use negation.  *See supra* Part I.C.1.

Issue 3:   Whether the jury may infer intent based only on an omission or representation meeting the definition of materiality under 37 C.F.R. § 1.56.  A jury may not find intent for *Walker-Process* fraud based *solely* on a finding of materiality under Rule 56 and must weigh the evidence of intent independent of its analysis of materiality. *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1348 (Fed. Cir. 2007) ("It might be argued that because the omitted reference was so important to patentability, [the party] must have known of its importance and must have made a conscious decision not to disclose it. That argument has some force, but to take it too far would be to allow the high materiality of the omission to be balanced against a lesser showing of deceptive intent by the patentee. . . . [W]hen *Walker Process* claimants wield that conduct as a "sword" to obtain antitrust damages rather than as a mere "shield" against enforcement of the patent, they must prove deceptive intent independently [of materiality]." (citation omitted)); *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (discussing the inequitable conduct defense and stating, "a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality."); *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372–73 (Fed. Cir. 2012) ("A court can no longer infer intent to deceive from non-disclosure of a reference *solely* because that reference was known and

20

1  material." (emphasis added)).

2  **II.   BIFURCATION OF ISSUES**

3       Credit Acceptance does not request a bifurcated trial.

4  **III.   JURY TRIAL**

5       Plaintiff Westlake has a right to a jury trial on its antitrust claims for treble
6  damages.  *See generally Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 504 (1959)
7  (stating that "the right to trial by jury applies to treble damage suits under the antitrust
8  laws" (citing *Fleitmann v. Welsbach Street Lighting Co.*, 240 U.S. 27, 29 (1916))).

9       Both parties have made timely demands for a jury trial pursuant to Federal Rule of
10  Civil Procedure 38(b)(1).   In its original complaint [ECF No. 1] and First Amended
11  Complaint [ECF No. 37], Westlake demanded a jury trial generally and thus on all issues.
12  *See generally* Fed. R. Civ. P. 38(c) ("In its demand, a party may specify the issues that it
13  wishes to have tried by a jury; otherwise, it is considered to have demanded a jury trial on
14  all the issues so triable.").   In its answer to the First Amended Complaint [ECF No. 51],
15  Credit Acceptance likewise demanded a jury trial generally and thus on all issues.  *See id.*

16  **IV.   ATTORNEYS' FEES**

17       Defendant Credit Acceptance may seek its attorneys' fees as a sanction if the
18  evidence at trial establishes that Westlake has violated Federal Rule of Civil Procedure
19  11, including by filing a complaint alleging that it built its profit-sharing program around
20  the '807 Patent without first determining whether that allegation had or was likely to have
21  any evidentiary support.  *See* Fed. R. Civ. P. 11(c)(4) (stating that a sanction for violating
22  Rule 11 may include "an order directing payment to the movant of part or all of the
23  reasonable attorney's fees and other expenses directly resulting from the violation").[20]

24       Plaintiff Westlake seeks and has a statutory right to attorneys' fees under 15 U.S.C.

25  ───────────────────

26  [20] A prevailing defendant does not have a statutory right to attorneys' fees under the
    antitrust laws.  *See Dominick v. Collectors Universe, Inc.*, No. 2:12–cv–04782–
27  ODW(CWx), 2013 WL 990825, at *2 (C.D. Cal. Mar. 13, 2013) ("A prevailing
    defendant is not entitled to attorneys' fees by virtue of successfully resisting an antitrust
28  claim."); *see also* 15 U.S.C. § 15.

§ 15, if it prevails at trial.[21]   The Court, however, has discretion to reduce the amount of recoverable fees, including the attorneys' fees for time spent in the pursuit of unsuccessful claims.  *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1312 (9th Cir. 1982) ("The amount of attorney's fees allowed in connection with an award of damages in an antitrust suit is within the discretion of the trial court, reasonably exercised.").

# V.   ABANDONMENT OF ISSUES

Plaintiff Westlake has not abandoned any claims, issues, or requests for relief.

Defendant Credit Acceptance has abandoned the following defenses pleaded in its answer to the First Amended Complaint: Defense Nos. 9 (but only as to waiver and justification); 13 (waiver and release), 15 (35 U.S.C. § 271(d)); 18 (good faith);[22] 19 (reservation of right to assert other defenses).

DATED: October 30, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   _____  */s/  Jason D. Russell*
Jason D. Russell
Attorneys for Defendant
CREDIT ACCEPTANCE CORPORATION

---

[21] *See* FAC prayer for relief ¶ 3 ("[P]ursuant to Section 4 of the Clayton Act (15 U.S.C. § 15 WESTLAKE be awarded treble the amount of its actual damages and reasonable attorneys' fees and costs of litigation[.]"); 15 U.S.C. § 15(a) ("[Absent an exception not applicable here], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").

[22] Credit Acceptance does not intend to pursue a good faith reliance on advice of counsel defense at trial because it does not want to waive attorney-client privilege over its communications with in-house and outside counsel regarding the prosecution of the '807 Patent application or the filing of the patent infringement lawsuit against Westlake. Notably, Westlake may not ask the jury to draw a negative inference from Credit Acceptance's decision to maintain the attorney-client privilege.  *See Doe v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) ("[N]o negative inference could be drawn from a party's assertion of the attorney-client privilege." (citing *Nabsico, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999))).

DEFENDANT CREDIT ACCEPTANCE'S MEM. OF CONTENTIONS OF FACT AND LAW

804203-LACSR01A - MSW