**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**CORRECTED**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

| | |
|---|---|
| **CASE NO.:** CV 15-07490 SJO (MRWx) | **DATE:** December 28, 2017 |
| **TITLE:** Westlake Services, LLC v. Credit Acceptance Corporation | |

========================================================================

**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz  
Courtroom Clerk

Not Present  
Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**

Not Present

**COUNSEL PRESENT FOR DEFENDANT:**

Not Present

========================================================================

**PROCEEDINGS (in chambers): ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** [Docket No. 187]; **(2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ELEMENT OF SHAM LITIGATION CLAIM** [Docket No. 194]

These matters are before the Court on (1) Defendant Credit Acceptance Corporation's ("CAC" or "Defendant") Motion for Summary Judgment ("CAC Motion"); and (2) Plaintiff Westlake Services, LLC's ("Westlake" or "Plaintiff") Motion for Partial Summary Judgment as to Element of Sham Litigation Claim ("Westlake Motion"), both filed July 28, 2017. Plaintiff opposed the CAC Motion ("CAC Opposition") and Defendant opposed the Westlake Motion ("Westlake Opposition") on August 22, 2017. Both parties filed Replies ("CAC Reply" and "Westlake Reply," respectively) on September 11, 2017. The Court found these matters suitable for disposition without oral argument and vacated the hearings set for October 16, 2017. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS** the CAC Motion and **DENIES** the Westlake Motion.

I.  FACTUAL AND PROCEDURAL BACKGROUND

  A.  Procedural Background

The history of this long and oftentimes obstreperous action began when CAC filed a complaint for infringement of U.S. Patent No. 6,950,807 (the "'807 Patent") against Westlake in March of 2013 (the "Infringement Action").[1] *See generally Credit Acceptance Corp. v. Westlake Services, LLC et al.*, No. 13-cv-01523 SJO (C.D. Cal.). In response, Westlake filed two Covered Business Method ("CBM") petitions at the U.S. Patent Trials and Appeals Board ("PTAB") that ultimately succeeded in invalidating the '807 Patent on the grounds that its claims covered unpatentable subject matter outside the scope of 35 U.S.C. section 101 ("Section 101"). *See Westlake Services, LLC v. Credit Acceptance Corp.*, CBM2014-00176, 2015 WL 576798 (Patent Tr. & App.

---

[1] Citations to docket entries in *Credit Acceptance Corp. v. Westlake Services, LLC et al.*, No. 13-cv-01523 SJO (C.D. Cal.), of which the Court takes judicial notice pursuant to Federal Rules of Evidence 201(b) and 201(c)(1), are hereinafter cited as "([Document title], No. 13-cv-01523, ECF No. [X].)".

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CIVIL MINUTES - GENERAL**
**CORRECTED**

**CASE NO.:**  CV 15-07490 SJO (MRWx)          **DATE:** December 28, 2017

Bd. Feb. 9, 2015); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1047 (Fed. Cir. 2017).  Before all of the claims of the '807 Patent were invalidated, however, CAC moved to dismiss the Infringement Action with prejudice, and the Court granted the dismissal on August 24, 2015.  (*See* Order Granting Pl.'s Mot. to Voluntarily Dismiss with Prejudice and Denying Defs.' Mot. for Leave to File Second Am. Answer and Countercls., No. 13-cv-01523, ECF No. 109.)  Westlake promptly moved for attorneys' fees and costs, which the Court denied on the basis that the case was not "exceptional" within the meaning of 35 U.S.C. section 285.  (*See* Order Denying Defs.' Mot. for Recovery of Attorneys' Fees, Costs, and Expenses, No. 13-cv-01523, ECF No. 121.)

Not to be deterred, Westlake and its since-dismissed co-plaintiff Nowcom Corporation ("Nowcom") initiated the instant antitrust action against CAC on September 24, 2015.[2]  (*See* Compl., ECF No. 1.)  Westlake and Nowcom asserted four causes of action against CAC:  (1) violation of Section 2 of the Sherman Act; (2) sham litigation; (3) *Walker Process* fraud; and (4) unfair competition under California Business and Professions Code section 17200 *et seq.*  (*See generally* Compl.)  The primary theory underlying Westlake's case was that although the named inventor of the '807 Patent, Jeffrey Brock, held various positions at CAC, neither he nor anyone else at CAC disclosed to the U.S. Patent and Trademark Office ("PTO") that CAC had made sales and offers to sell its Credit Approval Processing System ("CAPS"), which embodied certain claims of the '807 Patent, more than a year prior to the filing of the application leading to the '807 Patent.  (*See* Compl. ¶¶ 19-22, 38-43.)

On December 7, 2015, the Court dismissed the Complaint for failure to state a claim ("First Dismissal Order"), granting the plaintiffs leave to amend.  (*See* First Dismissal Order, ECF No. 24.)  Westlake and Nowcom filed the First Amended Complaint ("FAC") on February 19, 2016, condensing their claims into a single cause of action:  violation of Section 2 of the Sherman Act via monopolization and attempted monopolization.  (*See generally* FAC, ECF No. 37.)  One year, countless motions, and several admonishments from the Court later, Westlake and CAC filed the instant cross-motions for summary judgment.

      B.     <u>Undisputed Facts</u>

The following facts are not in genuine dispute.[3]  The '807 Patent relates to a method of providing financing for allowing a customer to purchase a product selected from an inventory of products maintained by a dealer. (Decl. Douglas A. Smith. in Supp. CAC Mot. ("Smith Decl.") Ex. 41 ("'807 Patent") at Abstract, ECF No. 187-7; Def's Statement of Genuine Disputes of Material Fact and Conclusions of Law ("DSGDM") ¶ 8, ECF No. 198-1.)  The application that issued into the '807

---

   [2]  Nowcom was dismissed as a plaintiff in this action for lack of standing on April 6, 2016. (*See* Order Granting in Part & Den. in Part Def.'s Mot. to Dismiss FAC, ECF No. 43.)

   [3]  The Court has reviewed the parties' evidentiary objections and finds that none of the objections are relevant to the disposition of these Motions.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CIVIL MINUTES - GENERAL**
**CORRECTED**

CASE NO.: <u>CV 15-07490 SJO (MRWx)</u>     DATE: <u>December 28, 2017</u>

Patent was filed on December 31, 2001, assigned to CAC in January 2002, and names Jeffrey Michael Brock ("Brock") as the inventor. (Def's Reply Statement of Undisputed Material Facts and Conclusions of Law ("RSUMF") ¶ 1, ECF No. 231; DSGDM ¶ 4.) Brock also led the development of CAPS, a lending and financing platform that allows automobile dealers to receive financing terms for a customer against every item in their inventory almost instantly through the internet. (RSUMF ¶ 74; DSGDM ¶ 7.) CAPS is the commercial embodiment of at least claim 1 of the '807 Patent. (RSUMF ¶ 18; DSGDM ¶ 5.)

CAC began development of CAPS in January 2000, partnering with Oracle to create the software platform. (DSGDM ¶¶ 11, 13.) Prior to December 2000, CAC used a closed group of eleven (11) pilot dealers to live-test the system for approximately five months. (DSGDM ¶¶ 20-22, 25.) These eleven dealers used CAPS to originate actual loans for genuine customers. (DSGDM ¶¶ 26-29.) By the end of November 2000, CAPS had been used to generate over 800 retail installment sales contracts for used cars. (DSGDM ¶ 43.) CAC did not charge the eleven dealers for access to CAPS during the pilot period, and no dealer outside the pilot program was allowed access to CAPS before January 1, 2001. (RSUMF ¶¶ 36, 43.)

CAC also presented CAPS at its annual dealer-partner meeting in September 2000, which was attended by 308 dealers, managers, and family members. (DSGDM ¶ 35.) This meeting included a panel discussion among several used car dealers, including dealers that were involved in the CAPS pilot program, and a presentation on what CAPS was and how it worked. (DSGDM ¶¶ 36-37.) One of the pilot dealers, Mike Shaver, reported that "CAPS shows you how your customers qualify on all your cars in inventory. It lists front gross, warranty, back-end profit etc. Then you can reselect your customer up or down in inventory, get more front end, select older units even if the gross is less, it's remarkable. It's terrific for us. I get approval in nine seconds." (DSGDM ¶ 49.)

The pilot program proved successful, and by the end of 2001, seventy-eight percent (78%) of CAC's North American loans were processed through CAPS. (DSGDM ¶ 45.) CAC began receiving fees for the use of CAPS on January 9, 2001. (RSUMF ¶ 44.) However, CAC did not consider obtaining patent protection for CAPS until late November 2001. (DSGDM ¶ 44.) CAC employees worked diligently to ensure that the patent application was filed before January 1, 2002, completing the filing one day before on New Years' Eve. (RSUMF ¶ 18.) CAC did not disclose any information regarding the pilot program or the pre-2001 uses of CAPS to the USPTO. (Def's Resp. to Plaintiff's Separate Statement of Undisputed Facts in Supp. CAC Opp'n ("SSUF") ¶ 1, ECF No. 231-1.) The '807 Patent issued on September 27, 2005. (DSGDM ¶ 8.)

\\

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CIVIL MINUTES - GENERAL**
**CORRECTED**

**CASE NO.:** <u>CV 15-07490 SJO (MRWx)</u>   **DATE:** <u>December 28, 2017</u>

II. <u>LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(a) mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248. At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See id.* at 249. A court is required to draw all inferences in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

III. <u>DISCUSSION</u>

CAC asserts that Westlake's claims must fail as a matter of law for three primary reasons. (*See generally* CAC Mot., ECF No. 187.) First, Westlake's claims are time-barred by the four-year statute of limitations for an antitrust cause of action. (CAC Mot. 5-7.) Second, Westlake's claims are barred by way of the *Noerr-Pennington* doctrine, which immunizes patent owners from antitrust liability based on the filing of a lawsuit for infringement unless the patent was procured by fraud or the litigation was a "sham." (CAC Mot. 7-12.) Third, Westlake cannot prove key elements of its antitrust claims, including the existence of its alleged product and geographic markets or CAC's

Case 2:15-cv-07490-SJO-MRW Document 259 Filed 12/28/17 Page 5 of 12 Page ID #:15537

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CIVIL MINUTES - GENERAL
CORRECTED

CASE NO.: CV 15-07490 SJO (MRWx)          DATE: December 28, 2017

monopoly power in those markets. (CAC Mot. 13-25.) As Westlake is barred from bringing its antitrust claims as a matter of law, the Court does not address whether Westlake has established the required elements of its antitrust claims.

    A.    <u>Westlake's Pre-Infringement Litigation Claims are Barred by the Statute of Limitations</u>

        1.    <u>Legal Standard</u>

Private antitrust actions must be commenced within four years of accrual of the cause of action. 15 U.S.C. § 15b. An antitrust action "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). For antitrust actions involving patent fraud, the four-year statute of limitations generally begins running when the allegedly fraudulently procured patent is issued. *See, e.g.*, *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 268 (7th Cir. 1984). The Ninth Circuit, however, has recognized a continuing violation exception to the statute of limitations in antitrust actions. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (citing *Zenith*, 401 U.S. at 338).

To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: "1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987). This criteria is "meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). In *Samsung*, for example, the expansion of a previously adopted anticompetitive license to include new products, and the attempt to enforce those licenses by collecting royalty payments, constituted overt acts that caused a new anticompetitive harm and restarted the limitations period. *Id.* at 1202-05. Likewise, the Ninth Circuit held in *Pace* that the filing of a lawsuit to enforce a noncompete agreement constituted an overt act that caused an anticompetitive harm separate from the underlying agreement. *Pace*, 813 F.2d at 238. In contrast, the defendants' continuous refusal to include automobile parts from a certain manufacturer did not constitute an overt act where the initial refusal to deal was an "irrevocable, immutable, permanent and final" decision. *AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979).

In addition, "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). The plaintiff bears the burden of pleading and proving fraudulent concealment. *Id.*; *see also Conmar Corp. v. Mitsui & Co, (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988). To plead

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**CORRECTED**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CASE NO.:** CV 15-07490 SJO (MRWx)     **DATE:** December 28, 2017

fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have "actual or constructive knowledge of the facts giving rise to its claim" as a result of defendant's affirmative acts; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *Hexcel*, 681 F.3d at 1060; *see also Conmar*, 858 F.2d at 502. Allegations of fraudulent concealment must be pled with particularity. *Conmar*, 858 F.2d at 502.

    2.    <u>Discussion</u>

Absent any applicable tolling, the statute of limitations would run until September of 2009, four years after issuance of the patent. Westlake argues that the fraudulent concealment exception should operate to toll the statute of limitations due to "CAC's nondisclosure of [sic] material information from the PTO." (CAC Opp'n 10.) Westlake fails to demonstrate that CAC took affirmative acts to mislead *Westlake* of the facts giving rise to its claim, however, and its allegations of fraudulent concealment fall far below the particularity required by this exception.

Westlake also argues that the continuing violation doctrine applies in this case due to several overt acts by CAC: the payment of patent maintenance fees in 2009, 2013, and 2017, some unspecified advertising of its patent, and the filing of the infringement lawsuit against Westlake in March of 2013. (CAC Opp'n 9.) CAC argues that the "'continuing use of the patent and [its] refusal to surrender the patent or to notify [government] officials of the invalidity of the patent' merely **reaffirms** pre-limitations period conduct and does not constitute a 'new and independent act.'" (CAC Reply 3 [citing *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 508 (S.D.N.Y. 1989)].)

The Court agrees with CAC. Once a patent has been issued, it is presumed that a patent owner will maintain the patent for the full extent of the patent term. The payment of maintenance fees creates no new harm to Westlake that did not exist when the patent was previously issued. Likewise, any advertising CAC may have done which indicated that a valid patent existed caused no new harm to Westlake, as by its own admission it knew the patent existed far in advance of the expiry of the limitations period.

The Ninth Circuit has made it clear, however, that "[t]he initiation of a lawsuit is the final, immutable act of enforcement of an allegedly illegal contract" that constitutes an overt act for the purposes of the continuing violation doctrine. *Pace*, 813 F.2d at 238. The parties do not argue that there is any functional difference between an act of enforcement of an illegal contract, and an act of enforcement of an illegally obtained patent. Common sense would therefore dictate that the filing of a lawsuit for infringement constitutes an overt anticompetitive act that would restart the limitations period.

The filing of the lawsuit, however, occurred in 2013, nearly four years after the limitations period expired. This conduct cannot therefore constitute a continuing violation for the purposes of tolling the statute of limitations, and must be treated as an independent action with any relevant damages

Case 2:15-cv-07490-SJO-MRW   Document 259   Filed 12/28/17   Page 7 of 12   Page ID #:15539

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CIVIL MINUTES - GENERAL
CORRECTED

CASE NO.: **CV 15-07490 SJO (MRWx)**        DATE: **December 28, 2017**

attributed solely to the injury caused by the infringement suit.  See *Zenith*, 401 U.S. at 338 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.").  Westlake is therefore barred from asserting a claim for damages based on harm caused by any anticompetitive pre-litigation activity.

    B.    <u>Westlake Cannot Overcome *Noerr-Pennington* Immunity</u>

        1.    <u>Legal Standard</u>

CAC next argues that Westlake's claims are barred by the *Noerr-Pennington* doctrine, which provides immunity from antitrust liability based on "attempts to influence the passage or enforcement of laws."  *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961).  The Supreme Court has recognized two exceptions to *Noer-Pennington* immunity in this context, including "*Walker Process* fraud" and "sham" litigation.  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993); *Walker Process Equip, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176-77 (1965).

To establish *Walker Process* fraud, a plaintiff must prove: (1) "the asserted patent was acquired by means of either a fraudulent misrepresentation or a fraudulent omission" before the PTO; (2) the party enforcing the patent "must also have been aware of the fraud when bringing suit"; (3) "independent and clear evidence of deceptive intent"; (4) "a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission," i.e., materiality; and (5) "the necessary additional elements of [an underlying] violation of the antitrust laws."  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068–71 (Fed. Cir. 1998) (internal quotations omitted) (citing *Walker Process*, 382 U.S. at 177, 178).

For the sham litigation exception to apply, the plaintiff must prove that: (1) the lawsuit was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) the lawsuit constitutes "an attempt to interfere *directly* with the business relationships of a competitor . . . through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."  *PRE*, 508 U.S. at 60-61 (emphasis in original) (citations and quotations omitted).  The first element requires "no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication."  *Id.* at 62-63 (citations and quotations omitted).

        2.    <u>*Walker Process* Fraud</u>

CAC argues that Westlake cannot prove at least two essential elements of a claim for *Walker Process* fraud: materiality and intent.  A finding of *Walker Process* fraud requires high threshold showings of both of these elements, supported by clear and convincing evidence.  *Nobelpharma*, 141 F.3d at 1070–71.  Westlake has not met its burden.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CIVIL MINUTES - GENERAL**
**CORRECTED**

**CASE NO.:** <u>CV 15-07490 SJO (MRWx)</u>   **DATE:** <u>December 28, 2017</u>

      a.      Materiality

Under the materiality prong, Westlake must prove that the '807 Patent would not have issued **but for** CAC's failure to disclose the use of CAPS in its pre-2001 pilot program. Westlake relies on section 102(b) of the Patent Act, which states that an invention is not patentable if it is "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102. CAC does not argue that the eleven dealers' use of CAPS during the pilot program does not qualify as a public use, but rather, that it falls within the experimental use exception to the public use bar.

An experimental use "negates patent invalidity for public use; when proved, it may show that particular acts do not constitute a public use within the meaning of § 102." *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1313 (Fed. Cir. 2005). As such, "an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 64 (1998). The primary question is whether the public use or sale was "not incidental to the primary purpose of experimentation, i.e., whether the primary purpose of the inventor . . . as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *EZ Dock v. Schafer Sys., Inc.*, 276 F.3d 1347, 1357 (Fed. Cir. 2002) (citations and quotations omitted).

Courts use a variety of factors to determine whether a public use or sale was experimental, including: (1) the necessity for public testing; (2) the amount of control over the experiment retained by the inventor; (3) the nature of the invention; (4) the length of the test period; (5) whether payment was made; (6) whether there was a secrecy obligation; (7) whether records of the experiment were kept; (8) who conducted the experiment; (9) the degree of commercial exploitation during testing; (10) whether the invention reasonably requires evaluation under actual conditions of use; (11) whether testing was systematically performed; (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers. *Id.*

However, "once the invention is reduced to practice, there can be no experimental use negation." *Id.* An invention is reduced to practice when it works for its intended purpose. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 997 (Fed. Cir. 2007) (citing *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000)). An invention is said to work for its intended purpose when there is a demonstration of its workability or utility. *Honeywell*, 488 F.3d at 997. Tests that determine whether an invention works for its intended purpose are generally considered part of an effort to reduce the invention to practice, with actual reduction to practice occurring after the tests have been completed. *Id.* (holding that the experimental use exception applied to the use of terrain warning systems aboard an aircraft because the uses were part of tests to ensure that the system was working properly, even if no changes to the system occurred after the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CIVIL MINUTES - GENERAL
CORRECTED

CASE NO.: <u>CV 15-07490 SJO (MRWx)</u>     DATE: <u>December 28, 2017</u>

experimentation was completed). Tests that only concern the commercial feasibility of the invention do not qualify as experimental use for the purpose of negating the public use bar. *Clock Spring, L.P. v. Applied Consultants, Inc.*, 560 F.3d 1317, 1328 (Fed. Cir. 2009).

When rejecting an application for a patent, the burden of persuasion is on the PTO to show why the applicant is not entitled to the patent. *In re Epstein*, 32 F.3d 1559, 1570 (Fed. Cir. 1994) (Plager, J., concurring). Assuming that CAC had disclosed the information about its pilot program to the PTO, the examiner would have had to find by a preponderance of the evidence that the pilot program fell under the public use bar and that the experimental use exception did not apply. *See In re Caveney*, 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed. Cir. 1985) ("[P]reponderance of the evidence is the standard that must be met by the PTO in making rejections."). And to prove the materiality essential for a finding of *Walker Process* fraud, Westlake must demonstrate by clear and convincing evidence that the examiner **necessarily** would have made this determination. *See Nobelpharma*, 141 F.3d at 1070–71.

Westlake's primary argument against the application of the experimental use exception is that CAPS was reduced to practice before conclusion of the pilot program, as demonstrated by the fact that CAPS was "up and running" in several pilot dealers by September 2000 and those dealers were using CAPS to generate all of their loans with CAC. (CAC Opp'n 12, SSUF ¶¶ 18-20, 24.) Use of an invention, however, will not **necessarily** indicate a reduction to practice so long as the use is part of an experiment to determine if the invention works for its intended purpose. *See, e.g., Honeywell*, 488 F.3d at 997. CAC has presented numerous pieces of evidence that the CAPS pilot program was meant to test that the system and the written code "would work, the financial packages being presented were performing in accordance with our expectations, [and] that the technology could handle additional dealers coming on board." (DSGDM ¶¶ 20-21.) This type of testing could certainly indicate experimental use that would negate the public use bar.

In its own Motion for Summary Judgment, Westlake counters that the purpose of CAC's experimentation was not to test the features of the claimed method, as required for the experimental use exception, but to test the effect of CAPS on CAC's business model. (Westlake Mot. 17-18, ECF No. 194.) Westlake points to portions of CAC's testimony which state that the company wanted to test whether CAPS was "scalable." (SSUF ¶ 43; Smith Decl. Ex. 13 ("Pearce Dep.") at 28:6-8, 18-20, ECF No. 187-04.) Yet this same testimony also mentions wanting to test if "the technology, the code that was written, you know, would it work[.]" (SSUF ¶ 43; Pearce Dep. 28:6-8, 18-20.) While Westlake is correct that it is not clear from the record whether testing if "the technology" would work means testing whether the claimed method would work, it is certainly not established in the record that the pilot program was meant to test only the commercial feasibility of the invention rather than its workability or utility.

Westlake next argues that the experimental use exception cannot apply because the CAPS pilot program was not experimentation for the purpose of filing a patent application, as CAC did not even consider filing a patent application until late November 2001. (Westlake Mot. 19;

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**CORRECTED**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.:  CV 15-07490 SJO (MRWx)          DATE: December 28, 2017

SSUF ¶ 45.)  Westlake relies on *Clock Spring*, which states that "there is no experimental use unless claimed features or overall workability are being tested for purposes of the filing of a patent application."  560 F.3d at 1327.  *Clock Spring*, however, only stands for the unremarkable proposition that an experimental use must be designed to reduce an invention to practice and make it "ready for patenting"– not that an experiment must be conducted with the subjective intent to file a patent.  *Id.*  The Federal Circuit thus held in *Clock Spring* that durability testing performed after the filing of a patent application in 1992, even if the test began before the application was filed, could not qualify as experimental use as because it was clearly not intended to determine whether the invention will work for its intended purpose– a requirement of patentability.  *Id.* at 1328 ("By filing the 1992 application, the inventors represented that the invention was then ready for patenting, and studies done thereafter cannot justify an earlier delay in filing the application under the rubric of experimental use.").  Here, the experimental use claimed by CAC was both commenced and completed prior to the filing of the patent application.

Finally, Westlake argues that aside from the pilot program itself, the introduction of CAPS at CAC's annual dealer-partner meeting in September 2000 qualifies as a non-experimental public use for the purpose of the statutory bar.  (Westlake Mot. 14.)  Westlake fails, however, to show any evidence that supports a finding that all of the claim limitations of the '807 Patent embodied by CAPS were disclosed at this meeting– perhaps by a live demonstration of CAPS or something similar– and thus cannot establish that this presentation constituted an invalidating public use.  *See Clock Spring*, 560 F.3d at 1325 ("In order for a use to be public within the meaning of § 102(b), there must be a public use with all of the claim limitations.").

Westlake attempts to shift its burden of production on these issues by stating that CAC must "prove that a section 102(b) bar would not, as a matter of law, have prevented issuance of the '807 patent," and that at the very least there are genuine issues of material fact as to the applicability of the public use bar.  (CAC Opp'n 11-12.)  This is not CAC's burden.  Under the appropriate standard, Westlake must prove by clear and convincing evidence that the patent examiner would **necessarily** have applied the public use bar to reject the '807 patent, even considering CAC's arguments for experimental use.  At most, Westlake has produced enough evidence to suggest that the patent examiner **might** have rejected the '807 Patent on the basis that the invention was in public use and reduced to practice prior to the critical date.  This is far below the high threshold showing required to establish materiality, and Westlake's argument fails as a matter of law.

        b.    <u>Deceptive Intent</u>

In addition to proving materiality, Westlake must also demonstrate independent and clear evidence of deceptive intent.  In particular, Westlake must "prove by clear and convincing evidence that the applicant knew of the [undisclosed information], knew that it was material, and made a deliberate decision to withhold it."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).  "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence."  *Id.*  However, specific intent to deceive must be "the

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

**CIVIL MINUTES - GENERAL
CORRECTED**

**CASE NO.:** <u>CV 15-07490 SJO (MRWx)</u>        **DATE:** <u>December 28, 2017</u>

single most reasonable inference able to be drawn from the evidence" and "when there are multiple inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91.

Westlake highlights only one piece of circumstantial evidence that allegedly indicates a specific intent to deceive: a public 2001 newsletter in which CAC told its shareholders that the company had begun a "roll-out" of CAPS in December of 2000. (CAC Opp'n 13-14; SSUF ¶ 38.) According to Westlake, the single most reasonable inference created by the fact that CAC had its employees working diligently to file the patent application by December 31, 2001, and not January 9, 2002– one year after the first access fee to CAPS was charged– is that CAC knew it had released public information about disqualifying prior sales and public uses and needed to file the application by December of 2001 in order to avoid suspicion from the PTO. (CAC Opp'n 13-14.) This belies sense. In that same newsletter, CAC noted that testing of CAPS had begun in August 2000. (SSUF ¶ 38.) If CAC had truly believed that the pilot program qualified as an invalidating public use, the December "roll-out" deadline would have been irrelevant. Moreover, the weight of the evidence indicates that CAC made CAPS available to non-pilot dealers in January of 2001. (RSUMF ¶¶ 36, 43.) This means that as of January 1, 2001, CAPS could have been considered "on sale"– even if an actual sale didn't occur until January 9– for the purposes of the statutory bar. Thus, the single most reasonable inference in this instance is that CAC believed that the statutory bar would go into effect on January 1, 2002, and worked diligently to file the application prior to that date.

Westlake also argues that even if CAC had an earnest belief that the experimental use exception applied to the pre-2001 CAPS activity, it had a duty to disclose that activity to the PTO. (CAC Opp'n 14 [citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551 (Fed. Cir. 1990)].) Yet the very case cited by Westlake makes it clear that breach of a duty to disclose does not by itself indicate a specific intent to deceive absent further supporting evidence. *Manville,* 917 F.2d at 552 ("The district court erred in concluding that there was no duty to disclose the experimental use. However, the district court found that Appellants failed to provide any evidence of intent to mislead or deceive, and we cannot say this finding was clearly erroneous.") Westlake has not provided any independent evidence of deceptive intent– much less clear and convincing evidence– and has thus failed to meet its burden.

       3.     <u>Sham Litigation</u>

Westlake also argues in its own Motion for Summary Judgment that the "sham litigation" exception to *Noerr-Pennington* immunity applies in this instance, based on CAC's assertion of the '807 Patent against Westlake in the Infringement Action. (*See generally* Westlake Mot.) Westlake argues that the litigation was "objectively baseless" because CAC could not reasonably believe the '807 Patent was valid due to its intentionally withheld violation of the public use bar under section 102(b) of the Patent Act. (Westlake Mot. 1-2.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL
CORRECTED

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: CV 15-07490 SJO (MRWx)         DATE: December 28, 2017

As described in Section III(B)(2), *supra*, Westlake has not produced clear and convincing evidence that demonstrates that CAC's pre-2001 use of CAPS **necessarily** triggered the public use bar, much less that CAC's stated belief that the statutory bar went into effect in January 2002, one day after it filed its application, was objectively unreasonable. Westlake has therefore failed to prove that CAC's belief in the validity of the '807 Patent was objectively baseless. *See PRE*, 508 U.S. at 62-63 (overcoming the first element of a sham litigation claim requires "no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication"). Westlake cannot prove that the Infringement Action qualifies as a "sham litigation" exception to *Noerr-Pennington* immunity, and therefore the Westlake Motion is **DENIED**.

III.   RULING

For the foregoing reasons, the Court **GRANTS** Defendant Credit Acceptance Corporation's Motion for Summary Judgment and **DENIES** Plaintiff Westlake Services, LLC's Motion for Partial Summary Judgment as to Element of Sham Litigation Claim. Defendant shall lodge a proposed judgment within **seven (7) days** of the issuance of this Order. The parties' pending Motions will be **DENIED** as moot.

IT IS SO ORDERED.